1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,  )    **CASE NO. 05-CR-10175-WGY**

                            **Plaintiff,**  )    **MANDATORY JUDICIAL NOTICE**

                        **vs.**  )    **VERIFIED AFFIDAVIT WITH EXHIBTS**
)    **IN SUPPORT OF MOVE FOR FAIR AND**
)    **IMPARTIAL HEARINGS AND/OR TRIAL**

Nadine J. Griffin,  )
)    **Nadine J. Griffin**
           **Affiant, Accused.**  )

1. Nadine J. Griffin (hereinafter referred to as the "Affiant") declares and states as follows:

2. That all statements made within this affidavit are true and correct not meant to mislead;

3. That Nadine J. Griffin exists as a Conscious, Thinking, Living, Feeling, Breathing, Flesh and Blood Sentient Being; NOT a statutory person, natural person, artificial person, individual, corporation, entity, partnership or any other *sub-status*, fourth class citizen *ens legis* creation of any government, federal, state, local or otherwise and competent to state the facts herein to wit;

4. That Nadine J. Griffin is unschooled in law, is not an attorney or bar-association member, and is attempting to defend and dispose of this action to the best of her ability with reliance upon your statutes, codes, rules and regulations; including those relied upon by your employer the United States Plaintiff and established by the Constitution of the United States of America, United States Congress, and the United States Supreme Court;

VERIFIED AFFIDAVIT IN SUPPORT OF MOVE
FOR FAIR AND IMPARTIAL HEARING - 04      1 of 13      Nadine J. Griffin — Exhibits 76 pages
Notary & Certificate of Service page 13

5. That on or about July 13, 2005, Affiant was falsely accused and charged with a statutory victimless commercial crime of belief — "thought crime" — (by United States Federal employees acting *in qui tam*) for alleged violations of private statute 26 U.S.C. § 7206(1), asserting the "belief" that Affiant willingly filed false federal tax returns for your tax years 1998 and 1999;

6. That prior to being charged with this statutory victimless commercial crime of belief – "thought crime", Nadine J. Griffin's then attorney James B. Krasnoo was offered by the United States Plaintiff's Federal employee attorney to plead guilty to a felony charge for which she refused with the conviction that she has in no way violated the law – and would be committing a crime punishable as a felony - pleading guilty to a crime for which she did not commit.

7. That the assertion of the statutory victimless commercial crime of belief — "thought crime" — presumes to know the mental intent (*mens rea*) of Nadine J. Griffin, makes the unfounded claim that the Affiant does not believe the 1998 and 1999 returns to be correct as to every material matter;

8. That this statutory victimless commercial crime of belief — "thought crime" — has been instituted only by officers, agents and employees working on behalf of, and maintain employment with, the United States Federal Corporation as defined at 28 U.S.C. § 3002(15)(A) – and derive pecuniary benefits from the successful prosecution thereof;

9. That Affiant is with first hand knowledge that no Flesh and Blood, Living, Breathing, Sentient Human Being has instituted a claim against Nadine J. Griffin. ALL parties to this action, including officers and employees of this Court are working on behalf of its corporate (corpse) United States Plaintiff Federal employer, void of conscience – giving life

through its financial profiteers, including but not limited to, judicial officials, attorneys and revenue generating agents – to take the Life, Freedom, Liberty and Property of Nadine J. Griffin while continuing to promote its political agenda;

10. That the United States Plaintiff *qui tam* agents, officers and employees instituting this claim brag (on its Internal Revenue Service website at www.irs.gov) about maintaining a successful 90% conviction rate regarding tax prosecutions since 1917 to date, therein admitting the destruction of thousands of lives for more than nine decades;

11. That the United States Plaintiff's Federal employee *qui tam* agents and officers instituting this claim, particularly officials within the Internal Revenue Service – working in absolute collusion with ex-federal judicial official, ex-appellant judge, ex-FBI, and CIA Director William H. Webster and Commissioner of Internal Revenue, Charles O. Rossotti, publishing the Webster Review 1999 at www.irs.gov - establishing how CID should conduct investigations and the Department of Justice attorneys should present their case in order to get a successful conviction for alleged violations of the internal revenue laws (see **Exhibit A**);

12. That Affiant is with information that this constitutes a "blending" of the executive and judicial branch of Government, in violation of the "separation of powers doctrine," establishing the obvious favoritism and partiality judicial officials have for their United States Plaintiff Federal employer — working openly in collusion to the destruction of Nadine J. Griffin;

13. That the following *qui tam* actors on behalf of their United States Plaintiff Federal employer are responsible for collusively levying financial statutory victimless commercial crimes of belief — thought crimes — against Nadine J. Griffin and are benefactors of the

1    same, including but not be limited to:

2    (a) Michael J. Harriman, Revenue Officer: United States Federal employee;

3    (b) Jessica Crocker, Revenue Officer: United States Federal employee;

4    (c) Lynne Walsh,  Field Director: United States Federal employee;

5    (d) Cheryl Sherwood Director, Collection Policy: United States Federal employee;

6    (e) Christopher Maietta, United States Attorney: United States Federal employee;

7    (f) Michael Boudin, United States Attorney: United States Federal employee;

8    (g) Joyce London Alexander, U.S. Magistrate Judge: United State Federal employee;

9    (h) William G. Young,  District Court Judge: United States Federal employee;

10

11   14. That Affiant is with first hand knowledge that the above named actors, on behalf of their

12       United States Plaintiff Federal employer, have ignored their own statutes, codes, rules,

13       regulations and manuals, daily destroying lives with their statutory victimless commercial

14       crimes of belief, "thought-crimes statues,"  claiming victims and destroying lives without

15       reproach;

16   15. That Affiant is with first hand knowledge of the "Institutionalized Control" of this corrupt

17       and abusive judicial system and this judicial process, judicial officials self-policing rendering

18       themselves "IMMUNE" from being prosecuted for their often bad behavior and intentional

19       misapplication of the facts and the law to their discretion and on behalf of their United States

20       federal employer, as referenced in the article "Rigged courts, bribed judges, phony trials,

21       extortion by lawyers, and over 2 million prisoners in the USA Gulag (see **Exhibit B**);

22

23   16. That Affiant is with first hand knowledge that this Court and its actors DO NOT have

24       Nadine J. Griffins best interest at hand, but as *qui tam* actors, your first duty is to your

25       United States Plaintiff Federal employer, favoring the venomous acts of victimless crime

persecutions employed to protect the status quo monopolized control of a system from which qui tam actors listed in Item 12(a) to (h) above earn your living: unable to exist or survive without Human Capital obtained from stealing another Mans energy;

17. That the following acts committed on the record by said "Actors," listed in Item 12 (a) to (h) above, are herein documented for purposes of the move for a fair and impartial hearing in an attempt to bring fairness and impartiality into balance as to Nadine J. Griffin;

18. That Affiant's appearance before judicial official, actor, statutory Judge and CEO William G. Young – employee of the United States Plaintiff in the United States District Court for the District of Massachusetts – has continually result in documented treatment of bias, partiality towards Affiant and favoritism in support of his United States Plaintiff and Federal employer;

19. That Affiant has been prejudiced from the beginning of this well orchestrated and planned lynching wherein the United States Plaintiff's employees used the media to exploit the alleged judicial processing of Nadine J. Griffin, swaying public opinion;

20. That Affiant includes documents sufficient to conclude that the employees of the United States Plaintiff Federal employees strategically use mainstream media successfully brainwashing the masses citizen and subjects (shaping the belief systems and public policy of potential jurors) to exploit litigants like Nadine J. Griffin charged a statutory victimless commercial crimes of belief – thought crimes: resulting in the successful persecution of their victims as bragged on at their website, www.irs.gov;

21. That Affiant is with first hand knowledge that the typical thinking of all media – manipulated, thought–controlled society of Citizens (Flesh and Blood Beings, not corporations) surrounding the public opinion regarding criminal defendants is: "he must be

guilty or he would not have been charged"- has resulted in the effective tainting of any potential juror presumed to be neutral and without bais: Nadine J. Griffin's demise is their belief – Not her own;

22. That Affiant is aware that the Department of Justice, an executive department of the United States Plaintiff, strategically uses the mainstream media to prosecute and destroy the lives of innocent Citizens – refusing to yield and plead guilty, standing on their innocence; resulting in harsher sentences when forcing the United States Plaintiff Federal employers spend funds from their Human Capital Budget - forced to prepare a case and prove their claim. (see **Exhibit C**);

23. That Affiant is with information that the United States Plaintiff paid bribes of more than sixty-thousand dollars ($60,000) to have a witness testify (who's testimony was impeached) on its behalf that resulted in the conviction of a Citizen — the United States Plaintiff's United States Appellant Court did not find any wrongdoing, making up Law as they go with sham opinions and excuses, protecting their judicial processing plants (see **Exhibit D**);

24. That the Affiant is aware that federal judges give themselves immunity from prosecution for their malicious and capricious acts, demonstrate godlike complexes, protected by the brotherhood and allowed to apply their interpretation of the law incorporated with their own political agenda in direct contradiction to legislative intent; as Affiant has been subjected to such treatment by statutory judicial official and CEO William G. Young regarding his undisclosed interpretation of the Bill of Particulars and the Speedy Trial Act (see **Exhibit E-6**);

25. That at the hearing on September 27, 2005, judicial official William G. Young stated on **page 4 at lines 10 through 13** (of the Transcript of said hearing) in pertinent part: **"The**

1    **fact is we'll treat it just like we treat any other case, fairly and impartiality . . ."**

2    applying the minimum standards of the "appearance of fairness doctrine," yet acting in

3    contempt of law as further shown in this hearing and by future actions (see **Exhibit F-4**);

4    26. That at the same hearing stated above, judicial official William G. Young stated on page 8

5    at lines 17 through 18 (of the Transcript of said hearing) in pertinent part: "*I'll set the trial*

6    *in ten days. Do you want to go to trial then?*"   Judicial official and CEO William G Young

7    employed **threats, intimidation, and coercion** showing angry that Nadine J. Griffin

8    refused to schedule a trial date because her speedy trial rights were being violated seeking

9    dismissal of the victimless crime of belief charges: **with objection and under duress, after**

10   **being worn down by Young, Affiant yelled out a date** (see **Exhibit F page 8, line 17 to**

11   **page 9 line 22**);

13   27. That judicial official William G. Young inferred on **page 7 lines 1 to 6** of the transcript

14   dated September 27, 2005 that Nadine J. Griffin believed the tax laws were

15   unconstitutional; however, no such attitude or statement has ever been taken or made by

16   Affiant to this effect (see **Exhibit F-7**);

17   28. That Nadine J. Griffin, is not now, nor has ever been a "Tax Resister" or "Tax Protester,"

18   has always filed federal tax returns that she believes she was required to file, and these

19   statements made by statutory judicial official and CEO William G. Young is an utterance

20   that speaks to his preexisting prejudicial mindset – exposing his inability to be impartial,

21   non-biased, and neutral (see Item 26 above);

22

23   29. That Affiant is with information that statutory judicial officials and CEO's like William G.

24   Young has in the past and are presently participating in money laundering schemes, bribery,

25   witness tampering, jury tampering, coaching lawyers in cases for which they are

1  overseeing, intimidating litigants in criminal and civil hearings – and are never prosecuted

2  for their crimes; (See **Exhibit  G**.)

3  30. That judicial official and CEO William G. Young's failure to act in good faith judicially,

4  has mocked and prejudiced the Rights of Nadine J. Griffin by (1) refusing to issue any

5  findings of fact and conclusions of law in response to Affiant's [motions] filed supported by

6  affidavits and exhibits, only issuing minute orders as if they have the force and effect of a

7  lawful Order (see **Exhibit  E**);

8

9  31. That statutory judicial official and CEO William G. Young did know, or should have

10  known, that statutory magistrate judge Joyce London Alexander's presumed jurisdiction to

11  perform an arraignment for a federal felony (victimless crime of belief, thought crime)

12  over the objection of Nadine J. Griffin — violated Affiant's Rights to due process of law;

13  32. That statutory judicial official and CEO William G. Young did know, or should have

14  known, statutory magistrate judge Joyce London Alexander's presumed jurisdiction to

15  perform an arraignment for a federal felony (victimless crime of belief - thought crime)

16  without first obtaining permission, and presumed authority when she has no authority to

17  issue any process, including criminal subpoenas, arrest warrants, writs or any other process

18  without obtaining written consent from Nadine J. Griffin prior to such issuance;

19

20  33. That statutory judge magistrate Joyce London Alexander also violated the Code of Conduct

21  for United States Judges by harassing Nadine J. Griffin and falsely and fraudulently

22  asserting that Nadine J. Griffin could not proceed on her own behalf at that time, attempting

23  to induce her to becoming a "ward of this [Corporate] Court," therein deemed a person of

24  unsound mind;

25  34. That statutory magistrate judge Joyce London Alexander's presumed jurisdiction to

1    perform an arraignment for a victimless federal felony (crime of belief, a thought crime)

2    and to issue an order restricting Nadine J. Griffin's Right to Travel, issuing process without

3    the expressed permission from Nadine J. Griffin;

4   35. That on August 11, 2005, statutory magistrate judge Joyce London Alexander, also violated

5    the Code of Conduct for United States Judges by inviting a group of law students to "watch

6    the fun" as she (Alexander) attempted to bully, harass, and manipulate Nadine J. Griffin

7    into waiving Sixth Amendment Rights. Nadine J. Griffin, steadfast in her position,

8    confronted the impropriety of Alexander's actions; Alexander behaved in a childish and

9    deceitful manner — unbecoming a federal magistrate — as she ran out of the courtroom;

10

11   36. That statutory judicial official and CEO William G. Young repeatedly breached his judicial

12    duty to rule on Nadine J. Griffin's objections and motions. Young has repeatedly

13    contravened United States Supreme Court authority by issuing minute orders and electronic

14    orders assuming Affiant did not know that minute orders or electronic orders are not orders

15    of the court sufficient to resolve issues of Law (see Exhibit **E**);

16   37. That statutory judicial official and CEO William G. Young has acted with childish mischief

17    in violating 18 U.S.C. § 1001 by **altering court records and scribbling a note on Nadine**

18    **J. Griffin's [m]otion, purporting that to be a Court Order** denying Griffin's speedy trial

19    [m]otion and **served a copy of Young's note on top of page one of her Response Docket**

20    **Item 34 (undisclosed on docket), as if it were a Court Order** (see **Exhibit H** );

21

22   38. That statutory judicial official and CEO William G. Young refused to take Mandatory

23    Judicial Notice of the Constitution of the United States and professed not to know and

24    understand that magistrate judges are deprived of judicial power to perform felony

25    arraignments without consent and over the objection of Nadine J. Griffin;

39. That Nadine J. Griffin is with information that statutory judicial official and CEO William G. Young will continue to: (1) intentionally avoid ruling on [m]otions filed by Nadine J. Griffin, motions that would prove to successfully dispose of this victimless commercial crime of belief (a thought crime), and (2) continue to provide no findings of fact and conclusions of law; but instead, force this case to go before a media manipulated jury influenced only by Public Policy (belief systems), this Court's 12 man Lynch Mob – prohibited from considering the Law when deciding an issue of this case — allowed only to consider prejudicial and inflammatory facts: making decisions completely on their own beliefs, prejudice, ignorance and emotions.

40. That Nadine J. Griffin is with information that the United States Plaintiff's employee attorney Maietta and other agents, will not only prevent the Law of the case from ever getting before a jury, but will insight and manipulate the emotional sphere of a juror, parading the appearance of material wealth presumed to be possessions of Affiant, planting the false impression in their minds that she amassed great wealth and failed to report it on the filed 1998 and 1999 information returns;

41. That Nadine J. Griffin is with information that the United States Plaintiff (and Federal employer of statutory judicial official and CEO William G. Young) has effectively tampered with the pool of jurors that may be selected to sit on this case (just as the Grand Jury was tainted by being given one side of the story by the United States Plaintiff) by applying its personal beliefs, emotional prejudices and information distributed and distorted by the media which acts with blind patriotism on behalf of the United States Plaintiff;

42. That Nadine J. Griffin is with information that judicial official William G. Young, employed by the United States Plaintiff, will block favorable evidence sufficient to

VERIFIED AFFIDAVIT IN SUPPORT OF MOVE          10 of 13          Nadine J. Griffin — Exhibits 76 pages
FOR FAIR AND IMPARTIAL HEARING - 04                              Notary & Certificate of Service page 13

establish the culpable intent of Nadine J. Griffin, but such evidence will never get before a juror due to the prejudices and favoritism for his United States Plaintiff and Federal employer liken to District Judge John McBryde in the Simkanin case (see **Exhibit I**);

43. That Nadine J. Griffin is at peril to proceed to a "Bench Trial" before statutory judicial official and CEO William G. Young, an employee of the United States Plaintiff a Federal corporation, maintaining an average salary of $154,700 per annum (excluding cash merit awards and other perks unknown to the general public), a direct result of [t]axpayers "Human Capital" funding the United States Plaintiff (see **Exhibit J**);

44. That Nadine J. Griffin is at peril to proceed to a "Bench Trial" before statutory judicial official and CEO William G. Young (an employee of the United States Plaintiff a Federal corporation) who's first duty is to [his] Court (his means of financial security) and not to the Law, having a vested financial interest in the successful prosecution of the statutory victimless commercial crime of belief — thought crime — for which Nadine J. Griffin has been accused and charged;

45. That Nadine J. Griffin is prejudiced to proceed in any manner before this United States District Court, a political subdivision of the United States Plaintiff a Federal corporation, its corporate officers All on the payroll of the United States Plaintiff, protecting their personal financial interest (see **Exhibit J**);

46. That Nadine J. Griffin is with information that United States attorneys and judicial officials routinely misbehave and overstep the bounds of their authority because internal checks and balances through self-policing are non-existent – as in any "fox guarding the henhouse" forum, protecting their multitude of revenue generating schemes (see **Exhibit K**);

///

1  47. That Nadine J. Griffin is with information that the Law is a mere obstacle course for

2      judicial official and CEO William G. Young, proceeding with the appearance of fairness,

3      routinely manipulating and perverting the law to the whims of the judicial officials'

4      discretion, political and social climate of the day, making it up as they go with their own

5      opinions – for in the end there is no law, only the opinions of fallible men and women

6      which has lead to the lawlessness and insanity of judicial officials in charge of overseeing

7      the judicial process (see **Exhibit L**);

8

9  48. That Nadine J. Griffin cannot predict the extent of continued bias, injustice and/or prejudice

10     she will continue to suffer at the heavy hands of judicial official William G. Young acting

11     on behalf of and in favor of his United States Plaintiff Federal employer, but does not waive

12     any Rights or protections of her Creator or the Constitution for the United States of

13     America, and other applicable Laws deemed to protect the Rights of Nadine J. Griffin;

14     I, Nadine J. Griffin, declare under penalty of perjury as a conscious Flesh and Blood

15  Sentient Being that the forgoing is true and correct.

16

17  Executed this 31 day of January, 2006.

18                                                            Signature: _Nadine J. Griffin_

19                                                                        Nadine J. Griffin
                                                                 c/o 13799 Park Blvd. North #244
20                                                                   Seminole, Florida [33776-3402]

21

22

23

24

25

1

# NOTARY ACKNOWLEDGMENT

2  State of Florida            )
                              ) subscribed and sworn
3  County of _CARROLL_ )

4  On this __1__ day, of _February_____, 2006, **Nadine J. Griffin** personally appeared,

5  personally known to me, OR proved to me on the basis of satisfactory evidence to be the one

6  whose name is subscribed to within this instrument and who did take an Oath

7
                  Witness my hand and official seal. _[signature]_
8
                                              **Signature of Notary**
9                                             AMELIA M. CAPONE
                                             Notary Public - New Hampshire
10                              My Commission Expires: _____   My Commission Expires October 20, 2009

11

12                          # CERTIFICATE OF SERVICE
                              Feb.
13  I, Nadine J. Griffin, certify that on ~~January~~ __1__, 2006, served a true and correct copy of the

14  above and foregoing "Verified Affidavit in Support of Move for Fair and Impartial Hearing" by

15  Certified Mail, postage fully prepaid and addressed to:

16  Christopher Maietta
17  United States Attorney's Office
    1 Courthouse Way
18  Suite 9200
    Boston, Massachusetts 02210
19  Certified Mail No. 7004 2890 0001 9659 8651

20
    William Smith, Majority Chief Counsel
21  Preet Bharara, Democratic Chief Counsel
    US Committee on the Judiciary
22  Subcommittee on Administrative Oversight and the Courts
    224 Dirksen Senate Office Building
23  Washington, D.C. 20510

24  Certified Mail No. 7004 2890 0001 9659 8668

25
                      Signature: _[signature]_
                                          Nadine J. Griffin, Affiant

VERIFIED AFFIDAVIT IN SUPPORT OF MOVE          13 of 13          Nadine J. Griffin — Exhibits 76 pages
FOR FAIR AND IMPARTIAL HEARING - 04                            Notary & Certificate of Service page 13

VERIFIED AFFIDAVIT IN SUPPORT OF MOVE
FOR FAIR AND IMPARTIAL HEARING

Nadine J. Griffin,
CASE NO. 1:05-CR-10175-WGY

# EXHIBIT A — 4 pages

Internal Revenue Service
United States Department of the Treasury

**Letter from Webster to Rossotti - Webster Review 1999**

WILLIAM H. WEBSTER
**INTERNATIONAL SQUARE BUILDING
WASHINGTON, D.C. 20006**

April 9, 1999

The Honorable Charles O. Rossotti
Commissioner
Internal Revenue Service
1111 Constitution Avenue, N.W.
Room 3000
Washington, D.C. 20224

Re: Review of the Internal Revenue Service's Criminal
Investigation Division

Dear Commissioner Rossotti:

I am pleased to submit herewith the Report of my review of the Internal Revenue Service's
Criminal Investigation Division. During your Senate confirmation hearing in the fall of 1997,
you committed to reform and improve the work of the Internal Revenue Service. As a first
step to bringing positive change to the Service, you promised thorough reviews of each of its
major components, including Criminal Investigation (CI).

You asked me to direct an independent review of CI and assess CI's effectiveness in
accomplishing its mission as the Service's criminal enforcement arm. With the assistance of
Michael Shaheen, the former head of the Department of Justice's Office of Professional
Responsibility, I assembled a task force of federal law enforcement personnel with extensive
experience in financial investigations. The Task Force, supervised by Nancy Jardini, a trial
attorney from the Fraud Section of the Criminal Division of the Department of Justice,
conducted a full top-to-bottom review of CI, focusing specifically, as you had suggested, on
the make-up of its caseload, its investigative methods, its organizational structure and its
personnel policies and practices. Over the last nine months, the Task Force has conducted
over six hundred interviews, has examined countless documents and has sought the
opinions of a variety of law enforcement officials. This Report summarizes the results of the
Task Force and contains my findings and recommendations.

It has been my privilege to undertake this assignment for you.

Sincerely,

/S

William H. Webster

WHW:ceh

DC1:#8043228v1

Table of Contents - Webster Review 1999

All About Criminal Investigaton (CI)

| EXHIBIT | PAGE | of |
|---------|------|-----|
| **A** | **1** | **4** |

**Internal Revenue Service**
United States Department of the Treasury

**Letter from Rossotti to Webster - Webster Review 1999**

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

COMMISSIONER                                         April 12, 1999

The Honorable William H. Webster
International Square Building
1825 Eye Street, N.W.
Washington, D.C. 20006

Dear Judge Webster:

I have read the report of your extremely thorough and thoughtful review of the Internal
Revenue Service Criminal Investigation Division (CID) and conclude that it will guide us to
improve the work of this critically important component of tax administration for many years
to come. Thank you for recognizing the critical role that CID plays in tax administration.

As you know, we are in the midst of major changes in the IRS as a whole, designed to
improve the way the IRS executes its mission. Your conclusion that the criminal investigation
function is an essential component of effective tax administration and that CID and other
compliance resources should be carefully targeted to identify tax compliance problems using
the full range of techniques to address these problems is fully consistent with our entire
approach. In an era of rapid economic growth and declining IRS staff resources, this is the
only approach that enables us to achieve our mission and meet the public's expectations.
This approach will also allow us to develop more considered decisions, in consultation with
the Treasury Department, on what portion of CID resources should be used for matters other
than tax administration.

Your recommendation that CID be set up as a distinct unit within the IRS with clear
responsibility for execution of agreed plans and strategies is also consistent with our new
organization concept for the IRS as a whole. Formation of the four IRS operating divisions,
each with responsibility for particular taxpayer groups, will facilitate a more systematic and
current understanding of taxpayers and their specific compliance issues and equip us to be
more knowledgeable and informed partners with the newly formed CID in developing
appropriate compliance strategies. We also agree with your recommendation that the next
head of CID should be a person with a strong record in tax law and law enforcement outside
the IRS.

Your conclusion that "[CID] is an organization of dedicated, talented and hardworking
individuals who carry out their law enforcement responsibilities in a professional manner' is
fully consistent with what I have observed in my time in office. Your recommendations for
improved training and management will help us further enhance their quality and
professionalism.

In addition to these broad conclusions, we also concur with the 25 specific recommendations
contained in your executive summary. As you noted, some of the recommendations,
particularly those concerning organization structure, need further analysis and design work in
coordination with our other organizational changes. We are prepared to appoint a design
team in the immediate future to work out these details and to develop implementation plans.

Finally, I would like to offer my profound appreciation for the tremendous work that you,
Michael Shaheen, Nancy Jardini and the whole team have done in preparing this report. I am
confident that it will long be recognized as a most important milestone in the history of the
IRS.

Sincerely,

/S

**Charles O. Rossotti**

| EXHIBIT | PAGE | of |
|---------|------|-----|
| A | 2 | 4 |

Table of Contents - Webster Review 1999

All About Criminal Investigaton (CI)

Internal Revenue Service
United States Department of the Treasury

## Introduction - Webster Review 1999

During his Senate confirmation hearing in the fall of 1997 Commissioner Charles Rossotti committed to improving the quality of service provided by the Internal Revenue Service. In furtherance of this goal, he launched reviews of each segment of the Service including Criminal Investigation (CI). The Commissioner then asked me to assemble a task force to compile data and information from which I could evaluate CI, determine its effectiveness in accomplishing its mission, and make recommendations for improvement.

Commissioner Rossotti announced my appointment to conduct this review in July, 1998. Michael Shaheen, former head of the Department of Justice Office of Professional Responsibility, assisted me in convening a task force to conduct the review. We recruited Nancy Jardini, a trial attorney from the Fraud Section of the Criminal Division of the Department of Justice, to supervise a staff with extensive criminal investigative, law enforcement, and federal prosecutive experience, including two other experienced prosecutors from the Department of Justice and nine federal law enforcement Special Agents.1

I relied on data, documents, and interviews to formulate the recommendations made in this report.2 The Task Force conducted over 600 interviews including: current and former employees of CI; current and former employees and executives from all components of the IRS both at national headquarters and in the field; the current IRS Commissioner and four former IRS Commissioners; United States District Court Judges; trial attorneys and managers from the Department of Justice Criminal Division, Tax Division, and United States Attorneys Offices nationwide, including the Assistant Attorney General for the Criminal Division and the Assistant Attorney General for the Tax Division; private attorneys who regularly represent targets of criminal tax investigations nationwide; agents, supervisors and executives of other federal law enforcement agencies, including the Commissioner of Customs and the Director of the FBI; Treasury Department executives, including the Under Secretary of Enforcement; staff members from both the House Judiciary Committee and the Senate Finance Committee; members of the public who have had contact with CI; and witnesses and investigators involved in the information presented to the Senate Finance Committee in April 1998.

The Task Force members visited nine IRS districts (Brooklyn, Manhattan, New Jersey, Illinois, North Texas, Georgia, South Florida, Los Angeles, and Rocky Mountain), the National CI Training Academy at FLETC, the CI Offices of Automation and Graphics in Florence, Kentucky, the CI laboratory in Chicago, and the IRS Service Center at Florence, Kentucky.

Numerous interviews and extensive file reviews were conducted during these visits. The Task Force compiled and reviewed countless documents, reports, and statistical analyses, including prior reports and studies on CI, CI policies, CI manuals, GAO reports, Internal Audits, policies of other federal law enforcement agencies, Treasury and Justice Department policies and delegations orders, proposed legislation, and the Internal Revenue Manual.

Finally, the Task Force received and reviewed letters from private individuals and IRS employees commenting about a variety of issues related to CI investigative activities. Any specific issues raised were incorporated into the review to determine whether they were indicative of systemic problems or whether the complaints were isolated incidents. Any allegation of specific instances of misconduct by IRS personnel were forwarded to the Treasury Inspector General for Tax Administration unless they had previously been referred to an appropriate authority for investigation.

In keeping with the Task Force mission, I charged Mr. Shaheen and the Task Force with investigating all essential aspects of CI. The report is presented in five chapters:

### CHAPTER I: THE IRS AND CRIMINAL INVESTIGATION

This chapter examines the missions of both the IRS and CI and discusses whether CI should remain a part of the IRS.

### CHAPTER II: CONFORMING THE WORK TO THE MISSION

This chapter describes how CI investigative resources have been allocated and highlights the need for the IRS to establish a compliance strategy to more efficiently target CI's caseload.

### CHAPTER III: METHODS OF INVESTIGATION

| EXHIBIT | PAGE | of |
|---------|------|-----|
| A | 3 | 4 |

This chapter evaluates how _ _ conducts its investigations, including the use of grand juries and intrusive enforcement techniques, such as undercover operations and search warrants.

**CHAPTER IV: PERSONNEL**

This chapter thoroughly analyzes personnel issues, including hiring, training, promotions, and disciplinary actions.

**CHAPTER V: ORGANIZATIONAL STRUCTURE**

This chapter evolved because of findings and recommendations made in the other chapters. It recommends a reorganization of CI designed to highlight CI's two priorities: enforcement oversight and compliance strategy development.

It is important to note that although this report identifies numerous issues and recommends changes, smooth and efficient transition will require additional study and practical analysis. The Commissioner should appoint a design team to facilitate the effective implementation of these recommendations.

1 These agents were seconded by the Bureau of Alcohol Tobacco and Firearms (ATF), the United States Customs Service, the Federal Bureau of Investigation (FBI), and the Secret Service.

2 Although I relied on the information collected by the Task Force, the recommendations contained in this report are mine

Table of Contents - Webster Review 1999

All About Criminal Investigaton (CI)

| EXHIBIT | PAGE | of |
|---------|------|-----|
| A | 4 | 4 |

VERIFIED AFFIDAVIT IN SUPPORT OF MOVE
FOR FAIR AND IMPARTIAL HEARING

Nadine J. Griffin,
CASE NO. 1:05-CR-10175-WGY

# EXHIBIT B — 6 pages



## sfBayView.com

**1/11/06**

**Home**

**What's Going On**
**Calendar**

**Opportunities**

**Pen pals**

**Wanda's picks**

**Spiritual News**

Help to provide affordable medication for every American

**Education – new choice:**


University of Phoenix


DeVry University


ITT Tech

# Rigged courts, bribed judges, phony trials, extortion by lawyers and over 2 million prisoners in the U.S. gulag

*by Les Sachs*



For most Black defendants and litigants, U.S. courts are a nightmare.

All world citizens should know how corrupt the U.S. legal system is a danger to every traveler, visitor and guest worker from overseas and to every individual who takes the risky step of entering upon American territory. Just ask the overseas families of prisoners who were put to death in the U.S., with their embassies never even being informed that they were arrested - or the many foreign people serving hugely long prison terms in America after they were jailed on flimsy tainted "evidence" from criminal snitches.

The reality is that the United States of America, which proclaims itself the "land of freedom," has the most dishonest, dangerous and crooked legal system of any developed nation. Legal corruption is covering America like a blanket.

The corruption of the legal system is well known, but also well hidden, by the news services of America's corporate-owned media. Media companies are afraid both of reprisal and of the social revolution that would come from exposing the truth. Here is what the U.S. media knows but is afraid to tell you about American "justice."

**Concentration camps with concrete walls**

America has the largest prison gulag in the entire world - yes, right there in the U.S., the self-proclaimed "land of freedom." The starting point for understanding anything about the U.S. is to digest the fact that just this one country, the United States of America, has 25 percent of all of the prisoners in the entire world.

More than 2 million prisoners - more than one out of every 150 people in America - are behind bars. This is now the world's biggest system of what are effectively concentration camps, though most of these prisoners are behind masonry walls and inside prison buildings.

For minorities, the statistics are even more brutal. For example, the U.S. is now imprisoning about one out of every 36 people in its Black population. American "justice" is especially focused on jailing young Black males.

Quite amazingly, Americans and the American government continually criticize the legal systems and so-called "political" legal proceedings in other countries such as China, Russia and even Belgium. This is ironic, considering that the proportion of prisoners in the U.S. is 30 times higher than it is in China - even though China is a country regularly criticized and denounced by the U.S. government.

No one imprisons people as readily or casually as does America. As you learn more about this horrifying legal system, you find out how easily and carelessly

**About us**

Google Search
◉ Search sfbayv
◯ Search WWW

**Advertise in the**

**San Francisco Ba**
*National Black Newspa*
4917 Third Street
San Francisco Cal
Phone: (415) 671-0
Fax: (415) 671-031
Email:
**editor@sfbayview**

| EXHIBIT | PAGE | of |
|---|---|---|
| B | 1 | 1/17/2006 |

America arrests people and tosses innocent people into prison.

It is estimated that America has at least 100,000 completely innocent people in jail, but the statistics of innocence may well run far higher. The number of people known to be innocent, who were actually sentenced to death in recent years, is already running into the hundreds.

The jailing of more than 2 million people is also, quite literally, a revival of slavery and slave labor, on a scale not seen since the days of the Nazis. American business corporations are using these prisoners as a giant slave labor pool.

Prisoners are forced to produce goods and products while earning mere pennies per hour, which they sometimes have to pay back to the prison for their own upkeep. The expanding system of prison slave labor is not only a major source of business profit but also a wedge to drive down the wages of workers outside the prison walls.

This policy of using mass casual imprisonment as a way to revive slavery is targeted particularly at minorities but ends up affecting all working people. Supervised by malicious judges and corrupt lawyers, this culture of mass prisons and slave labor is sold to the citizens by creating a psychology of fear among the American people. This climate of fear is nourished by both the media and the government, who work together with the judges and lawyers to maintain the whole crooked game.

Of America's more than 2 million prisoners, about 50,000 are known to be foreign citizens. This proportion might seem small, but remember that a population of 50,000 prisoners is more than the entire prison population of many other countries. It only appears to be a small percentage, because of America's obsession with jailing its own people, who have had more time to get caught in their web of legal horror.

The U.S. is also extremely casual about the jailing of foreigners and not honoring their rights under international law or treaties and agreements. Often, foreign citizens have been sentenced to death, while the U.S. didn't even bother to notify the foreign government that their citizens were arrested.

Several other governments are working hard just to try and obtain even the most primitive judicial rights for their own nationals who have been seized and held in abusive conditions by the U.S. Empire. And yet, the United States of America somehow still brags about its own legal system, while criticizing other countries.

Before you set foot in America, you should have a clear picture of the terror of the American legal system - the judges and lawyers and money and bribery that have made this system of fear so pervasive. There is not enough public media information about the domestic legal horrors, horrors which have been rapidly increasing. And the American public, even the victims of its legal system, have a hard time realizing why it is so hard to fight legal corruption there.

Theoretically, torture and abuse is totally outlawed by America's Constitution, but some of the nice words hold little power anymore, despite how often people quote them. Americans who still believe the Constitution protects them are mostly those people who haven't yet dealt with the judges and lawyers of America's corrupt legal system.

The U.S. Constitution and Bill of Rights are nearly dead, not just because the judges will no longer enforce them, but even more because the lawyers will not

EXHIBIT PAGE    of

B    2    6    1/17/2006

even fight for them. The two "political parties" are not fighting for them either, and the news media are also very passive.

If you look at America in depth, you can see there has been a widespread moral collapse in their legal and political structures. This means that the legal system has become largely a tool of government terror and of bribery for the rich and the powerful. The average person is just fodder for the meat-grinder of the courts.

Lies and sleazy arguments to make excuses for torture or to deny people the rights of the Geneva Convention or holding people for many years without charges are also just an extension of the deviousness in America's domestic legal system. In America, neither its laws nor its Constitution nor the facts nor evidence nor anything else have real authority inside the courts.

All that's left is what American lawyers and judges call "the game." As part of playing this game, U.S. lawyers and judges just twist words around in order to produce any excuse, however flimsy, to achieve their objective, whether that be to jail an innocent person or give the verdict that was sought by the big company that paid the big bribe through its law firm.

It is an endlessly devious manipulation of words and phrases to get the desired result, just devious falsehood and lies backed by the naked power of the judges. The only "real" part is the power that the judges and lawyers hold in America - to jail you and take away your property. The words of the law don't protect you in the U.S., because judges and lawyers have no scruples about bending them to mean the opposite of what they say.

### Lawyers controlled by the judges

American lawyers are controlled by the judges and don't really work for you - that's why they sell you out to the government. There are some very special aspects about the way American lawyers are controlled by American judges, which is central to why America's legal corruption is so much worse than any other advanced nation. Even if you are paying a lawyer huge amounts of money, he or she doesn't really work for you and in fact may sell you down the river to the jailhouse.

American lawyers are directly under the thumb of the judges. Lawyers who try to fight the system can find themselves not only disbarred but also criminally charged and jailed, and no other lawyer will help them. It is a horribly crooked system.

American lawyers are afraid to do things in court that the judges don't want them to do. Their army of nearly a million lawyers is almost totally under the control of a few thousand judges, with their entrenched culture of bribery and fraud and miscarriage of justice.

So a totally unique factor in U.S. legal corruption is the amazingly dishonest profession of American lawyers, these lawyers who "play the game" with the judges and politicians and police. It is a savage culture of legal fraud, where lawyers work with judges to rob and terrify people - especially all those who dare to question the system.

You will also find, in the American legal system, that you essentially have no recourse whatsoever against wrongdoing by your own lawyer. A lawyer can sell you out, betray you, steal your money, engage in malpractice, help out the other side, hide the evidence that proved you were right or commit felony crime.

against you, and there is nothing you can do about it so long as the lawyer made the judge happy and the judge gets his cut of any money the lawyer stole from you.

**Innocent and being arrested - they don't like to admit a mistake in America**

The police and prosecutors in America have no concern at all whether they have arrested someone who is innocent. They just don't care. When a crime is committed, they try to arrest somebody, anybody, just to say they got the bad guy. And they never like to admit they made a mistake.

Once they arrest you, they will try to make up and plant false evidence to help try and convict you. A common trick is to take other criminals they know, who are facing jail on other charges, and get those criminals to be false witnesses against you. The cops justify this kind of thing by saying to themselves, "Well, if you didn't commit this crime, you probably committed some other crime we don't know about."

If they do arrest you in America, they like to pile on all sorts of criminal charges. The idea is to charge you with 10 crimes because it makes you sound bad and maybe convict you on three of them, or you will accept a plea bargain on one or two of them. Any kind of guilty plea and they call it a success, even though you were totally innocent. For the police and prosecutors, it's all a kind of sporting game so they can bring about their "high conviction rate."

**Multi-millionaires and big corporations vs. everybody else**

The only people who really can expect some fairness in American courts are multi-millionaires and big corporations. Nobody else really matters to American judges and lawyers.

American judges are very devious and use all sorts of techniques to prevent a victim from getting justice. Lots of judges issue gag orders and bans on freedom of speech to help prevent other people from finding out what is going on. Judges set up a trial in all sorts of ways, giving orders that all sorts of evidence be hidden from a jury, for example. The judge may declare that the evidence - especially evidence that proves that you are innocent - will not be allowed at the trial.

Jury trials are actually very rare in America, unlike what you see in the movies. Most cases are settled through some deal or extortion or intimidation before there is an actual trial. If there is a jury trial, they tend to stack the jury with uneducated idiots who will tend to believe whatever lies they are told by the judge and the government.

If you are trying to fight a rich person in court, the judge might let the fancy lawyers for the rich person say anything they want, while he tells you to shut up as soon as you start talking. The judges have a thousand ways to rig a legal proceeding to benefit rich people or the government.

It's no wonder so many innocent people go to prison. With the fundamental brutality and harshness of life in America, citizens are confused and fearful and gullible to propaganda. So a jury in a courtroom - these people who tend to be poorly educated - will tend to go along with any lies presented by government prosecutors. In this environment of fear, the feeling of safety comes from following the "strong" government and sending various "suspected criminals" to jail.

| EXHIBIT | PAGE | of |
|---------|------|-----|
| B | 4 | 6 |
| | | 1/17/2006 |

Yes, there are appeals courts, but these are just more judges who are often friends with the lower court judge who originally sold you out. The appeals judges tend to go along with the lower court judge unless you have suddenly acquired some politically powerful backing on your side.

Americans love to talk about "taking it all the way to the Supreme Court," but this is a nearly empty hope. The U.S. Supreme Court simply refuses to consider most cases that are presented to it.

You can find no end of documented horror about American judges behaving like criminal lunatics, and it is getting worse all the time. In the Hollywood version, there are brave lawyers who will fight for your rights, to win justice for you. In reality, you can't find a lawyer brave enough to fight judicial corruption, even if you are innocent and the judge's friends have threatened to murder you or to send you to jail for the rest of your life.

The lawyers who used to be brave were destroyed or intimidated, and nearly all American lawyers now submit themselves to the culture of corruption and bribery and betraying and abandoning the people who need legal help. Even the lawyers who don't want to be wicked themselves are too timid to really fight the system. At a certain point, nearly all American lawyers will hold back and abandon their clients, because they are trying to survive themselves and avoid revenge by the judges.

**The growing American nightmare**

In the Hollywood version, the average person is also helped by the "brave investigative reporter" at some newspaper or television station, who shows great courage in exposing the truth and bringing powerful wrongdoing to face justice. However, the brave "investigative reporter" in America is now as fictional and non-existent as the "brave lawyer."

America is the land of fear as regards the legal system and the culture of corruption. Everyone involved with the U.S. legal system is afraid, very afraid, of stepping on the wrong toes. Even judges themselves get driven out of office if they don't participate in the bribery culture - no recourse against crime and fraud by judges and lawyers.

In reality, there is almost nothing you can do against misconduct or crime committed against you by American judges and lawyers. All of the official complaint procedures you find on the internet or at the courthouse or in the law books turn out to be a joke, a farce and a fraud.

Complaints about lawyers in America usually go to the "Bar," which is itself run by the judges who are involved in bribery. And complaints about judges go to other judges, their friends.

Nearly all the complaints about lawyers and judges - tens of thousands of them - are kept secret. Nearly all are dismissed or ignored. They are generally only used if the judges or politicians want to specially destroy someone - some radical minority lawyer, someone who is not playing the bribery game, somebody who has dared to expose wrongdoing. Otherwise, even criminal acts by lawyers and judges get a smiling cover-up.

It's getting worse and worse in America all the time, as the judges and lawyers get away with committing crimes, they are getting more open and blatant, committing felony crimes in broad daylight, because they know no one will stop them or bring them to account.

| EXHIBIT | PAGE | of |
|---------|------|-----|
| B | 5 | 6 |

No one should ever again be fooled by U.S. propaganda about being the "land of freedom." Those who are thinking of traveling to, visiting or working in America should think again. It might not be worth the risk of being in a country that has one of the most crooked legal systems in the world.

*These are excerpts from an article that can be read in its entirety at http://bannedinamerica.blogspot.com/. Email Dr. Les Sachs at drlessachs@lycos.com.*

| EXHIBIT | PAGE | of |
|---------|------|-----|
| B | 6 | 6 |

VERIFIED AFFIDAVIT IN SUPPORT OF MOVE
FOR FAIR AND IMPARTIAL HEARING

Nadine J. Griffin,
CASE NO. 1:05-CR-10175-WGY

# EXHIBIT C — 11 pages

# Share Wealth; Cut Gas Prices

### By Mike Blair

As more and more Americans feel the pinch of rising gas and oil prices, it is "time for President Bush to get on the phone and make some calls."

That succinct commentary by a network television broadcaster was directed squarely at the Bush administration with the recommendation that someone in the White House call the Organization of Petroleum Exporting Countries and the big oil companies and demand they share some of their soaring profits with strapped U.S. citizens whipsawed between higher prices and static income.

The cost of gasoline is apparent to everyone. But not much has appeared in the national media about the increasing cost of home heating oil.

*American Free Press* checked on the current costs to heat a home for the coming winter in New York and Virginia, taking these two states as examples of what is likely to occur nationwide.

The worst and most dramatic cost of heating a home is likely to occur for those who use fuel oil and natural gas, which is also up in cost.

In Virginia heating oil stands at about $2.80 per gallon, which makes it about 30 cents more than gasoline at the pump in certain areas.

The most dramatic price change, however, is for kerosene, which many people use to heat their homes, particularly if their tanks are outside and subject to having frost problems. The price for kerosene is hanging at $3.25 per gallon.

In New York, the costs of both fuel oil and kerosene are

*See WINTER MAY RUIN, Page 7*

---



RONALD SACHS-POOL/GETTY IMAGES

**REFORM FOR THE ROTUND:** Above, President Bush is discussing taxes with reporters, but he could be describing, with his hand gestures, the size of his bloated budget and how fat-cats will enrich themselves off his proposed reforms.

---

meeting was "fraudulent political theater designed to protect the corrupt tax code and those who profit from its manipulation."

The President's Advisory Panel on Federal Tax Reform has been charged with formulating recommendations to make the income tax a fairer and more economically productive system. Its final report is due out on Nov. 1.

However, Leo Linbeck, chairman of Americans for Fair Taxation, says he saw through the ruse.

"When a presidential panel engages in such activities it does a great disservice to the people," said Linbeck. "Tar

*See 'TAX REFORM', Page 5*

---

# Media Admits: It's the Enemy

### By James P. Tucker Jr.

The mainstream media was forced to take a good hard look at itself for a full day and found itself guilty of peddling government propaganda, slanting stories to reflect the views of corporate owners, sloppy reporting and other sins. Nothing was published on this event in any major U.S. daily or on any of the nightly network news broadcasts.

The day-long self-examination at the National Press Club in Washington on Oct. 17 was mandated by the late Grant Howell, editor of *The Daily Tribune* in Royal Oak.

*See MAINSTREAM MEA CULPA, Page 12*

## Homeland Security Czar Surprises With Vow to Oust Illegals.

## See the story on page 13.

---



The Judith Miller case and shoddy reporting by *The New York Times* were topics of self-flagellation at the Press Club recently.

---

## The Inside Scoop

- **Personal from the Editor.** Page 2.
- **News You May Have Missed.** Page 2.
- **Worldwide bribery scandal:** Scammers scammed. Page 3.
- **Editorial:** Show some compassion! Page 3.
- **Public radio** overseen by special interest. Page 4.
- **Spotlight on Congress:** Looking for waste. Page 8.
- **Ron Paul:** Highway robbery. Page 9.
- **Paul Craig Roberts:** Iraq fairy trail. Page 11.
- **White advocates** meet in West Virginia. Page 13.
- **Mystery** of missing kids. Page 14.
- **Charley Reese:** Every bully gets it. Page 17.
- **Letters to the Editor.** Pages 18-19.

---

0  74470 04793  3

4 4>

************************AUTO**3-DIGIT  981
                                              B-1246

741
3133-6865

EXIT        PAGE        of
C           1          /1

EXHIBIT | PAGE | of
C | 2 | Media / uch

# Mainstream Mea Culpa

**Continued from Page 1**

Mich. He left big bucks to the Michigan State University School of Journalism on condition it conduct an annual examination of the use of "propaganda and unverifiable facts in print and broadcast media."

The first panel addressed "stealth stories: how hidden agendas seep into media coverage."

Panelists raised these questions: "Can the White House correspondent opining on *Meat the Press* be objective in his coverage? When Armstrong Williams (secretly paid by the administration) was pitching to make sure no child was left behind, did a score of TV stations leave their ethics behind by broadcasting his cable show?"

Another panel tried to define "journalist." "The dictionary definition of a journalist is one who writes and excludes broadcasters. Yet many radio and TV newsmen call themselves 'journalists.'"

There is a great cultural divide between journalists and broadcasters. Journalists are usually removed from the happenings of the corporate owner. However, in broadcasting, the "news announcer" also does commercials for corporations, including those that own the network. When the biggest story focuses on the corrupt practices of the parent corporation, how does he cover it?

In a luncheon address, Sam Donaldson of ABC News suggested that reporters slant stories based on their affinity for the subject. If somebody you like gets a $100 ticket for jaywalking, it is reported as a gross miscarriage of justice, he suggested. But if the ticket is given to someone you dislike, he deserves it.

Major newspapers, including *The Washington Post* and *The New York Times*, were lambasted for parroting the government line that the invasion of Iraq was justified on grounds of weapons of mass destruction, even when their own staff reporters were questioning the veracity of White House information.

Also much discussed was Judith Miller. Miller was the *Times* reporter who went to jail rather than disclose which source outed Valerie Plame—the CIA agent wife of a Bush critic. Miller won a coveted journalism award for going to jail. But how reliable could she be, considering the *Times* pulled her off the Iraq beat because of her mistakes and her cozy relationship with the White House?

The *Times* was also kicked around for allowing a reporter to write fiction as facts for months before he was exposed and fired. He was under less scrutiny, *Times* reporters themselves have acknowledged, because he was a black man, and

the paper wanted to fill its "diversity" quota.

Old-timers also recalled the time, years ago, when *The Washington Post* had to return a Pulitzer prize when it was learned that the winning story was fiction. The Post was also victimized by the cultural diversity fad: the fiction-writing reporter was a black woman.

Newspapers should strive more to write honest, provocative, candid articles, several newsmen agreed. One graphic example was cited by older newspapermen who remain angry.

Sen. Barry Goldwater calls for using nuclear bombs in Vietnam, Associated Press reported in August 1964. Goldwater, the Republican nominee challenging President Lyndon Johnson, had addressed a luncheon meeting in California. At the question-and-answer session, someone asked for all the options the Pentagon had offered on Vietnam. Goldwater mentioned several, then, in a bemused way, noted that one suggestion was to use nuclear weapons to defoliate a line separating North and South to make it easier to root out communist infiltrators. Again, the catch-up facts were buried deep in AP's election story the next day. It either appeared inside the newspapers or was chopped for space reasons.

"And again," one reporter said as others nodded in agreement, "somebody, somewhere, is saying that Goldwater wanted to nuke North Vietnam." ★

*These videos were reviewed in AFP, Vol. II, #40, Oct. 7, 2002.

## Easy Ordering Here!

**PLEASE SEND ME:** (Check products desired and format; return coupon & payment to address below.)

❏ Jeffrey Blankfort. $20. ❏ DVD or ❏ VHS
❏ Rosa Remembers Palestine. $20. ❏ DVD or ❏ VHS
❏ Neturei Karta . . . $20. ❏ DVD or ❏ VHS
❏ Myth, Terrorism . . . $20. ❏ DVD or ❏ VHS
❏ Deciphering Jewish. . . $20 ❏ DVD or ❏ VHS

## Courageous Filmmaker Wendy Campbell* Exposes the Myths & Lies of the Mideast!

**JEFFREY BLANKFORT: THE INTERVIEW AND THE LECTURE**—("Washington, DC: Israel's Most Important Occupied Territory"). Jeffrey Blankfort is a veteran human rights activist and an expert on the Palestine-Israel conflict since the 1970s when he was a photojournalist there. He is Jewish but opposed to the racist ideology of Zionist Israel, and explains how the Jewish Lobby and media manipulates the U.S. government and public opinion to provide unconditional support for Israel—whether right or wrong. Get your pen and paper out and take notes!

**MYTH, TERRORISM AND TABOO**—TV host Mark Green interviewed political experts and activists regarding U.S. foreign policy and the Middle East who express opinions and facts rarely covered on US mainstream media; including dissident radio talk show host Jeffrey Blankfort, film-maker Wendy Campbell on "Zionism: Kosher Apartheid", author Ivan Eland, Prof. Stephen Zunes, and many others. Thought-provoking! (60 mins) VHS or DVD. $20.

**DECIPHERING JEWISH INTELLECTUAL MOVE-**

Department of Justice > USAM > Title 1
prev | next | Organization and Functions Manual

# 1-7.000
# MEDIA RELATIONS

1-7.001 Purpose
1-7.110 Interests Must Be Balanced
1-7.111 Need for Confidentiality
1-7.112 Need for Free Press and Public Trial
1-7.210 General Responsibility
1-7.220 Designation of Media Representative
1-7.310 Department of Justice Components
1-7.320 United States Attorneys
1-7.330 Procedures to Coordinate with OPA
1-7.400 Coordination With United States Attorneys -- Issuance of Press Releases
1-7.401 Guidance for Press Conferences and Other Media Contacts
1-7.500 Release of Information in Criminal and Civil Matters -- Non-Disclosure
1-7.520 Release of Information in Criminal and Civil Matters -- Disclosable Information
1-7.530 Disclosure of Information Concerning Ongoing Investigations
1-7.531 Comments on Requests for Investigations
1-7.540 Disclosure of Information Concerning Person's Prior Criminal Record
1-7.550 Concerns of Prejudice
1-7.600 Assisting the News Media
1-7.700 Freedom of Information Act (FOIA)

## 1-7.001 Purpose

The purpose of this policy statement is to establish specific guidelines consistent with the provisions of 28 CFR 50.2 governing the release of information relating to criminal and civil cases and matters by all components (FBI, DEA, INS, BOP, USMS, USAO, and DOJ divisions) and personnel of the Department of Justice. These guidelines are: 1) fully consistent with the underlying standards set forth in this statement and with 28 CFR 50.2; 2) in addition to any other general requirements relating to this issue; 3) intended for internal guidance only; and 4) do not create any rights enforceable in law or otherwise in any party.

## 1-7.110 Interests Must Be Balanced

These guidelines recognize three principal interests that must be balanced: the right of the public to know; an individual's right to a fair trial; and, the government's ability to effectively enforce the administration of justice.

## 1-7.111 Need for Confidentiality

| EXHIBIT | PAGE | of |
|---------|------|-----|
| C | 3 | 14 |

Careful weight must be given in each case to protecting the rights of victims and litigants as well as the protection of the life and safety of other parties and witnesses. To this end, the Courts and Congress have recognized the need for limited confidentiality in:

- On-going operations and investigations;
- Grand jury and tax matters;
- Certain investigative techniques; and,
- Other matters protected by the law.

## 1-7.112 Need for Free Press and Public Trial

Likewise, careful weight must be given in each case to the constitutional requirements of a free press and public trials as well as the right of the people in a constitutional democracy to have access to information about the conduct of law enforcement officers, prosecutors and courts, consistent with the individual rights of the accused. Further, recognition should be given to the needs of public safety, the apprehension of fugitives, and the rights of the public to be informed on matters that can affect enactment or enforcement of public laws or the development or change of public policy.

These principles must be evaluated in each case and must involve a fair degree of discretion and the exercise of sound judgment, as every possibility cannot be predicted and covered by written policy statement.

## 1-7.210 General Responsibility

Final responsibility for all matters involving the news media and the Department of Justice is vested in the Director of the Office of Public Affairs (OPA). The Attorney General is to be kept fully informed of appropriate matters at all times.

Responsibility for all matters involving the local media is vested in the United States Attorney.

## 1-7.220 Designation of Media Representative

Each United States Attorney's Office and each field office of the various components of the Department shall designate one or more persons to act as a point of contact on matters pertaining to the media.

In United States Attorneys' offices or field offices where available personnel resources do not permit the assignment of a full time point of contact for the media, these responsibilities should be assigned to a clearly identified individual. (This, of course, could be the United States Attorney or field office head.)

## 1-7.310 Department of Justice Components

The public affairs officers at the headquarters level of the Federal Bureau of Investigation, Drug Enforcement Administration, Immigration and Naturalization Service, Bureau of Prisons, United States Marshals Service, Office of Justice Programs, and Community Relations Service are responsible for coordinating their news media effort with the Director of OPA.

| EXHIBIT | PAGE | of |
|---------|------|-----|
| C | 4 | 11 |

## 1-7.320 United States Attorneys

Recognizing that each of the 93 United States Attorneys will exercise independent discretion as to matters affecting their own districts, the United States Attorneys are responsible for coordinating their news media efforts with the Director of OPA in cases that transcend their immediate district or are of national importance.

## 1-7.330 Procedures to Coordinate with OPA

In order to promote coordination with the OPA, all components of the Department shall take all reasonable steps to insure compliance with the following:

**A. International/National/Major Regional News.** As far in advance as possible, OPA should be informed about any issue that might attract international, national, or major regional media interest. However, the OPA should be alerted not to comment or disseminate any information to the media concerning such issues without first consulting with the United States Attorney.

**B. News Conferences.** Prior coordination with OPA is required of news conferences of national significance.

**C. Requests from National Media Representatives (TV, Radio, Wire Service, Magazines, Newspapers).** OPA should be informed immediately of all requests from national media organizations, including the television and radio programs (such as the nightly news, Good Morning America, Meet the Press and Sixty Minutes), national wire services, national news magazines and papers (such as the New York Times, U.S.A. Today, and the Wall Street Journal) regarding in-depth stories and matters affecting the Department of Justice, or matters of national significance.

**D. Media Coverage Affecting DOJ.** When available, press clippings and radio/television tapes involving matters of significance should be forwarded to OPA.

**E. Comments on Specific Issues (i.e., New Policies, Legislative Proposals, Budget).** OPC should be consulted for guidance prior to commenting on new policies and initiatives, legislative proposals or budgetary issues of the Department. This should not be interpreted to preclude recitation of existing well-established Departmental policies or approved budgets.

## 1-7.400 Coordination With United States Attorneys -- Issuance of Press Releases

**By OPA or Headquarters.** In instances where OPA or the headquarters of any division, component or agency of the Department issues a news release or conducts a news conference which may affect an office or the United States Attorney, such division, component, or agency will coordinate that effort with the appropriate United States Attorney.

**Issuance of Press Release by Field Officers of Any Division.** In instances where local field officers of any division or component plans to issue a news release, schedule a news conference or make contact with a member of the media relating to any case or matter which may be prosecuted by the United States Attorney's office, such release, scheduling of a news conference or other media contact shall be approved by the United States Attorney. *See* the DOJ Organizations and Functions Manual at 28 for a discussion of press releases in cases involving the Internal Revenue Service.

## 1-7.401 Guidance for Press Conferences and Other Media Contacts

| EXHIBIT | PAGE | of |
|---------|------|-----|
| C | 5 | 11 |

The following guidance should be followed when Department of Justice components or investigative agencies consider conducting a press conference or other media contact:

A. The use of a press release which conforms to the approval requirements of USAM 1-7.400 is the usual method to release public information to the media by Department of Justice components and investigative agencies. Press conferences should be held only for the most significant and newsworthy actions, or if a particularly important deterrent or law enforcement purpose would be served. Prudence and caution should be exercised in the conduct of any press conference or other media contact.

B. Press conferences about pending cases or investigations that may result in an indictment by all Department of Justice components and investigative agencies must be approved by the appropriate Assistant Attorney General or by the United States Attorney responsible for the case. In joint or multi-district cases the approving official should consult with other districts or divisions affected. If it is a national case, press conferences must be approved by the Director, Office of Public Affairs. *See* USAM 1-7.320 to 1-7.330.

C. There are exceptional circumstances when it may be appropriate to have press conferences or other media outreach about ongoing matters before indictment or other formal charge. These include cases where: 1) the heinous or extraordinary nature of the crime requires public reassurance that the matter is being promptly and properly handled by the appropriate authority; 2) the community needs to be told of an imminent threat to public safety; or 3) a request for public assistance or information is vital. *See* USAM 1-7.530 to 1-7.550 and 28 C.F.R. 50.2.

D. There are also circumstances involving substantial public interest when it may be appropriate to have media contact about matters after indictment or other formal charge but before conviction. In such cases, any communications with press or media representatives should be limited to the information contained in an indictment or other charging instrument, other public pleadings or proceedings, and any other related non-criminal information, within the limits of USAM 1-7.520, 540, 550, 500 and 28 C.F.R. 50.2.

E. Any public communication by any Department component or investigative agency or their employees about pending matters or investigations that may result in a case, or about pending cases or final dispositions, must be approved by the appropriate Assistant Attorney General, the United States Attorney, or other designate responsible for the case. In joint or multi-district cases, the approving official should consult with other districts or divisions affected. If it is a national case, press conferences must be approved by the Director, Office of Public Affairs.

F. The use of displays or handouts in either press conferences or other media outreach when it involves a pending case or an investigation that may lead to an indictment requires separate and specific approval by the officials authorizing approval as set forth in section B.

G. All Department personnel must avoid any public oral or written statements or presentations that may violate any Department guideline or regulation, or any legal requirement or prohibitions, including case law and local court rules.

H. Particular care must be taken to avoid any statement or presentation that would prejudice the fairness of any subsequent legal proceeding. See also 28 C.F.R. 16.26(b). In cases where information is based directly or indirectly on tax records, care should be taken to comply with any applicable disclosure provisions in the Tax Reform Act, section 6103 of the Internal Revenue

EXHIBIT PAGE of
C 6

Code of 1986. The fact of conviction, sentences and guilty pleas may be reported in a press release based on information uttered in court as opposed to waiting for the publicly filed documents relating to the fact of conviction, plea or sentence. If you have any questions please contact the Tax Division. Special rules apply and should be closely followed to ensure that the identity of minors directly or indirectly is not revealed in juvenile proceedings.

I. For press releases or other public comment concerning the filing of a request for commutation of a federal death sentence or whether such a sentence should be commuted, special rules apply. In clemency matters, the Department acts both as prosecutor and as advisor to the President on the issue of clemency. In order to ensure clarity about the role in which the Department is making a public comment and to ensure that there is no potential for infringement upon the President's prerogative in exercising his clemency powers or conflict in the Department's role in such matters, press releases or other comment to the press concerning the issue of clemency should be transmitted through the Office of Public Affairs to the Deputy Attorney General for final approval.

J. Prior to conducting a press conference or making comments on a pending investigation regarding another DOJ component, the U.S. Attorney shall coordinate any comments, including any written statements, with the affected component.

K. The Office of Inspector General is exempt from any approval requirement for media contacts. However, the Office of Inspector General should inform the Office of Public Affairs on public or other media issues.

## 1-7.500 Release of Information in Criminal and Civil Matters -- Non-Disclosure

At no time shall any component or personnel of the Department of Justice furnish any statement or information that he or she knows or reasonably should know will have a substantial likelihood of materially prejudicing an adjudicative proceeding.

## 1-7.520 Release of Information in Criminal and Civil Matters -- Disclosable Information

Department personnel, subject to specific limitations imposed by law or court rule or order and consistent with the provisions of these guidelines, may make public the following information in any criminal case in which charges have been brought:

The defendant's name, age, residence, employment, marital status, and similar background information;

A. The substance of the charge, limited to that contained in the complaint, indictment, information, or other public documents;

B. The identity of the investigating and/or arresting agency and the length and scope of an investigation;

C. The circumstances immediately surrounding an arrest, including the time and place of arrest, resistance, pursuit, possession and use of weapons, and a description of physical items seized at the time of arrest. Any such disclosures shall not include subjective observations; and

| EXHIBIT | PAGE | of |
|---------|------|-----|
| C | 7 | 12 |

7/4/04



D. In the interest of furthering law enforcement goals, the public policy significance of a case may be discussed by the appropriate United States Attorney or Assistant Attorney General.

In civil cases, Department personnel may release similar identification material regarding defendants, the concerned government agency or program, a short statement of the claim, and the government's interest.

## 1-7.530 Disclosure of Information Concerning Ongoing Investigations

A. Except as provided inn subparagraph B. of this section, components and personnel of the Department of Justice shall not respond to questions about the existence of an ongoing investigation or comment on its nature or progress, including such things as the issuance or seving of a subpoena, prior to the public filing of the document.

B. In matters that have already received substantial publicity, or about which the community needs to be reassured that the appropriate law enforcement agency is investigating the incident, or where release of information is necessary to protect the public interest, safety, or welfare, comments about or confirmation of an ongoing investigation may need to be made. In these unusual circumstances, the involved investigative agency will consult and obtain approval from the United States Attorney or Department Division handling the matter prior to disseminating any information to the media.

## 1-7.531 Comments on Requests for Investigations

Individuals, groups, or organizations often send letters to the Department of Justice or a Department component requesting that a person or entity be investigated for violations of law. Sometimes, the requestor then conducts a press conference or releases a statement leaving an implication that an investigation will result. This can cause media inquiries.

Receipt of a request to open an investigation may be publicly acknowledged. Care should be taken to avoid any implication that the referral will necessarily lead to an investigation. It should be pointed out that there is a distinction between "reviewing a request for an investigation" and "opening an investigation."

Any acknowledgment should state that such requests are referred to the proper investigative agency for review but that no decision has been made whether to proceed on the specific request received. Finally, it should be noted that all substantiated allegations are reviewed in light of The Principles of Federal Prosecution (see USAM 9-27.000), and the Department does not ordinarily confirm or deny the existence or status of an investigation.

The same considerations apply if there is an investigation already underway when such a request is received. If the existence of an investigation is not public the same procedure should be followed as outlined above.

## 1-7.540 Disclosure of Information Concerning Person's Prior Criminal Record

Personnel of the Department shall not disseminate to the media any information concerning a defendant's or subject's prior criminal record either during an investigation or at a trial. However, in certain extraordinary situations such as fugitives or in extradition cases, departmental personnel may confirm the identity of defendants or subject and the offense or offenses. Where a prior conviction is an

EXHIBIT PAGE of

C   8 7/4/04

element of the current charge, such as in the case of a felon in possession of a firearm, departmental personnel may confirm the identity of the defendant and the general nature of the prior charge where such information is part of the public record in the case at issue.

## 1-7.550 Concerns of Prejudice

Because the release of certain types of information could tend to prejudice an adjudicative proceeding, Department personnel should refrain from making available the following:

A. Observations about a defendant's character;

B. Statements, admissions, confessions, or alibis attributable to a defendant, or the refusal or failure of the accused to make a statement;

C. Reference to investigative procedures, such as fingerprints, polygraph examinations, ballistic tests, or forensic services, including DNA testing, or to the refusal by the defendant to submit to such tests or examinations;

D. Statements concerning the identity, testimony, or credibility of prospective witnesses;

E. Statements concerning evidence or argument in the case, whether or not it is anticipated that such evidence or argument will be used at trial;

F. Any opinion as to the defendant's guilt, or the possibility of a plea of guilty to the offense charged, or the possibility of a plea of a lesser offense.

## 1-7.600 Assisting the News Media

A. Other than by reason of a Court order, Department personnel shall not prevent the lawful efforts of the news media to photograph, tape, record or televise a sealed crime scene from outside the sealed perimeter.

B. In order to promote the aims of law enforcement, including the deterrence of criminal conduct and the enhancement of public confidence, Department personnel with the prior approval of the appropriate United States Attorney may assist the news media in photographing, taping, recording or televising a law enforcement activity. The United States Attorney shall consider whether such assistance would:

   1. Unreasonably endanger any individual;

   2. Prejudice the rights of any party or other person; and

   3. Is not otherwise proscribed by law.

C. A news release should contain a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty.

D. In cases in which a search warrant or arrest warrant is to be executed, no advance information will be provided to the news media about actions to be taken by law enforcement personnel, nor shall media representatives be solicited or invited to be present. This prohibition will also apply to



operations in preparation for the execution of warrants, and to any multi-agency action in which Department personnel participate.

E. Justice Department employees who obtain what may be evidence in any criminal or civil case or who make or obtain any photographic, sound or similar image thereof, in connection with a search or arrest warrant, may not disclose such material to the news media without the prior specific approval of the United States Attorney or Assistant Attorney General, who shall consider applicable regulations and policy, or upon a court order directing such production.

If news media representatives are present, Justice Department personnel may request them to withdraw voluntarily if their presence puts the operation or the safety of individuals in jeopardy. If the news media declines to withdraw, Department personnel should consider cancelling the action if that is a practical alternative.

Exceptions to the above policy may be granted in extraordinary circumstances by the Office of Public Affairs.

## 1-7.700 Freedom of Information Act (FOIA)

Nothing contained herein is intended to control access to Department of Justice records which are publicly available under provisions of the Freedom of Information Act (FOIA).

(28 U.S.C. 509) (Order No. 469-71, 367 F. 21028, No. 3, 1971. Amended by Order No. 602-75, 40 FR 22119, May 20, 1975)

---

**November 2003**                                                                                          **USAM Chapter 1-7**

| EXHIBIT | PAGE | of |
|---------|------|-----|
| *C* | *10* | *11* |

(e) conducting supplemental investigations, collateral investigations, and other priority investigations as directed.

(f) Nationally Designated General Investigations (see IRM 9812).

(g) Fraud referrals that meet district criminal criteria and are assigned as subject investigations.

## 9162 (11–11–96)
### News Coverage

The Service will endeavor to obtain news coverage of its enforcement activities in order to help deter violations of the internal revenue laws, and increase the confidence of conscientious taxpayers that the Service prosecutes violators. To achieve this objective, Criminal Investigation managers must maintain close cooperation and coordination with the district official assigned overall public information responsibility. (See policy statement P–1–183 and IRM 9448.)

## 9163 (11–11–96)
### Business Master Plan (BMP)

The Business Master Plan (BMP) links the Service's Objectives and Business Vision with the actions needed to implement them. The BMP reflects the business priorities set by the Service's top executives. The goals and objectives of Criminal Investigation are contained within the BMP. Criminal Investigation will strive to conduct investigations of substance as part of an overall balanced enforcement effort.

## 9164 (11–11–96)
### Personnel Management

(1) The professional status of special agents should be stressed by supervisors in group meetings and in personal contacts, with special emphasis on the identification and resolution of pertinent issues in criminal investigations, the development of competent evidence relevant to the issues involved and the preparation of detailed technical reports, with sound conclusions and recommendations, for the ultimate use of Government attorneys in the preparation and trial of prosecution cases. Managers should also impress upon special agents that, in addition to investigating referred fraudulent tax practices and schemes, they have a basic responsibility to be alert for indications of noncompliance with the tax laws and to report such indications.

(2) Normally special agents in grades GS–11 and above will receive a minimum of guidance and counsel as successful

performance at such levels requires an ability to plan and conduct investigations which will resolve the issues involved, to determine the time and sequence of investigative efforts, to accurately appraise findings, and to determine whether or not further inquiries are warranted. However, group managers will sufficiently acquaint themselves with significant investigative actions taken by special agents in those grades and will review their decisions to ensure that manpower is not wasted through overinvestigation or through lack of diligence in completing assignments.

(3) Special agents in the trainee and development grades of GS–5 should receive closer attention, guidance, and direction in order to develop optimum individual capabilities and quality performance. Managers must maintain a thorough knowledge of the issues and progression in investigations being conducted by special agents in those grades in order to provide competent guidance and counsel and to prevent unessential investigative effort.

(4) The Chief is responsible for the performance of group managers and he/she should ensure that he/she has sufficient personal contact with each group manager so that he/she can determine whether duties and responsibilities are being properly discharged.

(5) Managers should devise and apply check methods to ensure that policy and procedure issuances are reaching personnel whom they concern and that they are understood and are being properly applied by such personnel. This can be done both formally and informally, through group and individual employee contact.

## 9165 (11–11–96)
### Prompt Completion of Work

## 9165.1 (11–11–96)
### General

(1) Service policy requires that all criminal investigations be commenced and concluded as expeditiously as possible.

(2) The Criminal Investigation Division goal is to have no more than 5% of investigations in inventory (excluding investigations beyond the control of the district such as summons enforcement, grand jury, etc.) in excess of 21 months. However, in no event should an investigation be concluded without being fully investigated.

## 9165.2 (11–11–96)
### Responsibilities

(1) The Chief has overall responsibility for the expeditious completion of investigations and should, as required, participate in the direction of investigative effort. Specifically, the Chief has primary responsibility for:

VERIFIED AFFIDAVIT IN SUPPORT OF MOVE
FOR FAIR AND IMPARTIAL HEARING

Nadine J. Griffin,
CASE NO. 1:05-CR-10175-WGY

# EXHIBIT D — 8 pages

Number: **200007029**
Release Date: 2/18/2000

December 20, 1999
CC:EL:CT

# *Criminal Tax Bulletin*

*Department of Treasury*
*Internal Revenue Service*
UILN: 9999.00-00

*Office of Chief Counsel*
*Criminal Tax Division*

December                This bulletin is for informational purposes. It is not a directive.                1999

## SUPREME COURT CASES

### No General Murder Scene Exception To Warrant Requirement

In *Flippo v. West Virginia, 120 S.Ct. 7* (1999), Flippo called the police to report he and his wife had been attacked. The police arrived at the scene and found Flippo wounded and his wife dead. They conducted a 16 hour search resulting in the discovery of photographs and negatives tending to implicate Flippo. Flippo was indicted for murder and his motion to suppress the photos was denied. The West Virginia Supreme Court of Appeals denied discretionary review. The United States Supreme Court granted certiorari, reversed the judgement of the West Virginia Supreme Court of Appeals and remanded the matter to the trial court.

Supporting the denial of Flippo's motion to suppress, the state cited exceptions to the warrant requirement, including immediate investigation to preserve evidence, plain view and implied consent. The trial court did not rely on these exceptions. Rather, the trial court held once a homicide scene is secured, a warrantless general search of the scene is permissible.

The Court rejected the trial court's proposition that warrantless general searches are permissible at homicide scenes. Relying on *Mincey v. Arizona,* 437 U.S. 385 (1978), the Court held there is no homicide scene exception to the warrant requirement. One of the recognized exceptions to the warrant requirement, such as a reasonable belief a person is in need of aid, the possibility of other victims, or a killer on the premises is required for a warrantless search of a homicide scene. The Court did not address the state's argument that one of these recognized exceptions to the warrant requirement applied.

## TITLE 26 AND TITLE 26 RELATED CASES

### A Clear Indication Of Fraud Requires A Referral

In *United States v. McKee,* 192 F.3d 535 (6th Cir. 1999), McKee was audited by a revenue agent investigating reports of two informants who alleged McKee was diverting corporate income to pay personal expenses. Between September 2, 1992 and the May 5, 1993 referral of the civil investigation to Criminal Investigation ("CI"), the revenue agent met with McKee several times, requested documents and interviewed employees. Ultimately, the case was referred for prosecution and McKee was indicted for violating 26 U.S.C. § 7206(1). McKee's motions to suppress and to dismiss were denied. McKee subsequently pled guilty reserving the right to appeal the denial of her motions.

On appeal, McKee argued the revenue agent failed to comply with provisions of the Internal Revenue Manual ("IRM") by not referring her investigation to CI earlier and by not completing a Form 2797 pertaining to McKee. The Sixth Circuit began its analysis with the premise that violations of IRM provisions are not due process violations unless the provisions violated are designed to protect the constitutional rights of taxpayers. The court determined failure to fill out a Form 2797 was not a violation of due process since the relevant IRM provision was designed to promote administrative ease and did not protect the

EXHIBIT   PAGE   of

D   1   8

Constitutional rights of taxpayers.

The Sixth Circuit also rejected McKee's argument which alleged the revenue agent violated the IRM provision requiring referral to CI upon a "firm indication of fraud." At the inception of the civil investigation the allegations against McKee were not substantiated by documentary evidence. The court, therefore, considered the allegations to be "first indications of fraud" not amounting to firm indications of fraud. Moreover, the purpose of the civil audit is to allow a taxpayer to explain discrepancies before a revenue agent takes action such as referring the case to CI. As for the revenue agent's decision not to refer the case sooner, the court deferred to the discretion of the revenue agent. The court, however, stated its conclusion with reluctance since "almost all of the government's evidence against the McKees was practically handed to CI on a silver platter as a result of the civil investigation."

# SEARCH AND SEIZURE

## Thermal Scan Of Home Is Not A Search Within Meaning Of The Fourth Amendment

In *United States v. Kyllo*, 190 F.3d 1041 (9th Cir. 1999), the Ninth Circuit held the warrantless use of a thermal imaging device to perform a thermal scan of Kyllo's residence was not a search within the meaning of the Fourth Amendment. Federal and state narcotics agents suspected Kyllo was conducting an indoor marijuana growing operation from the unit of a triplex where he resided. The agents subpoenaed Kyllo's utility records and compared them to a spreadsheet for average electrical use. Concluding Kyllo's electrical usage was abnormally high, agents then employed an Agema Thermovision 210 thermal imaging device to scan the outside surface of Kyllo's residence.

The Agema 210 detected high heat loss emanating from the roof of Kyllo's home and from one wall. Additionally, Kyllo's unit "showed much warmer" than the other units in the triplex. The agents concluded these high heat levels indicated the presence of high intensity lights used to grow marijuana indoors. This information was placed in an affidavit and presented to a magistrate who issued a search warrant for Kyllo's home. As suspected, an indoor growing operation was found, resulting in the seizure of over one hundred marijuana plants. Kyllo's motion to suppress the evidence seized during the search was denied and he was subsequently convicted of one count of

manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1).

On appeal, Kyllo argued the thermal scan was a government intrusion into the activities within his home, in which he had a reasonable expectation of privacy, and its warrantless use violated the Fourth Amendment. The government contended use of the thermal imaging device to innocuously measure heat emissions from Kyllo's residence was non-intrusive and not a search within the meaning of the Fourth Amendment.

The Ninth Circuit applied a two part test to determine whether the Fourth Amendment had been violated. The court stated it must first determine whether the individual has made a showing of an actual subjective expectation of privacy and then evaluate whether society recognizes this expectation as objectively reasonable. The court stressed the fact the Agema 210 did not "literally or figuratively" penetrate the walls of Kyllo's residence to expose his marijuana growing operation. All the scanner did was to passively record thermal emissions rather than send out intrusive beams or rays. Moreover, Kyllo took no "affirmative action to conceal the waste heat emissions created by the heat lamps needed for a successful indoor grow." The court concluded failing to conceal these heat emissions demonstrated a lack of concern with the heat emitted and, therefore, a lack of a subjective privacy expectation. Even if Kyllo had demonstrated a subjective expectation of privacy in the heat emissions from his residence, he failed to establish that this privacy expectation would be accepted by society as "objectively reasonable."

The court acknowledged "[w]hile a heightened privacy expectation in the home has been recognized for purposes of Fourth Amendment analysis . . . activities within a residence are not protected from outside, non-intrusive, government observation, simply because they are within the home or its curtilage." Here, in evaluating "whether technology [had] been used to aid in permissible observation or to perform a warrantless search, the crucial inquiry . . . is whether the technology reveals intimate details." Because the thermal scan exposed no intimate or sensitive details of Kyllo's life, the court stated its use did not "step over the edge from permissible non-intrusive observation into [an] impermissible warrantless search." Accordingly, the court found no violation of the Fourth Amendment.

EXHIBIT | PAGE | of
D | 2 | 8

# OTHER CONSTITUTIONAL ISSUES

## Defense Counsel May Waive Client's Sixth Amendment Right To Confrontation Based On Sound Trial Strategy

In *United States v. Plitman*, No. 99-1177, 1999 U.S. App. LEXIS 24289 (2nd Cir. Sept. 30, 1999), the Second Circuit joined the majority of circuit courts in holding a defense counsel may waive a defendant's Sixth Amendment right to confrontation where the decision is one of sound trial tactics or strategy. Plitman was convicted on two counts of tax evasion for the tax years 1991 and 1992, in violation of 26 U.S.C. § 7201. During these years, Plitman worked for Silatex, USA Ltd., the New York affiliate of a Venezuela based company that manufactured women's clothing. Plitman directed Silatex to pay approximately 75 percent of his salary to FMP Investments, a British Virgin Islands corporation, owned by Plitman's cousins. In turn, Plitman's cousins caused FMP to transfer the majority of this money into their accounts at the Israel Discount Bank. The money was then transferred to Plitman's personal bank accounts and never reported as income.

During the course of the investigation, a special agent conducted a telephonic interview with the president of Silatex, in which the president stated it was Plitman's idea to have 75 percent of his compensation sent to FMP. At a pre-trial conference, Plitman's attorney stipulated to the admission of the special agent's hearsay account of his conversation with the Silatex president. This stipulation was made based upon a strategical decision by Plitman's attorney to gain an earlier trial date and to prevent the prosecutor from deposing the Silatex president or from obtaining his presence as a live witness at trial. Plitman was subsequently convicted on both counts.

On appeal, Plitman claimed his Sixth Amendment right to confront the witnesses against him was violated when the district court allowed the special agent to testify about his conversation with the Silatex president. Plitman argued this was inadmissible hearsay and, therefore, his defense counsel could not stipulate to its admission into evidence. Moreover, he asserted the stipulation was invalid for he never made

a knowing waiver of his right to confrontation and matters of trial strategy did not justify his attorney's action. The government contended Plitman's stipulation through counsel was a valid waiver similar to any other ordinary evidentiary stipulation in a trial.

In weighing Plitman's arguments, the Second Circuit identified two types of constitutional rights possessed by criminal defendants, each with a different standard of waiver. The first category "involves rights that defense counsel may waive on behalf of [a] defendant because they concern strategic and tactical matters such as selective introduction of evidence, stipulations, objections,...and pre-trial motions." The second category involves rights "that only [a] defendant himself may waive because they are 'personal' and include matters like pleading guilty, waiving a jury trial,...and deciding to testify." Upon reviewing the decisions of other circuit courts, the Second Circuit concluded counsel in a criminal case may waive his client's Sixth Amendment right of confrontation by stipulating to the admission of evidence, "so long as the defendant does not dissent from his attorney's decision, and so long as it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy." Here, Plitman achieved several significant tactical advantages by stipulating to allow the hearsay testimony of the special agent. These advantages included a quicker trial date, which the government opposed, limitations on the Silatex president's testimony and an opportunity to cross-examine the special agent with respect to the accuracy of his recollection. Moreover, Plitman was present when his attorney agreed to the stipulation and raised no objections or questions. Accordingly, the Second Circuit affirmed Plitman's tax evasion convictions.

## Prosecutorial Misconduct Must Be Intentional To Warrant Reversal Of Conviction

In *United States v. Albanese*, 99-1078, 1999 U.S. App. LEXIS 24652 (8th Cir. Oct. 5, 1999), Albanese's first trial ended in a mistrial and on retrial he was convicted of conspiracy to distribute cocaine. During trial, a government witness who was paid in excess of $60,000 for his testimony, testified against Albanese and made inconsistent statements.

On appeal, Albanese argued, *inter alia*, his retrial following the mistrial violated his rights under the Double Jeopardy Clause because of prosecutorial misconduct. Citing *Oregon v. Kennedy*, 456 U.S. 667 (1982), Albanese claimed government misconduct regarding inconsistent testimony by a paid government

| EXHIBIT | PAGE | of |
|---------|------|-----|
| D | 3 | 8 |

witness caused his trial to end in a mistrial and, therefore, *Kennedy* barred his retrial and consequent conviction. The court disagreed finding *Kennedy* applicable only to situations where prosecutorial misconduct is intentional and causes a defendant to have to chose between requesting a mistrial or waiting and chancing reversal on appeal. Specifically, the court found the prosecution's failure to inform the defense of the witness's inconsistent statement was not intentional (Albanese had not argued that it was), therefore, the prosecutor's omission did not rise to the level of misconduct required for application of *Kennedy*. Finding no *Kennedy* violation, the court held retrial was permissible as jeopardy had not attached following the prior mistrial.

# PROCEDURE

## McDade Act Requires Federal Prosecutors To Follow State Rule Restricting Lawyer Subpoenas

In *United States v. Colorado Supreme Court*, 189 F.3d 1281(10th Cir. 1999), the court held the Colorado rule limiting a prosecutor's ability in a criminal case to subpoena lawyers for evidence about past and present clients is covered by 28 U.S.C. § 530B, originally entitled the McDade Act. The McDade Act requires attorneys for the federal government to comply with state laws and rules, as well as local federal court rules, governing attorneys in the states where the lawyers perform their duties.

The court determined the Colorado rule of professional conduct 3.8(f) which declares ". . . a prosecutor in a criminal case shall not subpoena a lawyer to provide client information in a criminal proceeding unless the prosecutor reasonably believes that the information is essential to the successful completion of an ongoing investigation or prosecution, is not otherwise available, privileged," to be an ethics rule pursuant to the McDade Act as opposed to a procedural or substantive rule. The court held the McDade Act, enacted while this case was on appeal, conclusively established a state rule governing attorney conduct applied to federal attorneys practicing in the state.

## Court Disallows Offensive Collateral

## Estoppel Based On Criminal Sentence

In *Securities and Exchange Commission v. Monarch Funding Corp.*, 192 F.3d 295 (2nd Cir.1999), the court held the giving of preclusive effect in a civil action to findings made in a criminal sentencing proceeding "should be presumed improper." The court further concluded applying collateral estoppel in this context is reversible error when, as in this case, the pertinent findings were not necessary to the final sentence, were not actually litigated and decided at sentencing and did not promote judicial economy in the civil suit.

In a federal criminal case in which the SEC consulted with the prosecution, a jury acquitted Monarch of RICO charges from which predicate acts of securities fraud were alleged. Monarch was convicted of conspiracy to obstruct justice on the basis of its attempts to obstruct civil, grand jury and criminal proceedings arising from its alleged fraud and on moving the proceeds of the alleged racketeering activities from the Cayman Islands to Andorra.

While the criminal case was pending, the SEC brought a civil suit seeking disgorgement and injunctive relief. The suit was stayed while the criminal case was pending, but once Monarch was sentenced, the SEC moved for summary judgment, arguing Monarch should be collaterally estopped by the criminal sentencing findings from denying it had violated federal securities laws. The district court granted the motion, saying the "protracted" sentencing proceedings had afforded Monarch ample opportunity to challenge the government's evidence supporting the sentencing findings and the findings of securities fraud were necessary to the sentence.

The Second Circuit disagreed with the district court's finding. The court vacated the judgment which allowed the SEC to invoke offensive collateral estoppel in the civil case to bar Monarch from relitigating issues the SEC asserted were resolved in the an earlier criminal sentencing. To strike an appropriate balance between efficiency and fairness, the court identified four conditions that must be met before applying offensive collateral estoppel: 1) the issues in both proceedings must be identical, 2) the issued in the prior proceeding must have been actually litigated and actually decided, 3) there must have been a full and fair opportunity for litigation in the prior proceeding, and 4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

In finding the SEC had not met the burden, the court noted a defendant's opportunities to take discovery

EXHIBIT PAGE of

D    4    8

and present evidence are more limited in sentencing proceedings than in a civil proceeding. In addition, a criminal defendant may be less likely to challenge sensitive issues in a sentencing proceeding than in a full blown civil trial, either out of hope for a prosecutorial downward departure motion, or out of fear that the judge may disbelieve his testimony and enhance his sentence accordingly.

# Evidence

## Inconsistency Between Informant's Testimony And A Proffer By His Lawyer Is *Brady* Material

In *Spicer v. Roxbury Correctional Institute*, No. 99-61197, 1999 U.S. App. LEXIS 25826 (4th Cir. Oct. 18, 1999), the Fourth Circuit affirmed a district court order granting Spicer's petition for a writ of *habeas corpus* on the ground state prosecutors suppressed exculpatory, material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Spicer was identified as the perpetrator of a brutal assault of a restaurant manager. He was tried and convicted of the offense principally on the testimony of three purported eyewitnesses. Although the state court rejected Spicer's *Brady* claim on post-conviction review, a federal district court granted a writ of *habeas corpus* and the State of Maryland appealed.

The *Brady* issue concerned the testimony of Larry Brown, one of the eyewitnesses. Brown was an acquaintance of Spicer's and testified in the case in exchange for sentencing leniency on an unrelated drug charge. At issue was whether the prosecution violated *Brady* when it failed to disclose to Spicer's attorney information Brown -- who told the prosecutor, the grand jury, and the trial jury he witnessed Spicer fleeing the restaurant on the day of the assault -- had previously told his attorney on multiple occasions he had not seen Spicer at all on that day.

The Fourth Circuit evaluated the challenge in light of the three "essential components" of a *Brady* violation which circumscribe the prosecutor's disclosure duty: (1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material. A majority of the court held Brown's prior inconsistent statement about whether he was an eyewitness clearly satisfied the first requirement of a *Brady* violation. In so holding, the majority found the

state court misunderstood the scope of *Brady* by failing to appreciate impeachment evidence is unequivocally subject to disclosure and also failing to appreciate the impeachment value of Brown's inconsistent statements to his attorney.

Clearly the evidence was suppressed by the state but the court found the prosecutor acted in good faith and simply misunderstood the scope of his *Brady* obligation. The court explained constitutional error in this instance occurs only if the exculpatory evidence was material. Evidence is material if it might have affected the outcome. Here, the majority decided the evidence was material because Brown, as opposed to the other witnesses, was an acquaintance of Spicer. Brown knew Spicer and could correctly identify him. According to the majority, if the jury doubted Brown was an eyewitness, it would have been left without any conclusive, or perhaps even persuasive, identification evidence. Based on these findings, the majority affirmed the district court's order that Spicer be released from custody unconditionally unless he is retried within four months.

## Police Officers Not Immune From Civil Rights Suit Based on Questioning "Outside Miranda"

In *California Attorneys for Criminal Justice v. Butts*, Nos. 97-56499, 97-56510, 1999 U.S. App. LEXIS 29309 (9th Cir. Nov. 8, 1999), the Ninth Circuit held police officers who, in accordance with their training, intentionally violated the suspects' rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), in order to obtain statements which could be used for impeachment purposes are not immune from a civil rights suit under 42 U.S.C. § 1983.

Two of the plaintiffs, who were California state prisoners, brought a civil rights action against officers of the Los Angeles and Santa Monica police departments for violating their right to counsel by employing a policy which defies the requirements of *Miranda*. The police officers/defendants brought an interlocutory appeal challenging the district court's denial of their motions to dismiss the suit and, in the alternative, summary judgment. Both motions were based on the defendants' claim of qualified immunity.

The defendants employed an interrogation technique known as questioning "outside Miranda." Under this policy, the defendant officers continue to interrogate suspects "outside Miranda" despite the suspects'

| EXHIBIT | PAGE | of |
|---------|------|-----|
| D | 5 | 8 |

invocation of their right to remain silent and their requests for an attorney. The purpose of such questioning is to take advantage of the rule of *Harris v. New York*, 401 U.S. 222 (1971) and *Oregon v. Hass*, 420 U.S. 714 (1975), that statements obtained in violation of *Miranda* may be used to impeach a defendant if he takes the stand at trial. In rejecting the applicability of these cases, the Ninth Circuit pointed out the Supreme Court had never suggested these decisions, which deal with "the peripheral use of statements obtained in violation of *Miranda*," somehow overcame *Miranda's* imperatives concerning proper police procedure.

The Ninth Circuit followed the ruling of *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) that questioning "outside Miranda" is cognizable as a basis for a §1983 action. The rule that interrogation must cease upon a suspect's invocation of his right to counsel were clearly established in *Miranda* thus a reasonable police officer conducting post *Miranda* interrogation should have known he was violating a suspect's rights by continuing an interrogation after the suspect asserted his right to speak to an attorney.

The defendants ultimately asserted their reliance on their training about questioning "outside Miranda" entitles them to qualified immunity. The court followed past decisions which held the fact officials were following orders will not provide them with immunity if the unlawfulness of the order was clearly established. Furthermore, the court concluded the fact the Los Angeles and Santa Monica police departments may have trained their officers to violate the rights of individuals does not provide any defense for these officers. The district court held, and the Ninth Circuit concurred, "'following orders' will only insulate officers from liability when 'reliance is objectively reasonable.'" Here, it was not.

## INVESTIGATIVE TECHNIQUES

### Anti-Gratuity Statute Not Applicable To Prosecutor's Payment Of Cash To

### Cooperating Witness

In *United States v. Albanese*, 99-1078, 1999 U.S. App. LEXIS 24652 (8th Cir. Oct. 5, 1999), Albanese was tried and convicted of conspiring to distribute cocaine. During trial, a government witness who was paid in excess of $60,000 for his testimony, testified against Albanese and made inconsistent statements. On appeal, Albanese argued, *inter alia*, the government violated the anti-gratuity statute by paying a witness for his testimony.

The court held the government's payments of cash to witnesses in exchange for their assistance and testimony in a prosecution does not violate the federal anti-gratuity statute, 18 U.S.C. § 201(c)(2). Specifically the court, following Eighth Circuit precedent and the approach and holding in *Singleton v. United States*, 165 F.3d 1297 (10th Cir. (en banc) 1999), found the statute did not apply to the government. The court viewed monetary payments comparable to other forms of benefits (*e.g.*, leniency). As such, the payment made to the witness in exchange for his testimony against Albanese was not improper nor did it violate the anti-gratuity statute. Upon rejecting all Albanese's arguments, the court affirmed his conviction.

## SENTENCING

### Sentencing Enhancement For Obstruction Of Justice Applicable Even If Obstruction Not Successful

In *United States v. Buckley*, 192 F.3d 708 (7th Cir 1999), Buckley, carrying a BB gun and a brief case, robbed a bank by handing a bank teller a note stating he had a gun and a bomb. Buckley initially confessed to possession of the BB gun and pled guilty to bank robbery but at his sentencing hearing, he denied possession of the BB gun. The government requested sentencing enhancements for possession of an object appearing to be a dangerous weapon pursuant to U.S.S.G. § 2B3.1(b)(2)(E) and because of Buckley's lie, for obstruction of justice pursuant to § 3C1.1. The district court accepted the enhancement request for possession but rejected the request for the obstruction of justice.

In accepting the request for an enhancement for possession, the district court reasoned Buckley's briefcase appeared to be the bomb mentioned in his note. Also, the district court did not believe Buckley's denial of possession of the BB gun. In rejecting the request for an enhancement for obstruction of justice,

EXHIBIT  PAGE  of

D  6  8

the district court reasoned Buckley's lie was immaterial since the enhancement for possession had been accepted on alternative grounds (i.e., the briefcase). Moreover, the district court applied a sentencing reduction for acceptance of responsibility since Buckley had pled guilty and the district court found no obstruction of justice.

On appeal, the Seventh Circuit held, when a violation charged as obstruction consists of a lie, the materiality of the lie is key since immaterial lies do not impede the justice process.  Materiality means a reasonable probability the lie could have affected the outcome of the process.  The court reasoned, since the district court could have believed Buckley's lie and could also have found the briefcase did not resemble a dangerous weapon, the outcome of the process could have been affected in Buckley's favor and the enhancement for possession could have been avoided.  Buckley's denial of possession, therefore, was a material lie constituting obstruction and the enhancement for obstruction should have been applied. Further, since Buckley did attempt to obstruct justice, he did not exhibit acceptance of responsibility and the district court should not have applied the acceptance of responsibility reduction.

-7-

EXHIBIT | PAGE | of

D | 7 | 8

CRIMINAL TAX BULLETIN

TABLE OF CASES

DECEMBER 1999

**SUPREME COURT CASES**

Flippo v. West Virginia, 120 S.Ct. 7 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**TITLE 26 AND TITLE 26 RELATED CASES**

United States v. McKee,192 F.3d 535 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**SEARCH AND SEIZURE**

United States v. Kyllo, 190 F.3d 1041 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**OTHER CONSTITUTIONAL ISSUES**

United States v. Plitman, No. 99-1177, 1999 U.S. App. LEXIS 24289 (2nd Cir. Sept. 30, 1999) . . . . . . . . . . . . . 3

United States v. Albanese, 99-1078, 1999 U.S. App. LEXIS 24652 (8th Cir. Oct. 5, 1999) . . . . . . . . . . . . . . . . . 3

**PROCEDURE**

United States v. Colorado Supreme Court, 189 F.3d 1281(10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Securities and Exchange Commission v. Monarch Funding Corp., 192 F.3d 295 (2nd Cir.1999) . . . . . . . . . . . . 4

**Evidence**

Spicer v. Roxbury Correctional Institute, No. 99-61197, 1999 U.S. App. LEXIS 25826 (4th Cir. Oct. 18, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

California Attorneys for Criminal Justice v. Butts, Nos. 97-56499, 97-56510, 1999 U.S. App. LEXIS 29309 (9th Cir. Nov. 8, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**INVESTIGATIVE TECHNIQUES**

United States v. Albanese, 99-1078, 1999 U.S. App. LEXIS 24652 (8th Cir. Oct. 5, 1999) . . . . . . . . . . . . . . . . . 6

**SENTENCING**

United States v. Buckley, 192 F.3d 708 (7th Cir 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Department of the Treasury
**Internal Revenue Service**
Document 10023 (Rev. 12-1999)
Catalog Number 24304B

- 8 -

EXHIBIT D PAGE 8 of 8

VERIFIED AFFIDAVIT IN SUPPORT OF MOVE
FOR FAIR AND IMPARTIAL HEARING

Nadine J. Griffin,
CASE NO. 1:05-CR-10175-WGY

# EXHIBIT E — 7 pages

MAG

# United States District Court
## District of Massachusetts (Boston)
## CRIMINAL DOCKET FOR CASE #: 1:05-cr-10175-WGY-ALL

Case title: USA v. Griffin

Date Filed: 07/13/2005

Assigned to: Judge William G. Young

## Defendant

**Nadine J Griffin** (1)

represented by **Nadine J Griffin**
13799 Park Blvd. North
#244
Seminole, FL 33776-3402
PRO SE

**James B. Krasnoo**
23 Main Street
Terrace Level
Andover, MA 01810
978-475-9955
Fax: 978-474-9005
Email: james@krasnoolaw.com
*TERMINATED: 07/20/2005*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

## Pending Counts

26;7206(1)-FILING FALSE INCOME
TAX RETURNS
(1-2)

**Disposition**

## Highest Offense Level (Opening)

Felony

## Terminated Counts

**Disposition**

None

## Highest Offense Level (Terminated)

None

| EXHIBIT | PAGE | of |
|---------|------|-----|
| *E* | *I* | *7* |

## Complaints

**Disposition**

None

## Plaintiff

**USA**

represented by **Christopher Maietta**
U.S. Dept. of Justice, Tax Division
601 D Street, NW
Room 7012
Washington, DC 20004
202-514-4661
Fax: 202-514-9623
Email:
Christopher.J.Maietta@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/13/2005 | 1 | INDICTMENT as to Nadine J Griffin (1) count(s) 1-2. (Diskes, Sheila) (Entered: 07/13/2005) |
| 07/13/2005 | 2 | Judge William G. Young : ORDER entered. ORDER REFERRING CASE to Magistrate Judge Joyce London Alexander Reason for referral: Bail and Arraignment Only as to Nadine J Griffin (Diskes, Sheila) (Entered: 07/13/2005) |
| 07/15/2005 | | Summons Issued as to Nadine J Griffin Arraignment set for 7/27/2005 04:00 PM in Courtroom 24 before Magistrate Judge Joyce London Alexander.(Miner, Valencia) (Entered: 07/15/2005) |
| 07/19/2005 | 3 | First MOTION to Withdraw as Attorney by James B. Krasnoo. as to Nadine J Griffin. (Krasnoo, James) (Entered: 07/19/2005) |
| 07/20/2005 | | Judge William G. Young : Electronic ORDER entered granting 3 Motion For James B. Krasnoo to Withdraw as Attorney as to Nadine J Griffin (1). cc/cl. (Bell, Marie) (Entered: 07/21/2005) |
| 07/20/2005 | | Attorney update in case as to Nadine J Griffin. Attorney James B. Krasnoo terminated. (Bell, Marie) (Entered: 07/21/2005) |
| 07/21/2005 | 4 | NOTICE OF APPEARANCE Pro Se by Nadine J Griffin. c/s. (Bell, Marie) (Entered: 07/22/2005) |
| 07/21/2005 | 5 | EMERGENCY MOTION to Continue Arraignment as to Nadine J Griffin. c/s.. (Bell, Marie) (Entered: 07/22/2005) |
| 07/21/2005 | 6 | MOTION to Quash Indictment as to Nadine J Griffin. c/s.(Bell, Marie) (Entered: 07/22/2005) |
| 07/21/2005 | 7 | BRIEF in Support by Nadine J Griffin re 6 MOTION to Quash Indictment. c/s. (Bell, Marie) (Entered: 07/22/2005) |

EXHIBIT PAGE of

*E*   2   7



| 07/21/2005 | 8 | Objection to Arraignment by Magistrate Judge: No Consent Given as to Nadine J Griffin. c/s. (Bell, Marie) (Entered: 07/22/2005) |
| 07/21/2005 | 9 | AFFIDAVIT of Nadine J. Griffin in Support of 8 Objection To Arraignment by Magistrate Judge. c/s. (Bell, Marie) (Entered: 07/22/2005) |
| 07/21/2005 | 10 | MANDATORY JUDICIAL NOTICE by Nadine J Griffin (Bell, Marie) (Entered: 07/22/2005) |
| 07/25/2005 | | Judge William G. Young : Electronic ORDER entered as to Nadine J Griffin re 10 Mandatory Judicial Notice (Other) filed by Nadine J Griffin. TREATED AS A MOTION TO TAKE JUDICIAL NOTICE, MOTION DENIED AS THE COURT CANNOT TAKE NOTICE OF ADJUDICATORY FACTS. FED. R. EVID. 201. cc/cl. (Bell, Marie) (Entered: 07/26/2005) |
| 07/26/2005 | | Judge William G. Young : Electronic ORDER entered denying 5 Motion to Continue Arraignment as to Nadine J Griffin (1) (Smith, Bonnie) (Entered: 07/26/2005) |
| 07/26/2005 | | Return receipt received for mail sent to Nadine J. Griffin Delivered on 7/19/05 as to Nadine J Griffin (Bell, Marie) (Entered: 07/26/2005) |
| 07/27/2005 | | Electronic Clerk's Notes for proceedings held before Judge Joyce London Alexander: Initial Appearance held on 7/27/2005. Defendant is SWORN. Def't indicates that she cannot afford an attorney but would like to proceed pro se today. Tim Watkins is in courtroom and indicates he has spoken to def't. Def't indicates that she does not want a court appointed attorney. Court continues to August 11, 2005 @ 3:00 P.M. so that Ms. Griffin may retain an attorney. Max penalties are read to Def't. Court sets conditions of release. Def't is released on $5,000.00 unsecured bond. (Digital Recording.) (Russo, Noreen). (Entered: 07/27/2005) |
| 07/27/2005 | | SET Hearings as to Nadine J Griffin: Arraignment CONTINUED to 8/11/2005 @ 03:00 PM in Courtroom 24 before Magistrate Judge Joyce London Alexander. (Miner, Valencia) (Entered: 07/28/2005) |
| 07/27/2005 | 11 | Magistrate Judge Joyce London Alexander : ORDER entered. ORDER Setting Conditions of Release as to Nadine J. Griffin (Miner, Valencia) Additional attachment(s) added on 8/11/2005 (Miner, Valencia). (Entered: 07/29/2005) |
| 07/27/2005 | 12 | Appearance Bond Entered as to Nadine J Griffin in amount of $ $5,000 (Unsecured). (Miner, Valencia) Additional attachment(s) added on 8/11/2005 (Miner, Valencia). (Entered: 07/29/2005) |
| 08/04/2005 | 13 | Complaint of Judicial Misconduct or Disability by Nadine J Griffin. c/s. (Bell, Marie) Additional attachment(s) added on 8/5/2005 (Bell, Marie). (Entered: 08/05/2005) |
| 08/04/2005 | 14 | MOTION to Vacate Re-Characterization of Judicial Notice by William G. Young as to Nadine J Griffin. c/s. (Bell, Marie) (Entered: 08/05/2005) |

| | EXHIBIT | PAGE | of |
| | 3 | 7 |

| 08/04/2005 | 15 | MOTION to Vacate Minute Order Issued by Magistrate Joyce London Alexanderas to Nadine J Griffin. (Bell, Marie) (Entered: 08/05/2005) |
|---|---|---|
| 08/04/2005 | 16 | NOTICE of Intent to Proceed Pursuant to the U.S. Constitution at Amendment VI and IX Regarding the Qui Tam Action Pending Against Defendant by Nadine J Griffin. c/s. (Bell, Marie) (Entered: 08/05/2005) |
| 08/04/2005 | 17 | AFFIDAVIT of Nadine J. Griffin In Support of 16 Notice of Intent filed by Nadine J Griffin, (Bell, Marie) (Entered: 08/05/2005) |
| 08/11/2005 | | Electronic Clerk's Notes for proceedings held before Judge Joyce London Alexander : John Mc Adams for Gov't, N. Griffin, Pro Se. Arraignment as to Nadine J Griffin (1) Count 1-2 held on 8/11/2005, Plea not entered by Deft. Gov't requests that the Court inform the deft of possible waiver of her 6th Amend. right to counsel by proceeding pro se. Ms. Griffin indicates that she is knowingly and intelligently waiving her 6th Amend. right. Ms. Griffin indicates that she still would like to proceed pro se. Court indicates that at 7/27/2005 hearing Ms. Griffin indicated that she would like to speak with an attorney and Court informed her of the consequences of proceeding pro se. Ms. Griffin returns today and indicates she would like to proceed pro se. Max Penalties are read to the Deft by the Gov't. Deft indicates she is not ready to be arraigned at this hearing but indicates she belives USMJ Alexander does not have jursidiction for Arraignment proceeding. Court notes defts objection and enters a plea of NOT GUILTY on Ms. Griffin's behalf and sends case back to District Court Judge. (Digital Recording.) (Russo, Noreen) Modified on 8/12/2005 (Russo, Noreen). (Entered: 08/11/2005) |
| 08/11/2005 | 18 | MOTION to Under Authority of F.R.Cr.P.12(b)(2) as to Nadine J Griffin. c/s.(Bell, Marie) (Entered: 08/12/2005) |
| 08/11/2005 | 19 | NOTICE and Demand by Nadine J Griffin re 18 MOTION to Dismiss. c/s. (received for docketing 8/18/05) (Bell, Marie) (Entered: 08/19/2005) |
| 08/12/2005 | | Notice of correction to docket made by Court staff. Correction: to clarify clerknote from 8/11/05 hearing regarding jursidictional issue objection as to Nadine J Griffin (Russo, Noreen) (Entered: 08/12/2005) |
| 08/18/2005 | | Judge William G. Young : Electronic ORDER entered denying 14 Motion to Vacate Re-Characterization of Judicial Notice by William G. Young as to Nadine J Griffin (1). cc/cl. (Bell, Marie) (Entered: 08/19/2005) |
| 08/22/2005 | 20 | RESPONSE to Motions by USA as to Nadine J Griffin re 18 MOTION to Dismiss, 5 MOTION to Continue to Arraignment, 6 MOTION to Quash Indictment/Information, 14 MOTION to Vacate, 15 MOTION to Vacate. c/s. (Bell, Marie) (Entered: 08/25/2005) |
| 08/23/2005 | | Judge William G. Young : Electronic ORDER entered denying 18 Motion to Dismiss as to Nadine J Griffin (1). cc/cl. (Bell, Marie) (Entered: 08/23/2005) |
| 08/26/2005 | | Case as to Nadine J Griffin no longer referred to Magistrate Judge Joyce |

EXHIBIT    PAGE    of

E    4    7

| | | London Alexander. (JLA, int1) (Entered: 08/26/2005) |
|---|---|---|
| 09/06/2005 | 21 | Response as to Nadine J Griffin to 20 Response to Motions filed by USA,and Objection to a Faretta Hearing Prior to Jurisdiction being Established. c/s. (Bell, Marie) (Entered: 09/08/2005) |
| 09/08/2005 | | Judge William G. Young : Electronic ORDER entered denying 6 Motion to Quash Indictment/Information as to Nadine J Griffin (1); denying 15 Motion to Vacate as to Nadine J Griffin (1). cc/cl. (Bell, Marie) (Entered: 09/08/2005) |
| 09/12/2005 | 22 | NOTICE OF HEARING as to Nadine J Griffin Scheduling Conference and Faretta hearing set for 9/27/2005 02:00 PM in Courtroom 18 before Chief Judge William G. Young. (Smith, Bonnie) (Entered: 09/12/2005) |
| 09/20/2005 | 23 | United States' Opposition as to Nadine J Griffinre: 21 Response (Dated September 6, 2005. c/s. (Bell, Marie) (Entered: 09/21/2005) |
| 09/27/2005 | | ElectronicClerk's Notes for proceedings held before Judge William G. Young :Defendant is present and is representing herself. The Court advises the defendant of the complexities of defending herself and inquires as to whether the defendant wants to continue representing herself. Defendant waives her right to counsel. Trial set for May 1, 2006. The Court Orders the time between 9/27/05 and 5/1/06 excluded. Defendant files a Motion to Dismiss the indictment. The Court Denies the motion as it applies to the Speedy Trial Act and takes Under Advisement the remainder of the motion. The Government has 14 days to file a response. Due to the Defendant objecting to a Magistrate Judge arraigning her, the Court arraigns the defendant and the Court enters a plea of Not Guilty for the defendant who refuses to answer. Scheduling Conference as to Nadine J Griffin held on 9/27/2005 Scheduling Order to issue. (Court Reporter Womack.) (Smith, Bonnie) (Entered: 09/28/2005) |
| 09/27/2005 | 24 | Judge William G. Young : ElectronicORDER entered. SCHEDULING ORDER as to Nadine J Griffin Jury Trial set for 5/1/2006 09:00 AM in Courtroom 18 before Chief Judge William G. Young.Final Pretrial Conference set for 4/3/2006 02:00 PM in Courtroom 18 before Chief Judge William G. Young. (Smith, Bonnie) (Entered: 09/28/2005) |
| 09/27/2005 | 25 | MOTION to Dismiss For Violation of the Sixth Amendment to the Constitution and Speedy Trial as to Nadine J Griffin. c/s.(Bell, Marie) (Entered: 09/28/2005) |
| 09/27/2005 | 26 | DECLARATION in Support by Nadine J Griffin re 25 MOTION to Dismiss For Violation of the Sixth Amendment and Speedy Trial. c/s. (Bell, Marie) (Entered: 09/28/2005) |
| 09/27/2005 | 27 | MOTION to Strike 23 Opposition to Defendant's Response Date 9/6/05. as to Nadine J Griffin. c/s.(Bell, Marie) (Entered: 09/28/2005) |
| 09/27/2005 | | Motions terminated as to Nadine J Griffin: 25 MOTION to Dismiss on Speedy Trial filed by Nadine J Griffin,. (Smith, Bonnie) (Entered: 10/05/2005) |

| EXHIBIT | PAGE | |
|---|---|---|
| E | 5 | 7 |

| 09/30/2005 | | Judge William G. Young : ElectronicORDER entered denying 27 Motion to Strike as to Nadine J Griffin (1). cc/cl. (Bell, Marie) (Entered: 10/03/2005) |
| 10/06/2005 | 28 | MOTION for Bill of Particulars Under the Fifth and Sixth Amendment to the U.S. Constitution as to Nadine J Griffin. c/s(Bell, Marie) (Entered: 10/07/2005) |
| 10/06/2005 | 29 | AFFIDAVIT in Support by Nadine J Griffin re 28 MOTION for Bill of Particulars (Attachments: # 1 Exhibit)(Bell, Marie) (Entered: 10/07/2005) |
| 10/11/2005 | 30 | RESPONSE to Motion by USA as to Nadine J Griffin re 25 MOTION to Dismiss on Speedy Trial (Maietta, Christopher) (Entered: 10/11/2005) |
| 10/13/2005 | | Judge William G. Young : ElectronicORDER entered re: 28 Motion for Bill of Particulars as to Nadine J Griffin (1).MOTION ALLOWED TO THE EXTENT OF REQUIRING THE GOVERNMENT, WITHIN 10 DAYS OF THE DATE OF THIS ORDER, TO PARTICULARIZE ANY FACT WHICH IT CONTENDS WOULD RAISE THE BASE OFFENSE LEVEL OF THIS OFFENSE UNDER THE UNITED STATES SENTENCING GUIDELINES. MOTION OTHERWISE DENIED. cc/cl. (Bell, Marie) (Entered: 10/13/2005) |
| 10/14/2005 | 31 | AFFIDAVIT in Support of 28 MOTION for Bill of Particulars by Nadine J Griffin (Bell, Marie) (Entered: 10/17/2005) |
| 10/14/2005 | 32 | AFFIDAVIT of Fact Regarding Hearing Before Judge William G. Young on 9/27/05 by Nadine J Griffin (Bell, Marie) (Entered: 10/17/2005) |
| 10/24/2005 | 33 | RESPONSE TO COURT ORDER by USA as to Nadine J Griffin (Maietta, Christopher) (Entered: 10/24/2005) |
| 10/25/2005 | 34 | REPLY TO RESPONSE to Motion by Nadine J Griffin re 25 MOTION to Dismiss on Speedy Trial (Patch, Christine) (Entered: 10/25/2005) |
| 10/25/2005 | 35 | Declaration of Nadine J. Griffin in Support 34 Reply to Response to Motion to Dismiss, filed by Nadine J Griffin, (Patch, Christine) (Entered: 10/25/2005) |
| 10/28/2005 | | Judge William G. Young : ElectronicORDER entered. as to Nadine J Griffin re 34 Reply to Response filed by Nadine J Griffin,, 35 Affidavit filed by Nadine J Griffin, "The motion to dismiss on the ground of violating the Speedy Trial Act is denied. Properly calculated, only 18 days have thus far elapsed under the Speedy Trial Act." (Smith, Bonnie) (Entered: 10/28/2005) |
| 10/28/2005 | 36 | Response as to Nadine J Griffin: 31 Affidavit in Support of Motion filed by Nadine J Griffin,, 32 Affidavit filed by Nadine J Griffin,. (Maietta, Christopher) (Entered: 10/28/2005) |
| 11/04/2005 | 37 | MOTION to Travel to New Hampshire as to Nadine J Griffin. c/s(Bell, Marie) (Entered: 11/10/2005) |
| 11/12/2005 | 38 | RESPONSE to Motion by USA as to Nadine J Griffin re 37 MOTION to |

EXHIBIT E  PAGE 6 of 7

|            |    |                                                                                                                                                                                                                                                                                                                                                                 |
|------------|----|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            |    | Travel (Maietta, Christopher) (Entered: 11/12/2005)                                                                                                                                                                                                                                                                                                              |
| 11/15/2005 | 39 | NOTICE of Alibi Defense by Nadine J Griffin. c/s. (Bell, Marie) (Entered: 11/15/2005)                                                                                                                                                                                                                                                                            |
| 11/15/2005 | 40 | NOTICE of Entrapment by Estoppel Defense by Nadine J Griffin. c/s. (Bell, Marie) (Entered: 11/15/2005)                                                                                                                                                                                                                                                           |
| 11/15/2005 |    | Judge William G. Young : Electronic ORDER entered granting 37 Motion to Travel as to Nadine J Griffin (1). cc/cl. (Bell, Marie) (Entered: 11/15/2005)                                                                                                                                                                                                            |
| 11/28/2005 | 41 | Response as to Nadine J Griffin: 39 Notice (Other) filed by Nadine J Griffin,, 40 Notice (Other) filed by Nadine J Griffin,. (Maietta, Christopher) (Entered: 11/28/2005)                                                                                                                                                                                         |
| 01/06/2006 | 42 | TRANSCRIPT of Initial Appearance as to Nadine J Griffin held on July 25, 2005 before Judge Alexander. Digital Recording: Transcribed by Maryann Young. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting Maryann Young at 508/384-2003 or the Clerk's Office. (Scalfani, Deborah) (Entered: 01/06/2006) |

| PACER Service Center                                           |
|----------------------------------------------------------------|
| **Transaction Receipt**                                        |
| 01/17/2006 14:48:47                                            |

| PACER Login: | ch1822        | Client Code:     | NJG                    |
|--------------|---------------|------------------|------------------------|
| Description: | Docket Report | Search Criteria: | 1:05-cr-10175-WGY      |
| Billable Pages: | 4          | Cost:            | 0.32                   |

| EXHIBIT | PAGE | of |
|---------|------|----|
| E       | 7    | 7  |

# EXHIBIT F — 25 pages

1
2
3

```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS

                                         Criminal No.
                                         05-10175-WGY
```

4
5
6
7
8
9

```
* * * * * * * * * * * * * * * *
                               *
UNITED STATES OF AMERICA       *
                               *
v.                             *   SCHEDULING CONFERENCE
                               *     and ARRAIGNMENT
NADINE J. GRIFFIN              *
                               *
* * * * * * * * * * * * * * * *
```

10
11

12
13

```
            BEFORE:  The Honorable William G. Young,
                          District Judge
```

14
15
16

```
APPEARANCES:
```

17
18

```
        CHRISTOPHER J. MAIETTA, Trial Attorney,
   U.S. Department of Justice, Tax Division,
   601 D Street, NW, Room 7012, Washington, D.C.
   20004, on behalf of the Government
```

19
20
21

```
        NADINE J. GRIFFIN, Pro Se, 13799 Park
   Boulevard North, #244, Seminole, Florida
   33776-3402
```

22
23
24
25

```
                              1 Courthouse Way
                              Boston, Massachusetts

                              September 27, 2005
```

| EXHIBIT | PAGE | of |
|---------|------|-----|
| F | 1 | 25 |

1          **THE CLERK:**  All rise.  Court is in session, please
2     be seated.

3          Calling Criminal Action No. 05-10175, the United
4     States v. Nadine Griffin.

5          **THE COURT:**  Good afternoon.  Would the parties
6     introduce themselves.

7          **MR. MAIETTA:**  Good afternoon, your Honor.  Chris
8     Maietta on behalf of the United States.

9          **MS. GRIFFIN:**  Good afternoon, your Honor.  Nadine
10    Griffin, Pro Se, on behalf of myself.

11         **THE COURT:**  Let's start with that.

12         Ms. Griffin, you have a constitutional right to
13    represent yourself.

14         **MS. GRIFFIN:**  Right.

15         **THE COURT:**  To, to be in absolute command of your
16    own defense at all stages of this proceeding.  It's my duty
17    to inform you of that right, but more than that, to enforce
18    the right, to make sure it's real, that I hear you as I
19    would hear a lawyer at every stage of the proceeding.

20         Now, having said that --

21         **MS. GRIFFIN:**  Uh-huh.

22         **THE COURT:**  -- it's also my duty and my
23    responsibility, my, my experience now with 28 years being a
24    judge, that people who represent themselves are making a big
25    mistake.  This is a very serious matter.  The government

| EXHIBIT | PAGE | of |
|---------|------|-----|
| F | 2 | 25 |

1    has -- of course, as you sit there now you're innocent, but

2    you're facing a criminal prosecution which can have various

3    consequences.

4           You know that if you were unable for financial

5    reasons to get counsel, I'll appoint counsel for you.  And

6    if you have the financial wherewithal to hire a counsel, I

7    strongly advise you to get a lawyer here and have a lawyer

8    familiar with the defense of criminal matters handle your

9    matters.

10          So, let me start, do you understand these things?

11          **MS. GRIFFIN:**  I want to thank you, your Honor.

12    Because I am before you today, I've requested to be in front

13    of you since July 21st.  I do understand my constitutional

14    rights.  I do understand the consequences of being pro se.

15    But I want to thank you for taking the time to point out

16    everything to me.  I really do.  But I must proceed pro se

17    at this time.

18          **THE COURT:**  Well, that's your right.

19          **MS. GRIFFIN:**  Right.

20          **THE COURT:**  Let's just talk practically now about

21    what's going to happen and make sure you understand other

22    things.

23          **MS. GRIFFIN:**  Okay.

24          **THE COURT:**  My job, as it is in every case, is to

25    be scrupulously neutral.  I have dealt with situations like

| EXHIBIT | PAGE | of |
|---------|------|-----|
| F | 3 | 25 |

1    this, and so I think I can tell you where there's a

2    procedural issue, where the rules of court say you've got to

3    do this by this time or don't you want to argue this, I'll

4    see to it, as best I can, that all those procedural rules

5    are understood by you.  But I cannot and I will not cut you

6    any slack.

7         **MS. GRIFFIN:**  Uh-huh.

8         **THE COURT:**  In the sense you're pro se and so

9    somehow we're going to treat this different than any other

10   case.  The fact is we'll treat it just like we treat any

11   other case, which is fairly and impartially, and I'll be,

12   I'll try to be sure you understand everything about the

13   procedure.  But you say you want to represent yourself,

14   correct?

15        **MS. GRIFFIN:**  Thank you.  Yes.

16        **THE COURT:**  And you understand what I just

17   explained to you?

18        **MS. GRIFFIN:**  Yes.

19        **THE COURT:**  All right.  Now, what more I want to do

20   today is, I want to create a scheduling order and I will do

21   it and we'll reduce it to writing.  And you can be heard on

22   each one of these things.

23        The second thing I want to do is I want to discuss

24   functionally -- you moved to, you tried to stop these

25   proceedings at the outset.

| EXHIBIT | PAGE | of |
|---------|------|-----|
| F | 4 | 25 |

```
1        MS. GRIFFIN:  I would like to explain that if I
2   could at this time.
3        THE COURT:  Well, we'll get to that.  Just
4   understand that's second.
5        MS. GRIFFIN:  Okay.
6        THE COURT:  So now first, a scheduling order.  The
7   way I do a scheduling order is pick a time for the trial and
8   then I work back from the time for the trial.
9        MS. GRIFFIN:  Okay.
10       THE COURT:  And I exclude the days that we now pick
11  for the trial from the running of the Speedy Trial Act.  One
12  of the rights you have is to be brought to trial within a
13  certain period.  But usually, in most cases, defendants want
14  a longer time and the government wants a longer time.  And
15  so, that's what I'm going to ask first -- wait a second.
16  We're just talking the schedule now.
17       MS. GRIFFIN:  Okay.
18       THE COURT:  And the schedule ends with the trial.
19       So when does the government want to go to trial?
20       MR. MAIETTA:  Your Honor --
21       MS. GRIFFIN:  I have to give this to you, your
22  Honor.  It was filed before I came in.  I gave it to the
23  clerk.
24       THE COURT:  I'm happy it receive it.
25       MS. GRIFFIN:  I apologize.
```

| EXHIBIT | PAGE | of |
|---------|------|-----|
| F | 5 | 25 |

```
1              THE COURT:  Mr. Maietta, when do you want to go to
2     trial?
3              MR. MAIETTA:  Your Honor, we would, the government
4     would be ready for trial March of next year.
5              THE COURT:  March of next year.
6              Now, when do you want to go to trial, Ms. Griffin?
7              MS. GRIFFIN:  I would like to discuss at this time
8     the Speedy Trial Act.  I believe that my first appearance in
9     court was the 27th.
10             THE COURT:  Of?
11             MS. GRIFFIN:  Of July.  And according to the Speedy
12    Trial Act this Court, the prosecution has 70 days to give me
13    a trial date.
14             THE COURT:  That's right.  So the 27th of July,
15    27th of August, 27th of September.  We've got --
16             MS. GRIFFIN:  Seventy days.
17             THE COURT:  -- to give you a trial right away --
18             MS. GRIFFIN:  Thirty days to prepare.
19             THE COURT:  -- under your, under your calculus.
20             MS. GRIFFIN:  According to the law that I'm
21    reading.
22             THE COURT:  When do you want to go, when do you
23    want to go to trial?
24             MS. GRIFFIN:  I do not want to go to trial but I --
25             THE COURT:  Well, I know that.  Please try to
```

| EXHIBIT | PAGE | of |
|---------|------|-----|
| F | 6 | 25 |

```
 1    listen to my questions.  I know you don't want to go to
 2    trial.  And one of the things I thought would be
 3    interesting, because I've never -- I've seen these arguments
 4    that the law under which you're being prosecuted is
 5    unconstitutional.  Candidly, I've never had one of them.
 6    Now I do.
 7             MS. GRIFFIN:  I didn't say the tax laws were
 8    unconstitutional.
 9             THE COURT:  Well, I'll entertain whatever it is you
10    do say.  But I want to wait -- I want to get my schedule
11    first.
12             MS. GRIFFIN:  Okay.  Could I speak on the schedule,
13    Judge?
14             THE COURT:  Yes, suppose you lose that.  You lose
15    your motion to dismiss.  When do you want to go to trial?
16             MS. GRIFFIN:  Could I please read this first, your
17    Honor?
18             THE COURT:  I can read.
19             MS. GRIFFIN:  I, I sent that in front of you.  I
20    would like for the record to read it for the Court.  I mean
21    no disrespect.
22             THE COURT:  It's in the record.
23             MS. GRIFFIN:  According to Title 18 --
24             THE COURT:  It's in the record.
25             MS. GRIFFIN:  -- 3161 --
```

EXHIBIT  PAGE  of

F   7   25

1          **THE COURT:**  MS. Griffin, either you're going to

2     listen to me or we'll, we'll --

3          **MS. GRIFFIN:**  I'm going by the law, your Honor.

4          **THE COURT:**  -- decide these things without your

5     listening to me.  It's in the record because you filed it.

6     It's part of the record.

7          **MS. GRIFFIN:**  Right.  I --

8          **THE COURT:**  I will be sure that it's part of the

9     record.

10         My question is, when do you want to go to trial?

11    You?

12         **MS. GRIFFIN:**  I cannot, I cannot answer that

13    question at this time, your Honor, based on the law.  The

14    only remedy of being outside of the time line of the Speedy

15    Trial Act is dismissal on motion of the defendant unless the

16    Speedy Trial Act has been abolished and I'm not aware of it.

17         **THE COURT:**  I'll set this case for trial in ten        ←

18    days.  Do you want to go to trial then?

19         **MS. GRIFFIN:**  No, your Honor, I would like you --

20         **THE COURT:**  You've got to listen to what I say.

21         **MS. GRIFFIN:**  I am listening to you.

22         **THE COURT:**  Just tell me when.

23         **MS. GRIFFIN:**  I do not want to set a trial date.  I

24    cannot set a trial date based on the law.

25         **THE COURT:**  No.  I'm sorry.  If you're going to

EXHIBIT  PAGE    of

F    8    25

```
1    insist on your rights under the speedy trial, naturally,
2    I'll vindicate them.  If you want what I would think would
3    be a more reasonable trial date, I'll vindicate that.  But
4    that's where we're starting.
5           When do you want to go to trial?  You've got to
6    assume that these, these intermediate motions are denied.
7    I'm not saying they'll be denied, but assume they're denied.
8    Get your mind around that.
9           When do you want to go to trial?  You?
10          MS. GRIFFIN:  Mr. Maietta said March of next year?
11          THE COURT:  That's what he's, he's--
12          MS. GRIFFIN:  I object to answering this question,
13   all right, for the record, but I will answer it.
14          THE COURT:  Thank you.  And that's, that's a good
15   way to proceed.
16          MS. GRIFFIN:  Okay.
17          THE COURT:  You may always say that and I will
18   always respect it.  But I do --
19          MS. GRIFFIN:  Thank you.
20          THE COURT:  -- insist upon an answer.  And you have
21   objected and your rights are saved.  When?
22          MS. GRIFFIN:  June of next year.
23          THE COURT:  No.  March of next year.  So, then the
24   time between now and March is excluded from the Speedy Trial
25   Act.  And we'll let the clerk propose a specific date.
```

| EXHIBIT | PAGE | of |
|---------|------|-----|
| F | 9 | 25 |

1          **THE CLERK:**  March 6th.

2          (Whereupon the Court and the Clerk conferred.)

3          **THE CLERK:**  Monday, March 6th.

4          **MR. MAIETTA:**  Your Honor, we could, the government

5     is available for trial in April or May.  If the Court wants

6     to move it to that day, if that's what the defendant wishes

7     for the time, the government would not oppose that.

8          **THE COURT:**  Well, all right, let's go to April

9     then.  Which do you, which do you prefer, April or May?  I

10    thank you for trying to accommodate her.  This is the

11    tentative trial date.

12         **MR. MAIETTA:**  Right.

13         **THE COURT:**  But I'm excluding the time from the

14    running of the Speedy Trial Act, subject to her opposition.

15    But now that I have a date, I'm going to work back from that

16    date.

17         **MR. MAIETTA:**  Let's go with May then.

18         **THE COURT:**  May.  The clerk will --

19         **MR. MAIETTA:**  Thank you.

20         **THE CLERK:**  May 1st.

21         **THE COURT:**  -- suggest -- May 1st, 2006, this case

22    is tentatively set for trial.  The time between now and then

23    is excluded from the running of the Speedy Trial Act.

24         Now, now let me move to this motion to dismiss.

25    Insofar as you move to dismiss for a violation of the Speedy

| EXHIBIT | PAGE | of |
|---------|------|-----|
| F | 10 | 25 |

```
 1    Trial Act, the motion is denied without hearing.  To the
 2    extent you move to dismiss for a violation of the Sixth
 3    Amendment, I will, I will hear that motion -- I will
 4    entertain that motion.  I'm not clear whether I'm going to
 5    give it an oral hearing, but I'll entertain it.  And under
 6    the rules, Mr. Maietta, it's filed today, you have 14 days
 7    to respond.  Is that satisfactory?
 8             MR. MAIETTA:  Yes, your Honor.
 9             THE COURT:  Very well.
10             THE CLERK:  You have to set a final pretrial
11    conference.
12             THE COURT:  Well, I'm not going to give an oral
13    hearing as to --
14             THE CLERK:  No, I said a final pretrial conference.
15             THE COURT:  Oh, I'm going to do that.  Let me do
16    that.
17             Now, working back from the 1st of May, I'm just
18    working back now, if the trial is going to be on May 1,
19    we're going to set the final pretrial conference for the
20    afternoon of April 1 if that's a, a business day.
21             THE CLERK:  No.  How about Monday, April 3rd.
22             THE COURT:  Monday, April 3rd at 2:00 p.m.  And
23    Ms. Griffin, you're supposed to be here then.
24             MS. GRIFFIN:  Uh-huh.
25             THE COURT:  The only other thing I need to do
```

| EXHIBIT | PAGE | of |
|---------|------|-----|
| F | 11 | 25 |

| | |
|---|---|
| 1 | today, we've now got a schedule for the entertaining of your |
| 2 | motion to dismiss, but there may be other substantive |
| 3 | motions, a motion to suppress or other motions of any sort. |
| 4 | And I would propose to give you as much time as this |
| 5 | schedule allows to deal with those, and I would propose that |
| 6 | you must file your substantive motions no later than |
| 7 | March 1, 2006, and the response by the government by |
| 8 | March 15, 2006. |
| 9 | And we'll start with you, Ms. Griffin, is that |
| 10 | satisfactory? |
| 11 | **MS. GRIFFIN:**  Yes. |
| 12 | **THE COURT:**  And Mr. Mierra, is that satisfactory? |
| 13 | **MR. MAIETTA:**  Yes, your Honor. |
| 14 | **THE COURT:**  Maietta, excuse me. |
| 15 | **MR. MAIETTA:**  Maietta. |
| 16 | **THE COURT:**  Maietta. |
| 17 | **MR. MAIETTA:**  Thank you. |
| 18 | **THE COURT:**  Very well.  So that's the initial |
| 19 | scheduling order.  If I decide to give an oral hearing to |
| 20 | Ms. Griffin's motion to dismiss, I will notify you both of |
| 21 | when that hearing will take place. |
| 22 | Is there anything else to be brought up today?  Mr. |
| 23 | Maietta? |
| 24 | **MR. MAIETTA:**  None from the government, your Honor. |
| 25 | But I do want to let you know that I did file an automatic |

EXHIBIT  PAGE  of

F  12  25

1   discovery letter with Ms. Griffin on the 8th of, or the 7th
2   of September and I have set forth an explanation of the
3   discovery material I had sent to her. I just want to note
4   that for your Honor.

5           **THE COURT:**  And, Ms. Griffin, anything else that
6   you would like to raise?

7           **MS. GRIFFIN:**  Yes, I would like to raise a couple
8   of issues, your Honor, and I hope you don't mind.

9           I do fly all the way from Florida to be here and
10  this is my third time in this courtroom.

11          I wanted to address the fact that I have been
12  filing in the briefs that I have sent to you that I do
13  receive, and I have the indictment in front of me, granted
14  I'm not an expert, but based on the law and everything that
15  I've studied and the friends that I have that I work with, I
16  seem to look at this indictment, which is three pages -- and
17  I have been told that you can indict a ham sandwich, but now
18  I guess you really can. Because there is no factual
19  sufficiency to this indictment, your Honor.

20          **THE COURT:**  There doesn't -- well --

21          **MS. GRIFFIN:**  Have you seen the indictment?

22          **THE COURT:**  I have. I've got it right here. The
23  indictment simply has to make allegations that fall within
24  the four corners of the governing statute. The, the usual
25  procedural response to an indictment that is not specific

EXHIBIT  PAGE    of

F    13   25

| 1  | enough is to move for a bill of particulars. |
|---|---|
| 2  | **MS. GRIFFIN:**   Uh-huh. |
| 3  | **THE COURT:**   I was taught as a judge that usually |
| 4  | you deny a motion for a bill of particulars.  And today, |
| 5  | though you may quarrel with it, in this court especially we, |
| 6  | we have as good discovery rules for a defendant as any |
| 7  | court.  And I expect those rules to be followed.  And I, |
| 8  | myself, have become more interested in a motion for a bill |
| 9  | of particulars because of the complex sentencing laws of the |
| 10 | United States.  But I can't tell you how I would act on such |
| 11 | a motion.  And it looks to me, at quick glance, that the |
| 12 | indictment is fine. |
| 13 | **MS. GRIFFIN:**   But there are no facts, your Honor, |
| 14 | there's no factual sufficiency to this indictment |
| 15 | whatsoever. |
| 16 | **THE COURT:**   So you say, in a conclusory fashion. |
| 17 | **MS. GRIFFIN:**   No, you -- |
| 18 | **THE COURT:**   I'm telling you it looks fine to me. |
| 19 | It does raise one question though.  You understand, |
| 20 | Mr. Maietta, that in this session of the Court as part of |
| 21 | its standing orders, if you have any statutory enhancements, |
| 22 | any enhancements under the advisory sentencing guidelines, |
| 23 | those are to be set forth and proved at the time of trial. |
| 24 | So if there's a loss here, a tax loss to the government, or |
| 25 | however you would calculate the sentencing, that's going to |

| EXHIBIT | PAGE | of |
|---|---|---|
| F | 14 | 25 |

| 1 | be proved and submitted to the jury and I'm going to find |
| 2 | out what the jury has to say about it.  I think that's an |
| 3 | important protection of the defendant. |
| 4 | **MS. GRIFFIN:**  According to the IRS manual, I mean, |
| 5 | I have the code and the IRS manual, before bringing suit the |
| 6 | prosecution -- before bringing suit the IRS must exhaust all |
| 7 | administrative remedies. |
| 8 | **THE COURT:**  Yes.  Yes. |
| 9 | **MS. GRIFFIN:**  I have received no notice of |
| 10 | deficiency of anything. |
| 11 | **THE COURT:**  Then, then why don't you -- I don't |
| 12 | understand -- you think that's a ground to dismiss the |
| 13 | action? |
| 14 | **MS. GRIFFIN:**  No, I don't think that's a ground to |
| 15 | dismiss.  I think the Speedy Trial Act and jurisdiction not |
| 16 | being ceded by the prosecution is grounds to dismiss. |
| 17 | **THE COURT:**  I'll -- well, the first, Speedy |
| 18 | Trial -- |
| 19 | **MS. GRIFFIN:**  But you did say that you would look |
| 20 | at it. |
| 21 | **THE COURT:**  The Speedy Trial Act I've denied.  The |
| 22 | other one I'm going to look at. |
| 23 | Now, now -- |
| 24 | **MS. GRIFFIN:**  Okay. |
| 25 | **THE COURT:**  And again my initial look at this leads |

| EXHIBIT | PAGE | of |
|---------|------|-----|
| F | 15 | 25 |

1   me to believe that it's adequate, it's an adequate

2   indictment.

3           Anything else to raise today?

4       **MS. GRIFFIN:**  Yeah, I would like to ask you one

5   more thing just for yuks, I guess.

6           I was arraigned in front of a magistrate judge and

7   I went before her twice insisting that I don't need an

8   attorney, I'm pro se.  I know that scares a lot of people.

9   It scares me.  But I'm doing what I'm doing.  And I went in.

10  She said: How do you plead?  I've got the docket.  I can't

11  get the transcripts, it's taken me two months just to

12  request the ones from July 27th.  I still don't have them

13  yet.  How do you plead?  I said I cannot enter a plea at

14  this time because, it wasn't that I was not ready, I believe

15  the prosecution hasn't invoked the jurisdiction of the

16  Court, number one.

17          So she entered a not guilty plea on my behalf.  I

18  said, your Honor, I object.  I pulled out Title 18, Section

19  636 that says that I cannot be arraigned in front of a

20  magistrate judge, okay, with the objection and rulings that

21  I have filed.  She cannot arraign a felony case.

22          I guess what I need you to do, your Honor, is if

23  you could please certify the question for me.  Was I

24  arraigned officially or not?

25          According to Title 18, Section 636, I have not been

EXHIBIT | PAGE | of
F | 16 | 25

| | |
|---|---|
| 1 | arraigned.  I objected on July 21st.  I pleaded to you.  I |
| 2 | pleaded to you.  And I believe I spoke to Mr. Maietta before |
| 3 | we came to court and I told him I do not want to be |
| 4 | arraigned in front of a magistrate judge.  The magistrate |
| 5 | does not have the authority.  I have always wanted to be in |
| 6 | front of you.  Mr. Maietta said, oh, I believe it's a |
| 7 | district judge.  Well, it was a magistrate judge twice.  So |
| 8 | I had to fly from Florida up to Boston twice insisting, and |
| 9 | I didn't want to embarrass anybody, but I read the law right |
| 10 | from the law book.  She got up, walked away and continued |
| 11 | the matter with you, your Honor. |
| 12 | **THE COURT:**  Let me, let me take a look at that |
| 13 | section.  I will also say that we're going to try to keep |
| 14 | your expenses down.  I need you here for the final pretrial |
| 15 | conference that we've set and you're required to be here for |
| 16 | the trial.  But other than that, I don't see any need, Mr. |
| 17 | Maietta will cooperate with you with respect to discovery. |
| 18 | Now, if I give an oral hearing to this motion that |
| 19 | means I'm giving an oral hearing, I want to hear what you |
| 20 | have to say here in court. |
| 21 | **MS. GRIFFIN:**  Thank you. |
| 22 | **THE COURT:**  But I certainly will try not to have |
| 23 | you fly back and forth. |
| 24 | **MS. GRIFFIN:**  Thank you. |
| 25 | **THE COURT:**  What do you say to this business about |

| EXHIBIT | PAGE | of |
|---|---|---|
| F | 17 | 25 |

| 1 | arraignment before a magistrate judge, Mr. Maietta? |
| 2 | **MR. MAIETTA:** Your Honor, the government had |
| 3 | addressed that on Page 4 of its motion that was filed on |
| 4 | August 22nd. At least one district court has found that |
| 5 | arraigning a defendant before a magistrate is not, is |
| 6 | constitutional. And Rule 10 of the Rules of Criminal |
| 7 | Procedure also sets forth that an arraignment must be done |
| 8 | in open court and the defendant must be made aware of the |
| 9 | charges. And that's what happened at the arraignment before |
| 10 | Judge, Judge Benton. And just for the record, your Honor, |
| 11 | and to let you know, I was not present at the initial |
| 12 | appearance. |
| 13 | **THE COURT:** No, that's all right. |
| 14 | **MR. MAIETTA:** Another assistant had stepped in for |
| 15 | me. |
| 16 | **THE COURT:** You're telling me someone has found |
| 17 | that arraignments must take place before a United States |
| 18 | District Judge? |
| 19 | **MR. MAIETTA:** No, no, I wasn't saying they had to |
| 20 | be. What I was -- what I'm saying, your Honor, is that a |
| 21 | defendant's not prejudiced by having, appearing before a |
| 22 | magistrate judge and having the magistrate judge arraign a |
| 23 | defendant. |
| 24 | **MS. GRIFFIN:** Look at -- |
| 25 | **THE COURT:** What's your, what's your statutory |

EXHIBIT  PAGE  of

F   18   25

| | |
|---|---|
| 1 | citation, Ms. Griffin? |
| 2 | **MS. GRIFFIN:** Title 18, Section 636, jurisdiction, |
| 3 | powers and temporary assignment. You can -- actually 4 and |
| 4 | 5(b)(1) and (A). I could read it for you. |
| 5 | **THE COURT:** No, I'll read it. |
| 6 | **MS. GRIFFIN:** Okay. |
| 7 | **THE COURT:** All right, thank you. I'll consider |
| 8 | that. |
| 9 | **MS. GRIFFIN:** Okay. Thank you very much, your |
| 10 | Honor. I appreciate that. |
| 11 | **THE COURT:** Let's say you're right. I'll just have |
| 12 | you -- do you want -- let's take care of it right now. |
| 13 | **MS. GRIFFIN:** Okay, what I would like to ask -- |
| 14 | **THE COURT:** Ms. Smith will arraign you now. Have |
| 15 | you read the -- did you want that? |
| 16 | **MS. GRIFFIN:** What I would like is this. All |
| 17 | right, your Honor? And I thank you because you are |
| 18 | listening to me. I just feel like nobody's been listening |
| 19 | to me and punishing me and prejudicing, prejudicing, I can't |
| 20 | say it, my case because I'm pro se. |
| 21 | I guess what I want you to do first, your Honor, is |
| 22 | could you please certify to me that the last two visits that |
| 23 | I've been here I have not been arraigned by a magistrate |
| 24 | judge. |
| 25 | **THE COURT:** No, I don't, I don't give advisory |

| EXHIBIT | PAGE | of |
|---|---|---|
| F | 19 | 25 |

1    opinions.

2              **MS. GRIFFIN:**  That's an advisory opinion?

3              **THE COURT:**  Yes.  I don't -- I deal with the

4    matters that are before me and I try not to deal with them

5    on the fly.  However, I am satisfied that you've not been

6    prejudiced in any way.  And further, if there's any question

7    about it at all, I'm going to proceed to arraign you now.

8              So, have you read the indictment that's --

9              **MS. GRIFFIN:**  Before you arraign me, your Honor --

10   I will accept that, okay?

11             **THE COURT:**  Fine.  I appreciate it.

12             **MS. GRIFFIN:**  I will accept that you arraign me

13   now.

14             **THE COURT:**  Right.

15             **MS. GRIFFIN:**  Obviously, because the reason why I'm

16   curious about this, and this is an important question, your

17   Honor, according to the law I have not been arraigned, how

18   can we have a trial, set a trial date when I haven't been

19   arraigned?

20             **THE COURT:**  Ms. Griffin, I'm satisfied with my

21   proceeding.  Try my question.

22             **MS. GRIFFIN:**  And can I also say one other thing?

23             **THE COURT:**  Not now.  Not now.  Have you read the

24   indictment?

25             **MS. GRIFFIN:**  Yes, I have.

| EXHIBIT | PAGE | of |
|---------|------|-----|
| F | 20 | 25 |

1          **THE COURT:**   Do you want the clerk to read the

2     indictment in open court?

3          **MS. GRIFFIN:**   No, your Honor.

4          **THE COURT:**   All right, waives the reading of the

5     indictment.   Ms. Smith is now going to arraign you on this

6     charge.

7          **THE CLERK:**   Nadine J. Griffin, you have been

8     charged in a one count indictment with violating 26 U.S.C.,

9     Section 7206(1), filing false -- excuse me, more than one

10    count -- two count indictment filing false income tax

11    returns.

12          How do you plead to Counts 1 and 2, guilty or not

13    guilty?

14          **MS. GRIFFIN:**   I cannot enter a plea at this time

15    until the jurisdiction has been ceded in this Court.

16          **THE COURT:**   All right.   I enter a plea of not

17    guilty and we'll entertain the jurisdiction question on the

18    motion challenging the jurisdiction.

19          All right, I think -- now, I didn't really mean to

20    cut you off, but I do have other things I have to do.   Is

21    there anything else you wanted to say, Ms. Griffin?

22          **MS. GRIFFIN:**   I just wanted to say what Mr. Maietta

23    had said, Rule of Criminal Procedure 10 provides in

24    pertinent part, true, that an arraignment must be conducted

25    in open court and must consist of reading the indictment.

| EXHIBIT | PAGE | of |
|---------|------|-----|
| F | 21 | 25 |

```
 1    No kidding.  And that was Samuel Carter in 1972, he did not
 2    object and he did not waive his right, he did not object to
 3    being arraigned in front of a magistrate, and he also had an
 4    attorney by his side.
 5                THE COURT:  Ms. Griffin?
 6            MS. GRIFFIN:  I just wanted to make sure that we
 7    had that complete information.
 8                THE COURT:  Thank you.
 9            MS. GRIFFIN:  And that you are correct.
10            THE COURT:  All right, we'll call the next case.
11            And as far as I can see, unless you want to be
12    heard on, not want to be heard, unless I assign a motion for
13    oral hearing, it won't be necessary for you to come back
14    until such time as the final pretrial conference unless, of
15    course, you violate the rules of bail.  Bail is the bail as
16    set by the magistrate judge.
17            MS. GRIFFIN:  Okay.  And the thing is I was called
18    here because Mr. Maietta requested a Faretta hearing.  It
19    says in my letter that I got from the government that I
20    requested a Faretta hearing.
21            THE COURT:  It makes no difference who requested
22    it.
23            MS. GRIFFIN:  Okay.  Well --
24            THE COURT:  It's your right, that's why we held it.
25            MS. GRIFFIN:  But on the docket it says that I
```

EXHIBIT PAGE of

F  22  25

| | |
|---|---|
| 1 | waived my Sixth Amendment right. I did not waive my Sixth |
| 2 | Amendment right. |
| 3 | **THE COURT:** The record is the record taken down by |
| 4 | the court reporter. |
| 5 | **MS. GRIFFIN:** Okay. Great. |
| 6 | **THE COURT:** We'll call the next case. |
| 7 | **MR. MAIETTA:** Your Honor, just one -- |
| 8 | **THE COURT:** Yes. |
| 9 | **MR. MAIETTA:** -- one additional question. Are you |
| 10 | finding that the defendant has made a knowing and |
| 11 | intelligent waiver of her Sixth Amendment right to counsel |
| 12 | and the right to proceed pro se at this time? |
| 13 | **THE COURT:** I am. |
| 14 | **MR. MAIETTA:** Thank you. |
| 15 | **THE COURT:** I mean, that, I mean, you are waiving, |
| 16 | waiving your right to counsel. You see, I should make that |
| 17 | clear. |
| 18 | **MS. GRIFFIN:** I understand. |
| 19 | **THE COURT:** You are waiving it because you want to |
| 20 | go pro se, correct? |
| 21 | **MS. GRIFFIN:** Right. Barring the part that I have |
| 22 | a mental breakdown and I'm not capable and emergency counsel |
| 23 | has to come in for me, I understand. |
| 24 | **THE COURT:** Well, that's, that's important. |
| 25 | **MS. GRIFFIN:** That's important. |

| EXHIBIT | PAGE | of |
|---|---|---|
| F | 23 | 25 |

1           **THE COURT:**  That's important.  Though your

2     scenario, if you had a mental breakdown, of course, I

3     would --

4           **MS. GRIFFIN:**  Of course.

5           **THE COURT:**  -- take that account.  Listen to me.

6     But not infrequently in cases of this sort, when we get to

7     next spring, and we're hard up against the trial then it

8     suddenly occurs to a pro se defendant maybe I'll want to

9     have counsel but I can't get one.  And if at the eleventh

10    hour you're in here saying, well, I can't get counsel and

11    counsel can't get prepared, I will not be sympathetic.

12           You understand that?

13          **MS. GRIFFIN:**  I wouldn't do that.  And thank you

14    for your time today.

15          **THE COURT:**  Very well.

16          **MR. MAIETTA:**  One additional comment, your Honor.

17           The range of penalties in this case, I'm not sure

18    if we addressed that with the defendant and what those

19    penalties are and that she's aware of what the penalties

20    are.

21          **MS. GRIFFIN:**  Yes, the penalties I am aware of.

22          **MR. MAIETTA:**  Well, I think that and for Faretta

23    purposes, I think that's --

24          **THE COURT:**  What do you suggest the penalties are?

25          **MR. MAIETTA:**  Under 7206(1) the penalties are, the

EXHIBIT   PAGE   of

F   24   25

```
 1    maximum is three years per count and a $250,000 fine.
 2              THE COURT:  He's telling you that under each count
 3    the maximum penalty provided by the statute --
 4              MS. GRIFFIN:  Right.
 5              THE COURT:  -- is three years in prison and a
 6    $250,000 fine.
 7              MS. GRIFFIN:  I understand.
 8              THE COURT:  And you still want to go pro se?
 9              MS. GRIFFIN:  Still want to go.
10              THE COURT:  That is your right.  Thank you.
11              MR. MAIETTA:  Thank you, your Honor.
12              (Whereupon the matter concluded.)
13                        C E R T I F I C A T E
14
15
16              I, Donald E. Womack, Official Court Reporter for
17    the United States District Court for the District of
18    Massachusetts, do hereby certify that the foregoing pages
19    are a true and accurate transcription of my shorthand notes
20    taken in the aforementioned matter to the best of my skill
21    and ability.
22
23              _____
                        DONALD E. WOMACK
24                   Official Court Reporter
                          P.O. Box 51062
25              Boston, Massachusetts 02205-1062
                     womack@megatran.com
```

EXHIBIT    PAGE    of

F    25    25

# EXHIBIT G — 4 pages



 Over the past 20 years over 30,000 law firms have come to trust one integrated program to run their practice

**TIME BILLING    ACCOUNTING    PRACTICE MANAGEMENT**

**FindLaw**
Legal News and Commentary
http://news.findlaw.com

Wednesday, Aug. 31, 2005



## N.Y. Judge Accused of Money Laundering

By MICHAEL WEISSENSTEIN Associated Press Writer

(AP) - NEW YORK-A quirky judge accused of conspiring with mobsters appeared in court Tuesday to face charges he laundered cash through his re-election campaign and trafficked in stolen cigarettes and diamonds.

Judge David A. Gross, 43, was arraigned in federal court on Long Island on charges of conspiring to launder money and receive and dispose of stolen merchandise. He was released on $500,000 bail and has been temporarily suspended from the bench, a court spokesman said.

Until the charges were unsealed, Gross was best known for presiding over a drunken-driving case against actress Lindsay Lohan's father and for annoying his neighbors by showering in his backyard. He also self-published "If the Robe Fits," a book of stories about his time on the bench in Nassau County.

Gross' attorney declined to comment on the charges.

The judge's legal troubles began in January, when he was ensnared in an FBI investigation of mob-run illegal gambling machines at Turkish social clubs on Long Island, according to an FBI affidavit.

An undercover FBI agent posing as a trafficker in stolen African diamonds and other merchandise met Gross through a mutual acquaintance, a reputed member of the Genovese crime family.

A spokesman for U.S. Attorney Roslynn Mauskopf said he did not know how Gross and the mobster became acquainted.

Gross joined the mob acquaintance, the FBI agent and other suspected mobsters at a dinner at which he boasted of bending campaign finance rules, saying, according to the affidavit, "I know which rules not to break, and I know how to get around everything else. You know, so cash is not a problem."

The judge and the undercover agent met the next day at a hotel, where the agent showed Gross a packet of 19 loose diamonds that he said he was looking to sell, the affidavit said.

Gross called a friend and described the gems as "orphans in need of a new home," an apparently coded reference to stolen goods, according to the affidavit.

Gross allegedly described his involvement in a fraudulent restaurant purchase and other criminal activities, including evading gas taxes and attempting to distribute untaxed cigarettes.

EXHIBIT PAGE of G 1 4

The New York Times

**New York/Region**

Are you a Sophisticated Shopper?

NYTimes: Home - Site Index - Archive - Help

Welcome, - Member Center - Log Out
Go

Go to a Section [ ] Go    Site Search: [ ]

NYTimes.com > New York Region

## Played in Court, Tapes Show Judge Coaching Lawyer and Taking Cash

By ANDY NEWMAN
Published: August 19, 2004


Brooklyn District Attorney's Office
Paul Siminovsky, left, a lawyer, aided the investigation of Justice Gerald P. Garson, a Brooklyn matrimonial judge.

**⊞** Enlarge This Image

**S**urveillance tapes made last year in a Brooklyn matrimonial judge's office and played publicly by prosecutors for the first time yesterday show the judge, Gerald P. Garson, offering a lawyer detailed instructions on how to argue a case before him. He also assures the lawyer that if he follows them, "The worst possible scenario is a win."

In the tapes, Justice Garson tells the lawyer, Paul Siminovsky, that he will award his client in a divorce case the rights to a house and uses an expletive to describe how the decision would affect the client's estranged wife. Justice Garson also dictates to Mr. Siminovsky the exact language he should use in a memo to the judge and urges him to charge his client extra for the memo.


Advertisement

The tapes were played yesterday in State Supreme Court in Brooklyn in the criminal trial of Justice Garson's former clerk and a court officer, who are charged with taking bribes to steer Mr. Siminovsky's cases to Justice Garson.

Justice Garson himself has been charged with accepting cash, cigars and dozens of meals from Mr. Siminovsky in return for giving him the edge in divorce cases and for referring clients to him. His case will not come to trial until next year at the earliest, as prosecutors are appealing the dismissal of some of the charges against him.

Prosecutors say they played the tapes yesterday in the case against the clerk, Paul Sarnell, and the officer, Louis Salerno, to show the jury how closely Mr. Garson and Mr. Siminovsky were working.

The tapes, peppered with profanity and ethnic slurs and including several other court employees, depict a courthouse culture that appears at best indifferent to conflicts of interest if not outright collusion.

Justice Garson's lawyer, Ronald P. Fischetti, said yesterday that the tape segments and the transcripts of them released by the prosecutors had been unfairly excerpted from hundreds of hours of tape made in Justice Garson's robing room.

"There are many other tapes surrounding this tape," Mr. Fischetti said. "During the trial, you will see many other tapes that we are going to put into evidence that will put an entirely different slant on things."

The Brooklyn district attorney's office has described the tapes as the centerpiece of its case against Justice Garson largely because they show him accepting $1,000 cash and a $250 box of cigars in his office from Mr. Siminovsky, who by then was cooperating with prosecutors and who now faces no charges.

While those tapes were also shown yesterday, it was a tape made on Feb. 5, 2003, before Mr. Siminovsky was recruited, that shows what appears to be blatant case-rigging.

The tape shows the two men discussing a case in which Mr. Siminovsky represented a man named Avraham Levi, who was suing his wife for divorce. The judge says of the house the couple lived in, "I'll award him exclusive use on it."

**ARTICLE TOOLS**
- E-Mail This Article
- Printer-Friendly Format
- Most E-Mailed Articles
- Reprints & Permissions

**TIMES NEWS TRACKER**
| Topics | Alerts |
|---|---|
| Brooklyn (NYC) | Create |
| Decisions and Verdicts | Create |
| Bribery | Create |
| Courts | Create |

Create Your Own · Manage
Most Popular Alerts · Take a Tour
CLICK HERE TO SUBSCRIBE

**Automobiles**
nytimes.com/autos

**10 steps to buying a new car**
Also in Autos:
- 10 steps to finding the right car for you
- 10 steps to buying a used car
- 10 steps to leasing a new car

Justice Garson later adds: "You're in good shape. You're a winner either way." He adds that the client does not deserve the favorable ruling.

In a tape made a month later, after Mr. Siminovsky began cooperating with investigators, Justice Garson feeds him language to use in the memo in the case. "The only evidence in this case is the deed," Justice Garson dictates.

The judge interrupts himself, then continues: "The house has been evaluated at --"

"Six-fifty," Mr. Siminovsky fills in.

"Whatever the hell it is," the judge says, continuing: "During the course of the marriage the parties have --"

"incurred these debts," Mr. Siminovsky says.

Justice Garson corrects him: "Did certain improvements to the property."

Justice Garson tells Mr. Siminovsky to be sure to bill Mr. Levi for writing the memo. "I'm telling you to charge for it," the judge says:" 'The judge made me do it If you don't like it, then I can't really put too much effort into your memo.' "

Justice Garson granted Mr. Levi's divorce in January 2003 but did not get a chance to rule on the house because he was arrested on corruption charges.

Mr. Levi's ex-wife and the mother of his five children, Sigal Levi, said yesterday by phone that she had the feeling during the case that it had been fixed. But she said she had not known how closely the judge was working with her husband's lawyer.

"Is he a judge?" Ms. Levi said. "What is he? How is he deciding the fates of people and families, ruining houses and families and children? They should put him in Alcatraz. And when he dies, vultures should eat his body."

In June, Mr. Levi pleaded guilty to giving a middleman $10,000 to obtain favorable treatment from Justice Garson.

In the final tape shown yesterday, made March 10, 2003, Justice Garson shares with Mr. Siminovsky some of his judicial philosophy.

When Mr. Siminovsky asks, "Do you got any trials this week?" Justice Garson replies: "Let me tell you something about this job. One of the greatest things about this job is I don't know what the [expletive] I have tomorrow until I get here. I don't give a [expletive] either, you know."

Mr. Siminovsky replies, "Can't argue with that."

A few minutes later on the tape, Mr. Siminovsky hands the judge something that prosecutors say is a short stack of ten marked $100 bills. The judge pockets it without comment. Ten minutes later, Justice Garson, alone in his office, pulls what appears to be the money out of his pocket and counts it.

After an interlude in which he is interviewed in his office by a high school student, Justice Garson, having apparently summoned Mr. Siminovsky back to his office, gives him back the money and asks him to write a check to his wife's judicial campaign instead.

Mr. Siminovsky urges the judge to take the money and offers to write a check, too. Justice Garson seems to agree and puts the money in his drawer.

A few minutes later, Mr. Siminovsky leaves the office.

"Keep the faith," he tells the judge.

**Click here to download a copy of Today's New York Times**

---

Ads by Google

**Supreme Courts**
Progressive Guide and Analysis on Judges and the Courts
www.AmericanProgress.org

**Maricopa Co. Court Record**
Search court filing records for lawsuits, liens, bankruptcies, more
www.KnowX.com

**Software for Courts**
150+ agencies using JustWare arrange an online demo today!
www.justware.com

what's this?    OUR ADVERTISERS

OKI Printing Solutions -- Click to
Save Now. It's Good Math



**RELATED ARTICLES**

* Metro Briefing | New York: Brooklyn: Ballot Bid Fails (August 8, 2001)
* Columnist Wins a Suit On Articles About Rape (February 7, 1997) $
Find more results for Brooklyn (NYC) and Decisions and Verdicts

**TOP NEW YORK REGION ARTICLES**



EXHIBIT

G    3    4

* Transit Talks Proceed in Starts and Stops
* Fire Officials Defend Action in Collapse
* Higher Limits on Donations From Unions to Take Effect
* The Furry, 4-Legged Centerpiece of a Custody Battle in Court

Go to New York Region

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

| EX | PAGE | of |
|----|------|-----|
| G | 4 | 4 |

VERIFIED AFFIDAVIT IN SUPPORT OF MOVE
FOR FAIR AND IMPARTIAL HEARING

Nadine J. Griffin,
CASE NO. 1:05-CR-10175-WGY

# EXHIBIT H — 1 page

*October 28, 2005,*
*The motion to dismiss on the*
*ground of violating the Speedy Trial Act*
*is denied. Properly calculated, only 18 days*
*have thus far elapsed under the speedy*
*Trial act.*

*William B Young*
*Chief Judge*

FILED
IN CLERKS OFFICE

2005 OCT 25  A 9: 03

U.S. DISTRICT COURT
DISTRICT OF MASS.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )     CASE NO. CR-05-10175-WGY
            Plaintiff    )
                         )     **Nadine J. Griffin's RESPONSE**
vs.                      )     **TO UNITED STATES MOTION**
                         )     **TO DENY MOVE FOR DISMISSAL**
Nadine J. Griffin        )
            Defendant    )
                         )

Nadine J. Griffin, proceeding *pro se*, responds to Plaintiff's motion to deny her Move for Dismissal under the Sixth Amendment to the Constitution for the United States of America and the Speedy Trial Act.

### BRIEF IN SUPPORT

The United States erroneously contends that the Accused defendant Nadine J. Griffin's reliance on the Sixth Amendment as it relates to the Speedy Trial Act is flawed proffering that: (1) the Accused Defendant was presumed to have been arraigned on August 11, 2005, and (2) and said period is excluded under Local Rule 112.2 and 18 U.S.C. 3161(h)(1)(f). The United States cites Local Rule 112.2 as the first basis and authority for this Court to explore the "exclusion" clause of the Speedy Trial Act.

First, the Accused defendant Nadine J. Griffin proceeding *pro se* was NOT arraigned on August 11, 2005, as indicated on the Court Docket Entry on 7/21/05 Docket Entries 8 and 9, of

RESPONSE TO UNITED STATES
                                          1 of 6                  Nadine J. Griffin

VERIFIED AFFIDAVIT IN SUPPORT OF MOVE                    Nadine J. Griffin
FOR FAIR AND IMPARTIAL HEARING                    CASE NO. 1:05-CR-10175-WGY

# EXHIBIT I — 2 pages

February 16, 2004    *The Idaho Observer*    9

# Yurko returns to court March 26

*Preliminary issues to be addressed and a trial date to be set in landmark case*

**CENTURY, Florida**—After serving nearly six years of a life sentence for allegedly shaking his infant son to death, Alan Yurko, 36, is just six weeks away from scheduling a trial that may reverse one of the nation's most unjust prosecutorial trends.

Yurko rushed his infant son to the hospital after the sickly baby stopped breathing in 1996. The distraught father was then taken into custody, charged, tried, convicted and sentenced to life plus 10 years in prison after prosecutors convinced a jury that Baby Alan died from shaken baby syndrome (SBS).

Rather than accept a life sentence for a crime he did not commit, Yurko began to research. He discovered that his son died from the administration of contraindicated vaccines complicated by medical malpractice at the hospital. It seems Baby Alan's death was hastened by an attending physician to facilitate the harvest of his organs.

In the process of his investigations, Yurko found that hundreds of men and women have been imprisoned for SBS and that many of them are innocent of the crime of killing or injuring their children.

Last March, Yurko won an appeal and was granted a new trial. The new trial is about to begin, but preliminary issues will be addressed in a "case management" hearing scheduled for March 26, 2004.

Much attention is being focused on the Yurko case. There is some concern that the state will settle out of court to avoid the embarrassment of a highly visible public trial.

Yurko has already been able to impeach the credibility of the state's witnesses. Yurko hopes to be admitted as co-counsel so that he may have the opportunity to question

# Simkanin travesty witness files judicial misconduct complaint

**NEW ORLEANS—** Texas Resident Charlotte Hanks was so appalled at how U.S. District Judge John McBryde handled himself at the second trial of businessman Dick Simkanin she filed a judicial misconduct complaint with the Fifth Circuit Court of appeals.

Hanks claims the judge engaged in several justice obstructing activities during the proceeding that resulted in a jury convicting income tax dissident Simkanin.

Among the complaints alleged by Hanks are Judge McBryde's violation of Simkanin's 5th Amendment right to trial by jury.

Court transcripts and witnesses concur that Simkanin was not allowed to present a proper defense because the judge blocked his ability to present witnesses in his own defense or cross-examine the government's witnesses. "There was no doubt that Judge McBryde did not provide Mr. Simkanin with a fair and impartial trial," commented Hanks.

The complaint goes on to list several incidents that describe how Judge McBryde created a combative and hostile courtroom atmosphere by chastising, coercing and intimidating Simkanin attorney Arch McColl. Hanks also noted that the judge was rude



**Many people who witnessed the second trial of tax-truth proponent Dick Simkanin were appalled at the travesty that took place in the courtroom of U.S. District Judge John McBryde. Pictured are those present when Charlotte Hanks filed her judicial misconduct complaint against the justice obstructionist McBryde.**

and contemptuous of Simkanin and McColl and seldom sustained their objections. When spectators responded to Judge McBryde's behavior with gasps or murmurs he frequently lost his composure, threatening to clear the room.

"It was apparent that Judge McBryde believed the 'trial' was a waste of time, that Mr. Simkanin was guilty of violating the law and the jury's only purpose was to confirm this determination," said Hanks.

Last December Judge McBryde was forced

to declare a mistrial after a jury hung 11-1 in favor of acquitting Simkanin of charges related to his refusal to withhold income taxes from his employees' wages.

Simkanin was immediately taken back into custody and charges against him were refiled by the U.S. Department of Justice.

Rather than hold a fair and impartial retrial, Judge McBryde decided to tilt the scales of justice in favor of the federal government to insure a conviction. Simkanin will appeal his kangaroo court conviction.

EXHIBIT I PAGE 1 2

DEBT CLOCK—11:21 PM, GMT,   Dec. 14, 2005: $8,145,798,528,459.37
$27,337.18 per person

# The Idaho Observer

*Since 1997*

Volume 8, No. 17    December 16 2005    www.idaho-observer.com    $2.00

Everyone who has ever referred to the nation's capital as the "District of Criminals" is being vindicated.

**THINK**

# Americans' faith & trust in politicians reach new low

An AP/Ipso poll released Dec. 8, 2005, revealed that most Americans believe that political corruption has been institutionalized in Washington, D.C. Sixty-one percent of respondents disproved of Capitol Hill lawmakers—the worst results in a year of polling the question.

The rush of investigations, indictments and bribes are taking their toll on public faith and trust. "It seems like everything seems to be corrupted," AP reported Ohio dietician Sylvia Kind as stating. Kind's comments are a reflection of Americans' growing impression that political corruption is not confined to the District of Columbia, but institutionalized throughout America. "From the local mayor or sheriff all the way up to the president, it means people have a real distrust of their government," said Larry Noble, head of the Center for Responsive Politics campaign, a watchdog group.



Clockwise: Rove, Boxer, Schumer, Gonzales

**Ask yourself:**

*"Are people the property of the state or free souls under their Creator?"*

The answer to that question is *the* riddle of all time; 21st century America is no exception.

## President confirms Constitution status in angry outburst

"It's just a g-d piece of paper," President Bush reportedly exclaimed in reference to the U.S. Constitution.

The alleged comment came last month during a meeting with congressional leaders who were cautioning President Bush about implementing some of the more controversial provisions of the new-improved Patriot Act and was reported by *Capitol Hill Blue* editor Doug Thompson. *Capitol Hill Blue* publishes the dirt coming from secretly disgruntled sources inside the Bush administration. The president's dramatic mood swings, substance abuse issues and profane language are commonly reported.

Thompson is hard to discredit. He has been a D.C. journalist for over 40 years and is known to have eyes and ears everywhere.

President Bush even commented that Dick Cheney is one of his best friends because he doesn't read about their private conversations in the press the next day.

The truth is that President Bush is right, in





Top and Bottom: The War Council comprised of Bush, Cheney, Rumsfeld, Card, Myers, Rice (and Barney)

I 2 2

VERIFIED AFFIDAVIT IN SUPPORT OF MOVE                    Nadine J. Griffin,
FOR FAIR AND IMPARTIAL HEARING                    CASE NO. 1:05-CR-10175-WGY

# EXHIBIT J — 3 pages

Order Code 98-53 GOV
Updated January 11, 2005

# CRS Report for Congress

### Received through the CRS Web

## Salaries of Federal Officials: A Fact Sheet

Barbara L. Schwemle
Analyst in American National Government
Government and Finance Division

The Ethics Reform Act of 1989 provides for an annual salary adjustment for all positions on the Executive Schedule as well as for Members and leaders of the Senate and the House of Representatives (103 Stat. 1716, at 1769).[1] Adjustments are based on the percent of change in the private sector wages and salaries element of the Employment Cost Index (ECI) minus 0.5%. They are to go into effect at the same time as, and at a rate no greater than, the basic pay rate adjustments for the General Schedule (GS). By law (95 Stat. 1183, at 1200), judges' salaries must be authorized separately.

**1994.** Congress legislated a freeze on the salaries of Members of Congress for calendar year 1994. With no GS base salary adjustment, there was no "automatic" adjustment in 1994 for officials in the three branches (107 Stat. 35 and 107 Stat. 1253).

**1995.** Projected adjustment: 2.6%. The FY1995 Treasury Appropriations Act provided that there would be no adjustment for federal officials (108 Stat. 2328, at 2424).

**1996.** Projected adjustment: 2.3%. The FY1996 Treasury Appropriations Act provided that there would be no adjustment for federal officials (109 Stat. 468, at 507).

**1997.** Projected adjustment: 2.3%. The FY1997 Treasury Appropriations Act provided that there would be no adjustment for federal officials (110 Stat. 3009-364).

**1998.** Adjustment: 2.3%, a rate equal to the January 1998 adjustment for GS base pay. No legislation was enacted to withhold the pay adjustment for federal officials.

**1999.** Projected adjustment: 3.1%. The FY1999 Treasury Appropriations Act provided that there would be no adjustment for federal officials (112 Stat. 2681-58).

**2000.** Adjustment: 3.4%. (P.L. 106-113 authorized judicial pay adjustment.)

**2001.** Adjustment: 2.7%. Projected 3.0% adjustment limited by GS base pay rate. P.L. 106-553 authorized the judicial salary adjustment.

**2002.** Adjustment: 3.4%. (P.L. 107-77 authorized the judicial salary adjustment.)

**2003.** Adjustment: 3.1%. Projected 3.3% adjustment limited by GS base pay rate. Judicial adjustment authorized through P.L. 108-6.

**2004.** Adjustment: 2.2%. Adjusted, temporarily, at 1.5% pending enactment of P.L. 108-99. Judicial pay adjustment authorized under P.L. 108-167 (12/06/03).

**2005.** Adjustment: 2.5%. Judicial pay adjustment authorized under P.L. 108-447 (12/08/04).

---

[1] This report was authored by Sharon S. Gressle until her retirement from the Congressional Research Service in September 2004.

*Congressional Research Service ❖ The Library of Congress*

CRS-2

## Table 1.  Salaries of Federal Officials

| Position | Jan. 2003 | Jan. 2004 | Jan. 2005 |
|---|---|---|---|
| **Legislative Branch** | | | |
| Vice President of the United States (President of the Senate) | $198,600 | $203,000 | $208,100 |
| Speaker of the House of Representatives | 198,600 | 203,000 | 208,100 |
| President Pro Tempore of the Senate | 171,900 | 175,700 | 180,100 |
| Majority and Minority Leaders — House and Senate | 171,900 | 175,700 | 180,100 |
| Senators, Representatives, Resident Commissioner of Puerto Rico, and Delegates | 154,700 | 158,100 | 162,100 |
| **Judicial Branch** | | | |
| Chief Justice of the United States | $198,600 | $203,000 | $208,100 |
| Associate Justices of the Supreme Court | 190,100 | 194,300 | 199,200 |
| Judges, U.S. Courts of Appeal | 164,000 | 167,600 | 171,800 |
| Judges, U.S. Court of Appeals for the Armed Services | 164,000 | 167,600 | 171,800 |
| Judges, U.S. District Courts | 154,700 | 158,100 | 162,100 |
| Judges, United States Court of Federal Claims | 154,700 | 158,100 | 162,100 |
| Judges, United States Court of International Trade | 154,700 | 158,100 | 162,100 |
| Judges, Tax Court of the United States | 154,700 | 158,100 | 162,100 |
| Judges, U.S. Court of Appeals for Veterans Claims | 154,700 | 158,100 | 162,100 |
| Bankruptcy Judges | 142,300 | 145,500 | 149,132 |
| Magistrate Judges | 142,300 | 145,500 | 149,132 |
| **Executive Branch** | | | |
| President of the United States [a] | $400,000 | $400,000 | $400,000 |
| *Executive Schedule* | | | |
| Level I:   Cabinet-level officials | $171,900 | $175,700 | $180,100 |
| Level II:   Deputy secretaries of departments, secretaries of military departments, & heads of major agencies | 154,700 | 158,100 | 162,100 |
| Level III:   Under secretaries of departments & heads of middle-level agencies | 142,500 | 145,600 | 149,200 |
| Level IV:   Assistant secretaries & general counsels of departments, heads of minor agencies, members of certain boards & commissions | 134,000 | 136,900 | 140,300 |
| Level V:   Administrators, commissioners, directors, & members of boards, commissions, or units of agencies | 125,400 | 128,200 | 131,400 |

| EXHIBIT | PAGE | of |
|---|---|---|
| J | 2 | 3 |

CRS-3

| Senior Executive Service (SES) Basic Pay Range | | |
|---|---|---|
| Effective January 2004 [b] | | |
| Minimum | Maximum | |
| $104,927 | $145,600 | Agencies without a certified performance appraisal system |
| $104,927 | $158,100 | Agencies with a certified performance appraisal system |
| Effective January 2005 | | |
| $107,550 | $149,200 | Agencies without a certified performance appraisal system |
| $107,550 | $162,100 | Agencies with a certified performance appraisal system |

a. Effective noon, January 20, 2001.

b. Pursuant to P.L. 108-136, §1125, the pay system for SES was changed to a system in which the agency head determines the salary rate for each individual once a year. See 69 FR 2048-2052 (Jan. 13, 2004) for interim regulations and 69 FR 70355-70367 (Dec. 6, 2004) for final regulations. The range includes a maximum rate equal to Level II when OPM, as directed by P.L. 107-296, certifies that the agency has an appropriate performance appraisal system in place. Members of the SES in agencies with certified performance appraisal systems may earn total compensation up to $208,100.

| EXHIBIT | PAGE | of |
|---|---|---|
| J | 3 | 3 |

VERIFIED AFFIDAVIT IN SUPPORT OF MOVE
FOR FAIR AND IMPARTIAL HEARING

Nadine J. Griffin,
CASE NO. 1:05-CR-10175-WGY

# EXHIBIT K — 2 pages

Read Stuart

# The New York Times

# **Business**

 

NYTimes: Home - Site Index - Archive - Help

Welcome, - Memb

| Go to a Section  🔲 Go | Quotes: ⬚ Go | Site Search: |



SAY CHEESE    **Digital cameras for every budget**    The New Techn nytimes

NYTimes.com > Business

# 2 Ex-I.R.S. Lawyers' Licenses Suspended for Misconduct

**By DAVID CAY JOHNSTON**
Published: August 21, 2004

**ARTICLE TOC**
✉ E-Mail This
🖨 Printer-Frie
🖳 Most E-Mai
Reprints &

The law licenses of two former Internal Revenue Service lawyers have been suspended for two years after a federal court ruling last year that they defrauded the courts so that the I.R.S. could win 1,300 tax shelter cases.

W. Kenneth McWade was suspended by the Oregon Supreme Court in an order dated Aug. 10 and released yesterday by the Oregon State Bar.

**TIMES NEWS** ·
**Topics**
Internal Revenu
Federal Taxes (
Decisions and \
› Create Your Ov
› Most Popular A
**CLICK HERE 1**

Four months ago Arkansas officials suspended the license of William A. Sims.

Advertisement

The United States Tax Court has also suspended both lawyers for two years, and the I.R.S. director of practice has suspended them indefinitely.



click here to learn more

The suspensions followed complaints brought by Michael Louis Minns, a Houston lawyer who represented 124 of the tax shelter buyers, most of them airline pilots. One buyer is seeking a $6 million refund.

**Bus**
nytimes.c

**Special Serie**
estate boom

Also in Busine
⬚ Wall Stree:
  how big ar
⬚ Now that b
  been distri
  raid talent
⬚ New 401(k
  should kno

The Federal Court of Appeals for the Ninth Circuit in San Francisco found in January 2003 that the lawyers had defrauded the court by making a corrupt deal with a few of the pilots who bought tax shelters in the 1970's and 1980's. Under the deal, no tax-collection actions in regard to the shelters would be taken against these pilots in return for testimony that would hurt the others.

| EXHIBIT | PAGE | of |
| K | 1 | 2 |

The court called this "extreme misconduct" and asked why the I.R.S. had not disciplined the lawyers, each of whom was paid a $1,000 bonus for his work on the cases.

Mr. Minns then asked the I.R.S. in which state each was licensed so that he could seek their disbarment. The I.R.S. refused, saying disclosure of their law licenses would violate their confidentiality.

In fighting suspension, the two lawyers filed papers contending that they had acted properly.

Mr. McWade, reached at home in Hawaii, said, "I guess the court has decided that Oregon lawyers are not entitled to due process." Mr. Sims did not respond to voice mail and e-mail messages.

The two men left the I.R.S. after their conduct came under scrutiny.

## The New York Times Electronic Edition Special Offer: 1 Week Free

Ads by Google                                                          what's this?

**Missing IRS Tax Records?**
Your 2002-2004 Tax Return, W2 or 1099. Easy Ordering - Since 1990
www.CreditTechnologies.com

**Wage Garnishment Stopped**
Wage Garnishment Stopped Today. IRS Secrets Revealed. Call for Help
www.IRS-Tax-Debt-Relief-Offer.com

**File Your Taxes Online**
Fast and easy. Free. File today, money tomorrow.
www.taxprepusa.net

OUR ADVERT

Free Online In·
Investment hel
Price

Get the tools y·
manage your c
Score Watch™

$7 Trades at S
"Highest in Inv·

Join Ameritrad·
COMMISSION
$100 cash.

Panason
ideas fo

**RELATED ARTICLES**

- Tech Company, Rebutting I.R.S. Auditor, Denies Getting Improper Tax Agreement (August 16, 2004)
- Top Tax Expert Calls for Tougher Penalties to Deter Corporate Cheating (March 9, 2000) $
- I.R.S. Accepts First Business Return on Net (February 10, 2000)
- Financial Spinoff Is Postponed (January 11, 2000) $
  Find more results for Internal Revenue Service and Federal Taxes (US)

**TOP BUSINESS ARTICLES**

- I.B.M. Earned $3.19 Billion to Beat Estimates
- S.E.C. Moves to Require More Disclosure on Executive Pay
- Guidant Backs Boston Scientific's Bid, Raising Ante for Johnson
- Industrial Production Posts Solid Dec. Gain
  Go to Business

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

| EXHIBIT | PAGE | of |
|---------|------|-----|
| K | 2 | 2 |

VERIFIED AFFIDAVIT IN SUPPORT OF MOVE
FOR FAIR AND IMPARTIAL HEARING

Nadine J. Griffin
CASE NO. 1:05-CR-10175-WGY

# EXHIBIT L — 5 pages



E-mail@Justice.com | MY FindLaw

Trust Western Union
to get it there fast and easy.
SEND MONEY

WESTERN UNION

Find A Lawyer | Law Jobs | CLE

**Lawyer Search**  City or ZIP      State     Select a Practice Area      Find Lawyers!

**Writ: Commentary**

**Search Writ**

[Go]

Front Page

**Special Coverage**
Hurricane Katrina
Enron
Tribunals
Terrorism

**Archives**
Columnists
Guest Columnists

**Law Students**

**Book Reviews**

Message Boards

**Legal News**

US Law
Supreme Court
Politics
Civil Rights
Crime
Tort
Business
Labor
Tech & IP
Environment

**Investigations**

**International**

**Entertainment**

**Sports**

**News Wires**

**Legal Documents**

**FindLaw Features**

Supreme Court Center
Recent Case Law
Cases & Codes
FindLaw Library
Legal Dictionary
MY FindLaw



Print This | Email This

## Thoughts on the Law Addressing Bad Federal Judges:
**Self-Policing Isn't Working, But Is There a Good Alternative?**
By JOHN W. DEAN

Friday, Aug. 13, 2004

Federal judges and federal courts typically reflect a very high standard of legal practice. The pruning process of selecting men and women who must be confirmed by the U.S. Senate -- where those who are clearly unqualified are rejected before they ever get to the bench -- has helped to maintain the highest standards at the federal level.

But with almost one thousand federal judges on the bench - typically underpaid and overworked -- it is not surprising there are a few blemished characters. The criminal law can effectively address the very rare judge who is truly corrupt. But what of judges who are incompetent (sometimes from mental decrepitude), lazy, dictatorial if not nasty in conducting the business of their small empire, or conspicuously biased (regarding gender, racial, ethnic, or sexual orientation)?

What - if anything - can be done about such judges, consistent with the constitutional guarantee of an independent federal judiciary? Under our Constitution, impeaching judges is extremely difficult. And in practice, the federal statute that attempts to address the situation of judges who are bad - but not corrupt - has been less than effective.

For this reason, the Chief Justice of the United States has requested that his colleague, Justice Stephen Breyer -- along with four other federal judges and a top Rehnquist administrative assistant -- undertake a study of the matter. Specifically, Justice Breyer has been asked "to evaluate how the federal judicial system has implemented the Judicial Conduct and Disability Act of 1980."

But don't hold your breath waiting for revelations. If past studies of this subject are any indication, the public will not really be told very much about how the federal judiciary currently deals with its dirty linen. But constructive recommendations about change may be offered - and they should be welcome, for this is a problem that needs to be addressed.

### Impeachment and the "Good Behavior of the Federal Judiciary"

To understand the situation of federal judges, it's important first to set forth some constitutional background. In designing our federal system, the founders sought to create an independent judiciary - one that did not bow to the power of the Executive or the Legislature, a truly coequal third branch. Alexander Hamilton famously expressed this point in **Federalist 78.**

Toward this end, once confirmed by the Senate, a federal judge is effectively tenured for life, or as Article III of the Constitution sets forth, they "hold their offices during good behavior." In addition, also under Article III, judges' compensation cannot be reduced while they are on the bench. Good behavior, as Hamilton made clear, is "the ... secure a steady, upright, and impartial administration of the ...

Column continues below ↓

**Coming Wednesday:**

Columnist Michael C. Dorf on The Government's Overreaching In The Case Of Jose Padilla

**Book Reviews**

*The Most Activist Supreme Court in History: The Road to Modern Judicial Conservatism,* and,

*Revolution by Judiciary: The Structure of American Constitutional Law*

- by KEVIN J. DOYLE

**Columnists**

Akhil Amar

Vikram Amar

Bart Aronson

Sherry Colb

John Dean

Michael C. Dorf

Joanna Grossman

Marci Hamilton

Julie Hilden

Edward Lazarus

Joanne Mariner

Anita Ramasastry

Anthony Sebok

Guest Columnists

**Writ Forum**



EXHIBIT

Message Boards

L | I | 5

WESTERN UNION

Trust Western Union to get it there fast and easy.

SEND MONEY

Ads by Google

**FXDD-Online Forex Trading**
2 pips EUR/USD, Fast Execution No Commission, $50,000 Demo Account
www.fxdd.com

**Trading Secrets Revealed**
Learn how to get an 900% return with only 3-5 trades per year!
www.timingcube.com

**Trade Online at Scottrade**
$7 Limit Trades / Market Trades, $500 to Open an Account. Apply Now!
www.Scottrade.com

**Forex Traders**
Trade Forex with up to 80% accurate forecasts. Free actual predictions.
www.tradertech.com

**Forexmentor.com**
Trading System Where You Learn to Trade Like the Pros. aff
www.forexmentor.com

Judges can only be removed because of their "Treason, Bribery or other high Crimes and Misdemeanors." Only a handful of federal judges have ever been impeached under this high standard. And Congress's failure to impeach and convict Chief Justice Samuel Chase made clear that mere disagreement with a judge's decisions, or judicial philosophy, is not grounds for removal.

The Constitution left a void as to how to address bad federal judges whose behavior does not rise to the level of criminal prosecution or impeachment. Since then, a patchwork of practice has tried, and continues to try, to fill the void. But it hasn't been very adept at doing so.

**The Advent of Judicial Councils**

The Chairman of the Judiciary Committee of the House of Representatives, James Sensenbrenner, seconded the Chief Justice's move to initiate the Breyer panel study. In doing so, Sensenbrenner issued a statement on the problem.

Sensenbrenner noted, "The 1980 Act, which was amended during the 107th Congress, is based on a self-governing construct that allows the judicial branch large deference to police itself regarding matters of judicial misconduct and discipline. This system worked quite well during the 1980's. . . . Since then, however, this process has not worked as well, with some complaints being dismissed out of hand by the judicial branch without any investigation." (Emphasis added.)

The mechanism that is not working well now was initially fashioned in the late 1930s with the emergence of the modern judiciary - with its ever increasing criminal and civil caseload, and the growth of additional judgeships. At that time, Congress created "judicial councils" in each of the federal circuits which cover the nation. (Today, there are twelve numbered circuits, plus the District of Columbia circuit.)

Judicial councils are composed of circuit judges, and they proceed under the direction of the senior circuit judge. Their purpose is to ensure the proper administration of court business within the circuit (including both the appellate-level circuit courts and the trial-level district courts).

In time, Congress gave each judicial council express authority to issue formal "orders for the effective and expeditious administration of the business of the courts within its circuit." These orders become the rules of the circuit. Judicial councils were later authorized to use this power in disciplinary matters as well, with the enactment of the Judicial Conduct and Disability Act of 1980 - the statute Rehnquist has asked Breyer to review.

Appropriately, after two and a half decades of experience, the Chief Justice has raised the question of how well this law actually works.

**The Workings of the Judicial Conduct And Disability Act of**

| EXHIBIT | PAGE | of |
|---|---|---|
| L | 2 | 5 |

### 1980

Anyone can file a complaint for judicial misconduct with the clerk of the federal court of appeals for the circuit in which a given judge sits.

When the complaint is received, the chief judge of the circuit reviews it. If he or she can resolve the matter, it ends there. If not, a special committee is formed to investigate the complaint.

If this special committee finds the complaint to have merit, it reports to the judicial council of the circuit. The judicial council can then impose a number of remedies: censure, reprimand, temporary suspension of the judge, and transferring cases on the judge's docket to others on the court.

Finally, if an impeachable offensive is uncovered, the judicial council reports its findings to the Judicial Conference of the United States (which has administrative jurisdiction over all the federal courts). In turn, the Judicial Conference can submit the matter to the U.S. House of Representatives for impeachment proceedings.

### Why the Act's Procedures Have Been Ineffective: A Case In Point

While this is all well and good, as many federal practitioners know, it really doesn't root out the bad judges. The process has worked for corrupt judges and some conspicuously egregious misconduct. But the run-of-the-mill bad judge can escape its reach.

Thus, the little robed czar or czarina who rules his or her courtroom empire with justice only for the chosen few, almost always remains immune. And unfortunately, even those who <u>are</u> subjected to the law escape public censure and condemnation, even of their peers.

Consider the following case: Harvard Law Professor Alan Dershowitz wrote the well-known book <u>Reversal Of Fortune</u>, about his work on the Claus von Bulow wife-murder case. When talking about his book, Dershowitz publicly commented that to deal with Rhode Island judges it was necessary to have a "local yokel" to deal with them behind the scenes.

Whether true or false, Dershowitz's intemperate remark was offensive. In response, former Rhode Island Superior Court Judge Ronald R. Lagueux told the *Providence Journal* that he'd never let Dershowitz practice in his courtroom again. According to the *Journal*, Lagueux said, "There's an old saying that you don't get into a urinating contest with a skunk."

Judge Lagueux was soon appointed to the federal bench. A former Dershowitz student and friend appeared before him - and asked the judge to recuse himself. But Judge Judge Lagueux refused, repeating his ban on Dershowitz's own appearances from the bench, and in a written ruling.

Dershowitz filed a complaint under the Judicial Conduct and Disability Act of 1980. As a result, the judicial council of the First Circuit censured Judge Lagueux. This step was praiseworthy but rare, for in fact, most complaints are not acted on.

More strikingly, following standard procedures under the 1980 Act, the judicial council ordered that both the complaint and the censure be kept secret. The obvious question is: What good is a censure if no one knows about it? Indeed, Dershowitz was told he would face a contempt of court citation if he disclosed either his complaint or the censure.

Nonetheless, the story leaked - and was reported in a July 14, 1989 *New York Times* article. But if it had not, the complaint and censure would have remained entirely secret. And in this case, escaping the pitiless spotlight of publicity means, in effect, escaping any sanction at all.

### Evidence Reveals Complaints About Judges Are Virtually Ignored

| EXHIBIT | PAGE | OF |
|---------|------|-----|
| L | 3 | 5 |

Dershowitz was lucky, in a way, that he was listened to at all. As Chairman Sensenbrenner's committee learned during the last Congress (when it tweaked the misconduct law), virtually no such complaints are acted on.

The subcommittee of the House Judiciary Committee examining the law was told of one study from "fiscal years 1996 and 1997" that showed that "more than 1000 formal complaints were filed against federal judges nationwide. The chief judges decided that not one of these cases required official discipline." In addition, "[i]n more that 450 cases, complainants appealed the dismissal of their complaint to the judicial council of an appellate court. These councils rejected every appeal."

These statistics were deeply disturbing. As expert witness Douglas Kendall explained to the subcommittee, while no doubt some of the complaints were frivolous, "given the evidence that suggest that ethical transgressions do occur with some regularity, it strains credibility to suggest that not one of over 1,000 formal complaints warranted any official disciplinary action." (Emphasis added.) Indeed, Kendall himself provided devastating evidence about "junkets for judges" - so-called educational retreats at plush resorts to instruct judges in the law (the way the sponsor wants the judge to understand the law).

Since it is futile to file a complaint, few attorneys do so. They anticipate little benefit - and a potentially devastating cost.

Attorneys understand that the judge will be shown their complaint and given an opportunity to respond -- all in secret, of course. Thus, they reasonably fear that, if they appear again before the judge, they will be punished for their complaint in some subtle or not-so-subtle way.

**Complaint Proceedings Should Be Open, Not Secret**

Since federal judges are appointed for life, complaints of their behavior should be open, and sanctions should be disclosed. The reason cited for secrecy is the need to preserve the federal judiciary's independence. But as noted above, the Constitution already does that quite effectively. So the independence of the judiciary actually cuts the other way: With judges effectively immune from impeaching, and serving for life, they ought to be able to withstand a little public scrutiny.

Ironically, more vulnerable and accountable state judges - who unlike federal judges usually are elected, with limited terms -- typically face open complaint procedures. Over thirty states - a healthy majority -- have open disciplinary proceedings for judges.

The result has been enhanced public confidence in the state judiciary. Hopefully, the Breyer Committee will look at the successes of the states in restoring confidence through openness. After all, federal judges' traditional prestige may be waning. With conservatives seeking to pack the federal judiciary it is politicizing the appointment process, and the public has developed a growing and understandable skepticism about the impartiality of the federal bench.

In the end, an imperial (and unchecked) judiciary is as troublesome as an imperial presidency. The high bar for impeachment is necessary to make sure the federal judiciary is a coequal branch of government.

But to further protect federal judges from any scrutiny or sanction, as the 1980 Act does, goes much too far. Being part of a democracy means openness and accountability - not secrecy and doubt - as much so for the judiciary, as for other branches.

Alexander Hamilton called the judicial branch the weakest. Its strength and power stems from its good judgment, for it must rely on others to enforce its rulings.

Not only would sunlight on their conduct proceedings be a disinfectant, it is the only possible disinfectant - for impeachment is rightly near-impossible, so openness in dealing with misconduct will serve to keep the federal judiciary a viable and vital part of our



democracy.

And when Justice Breyer finishes with the lower courts, he should turn his attention to his own court, which is not covered by the 1980 disability and misconduct law.

### What Do You Think? Message Boards

*John W. Dean, a FindLaw columnist, is a former counsel to the President.*



**LEGAL NEWS:** Top Headlines · Supreme Court · Commentary · Crime · Cyberspace · International
**US FEDERAL LAW:** Constitution · Codes · Supreme Court Opinions · Circuit Opinions
**US STATE LAW:** State Constitutions · State Codes · Case Law
**RESEARCH:** Dictionary · Forms · LawCrawler · Library · Summaries of Law
**LEGAL SUBJECTS:** Constitutional · Intellectual Property · Criminal · Labor · more...
**GOVERNMENT RESOURCES:** US Federal · US State · Directories · more...
**INTERNATIONAL RESOURCES:** Country Guides · Trade · World Constitutions · more...
**COMMUNITY:** Message Boards · Newsletters · Greedy Associates Boards
**TOOLS:** Office · Calendar · Email · West WorkSpace · FirmSites

Advertising Info · Add URL · Help · Comments

Company | Privacy Policy | Disclaimer

Jobs@FindLaw · Site Map

Copyright © 1994-2006 FindLaw

| EXHIBIT | PAGE | of |
|---------|------|-----|
| L | 5 | 5 |