## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **CASE NO. 05-CR-10175-WGY** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **AFFIDAVIT IN SUPPORT OF VERIFIED** |
| **vs.** | ) | **MOVE TO CLARIFY THE MEANING OF** |
| | ) | **THE CHAMELEON-LIKE WORD** |
| Nadine J. Griffin, | ) | **"PERSON" IN THE STATUTORY** |
| | ) | **CHARGE AS APPLIED TO THIS CASE** |
| **Accused, Belligerent Claimant.** | ) | |
| | ) | |

1. Nadine J. Griffin ("Affiant") declares and states as follows:

2. That all statements made within this affidavit are true and correct not meant to mislead;

3. That Nadine J. Griffin exists as a Conscious, Thinking, Living, Feeling, Breathing, Flesh and Blood Sentient Being; NOT a statutory person, natural person, artificial person, individual, corporation, entity, partnership or any other *sub-status*, fourth class citizen *ens legis* creation of any government, federal, state, local or otherwise and competent to state the facts herein to wit;

4. That Nadine J. Griffin is unschooled in law, is not an attorney or bar-association member, and is attempting to defend and dispose of this action to the best of her ability with reliance upon your statutes, codes, rules and regulations; including those relied upon by your employer the United States Plaintiff and established by the Constitution for the

1    United States of America, United States Congress, and the United States Supreme Court;

2    5.  That on or about July 13, 2005, Affiant was falsely accused and charged with a statutory

3        victimless commercial crime of belief — "a thought crime" — (by United States Federal

4        employees acting *in qui tam*) for alleged violations of private statute 26 U.S.C. § 7206(1),

5        asserting the "belief" that Claimant willingly filed false federal tax returns for your tax

6        years 1998 and 1999 (see **Exhibit A**);

7    6.  That the language of the statute, at 26 U.S.C. § 7206(1), uses the word, term and/or phrase

8        "Any *person* who" – the key word "*person*" fails to identify to whom this statute applies

9        and remains undisclosed (see **Exhibit B**);

10

11   7.  That the definition section for the word and/or term "person" relevant to 26 U.S.C. §

12       7206(1) of the Internal Revenue Code and/ or Title 26 of the United States Code is found at

13       26 U.S.C. § 7701. Definitions. which states in pertinent part: "(a) When used in this title,

14       *where not otherwise distinctly expressed* or manifestly incompatible with the intent thereof

15       — (1) **Person** The term "*person*" shall be construed to mean and include an individual, a

16       trust, estate, partnership, association, company or corporation."(see **Exhibit B**);

17   8.  That nowhere within the Internal Revenue Code at § 7206(1) et seq., is the word or term

18       person 'distinctly expressed' giving a specific meaning to its application resulting in

19       reliance on the definition section expressed at 26 U.S.C. § 7701(a)(1).

20

21   9.  That section 26 U.S.C. § 7701(a)(1) does not define anywhere within the Code the

22       definition or meaning of the word and/or term "*individual*" as used in 26 U.S.C. §

23       7701(a)(1), and Affiant is not privileged to presume the proper application of its meaning

24       in a statutory context.

25   10. That the word person as referenced at 26 U.S.C. § 7206(1) and 26 U.S.C. § 7701(a)(1) is

defined in law as a "Word of Art," given whatever idiomatic meaning so desired by the authors of that statute, law or instrument.

11. That although undisclosed in current publications of Blacks Law – the Fourth Edition (1968) on page 1779 defines "Words of Art" as, "The vocabulary or terminology of a particular art or science, and *especially those expressions which are idiomatic or particular to it*. (see **Exhibit C**);

12. That Webster's New Universal Unabridged Dictionary, Second Edition defines "Person" as a human being, whether man, woman, or child:  . . . as distinguished from an animal or a thing." (see **Exhibit D**);

13. That it is presently undisclosed to Affiant as to which statutory "*person*" referenced at either 26 U.S.C. § 7206(1) or 26 U.S.C. § 7701(a)(1) is presumed to be applicable to Nadine J. Griffin, as Nadine J. Griffin is not a 'creature of statute,' and retains all Rights, Privileges and Immunities of a sovereign as protected by the Constitution for the United States of America.

14. That IF Affiant Nadine J. Griffin, is defined by the statutory definition of the word "*person*" pursuant to 26 U.S.C. § 7701(a)(1), that would reduce her status and existence as a Living, Breathing, Conscious, Thinking, Flesh and Blood woman, a Sentient Human Being - to that of an entity, a thing void of conscience, thus waiving all Rights, Privileges and Immunities which protects the sovereign under the Constitution.

10. That the Internal Revenue Code includes the term "natural person" as distinct from the word "*person.*" **It is presumed that the term "natural person,"** an oxymoronic "Word of Art" and a creation of statutory legalese - **means a Flesh and Blood, Sentient Human**

**Being, Man or Woman**. The Internal Revenue Code and the United States Code makes

reference to the term "*natural person*" not limited to the following:

26 U.S.C. § 6049(b)(2)(A) - Returns regarding the payment of interest . . . "For purposes of this section . . . the term interest does not include . . . interest on any obligation issued by a *natural person*." (see **Exhibit E**);

26 U.S.C. § 2613(a)(1) – Skip person and non-skip person defined. For purposes of this chapter, the term "skip person" means . . . a *natural person* . . ." (see **Exhibit E**);

26 U.S.C. § 1271(b)(1)(A) – Treatment of amounts received on retirement or sale or exchange of debt instruments . . . "This section shall not apply to . . . any obligation issued by a *natural person* . . ." (see **Exhibit E**);

26 U.S.C. § 163(f)(2)(A)(i) – Interest . . . "For purposes of this section . . . the term "registration-required obligation" means any obligation . . . other than an obligation which . . . is issued by a *natural person* . . ." (see **Exhibit E**);

26 U.S.C. 72(u)(1) - Treatment of annuity contracts not held by natural persons. "In general, If any annuity contract is held by a person who is not a *natural person* . . .For the purposes of this paragraph, holding by a trust or other entity as an agent for a *natural person* shall to be taken into account." (see **Exhibit E**);

26 U.S.C. 141(b)(6)(B)  Clarification of trade or business. "For the purposes of the 1 sentence of subparagraph (A), any activity carried on by a person other than *a natural person* shall be treated as a trade of business." (see **Exhibit E**);

11.  That the above examples conclude that the term "*natural person*" implies a meaning substantially different than the term "*person*" as defined in 26 U.S.C. § 7701(a)(1) which applies to legal fictions and other government created entities see **Exhibit B**);

12.  That the term "*natural person*" is also a creature of statute, legalese and a "Word of Art," given whatever idiomatic meaning the author of the statute so chooses, inducing the reader to draw inference to the meaning to include a Flesh and Blood Man or Woman;

13.  That Although the term "*natural person*," is referenced in multiple sections of the Code as referenced in paragraph 10 above, it does not appear to be defined by the Code nor in the definition section of 26 U.S.C. § 7206 or 26 U.S.C. § 7701(a)(1) and fails to define how

1   Nadine J. Griffin, a Flesh and Blood woman is included in the statutory meaning of the

2   Word;

3   14.   That other evidence of the entity being identified as the taxpayer can be found in the

4   Internal Revenue Manual – Automated Non-Master File Accounting Glossary of

5   Accounting Terms page 3(17)(46)0-13(1-1-96): *(65) TAXPAYER: An entity liable for any*

6   *type of Federal tax* (see **Exhibit F**);

7   15.   That the only justification for the United States plaintiff's employees to intentionally type

8   Affiant's name in all capital letters, spelling it NADINE J. GRIFFIN and not Nadine J.

9   Griffin - is to effectively identify the statutory person NADINE J. GRIFFIN and not the

10   sovereign sentient being Nadine J. Griffin – existing in two wholly distinct capacities –

11   one having all Rights, Privileges and Immunities, the other having NONE;

12

13   15.   That the "*person*" referenced in 26 U.S.C. § 7206(1) and defined at 26 U.S.C. § 7701(a)(1),

14   and "***natural person***," are All creatures of statute – created as an inferior class of '*person*'

15   that does not exist in harmony with the common law and does not enjoy the sovereign

16   status as does the Flesh and Blood Sentient Being, Nadine J. Griffin;

17   16.   That the meaning of the word or term "*person*" is not defined with particularity at 26

18   U.S.C. § 7206 et. seq. The term "*Person*" is a deceptive semantic "Word of Art" that wears

19   many hats/meanings throughout the Internal Revenue Code which cannot, on its face, be

20   relied upon to apply to Affiant without clarification;

21   17.   That it is unknown to Nadine J. Griffin, as to which, if any, statutory "***person***" referenced

22   in 26 U.S.C. § 7206(1) and defined at 26 U.S.C. § 7701(a)(1), and/or "***natural person***,"

23   applies to Affiant;

24

25

18. That Affiant is with first hand knowledge that the statutory (Word of Art) *"person"* referenced in 26 U.S.C. § 7206(1) and defined at 26 U.S.C. § 7701(a)(1) is an entity void of conscience, existing as a sub-status and subclass — not entitled to all Rights, Privileges and Immunities as retained by sovereign Nadine J. Griffin and protected under the Constitution for the United States of America;

19. **That Nadine J. Griffin the sentient being and not NADINE J. GRIFFIN the entity,** exists as a Living, Breathing, Conscious, Thinking, Feeling, Flesh and Blood Sentient Being, a woman retaining all Rights, Privileges and Immunities protected by the Constitution for the United States of America and has not intentionally waived and seeks to insure that all rights are herein retained;

I, Nadine J. Griffin, declare under penalty of perjury as a Conscious, Thinking, Feeling, Living, Breathing, Flesh and Blood Sentient Being that the foregoing is true and correct. All Rights retained without recourse.

Executed this 27 day of February, 2006.

Signature: Nadine J Griffin

Nadine J. Griffin, Affiant
c/o 36 Center Street, #143
Wolfeboro, New Hampshire [03894]

1

2

3

## NOTARY ACKNOWLEDGMENT

4

State of New Hampshire )

5

County of Carroll ) subscribed and sworn

6

7

On this 27 day, of February , 2006, **Nadine J. Griffin** personally

8

appeared, personally known to me, or proved to me on the basis of satisfactory evidence to be

9

the one whose name is subscribed to within this instrument and who did take an Oath.

10

11

Witness my hand and official seal.

12

13

Signature of Notary

14

My Commission Expires: _____

15

16

**ATTACHMENTS:**

17

**Exhibit A:** Indictment of July 13, 2005

18

**Exhibit B:** 26 U.S.C. § 7206 and 26 U.S.C. § 7701 define the word "**Person**"

19

**Exhibit C:** Blacks Law Fourth Edition definition of "Words of Art"

20

**Exhibit D:** Webster's New Universal Unabridged Dictionary, 2nd Ed., defines "**Person**"

21

**Exhibit E**: Reference to "**Natural Person**" in the Title 26 of United States Code

22

**Exhibit F:** Internal Revenue Manual Definition of TAXPAYER

23

24

25

AFFIDAVIT IN SUPPORT
 OF MOVE TO CLARIFY WORD "PERSON"

Nadine J. Griffin,
CASE NO. 1:05-CR-10175-WGY

# EXHIBIT "A"
## 7 pages

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 26 U.S.C. § 7206(1) |
| v. | ) | (Filing False Income Tax Returns) |
| | ) | $CR$-$05$-$10175$-$WGY$ |
| NADINE J. GRIFFIN, | ) | |
| | ) | |
| Defendant. | ) | |
| .. | ) | |

## INDICTMENT

The Grand Jury Charges:

### INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1.    The defendant, NADINE J. GRIFFIN, is a United States Citizen and was a resident of Danvers, Massachusetts.

2.    From in or about 1996 through at least 1999, defendant NADINE J. GRIFFIN was a salesperson for Global Prosperity.

3.    Global Prosperity was an organization founded in 1996, which was in the business of selling a 12-part audiotape/compact disc series, as well as tickets to offshore seminars located in such places as Aruba and Cancun, Mexico. Global Prosperity was known by various names including Global Prosperity Marketing Group, the Global Prosperity Group, and the Institute of Global Prosperity (hereinafter referred to as "Global Prosperity").

4.    As a salesperson for Global Prosperity, Nadine J. Griffin sold the following goods and services:

a.  Global 1 (G1): a 12-part audiotape/compact disc series retail priced at $1,250 per series.

b.  Global 2 (G2): a seminar ticket to a three-day offshore seminar retail priced at $6,250 per ticket.

c.  Global 3 (G3): a seminar ticket to a five-day offshore seminar retail priced at $18,750 per ticket.

5.    Global Prosperity primarily marketed and sold its products through a network of distributors or salespersons modeled after the multi-level marketing design.

The Grand Jury further charges:

COUNT 1
26 U.S.C. § 7206(1)
(Filing False Income Tax Returns)

6.     On or about July 30, 1999, in the District of Massachusetts, defendant NADINE

J. GRIFFIN, who was a resident of Danvers, Massachusetts, did willfully make and subscribe

a 1998 U.S. Individual Income Tax Return, Form 1040, for the calendar year 1998, which was

verified by a written declaration that it was made under the penalties of perjury and which was

filed with the Internal Revenue Service, and which said income tax return defendant NADINE

J. GRIFFIN did not believe to be true and correct as to every material matter in that the said

1998 income tax return reported Schedule C gross receipts of $31,348.01, whereas, defendant

NADINE J. GRIFFIN then and there well knew and believed, that defendant failed and

omitted to disclose on the said 1998 income tax return and attached Schedule C, or any other

Schedule C, or otherwise, a substantial amount of gross receipts from her business activity as

a salesperson for Global Prosperity.

All in violation of Title 26, United States Code, Section 7206(1).

The Grand Jury further charges:

### COUNT 2
26 U.S.C. § 7206(1)
(Filing False Income Tax Returns)

7.    On or about April 12, 2000, in the District of Massachusetts, the defendant

NADINE J. GRIFFIN, who was a resident of Danvers, Massachusetts, did willfully make and

subscribe a 1999 U.S. Individual Income Tax Return, Form 1040, for calendar year 1999,

which was verified by a written declaration that it was made under the penalties of perjury and

which was filed with the Internal Revenue Service, and which said income tax return

defendant NADINE J. GRIFFIN did not believe to be true and correct as to every material

matter in that the said 1999 income tax return reported Schedule C gross receipts of

$30,127.00, whereas, defendant NADINE J. GRIFFIN then and there well knew and believed,

that defendant failed and omitted to disclose on the said 1999 income tax return and attached

Schedule C, or any other Schedule C, or otherwise, a substantial amount of gross receipts

from her business activity as a salesperson for Global Prosperity.

All in violation of Title 26, United States Code, Section 7206(1).

A TRUE BILL

_____

FOREPERSON OF THE GRAND JURY


_____

CHRISTOPHER MAIETTA

ASSISTANT U.S. ATTORNEY/ True Atty, 005 Itm Q.

DISTRICT OF MASSACHUSETTS; July 12, 2005.

Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

12:49 P

JS 45 (5/97) - (Revised USAO MA 6/29/04)

| **Criminal Case Cover Sheet** | **U.S. District Court - District of Massachusetts** |
|---|---|

**Place of Offense:** _District of Mass._     **Category No.** _II_     **Investigating Agency** _IRS/CI_

**City** _Boston_     **Related Case Information:**

**County** _Suffolk_     Superseding Ind./ Inf. _____ Case No. _____
Same Defendant _____ New Defendant _____
Magistrate Judge Case Number _____
Search Warrant Case Number _____
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name _Nadine J. Griffin_     Juvenile   ☐ Yes   ☒ No

Alias Name _____

Address _Seminole, FL_

Birth date (Year only): _1960_  SSN (last 4 #): _2839_  Sex _F_  Race: _Caucasian_   Nationality: _U.S. Citizen_

**Defense Counsel if known:**     _James Krasnoo_     Address: _23 Main Street, Terrace Level_
_Andover, Mass._
**Bar Number:** _____

**U.S. Attorney Information:**

**AUSA** _Christopher J. Maietta_     Bar Number if applicable _N/A_

**Interpreter:**   ☐ Yes ☒ No     List language and/or dialect: _____

**Matter to be SEALED:**   ☐ Yes   ☒ No

☐ **Warrant Requested**     ☒ **Regular Process**     ☐ **In Custody**

**Location Status:**

**Arrest Date:** _____

☐ Already in Federal Custody as _____ in _____ .
☐ Already in State Custody _____   ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by _____ on _____

**Charging Document:**   ☐ Complaint     ☐ Information     ☒ Indictment

**Total # of Counts:**   ☐ Petty _____   ☐ Misdemeanor _____   ☒ Felony _____

Continue on Page 2 for Entry of U.S.C. Citations

I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

Date: _7(13/05_     Signature of AUSA: _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

District Court Case Number (To be filled in by deputy clerk): _____

Name of Defendant _____ Nedie J. Griffin _____

**U.S.C. Citations**

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1 _26 USC 7206(1)_ | _USC. Filing False Tax Returns_ | _1_ |
| Set 2 _26 USC 7206(1)_ | _Filing False Tax Returns_ | _2_ |
| Set 3 _____ | _____ | _____ |
| Set 4 _____ | _____ | _____ |
| Set 5 _____ | _____ | _____ |
| Set 6 _____ | _____ | _____ |
| Set 7 _____ | _____ | _____ |
| Set 8 _____ | _____ | _____ |
| Set 9 _____ | _____ | _____ |
| Set 10 _____ | _____ | _____ |
| Set 11 _____ | _____ | _____ |
| Set 12 _____ | _____ | _____ |
| Set 13 _____ | _____ | _____ |
| Set 14 _____ | _____ | _____ |
| Set 15 _____ | _____ | _____ |

ADDITIONAL INFORMATION:

AFFIDAVIT IN SUPPORT
OF MOVE TO CLARIFY WORD "PERSON"

Nadine J. Griffin,
CASE NO. 1:05-CR-10175-WGY

# EXHIBIT "B"
**4 pages**

# AUGUST 2005

Includes the
Tax Provisions
of the Energy and
Transportation Acts
of 2005

# THE COMPLETE

All the Income, Estate & Gift, Employment, Excise, Procedure and Administrative Provisions

Updated to reflect all tax legislation through August 31, 2005



**THOMSON**

**RIA**

Visit  http://ria.thomson.com – Gateway to RIA's Research & Practice Aids

# Internal Revenue Code
## as amended through August 31, 2005

|  | *Page* |
|---|---|
| Index to Code | 101 |
| Amending Acts Table | 401 |
| Table of Sections | 501 |
| Income tax | 1,001 |
| Estate tax | 6,001 |
| Gift tax | 6,062 |
| Employment taxes | 7,001 |
| Excise taxes | 8,001 |
| Alcohol, tobacco, etc., taxes | 8,191 |
| Procedure and administration | 9,001 |

6050I, the first sentence of this section shall be applied by substituting "felony" for "misdemeanor" and "5 years" for "1 year".

In **1990**, P.L. 101-647, Sec. 3303(a), substituted "by substituting 'felony' for 'misdemeanor' and" for "by substituting" in the last sentence of Code Sec. 7203, effective for actions and failures to act occurring after 11/29/90.

In **1988**, P.L. 100-690, Sec. 7601(a)(2)(B), added the last sentence of Code Sec. 7203, effective for actions after 11/18/88.

In **1984**, P.L. 98-369, Sec. 412(b)(9), deleted "(other than a return required under authority of section 6015)" after "to make a return" in Code Sec. 7203, effective for tax. yrs. begin. after 12/31/84.

In **1982**, P.L. 97-248, Sec. 327, added the last sentence to Code Sec. 7203, effective 9/3/82.

—P.L. 97-248, Sec. 329(b), substituted "$25,000 ($100,000 in the case of a corporation)" for "$10,000" in Code Sec. 7203, effective for offenses committed after 9/3/82.

In **1968**, P.L. 90-364, Sec. 103, deleted "or section 6016" at end of parenthetical phrase, effective for tax. yrs. begin. after 12/31/67. For special provision on effective date, see Sec. 104 of this Act, reproduced after Code Sec. 6425.

### Sec. 7204.   Fraudulent statement or failure to make statement to employees.

In lieu of any other penalty provided by law (except the penalty provided by section 6674) any person required under the provisions of section 6051 to furnish a statement who willfully furnishes a false or fraudulent statement or who willfully fails to furnish a statement in the manner, at the time, and showing the information required under section 6051, or regulations prescribed thereunder, shall, for each such offense, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.

### Sec. 7205.   Fraudulent withholding exemption certificate or failure to supply information.

**(a) Withholding on wages.**

Any individual required to supply information to his employer under section 3402 who willfully supplies false or fraudulent information, or who willfully fails to supply information thereunder which would require an increase in the tax to be withheld under section 3402, shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.

**(b) Backup withholding on interest and dividends.**

If any individual willfully makes a false certification under paragraph (1) or (2)(C) of section 3406(d), then such individual shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.

In **1989**, P.L. 101-239, Sec. 7711(b)(2), amended subsec. (b), effective for returns and statements the due date for which (determined without regard to extensions) is after 12/31/89.

Prior to amendment subsec. (b) read as follows:

*"(b) Backup withholding on interest and dividends.*

"If any individual willfully makes—

"(1) any false certification or affirmation on any statement required by a payor in order to meet the due diligence requirements of section 6676(b), or

"(2) a false certification under paragraph (1) or (2)(C) of section 3406(d), then such individual shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both."

In **1984**, P.L. 98-369, Sec. 159(a)(1), and (2), substituted "in addition to" for "in lieu of" each place it appeared in Code Sec. 7205, and deleted "(except the penalty provided by section 6682)" each place it appeared in Code Sec. 7205, effective for actions and failures to act occurring after 7/18/84.

In **1983**, P.L. 98-67, Sec. 107(b)(1), substituted "(a) Withholding on wages. Any individual" for "Any individual" in Code Sec. 7205 . . . Sec. 107(b)(2), added subsec. (b), effective 8/5/83.

In **1981**, P.L. 97-34, Sec. 721(b), substituted "$1,000" for "$500" in Code Sec. 7205, effective for acts and failures to act after 12/31/81.

In **1966**, P.L. 89-368, substituted "3402" for "3402(f)", and substituted "other penalty provided by law (except the penalty provided in section 6682)" for "penalty otherwise provided." in Code Sec. 7205, effective for remuneration paid after 4/30/66.

### Sec. 7206.   Fraud and false statements.

Any person who—

**(1) Declaration under penalties of perjury.** Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or

**(2) Aid or assistance.** Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document; or

**(3) Fraudulent bonds, permits, and entries.** Simulates or falsely or fraudulently executes or signs any bond, permit, entry, or other document required by the provisions of the internal revenue laws, or by any regulation made in pursuance thereof, or procures the same to be falsely or fraudulently executed, or advises, aids in, or connives at such execution thereof; or

**(4) Removal or concealment with intent to defraud.** Removes, deposits, or conceals, or is concerned in removing, depositing, or concealing, any goods or commodities for or in respect whereof any tax is or shall be imposed, or any property upon which levy is authorized by section 6331, with intent to evade or defeat the assessment or collection of any tax imposed by this title; or

**(5) Compromises and closing agreements.** In connection with any compromise under section 7122, or offer of such compromise, or in connection with any closing agreement under section 7121, or offer to enter into any such agreement, willfully—

(A) Concealment of property. Conceals from any officer or employee of the United States any property belonging to the estate of a taxpayer or other person liable in respect of the tax, or

(B) Withholding, falsifying, and destroying records. Receives, withholds, destroys, mutilates, or falsifies any book, document, or record, or makes any false statement, relating to the estate or financial condition of the taxpayer or other person liable in respect of the tax;

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

In **1982**, P.L. 97-248, Sec. 329(c), substituted "$100,000 ($500,000 in the case of a corporation)" for "$5,000" in Code Sec. 7206, effective for offenses committed after 9/3/82.

### Sec. 7207.   Fraudulent returns, statements, or other documents.

Any person who willfully delivers or discloses to the Secretary any list, return, account, statement, or other document, known by him to be fraudulent or to be false as to any material matter, shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both. Any person required pursuant to section 6047(b), section 6104(d), or subsection (i) or (j) of section 527 to furnish any information to the Secretary or any other

**Code Sec. 7654**                                                    **Miscellaneous provisions**

"(1) such regulations as are necessary to insure that the provisions of this title, as made applicable in Guam by section 31 of the Organic Act of Guam, apply in a manner which is consistent with this section and section 935, and

"(2) regulations prescribing the information which the individuals to whom section 935 may apply shall furnish to the Secretary."

**In 1976,** P.L. 94-455, Sec. 1906(b)(13)(A), substituted "Secretary" for "Secretary or his delegate" each place it appeared in Code Sec. 7654, effective 2/1/77.

**In 1972,** P.L. 92-606, Sec. 1(b), amended Code Sec. 7654, effective for tax. yrs. begin. after 12/31/72.

Prior to amendment, Code Sec. 7654 read as follows:

"Sec. 7654. Payment to Guam and American Samoa of Proceeds of Tax on Coconut and Palm Oil.

"All taxes collected under subchapter B of chapter 37 with respect to coconut oil wholly of the production of Guam or American Samoa, or produced from materials wholly of the growth or production of Guam or American Samoa, shall be held as separate funds and paid to the treasury of Guam or American Samoa, respectively. No part of the money from such funds shall be used, directly or indirectly, to pay a subsidy to the producers or processors of copra, coconut oil, or allied products, except that this sentence shall not be construed as prohibiting the use of such money, in accordance with regulations prescribed by the Secretary or his delegate, for the acquisition or construction of facilities for the better curing of copra or for bona fide loans to copra producers of Guam or American Samoa."

### Sec. 7655.  Cross references.

**(a) Imposition of tax in possessions.**

For provisions imposing tax in possessions, see—

(1) Chapter 2, relating to self-employment tax;

(2) Chapter 21, relating to the tax under the Federal Insurance Contributions Act.

**(b) Other provisions.**

For other provisions relating to possessions of the United States, see—

(1) Section 931, relating to income tax on residents of Guam, American Samoa, or the Northern Mariana Islands;

(2) Section 933, relating to income tax on residents of Puerto Rico.

**In 1990,** P.L. 101-508, Sec. 11801(c)(22)(E)(i), substituted a period for the comma at the end of para. (a)(2) and deleted para. (a)(3)... Sec. 11801(c)(22)(E)(ii), substituted a period for the comma at the end of para. (b)(2) and deleted para. (b)(3), effective 11/5/90, except as provided in Sec. 11821(b) of this Act reproduced in note following Code Sec. 6418.

Prior to deletion, para. (a)(3) read as follows:

"(3) Chapter 37, relating to tax on sugar."

Prior to deletion. para. (b)(3) read as follows:

"(3) Section 6418(b), relating to exportation of sugar to Puerto Rico."

**In 1986,** P.L. 99-514, Sec. 1272(d)(11), redesignated paras. (b)(1) and (b)(2) as paras. (b)(2) and (b)(3), and added para. (b)(1), effective for tax. yrs. begin. after 12/31/86, except as provided in Sec. 1277(b) of this Act, which reads as follows:

"*(b) Special rule for Guam, American Samoa, and the Northern Mariana Islands.—*

"The amendments made by this subtitle shall apply with respect to Guam, American Samoa, or the Northern Mariana Islands (and to residents thereof and corporations created or organized therein) only if (and so long as) an implementing agreement under section 1271 is in effect between the United States and such possession."

**In 1976,** P.L. 94-455, Sec. 1904(b)(6), substituted "Chapter 37" for "Subchapter A of chapter 37" in para. (a)(5), and redesignated para. (a)(5) as para. (a)(3), effective 2/1/77.

**In 1970,** P.L. 91-513, Sec. 1102(k), deleted paras. (a)(3) and (4), effective 5/1/71.

Prior to deletion, paras. (a)(3) and (4) read as follows:

"(3) Parts I and III of subchapter A of chapter 39, relating to taxes in respect of narcotic drugs;

"(4) Parts II and III of subchapter A of chapter 39, relating to taxes in respect of marihuana".

**In 1958,** P.L. 85-859, redesignated para. (a)(6) as para. (a)(5) and deleted para. (a)(5), containing a cross reference to chapter 51 of this title, effective 9/3/58.

---

## CHAPTER 79.—DEFINITIONS

Sec.

7701. Definitions.

7702. Life insurance contract defined.

7702A. Modified endowment contract defined.

7702B. Treatment of qualified long-term care insurance.

7703. Determination of marital status.

7704. Certain publicly traded partnerships treated as corporations.

**In 1996,** P.L. 104-191, Sec. 321(e), added item 7702B.

**In 1988,** P.L. 100-647, Sec. 5012(c)(2), added item 7702A.

**In 1987,** P.L. 100-203, Sec. 10211(b), added item 7704.

**In 1986,** P.L. 99-514, Sec. 1301(j)(2)(B), added item 7703.

**In 1984,** P.L. 98-369, Sec. 221(c), added item 7702.

### Sec. 7701.  Definitions.

**(a)** When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

**(1) Person.** The term "person" shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation.

**(2) Partnership and partner.** The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization.

**(3) Corporation.** The term "corporation" includes associations, joint-stock companies, and insurance companies.

**(4) Domestic.** The term "domestic" when applied to a corporation or partnership means created or organized in the United States or under the law of the United States or of any State unless, in the case of a partnership, the Secretary provides otherwise by regulations.

**(5) Foreign.** The term "foreign" when applied to a corporation or partnership means a corporation or partnership which is not domestic.

**(6) Fiduciary.** The term "fiduciary" means a guardian, trustee, executor, administrator, receiver, conservator, or any person acting in any fiduciary capacity for any person.

**(7) Stock.** The term "stock" includes shares in an association, joint-stock company, or insurance company.

**(8) Shareholder.** The term "shareholder" includes a member in an association, joint-stock company, or insurance company.

**(9) United States.** The term "United States" when used in a geographical sense includes only the States and the District of Columbia.

**(10) State.** The term "State" shall be construed to include the District of Columbia, where such construction is necessary to carry out provisions of this title.

**(11) Secretary of the Treasury and Secretary.**

(A) Secretary of the Treasury. The term "Secretary of the Treasury" means the Secretary of the Treasury, personally, and shall not include any delegate of his.

(B) Secretary. The term "Secretary" means the Secretary of the Treasury or his delegate.

**(12) Delegate.**

(A) In general. The term "or his delegate" —

(i) when used with reference to the Secretary of the Treasury, means any officer, employee, or agency of

AFFIDAVIT IN SUPPORT
  OF MOVE TO CLARIFY WORD "PERSON"

Nadine J. Griffin,
CASE NO. 1:05-CR-10175-WGY

# EXHIBIT "C"
**2 pages**

# BLACK'S
# LAW DICTIONARY

Definitions of the Terms and Phrases of
American and English Jurisprudence,
Ancient and Modern

By

### HENRY CAMPBELL BLACK, M. A.

Author of Treatises on Judgments, Tax Titles, Intoxicating Liquors,
Bankruptcy, Mortgages, Constitutional Law, Interpretation
of Laws, Rescission and Cancellation of Contracts, Etc.

### REVISED FOURTH EDITION

By

### THE PUBLISHER'S EDITORIAL STAFF

Dallas West

JUL 1 6 1975

Dallas Public Library
**ST. PAUL, MINN.**
**WEST PUBLISHING CO.**
**1968**

parties. It usually commences with a reference to the agreement or intention to be effectuated, then states or refers to the consideration, and concludes with the operative words and parcels, if any. Where a deed effectuates two distinct objects, there are two witnessing parts. 1 Dav.Prec. Conv. 63, et seq.; Sweet.

**WITTINGLY.** With knowledge and by design, excluding only cases which are the result of accident or forgetfulness, and including cases where one does an unlawful act through an erroneous belief of his right. Osborne v. Warren, 44 Conn. 357.

**WITWORD.** A legally allowed claim, more especially the right to vindicate ownership or possession by one's affirmation under oath. Vinogradoff, Engl. Soc. in 11th Cent. 9.

**WOLD.** Sax. In England. A down or champaign ground, hilly and void of wood. Cowell; Blount.

**WOLF'S HEAD.** In old English law. This term was used as descriptive of the condition of an outlaw. Such persons were said to carry a wolf's head, (*caput lupinum*;) for if caught alive they were to be brought to the king, and if they defended themselves they might be slain and their heads carried to the king, for they were no more to be accounted of than wolves. Termes de la Ley, "Woolferthfod."

**WOMEN.** All the females of the human species. All such females who have arrived at the age of puberty. Dig. 50, 16, 13.

**WONG.** Sax. In old records. A field. Spelman; Cowell.

**WOOD.** The tough, hard substance of all trees and shrubs. It includes not only the hard fiber bundles of trees and shrubs in general, but also the tougher fibrous components of some herbaceous plants. It is a very broad term and includes not only material obtained from exogenous plants, but also like substances obtained from palms, from bamboo (which is a giant grass), and from some ferns (which are herbaceous plants). Steinhardt & Bro. v. U. S., 9 Ct.Cust.App. 62, 63.

**WOOD LEAVE.** A license or right to cut down, remove, and use standing timber on a given estate or tract of land. Osborne v. O'Reilly, 42 N.J.Eq. 467, 9 A. 209.

**WOOD PLEA COURT.** A court held twice in the year in the forest of Clun, in Shropshire, for determining all matters of wood and agistments. Cowell.

**WOOD-CORN.** In old records. A certain quantity of oats or other grain, paid by customary tenants to the lord, for liberty to pick up dead or broken wood. Cowell.

**WOOD-GELD.** In old English law. Money paid for the liberty of taking wood in a forest. Cowell.

Immunity from such payment. Spelman.

**WOOD-MOTE.** In forest law. The old name of the court of attachments; otherwise called the "Forty-Days Court." Cowell; 3 Bl.Comm. 71.

**WOODS.** A forest; land covered with a large and thick collection of natural forest trees. The old books say that a grant of "all his woods" (*omnes boscos suos*) will pass the land, as well as the trees growing upon it. Co.Litt. 4b. See Averitt v. Murrell, 49 N.C. 323; Hall v. Cranford, 50 N.C. 3; Achenbach v. Johnston, 84 N.C. 264.

**WOODSRIDER.** This term has been applied to an overseer of work in the woods for a private turpentine operator. Griffith v. Hulion, 90 Fla. 582, 107 So. 354, 355.

**WOOD-STREET COMPTER.** The name of an old prison in London.

**WOODWARDS.** Officers of the forest, whose duty consists in looking after the wood and vert and venison, and preventing offenses relating to the same. Manw. 189.

**WOODWORK.** Objects made of wood and things produced by the carpenter or joiner's art. Smith v. National Fire Ins. Co., 175 N.C. 314, 95 S.E. 562, 564.

**WOODWORKER.** A worker in wood, as a carpenter, joiner, or cabinetmaker. Smith v. National Fire Ins. Co., 175 N.C. 314, 95 S.E. 562, 564.

**WOOL-SACK.** The seat of the lord chancellor of England in the house of lords, being a large square bag of wool, without back or arms, covered with red cloth. Webster; Brande.

**WORDS.** Symbols indicating ideas and subject to contraction and expansion to meet the idea sought to be expressed. Association for Protection of Adirondacks v. MacDonald, 253 N.Y. 234, 170 N.E. 902, 903. But labels whose content and meaning are continually shifting with the times. Massachusetts Protective Ass'n v. Bayersdorfer, C.C.A.Ohio, 105 F.2d 595, 597.

As used in law, this term generally signifies the technical terms and phrases appropriate to particular instruments, or aptly fitted to the expression of a particular intention in legal instruments. See the subtitles following.

**WORDS ACTIONABLE IN THEMSELVES.** In libel and slander, impute the guilt of some offense for which the party, if guilty, might be indicted and punished by the criminal courts. Parker v. Kirkland, 298 Ill.App. 340, 18 N.E.2d 709, 718.

**WORDS OF ART.** The vocabulary or terminology of a particular art or science, and especially those expressions which are idiomatic or peculiar to it. See Cargill v. Thompson, 57 Minn. 534, 59 N.W. 638.

**WORDS OF LIMITATION.** See Limitation.

**WORDS OF PROCREATION.** To create an estate tail by deed, it is necessary that words of procreation should be used in order to confine the estate to the descendants of the first grantee, as

Nadine J. Griffin,
CASE NO. 1:05-CR-10175-WGY

# EXHIBIT "D"

**3 pages**

# WEBSTER'S

## NEW UNIVERSAL

# UNABRIDGED

# DICTIONARY

With definitions based on the
*Random House Webster's Unabridged Dictionary, Second Edition*

BARNES
&NOBLE
B O O K S
NEW YORK

Case 1:05-cr-10175-WGY    Document 63-5    Filed 02/28/2006    Page 3 of 4

Acknowledgments and Permissions

The "A Dictionary of the English Language" section of this book
(*Webster's New Universal Unabridged Dictionary*) is based on the second edition of
*The Random House Dictionary of the English Language, the Unabridged Edition*,
copyright 2001, 1998, 1997, 1996, 1993, 1987.

© 1996 by Random House Value Publishing, Inc.
All rights reserved under International and Pan-American Copyright Conventions.

No part of this book may be reproduced or transmitted in any form
or by any means electronic or mechanical including photocopying,
recording, or by any information storage and retrieval system, without
permission in writing from the publisher.

This edition published by Barnes & Noble, Inc.
by arrangement with Random House Value Publishing, Inc.

2003 Barnes & Noble Publishing, Inc.

ISBN 0-7607-4975-2

Printed and bound in China by C&C Printing Co., LTD.

3  5  7  9  10  8  6  4



t, a handwoven carpet or rug pro-
characterized by fine warp and filling
ght, even pile made with the Sehna
y of floral, foliate, animal, and avian
rich, harmonious colors. Also called
0–20]

long-haired variety of the domestic
d in Persia and Afghanistan. [1815–

**•e,** Persia (def. 1).

an arm of the Arabian Sea, between
ia. 600 mi. (965 km) long. Also called



**itates/.** See **Gulf States** (def. 2).

See **Sehna knot.**

1. the young lamb of the Karakul
ous, tightly curled fur of this animal,
and hats and as a trimming on vari-
el and accessories. [1885–90]

an Asian lilac, *Syringa persica*, hav-
urple flowers. [1630–40]

**1,** a round variety of muskmelon
eticulate, unribbed rind and orange
. bearing this fruit.

ee **Persian walnut.**

**•** tragedy (472 B.C.) by Aeschylus.

, any of several plants belonging to
native to the Old World, as *E. affine,*
•e leaves, and fragrant, bluish flowers:
useplant.

**ft.** See **Persian walnut.**

**ûr′si ket′ē),** n. **Vincent,** born 1915,

**r′zē enz′/,** *Fr.* pɛr syen′/), n. **1.** (used
See **Persian blinds. 2.** (*used with a*
ted or painted fabric of cotton or silk.
use of pl. *of persienne,* fem. *of persien,*
PERSIAN]

**/so fläzh′,** pär′-), n. **1.** light, banter-
**. 2.** a frivolous or flippant style of
[1750–60; < *F,* deriv. *of persifler* to
— See **siffler** to whistle, hiss <
sibilare; see SIBILANT, -AGE]
i_badinage, jesting.

**ir sim′ən),** n. **1.** any of several trees
ipyros, esp. *D. virginiana,* of North
istringent, plumlike fruit that is sweet
ipe, and *D. kaki,* of Japan and China,
or orange fruit. **2.** the fruit itself.
: Virginia Algonquian (E sp.) *pessem-
bushemins, putchamins* (unidentified
pfeflex of Proto-Algonquian *-min-*

**/,** -zist′), *v.i.* **1.** to continue steadi-
tome state, purpose, course of action,
pite of opposition, remonstrance, etc.:
**g** *for world peace; to persist in unpop-*
*ties.* **2.** to last or endure tenaciously:
*ng Arthur has persisted for nearly*
**3.** to be insistent in a statement, re-
**t:** [1530–40; < L *persistere* lit., to
**t],** equiv. to *per-* PER- + *-sistere,*
**tAND]** **—per·sist′er,** n. **—per·sist′-**
**sis′tive,** *adj.* **—per·sis′tive·ly,** *adv.*

**•continue. 3.** insist.

**te sis′təns,** -zis′-), n. **1.** the act or
the quality of being persistent: *You*
**il:say** *that for you.* **3.** continued ex-
*the persistence of smallpox.* **4.** the

peated; continued: *persistent noise.* **4.** *Biol.* **a.** continu-
ing or permanent. **b.** having continuity of phylogenetic
characteristics. **5.** Bot. remaining attached beyond the
usual time, as flowers, flower parts, or leaves. [1820–30;
< L *persistént-* (s. *of persisténs*), prp. *of persistere* to PER-
SIST; see -ENT] **—per·sist′ent·ly,** *adv.*
**—Syn. 1.** indefatigable, pertinacious, tenacious. See
**stubborn. 3.** steady. **—Ant. 3.** sporadic.

**Per·sius** (pûr′sē əs), n. *(Aulus Persius Flaccus),*
A.D. 34-62, Roman satirist.

**per·snick·et·y** (pər snik′i tē), *adj. Informal.* **1.** over-
particular; fussy. **2.** snobbish or having the aloof atti-
tude of a snob. **3.** requiring painstaking care. Also, **per-
nickety.** [1885–90; orig. Scots, var. of PERNICKETY]
**—per·snick′et·i·ness,** n.
**—Syn. 1.** nitpicking, finicky.

**per·son** (pûr′sən), n. **1.** a human being, whether man,
woman, or child: *The table seats four persons.* **2.** a
human being as distinguished from an animal or a thing.
**3.** *Sociol.* an individual human being, esp. with reference
to his or her social relationships and behavioral patterns
as conditioned by the culture. **4.** *Philos.* a self-conscious
or rational being. **5.** the actual self or individual per-
sonality of a human being: *You ought not to generalize,
but to consider the person you are dealing with.* **6.** the
body of a living human being, sometimes including the
clothes being worn: *He had no money on his person.* **7.**
the body in its external aspect: *an attractive person to
look at.* **8.** a character, part, or role, as in a play or
story. **9.** an individual of distinction or importance. **10.**
a person not entitled to social recognition or respect.
**11.** *Law.* a human being (**natural person**) or a group of
human beings, a corporation, a partnership, an estate, or
other legal entity (**artificial person** or **juristic person**)
recognized by law as having rights and duties. **12.**
*Gram.* a category found in many languages that is used
to distinguish between the speaker of an utterance and
those to or about whom he or she is speaking. In English
there are three persons in the pronouns, the first repre-
sented by *I* and *we,* the second by *you,* and the third by
*he, she, it,* and *they.* Most verbs have distinct third per-
son singular forms in the present tense, as *writes;* the
verb *be* has, in addition, a first person singular form. **13.**
*Theol.* any of the three hypostases or modes of being
in the Trinity, namely the Father, the Son, and the Holy
Ghost. **14. be one's own person,** to be free from re-
strictions, control, or dictatorial influence: *Now that
she's earning money, she feels that she's her own person.* **15.
in person,** in one's own bodily presence; personality: *Ap-
plicants are requested to apply in person.* [1175–1225;
ME *persone* < L *persōna* role (in life, a play, or a tale)
(LL: member of the Trinity), orig. actor's mask < Etrus-
can *phersu* (< Gk *prósōpa* face, mask) + *-na* a suffix]
**—Syn. 1.** PERSON, INDIVIDUAL, PERSONAGE are terms
applied to human beings. PERSON is the most general and
common word: *the average person.* INDIVIDUAL views a
person as standing alone or as a single member of a
group: *the characteristics of the individual;* its implica-
tion is sometimes derogatory: *a disagreeable individual.*
PERSONAGE is used (sometimes ironically) of an outstand-
ing or illustrious person: *We have a distinguished per-
sonage visiting us today.*
**—Usage.** See **individual, party, people, they.**

**-person,** a combining form of **person,** replacing in ex-
isting compound words such paired, sex-specific forms as
-**man** and -**woman** or -**er[1]** and -**ess:** *chairperson; sales-
person; woojperson.*
**—Usage.** The -PERSON compounds are increasingly
used, especially in the press, on radio and television, and
in government and corporate communications, with the
object of avoiding sex discrimination in language. Earlier
practice was to use -*man* as the final element in such
compounds regardless of the sex of the person referred
to (*anchorman; businessman*) or to use -*woman* when
referring to a woman (*anchorwoman; businesswoman*).
Some object to these new -PERSON compounds on the
grounds that they are awkward or unnecessary, insisting
that the equivalent and long-used compounds in -*man*
are generic, not sex-marked. Others reject the -*man*
compounds as discriminatory when applied to women or
to persons whose sex is unknown or irrelevant. See also
**chairperson, -ess, lady, -man, -woman.**

**per·so·na** (pər sō′nə), n., pl. **-nae** (-nē), **-nas. 1.** a
person. **2. personae,** the characters in a play, novel,
etc. **3.** the narrator of or a character in a literary work,
sometimes identified with the author. **4.** (in the psy-
chology of C. G. Jung) the mask or facade presented to
satisfy the demands of the situation or the environment
and not representing the inner personality of the indi-
vidual; the public personality (contrasted with *anima*).
**5.** a person's perceived or evident personality, as that
of a well-known official, actor, or celebrity; personal image;
public role. [1905–10; < L *persōna* mask, character. See
PERSON]

**per·son·a·ble** (pûr′sə nə bəl), *adj.* **1.** of pleasing per-
sonal appearance; handsome or comely; attractive. **2.**
having an agreeable or pleasing personality; affable;
amiable; sociable. [1400–50; late ME; see PERSON, -ABLE]
**—per′son·a·ble·ness,** n. **—per′son·a·bly,** *adv.*

**Per·so·nae** (pər sō′nē), n. a collection of poems (1926)
by Ezra Pound.

**per·son·age** (pûr′sə nij), n. **1.** a person of distinction
or importance. **2.** any person. **3.** a character in a play,

tended for a particular person: *a personal favor; one's
personal life; a letter marked "Personal."* **3.** intended
for use by one person: *a personal pen.* **4.** referring or
directed to a particular person in a disparaging or offen-
sive sense or manner, usually involving character, be-
havior, appearance, etc.: *personal remarks.* **5.** making
personal remarks or attacks: *to become personal in a dis-
pute.* **6.** done, carried out, held, etc., in person: *a per-
sonal interview.* **7.** pertaining to or characteristic of a
person or self-conscious being: *That is my personal be-
lief.* **8.** of the nature of an individual rational being. **9.**
pertaining to the body, clothing, or appearance: *personal
cleanliness.* **10.** provided for one's distinctive use:
*Employees are allowed 15 vacation days and two per-
sonal days.* **11.** *Gram.* **a.** noting person. In Latin *portō*
*"I carry," -ō is a personal ending.* **b.** of, pertaining to, or
characteristic of the personal pronoun. **12.** *Law.* of or
pertaining to personal property: *personal interests.* —n.
**13.** *Journalism.* **a.** a short news paragraph in a newspa-
per concerning a particular person, as one who is socially
prominent, or a group of particular persons who are so-
cially prominent. **b.** a brief, private notice in a newspa-
per or magazine, often addressed to a particular person
and typically bearing an abbreviated salutation and sig-
nature to preserve its confidentiality, usually printed in
a special part of the classified advertising section. **c.** a
similar notice placed by a person seeking companionship,
a spouse, etc. **d.** Usually, **personals.** a column, page, or
section of a newspaper, magazine, etc., featuring such
notices or items. [1350–1400; ME < LL *persōnālis.* See
PERSON, -AL[1]] **—per′son·al·ness,** n.

**per′sonal comput′er,** a microcomputer designed for
individual use, as by a person in an office or at home or
school, for such applications as word processing, data
management, financial analysis, or computer games.
*Abbr.:* PC [1975–80]

**per′sonal dis′tance.** See **personal space.** [1965–
70]

**per′sonal effects′,** privately owned articles consist-
ing chiefly of clothing, toilet items, etc., for intimate use
by an individual. Cf. **household effects.** [1835–45]

**per′sonal equa′tion,** the tendency to personal bias
that accounts for variation in interpretation or approach
and for which allowance must be made. [1835–45]

**per′sonal flota′tion device′,** a life preserver, life
jacket, or other device for keeping a person afloat in the
water: esp. in. Coast Guard use. *Abbr.:* PFD [1970–75]

**per′sonal foul′,** *Sports.* a foul, as in certain
games, as basketball or football, for illegal body contact
or rough, unsportsmanlike play. [1820–30]

**per·so·na·li·a** (pûr′sə nā′lē ə, -nāl′yə), *n.pl.* **1.**
personal belongings. **2.** biographical data, personal remin-
iscences, or the like: *He could never keep the personalia
out of his essays.* [1900–05; < LL, neut. pl. of L *persō-
nālis* PERSONAL]

**per′sonal identifica′tion num′ber,** *Computers.*
See **PIN.**

**per·son·al·ism** (pûr′sə nl iz′əm), n. **1.** Also called
**per′sonal ide′alism.** a modern philosophical movement
locating ultimate value and reality in persons, human or
divine. **2.** *Psychol.* an approach stressing individual per-
sonality as the central concern of psychology. [1840–50;
PERSONAL + -ISM] **—per·son·al·ist,** n. **—per′son·al·
is′tic,** *adj.*

**per·son·al·i·ty** (pûr′sə nal′i tē), n., pl. **-ties. 1.** the
visible aspect of one's character as it impresses others:
*He has a pleasing personality.* **2.** a person as an embod-
iment of a collection of qualities: *He is a curious person-
ality.* **3.** *Psychol.* **a.** the sum total of the physical, men-
tal, emotional, and social characteristics of an individual.
**b.** the organized pattern of behavioral characteristics of
the individual. **4.** the quality of being a person; exist-
ence as a self-conscious human being; personal identity.
**5.** the essential character of a person. **6.** something ap-
prehended as reflective of or analogous to a distinctive
human personality, as the atmosphere of a place or
thing: *This house has a warm personality.* **7.** a famous,
notable, or prominent person; celebrity. **8.** application
or reference to a particular person or particular persons,
often in disparagement or hostility. **9.** a disparaging or
offensive statement referring to a particular person: *The
political debate deteriorated into personalities.* [1350–
1400; ME *personalite* (< MF) < LL *persōnālitās.* See
PERSONAL, -ITY]
**—Syn. 1.** See **character.**

**personal′ity disor′der,** *Psychiatry.* any of a group
of mental disorders characterized by deeply ingrained
maladaptive patterns of behavior and personality style,
which are usually recognizable as early as adolescence
and are often lifelong in duration. [1935–40]

**personal′ity in′ventory,** *Psychol.* a questionnaire
designed to measure personality types or characteristics.
[1930–35]

**personal′ity test′,** *Psychol.* an instrument, as a
questionnaire or series of standardized tasks, used to
measure personality characteristics or to discover per-
sonality types. [1970–15]

**per·son·al·ize** (pûr′sə nl īz′), *v.t.,* **-ized, -iz·ing. 1.** to
have marked with one's initials, name, or monogram: *to
personalize stationery.* **2.** to make personal, as by apply-

# EXHIBIT "E"
## 7 pages

part E of part I of subchapter J of chapter 1 shall be disregarded.

**(2) Domestic trusts with foreign activities.** To the extent provided in regulations, a trust which is a United States person shall be treated as a foreign trust for purposes of this section and section 6677 if such trust has substantial activities, or holds substantial property, outside the United States.

**(3) Time and manner of filing information.** Any notice or return required under this section shall be made at such time and in such manner as the Secretary shall prescribe.

**(4) Modification of return requirements.** The Secretary is authorized to suspend or modify any requirement of this section if the Secretary determines that the United States has no significant tax interest in obtaining the required information.

**(5) United States person's return must be consistent with trust return or Secretary notified of inconsistency.** Rules similar to the rules of section 6034A(c) shall apply to items reported by a trust under subsection (b)(1)(B) and to United States persons referred to in such subsection.

---

**In 1997,** P.L. 105-34, Sec. 1027(b), added para. (d)(5), effective for returns of beneficiaries and owners filed after 8/5/97.

—P.L. 105-34, Sec. 1601(i)(1), substituted "owner" for "grantor" in the heading of subsec. (b), effective as provided in Sec. 1901(d) of P.L. 104-188 [see below]

**In 1996,** P.L. 104-188, Sec. 1901(a), amended Code Sec. 6048, effective as provided in Sec. 1901(d) of this Act, which reads as follows:

"(d) Effective dates.—

"(1) Reportable events.— To the extent related to subsection (a) of section 6048 of the Internal Revenue Code of 1986, as amended by this section, the amendments made by this section shall apply to reportable events (as defined in such section 6048) occurring after the date of the enactment of this Act.

"(2) Grantor trust reporting.— To the extent related to subsection (b) of such section 6048, the amendments made by this section shall apply to taxable years of United States persons beginning after December 31, 1995.

"(3) Reporting by United States — To the extent related to subsection (c) of such section 6048, the amendments made by this section shall apply to distributions received after the date of the enactment of this Act."

Prior to amendment, Code Sec. 6048 read as follows:

"Sec. 6048. Returns as to certain foreign trusts.

"(a) General rule.

"On or before the 90th day (or on or before such later day as the Secretary may by regulations prescribe) after—

"(1) the creation of any foreign trust by a United States person, or

"(2) the transfer of any money or property to a foreign trust by a United States person,

the grantor in the case of an inter vivos trust, the fiduciary of an estate in the case of a testamentary trust, or the transferor, as the case may be, shall make a return in compliance with the provisions of subsection (b).

"(b) Form and contents of returns.

"The returns required by subsection (a) shall be in such form and shall set forth, in respect of the foreign trust, such information as the Secretary prescribes by regulation as necessary for carrying out the provisions of the income tax laws.

"(c) Annual returns for foreign trusts having one or more United States beneficiaries.

"Each taxpayer subject to tax under section 679 (relating to foreign trusts having one or more United States beneficiaries) for his taxable year with respect to any trust shall make a return with respect to such trust for such year at such time and in such manner, and setting forth such information, as the Secretary may by regulations prescribe.

"(d) Cross reference.

"For provisions relating to penalties for violation of this section, see sections 6677 and 7203."

**In 1982,** P.L. 97-248, Sec. 341(b), added "(or on or before such later day as the Secretary may by regulations prescribe)" after "the 90th day" in subsec. (a), effective for returns filed after 9/3/82.

**In 1976,** P.L. 94-455, Sec. 1013(d)(1), redesignated subsec. (c) as subsec. (d) and added new subsec. (c) . . . Sec. 1013(e)(3), and (4), amended subsec. (d), as redesignated by Sec. 1013(d)(1) of the Act and amended the heading of Code Sec. 6048, effective for tax. yrs. end. after 12/31/75, but only for foreign trusts created after 5/21/74 and transfers of property to foreign trusts after 5/21/74.

Prior to amendment, subsec. (d) read as follows:

"(d) Cross references.

"(1) For provisions relating to penalties for violations of this section, see sections 6677 and 7203.

"(2) For definition of the term 'foreign trust created by a United States person', see section 643(d)."

Prior to amendment, the heading of Code Sec. 6048 read as follows:

"6048. Returns as to creation of or transfers to certain foreign trusts."

—P.L. 94-455, Sec. 1906(b)(13)(A), substituted "Secretary" for "Secretary or his delegate", in Code Sec. 6048, effective 2/1/77.

**In 1962,** P.L. 87-834, Sec. 7, added Code Sec. 6048, effective 10/17/62.

---

## Sec. 6049.   Returns regarding payments of interest.

**(a) Requirement of reporting.**

Every person—

**(1)** who makes payments of interest (as defined in subsection (b)) aggregating $10 or more to any other person during any calendar year, or

**(2)** who receives payments of interest (as so defined) as a nominee and who makes payments aggregating $10 or more during any calendar year to any other person with respect to the interest so received,

shall make a return according to the forms or regulations prescribed by the Secretary, setting forth the aggregate amount of such payments and the name and address of the person to whom paid.

**(b) Interest defined.**

**(1) General rule.** For purposes of subsection (a), the term "interest" means—

(A) interest on any obligation—

(i) issued in registered form, or

(ii) of a type offered to the public,

other than any obligation with a maturity (at issue) of not more than 1 year which is held by a corporation,

(B) interest on deposits with persons carrying on the banking business,

(C) amounts (whether or not designated as interest) paid by a mutual savings bank, savings and loan association, building and loan association, cooperative bank, homestead association, credit union, industrial loan association or bank, or similar organization, in respect of deposits, investment certificates, or withdrawable or repurchasable shares,

(D) interest on amounts held by an insurance company under an agreement to pay interest thereon,

(E) interest on deposits with brokers (as defined in section 6045(c)),

(F) interest paid on amounts held by investment companies (as defined in section 3 of the Investment Company Act of 1940 (15 U.S.C. 80a-3)) and on amounts invested in other pooled funds or trusts, and

(G) to the extent provided in regulations prescribed by the Secretary, any other interest (which is not described in paragraph (2)).

**(2) Exceptions.** For purposes of subsection (a), the term "interest" does not include—

(A) interest on any obligation issued by a natural person,

(B) interest on any obligation if such interest is exempt from tax under section 103(a) or if such interest is exempt from tax (without regard to the identity of the holder) under any other provision of this title,

(C) except to the extent otherwise provided in regulations—

(i) any amount paid to any person described in paragraph (4), or

(ii) any amount described in paragraph (5), and

(D) except to the extent otherwise provided in regulations, any amount not described in subparagraph (C) of this paragraph which is income from sources outside the United States or which is paid by—

(i) a foreign government or international organization or any agency or instrumentality thereof,

(ii) a foreign central bank of issue,

(iii) a foreign corporation not engaged in a trade or business in the United States,

(iv) a foreign corporation, the interest payments of which would be exempt from withholding under subchapter A of chapter 3 if paid to a person who is not a United States person, or

(v) a partnership not engaged in a trade or business in the United States and composed in whole of nonresident alien individuals and persons described in clause (i), (ii), or (iii).

**(3) Payments by United States nominees, etc., of United States person.** If, within the United States, a United States person—

(A) collects interest (or otherwise acts as a middleman between the payor and payee) from a foreign person described in paragraph (2)(D) or collects interest from a United States person which is income from sources outside the United States for a second person who is a United States person, or

(B) makes payments of such interest to such second United States person,

notwithstanding paragraph (2)(D), such payment shall be subject to the requirements of subsection (a) with respect to such second United States person.

**(4) Persons described in this paragraph.** A person is described in this paragraph if such person is—

(A) a corporation,

(B) an organization exempt from taxation under section 501(a) or an individual retirement plan,

(C) the United States or any wholly owned agency or instrumentality thereof,

(D) a State, the District of Columbia, a possession of the United States, any political subdivision of any of the foregoing, or any wholly owned agency or instrumentality of any one or more of the foregoing,

(E) a foreign government, a political subdivision of a foreign government, or any wholly owned agency or instrumentality of any one or more of the foregoing,

(F) an international organization or any wholly owned agency or instrumentality thereof,

(G) a foreign central bank of issue,

(H) a dealer in securities or commodities required to register as such under the laws of the United States or a State, the District of Columbia, or a possession of the United States,

(I) a real estate investment trust (as defined in section 856),

(J) an entity registered at all times during the taxable year under the Investment Company Act of 1940,

(K) a common trust fund (as defined in section 584(a)), or

(L) any trust which—

(i) is exempt from tax under section 664(c), or

(ii) is described in section 4947(a)(1).

**(5) Amounts described in this paragraph.** An amount is described in this paragraph if such amount—

(A) is subject to withholding under subchapter A of chapter 3 (relating to withholding of tax on nonresident aliens and foreign corporations) by the person paying such amount, or

(B) would be subject to withholding under subchapter A of chapter 3 by the person paying such amount but for the fact that—

(i) such amount is income from sources outside the United States,

(ii) the payor thereof is exempt from the application of section 1441(a) by reason of section 1441(c) or a tax treaty,

(iii) such amount is original issue discount (within the meaning of section 1273(a)), or

(iv) such amount is described in section 871(i)(2).

**(c) Statements to be furnished to persons with respect to whom information is required.**

**(1) In general.** Every person required to make a return under subsection (a) shall furnish to each person whose name is required to be set forth in such return a written statement showing—

(A) the name, address, and phone number of the information contact of the person required to make such return, and

(B) the aggregate amount of payments to, or the aggregate amount includible in the gross income of, the person required to be shown on the return.

**(2) Time and form of statement.** The written statement under paragraph (1)—

(A) shall be furnished (either in person or in a statement mailing by first-class mail which includes adequate notice that the statement is enclosed) to the person on or before January 31 of the year following the calendar year for which the return under subsection (a) was required to be made, and

(B) shall be in such form as the Secretary may prescribe by regulations.

**(d) Definitions and special rules.**

For purposes of this section—

**(1) Person.** The term "person" includes any governmental unit and any agency or instrumentality thereof and any international organization and any agency or instrumentality thereof.

**(2) Obligation.** The term "obligation" includes bonds, debentures, notes, certificates, and other evidences of indebtedness.

**(3) Payments by governmental units.** In the case of payments made by any governmental unit or any agency or instrumentality thereof, the officer or employee having control of the payment of interest (or the person appropriately designated for purposes of this section) shall make the returns and statements required by this section.

**(4) Financial institutions, brokers, etc., collecting interest may be substituted for payor.** To the extent and in the manner provided by regulations, in the case of any obligation—

(A) a financial institution, broker, or other person specified in such regulations which collects interest on such obligation for the payee (or otherwise acts as a middleman between the payor and the payee) shall comply with the requirements of subsections (a) and (c), and

(B) no other person shall be required to comply with the requirements of subsections (a) and (c) with respect to any interest on such obligation for which reporting is required pursuant to subparagraph (A).

**(5) Interest on certain obligations may be treated on a transactional basis.**

**Code Sec. 2612**                          **Tax on generation-skipping transfers**

of property to a trust would be a direct skip but for this paragraph, any generation assignment under this paragraph shall apply also for purposes of applying this chapter to transfers from the portion of the trust attributable to such property."

In **1988**, P.L. 100-647, Sec. 1014(g)(5)(B), added para. (c)(3) . . . Sec. 1014(g)(7), added the last sentence to para. (c)(2) . . . Sec. 1014(g)(15), amended para. (a)(2), effective for any generation-skipping transfer (within the meaning of Code Sec. 2611) made after 10/22/86, except as provided in Sec. 1433(b)-(d) of P.L. 99-514, reproduced in the note following Code Sec. 2601.

Prior to amendment, para. (a)(2) read as follows:

"(2) Certain partial terminations treated as taxable. If, upon the termination of an interest in property held in a trust, a specified portion of the trust assets are distributed to skip persons who are lineal descendants of the holder of such interest (or to 1 or more trusts for the exclusive benefit of such persons) such termination shall constitute a taxable termination with respect to such portion of the trust property."

In **1986**, P.L. 99-514, Sec. 1431(a), added Code Sec. 2612 as part of the amendments to Chapter 13, effective for any generation-skipping transfer (within the meaning of Code Sec. 2611) made after 10/22/86, except as provided in Sec. 1433(b)-(d) of this Act, reproduced in the note following Code Sec. 2601.

### Sec. 2613.  Skip person and non-skip person defined.
#### (a) Skip person.

For purposes of this chapter, the term "skip person" means—

➤ (1) a natural person assigned to a generation which is 2 or more generations below the generation assignment of the transferor, or

(2) a trust—

(A) if all interests in such trust are held by skip persons, or

(B) if—

(i) there is no person holding an interest in such trust, and

(ii) at no time after such transfer may a distribution (including distributions on termination) be made from such trust to a nonskip person.

#### (b) Non-skip person.

For purposes of this chapter, the term "non-skip person" means any person who is not a skip person.

In **1988**, P.L. 100-647, Sec. 1014(g)(5)(A), substituted "a natural person assigned" for "a person assigned" in para. (a)(1), effective for any generation-skipping transfer (within the meaning of Code Sec. 2611) made after 10/22/86, except as provided in Sec. 1433(b)-(d), of P.L. 99-514, reproduced in note following Code Sec. 2601.

In **1986**, P.L. 99-514, Sec. 1431(a), added Code Sec. 2613 as part of the amendments to Chapter 13, effective for any generation-skipping transfer (within the meaning of Code Sec. 2611) made after 10/22/86, except as provided in Sec. 1433(b)-(d) of this Act, which is reproduced in the note following Code Sec. 2601.

### Subchapter C.—Taxable Amount

Sec.

2621. Taxable amount in case of taxable distribution.

2622. Taxable amount in case of taxable termination.

2623. Taxable amount in case of direct skip.

2624. Valuation.

### Sec. 2621.  Taxable amount in case of taxable distribution.
#### (a) In general.

For purposes of this chapter, the taxable amount in the case of any taxable distribution shall be—

(1) the value of the property received by the transferee, reduced by

(2) any expense incurred by the transferee in connection with the determination, collection, or refund of the tax imposed by this chapter with respect to such distribution.

#### (b) Payment of GST tax treated as taxable distribution.

For purposes of this chapter, if any of the tax imposed by this chapter with respect to any taxable distribution is paid out of the trust, an amount equal to the portion so paid shall be treated as a taxable distribution.

In **1986**, P.L. 99-514, Sec. 1431(a), added Code Sec. 2621 as part of the amendments to Chapter 13, effective for any generation-skipping transfer (within the meaning of Code Sec. 2611) made after 10/22/86, except as provided in Sec. 1433(b)-(d) of this Act, reproduced in the note following Code Sec. 2601.

### Sec. 2622.  Taxable amount in case of taxable termination.
#### (a) In general.

For purposes of this chapter, the taxable amount in the case of a taxable termination shall be—

(1) the value of all property with respect to which the taxable termination has occurred, reduced by

(2) any deduction allowed under subsection (b).

#### (b) Deduction for certain expenses.

For purposes of subsection (a), there shall be allowed a deduction similar to the deduction allowed by section 2053 (relating to expenses, indebtedness, and taxes) for amounts attributable to the property with respect to which the taxable termination has occurred.

In **1986**, P.L. 99-514, Sec. 1431(a), added Code Sec. 2622 as part of the amendments to Chapter 13, effective for any generation-skipping transfer (within the meaning of Code Sec. 2611) made after 10/22/86, except as provided in Sec. 1433(b)-(d) of this Act, reproduced in the note following Code Sec. 2601.

### Sec. 2623.  Taxable amount in case of direct skip.

For purposes of this chapter, the taxable amount in the case of a direct skip shall be the value of the property received by the transferee.

In **1986**, P.L. 99-514, Sec. 1431(a), added Code Sec. 2623 as part of the amendments to Chapter 13, effective for any generation-skipping transfer (within the meaning of Code Sec. 2611) made after 10/22/86, except as provided in Sec. 1433(b)-(d) of this Act, reproduced in the note following Code Sec. 2601.

### Sec. 2624.  Valuation.
#### (a) General rule.

Except as otherwise provided in this chapter, property shall be valued as of the time of the generation-skipping transfer.

#### (b) Alternate valuation and special use valuation elections apply to certain direct skips.

In the case of any direct skip of property which is included in the transferor's gross estate, the value of such property for purposes of this chapter shall be the same as its value for purposes of chapter 11 (determined with regard to sections 2032 and 2032A).

#### (c) Alternate valuation election permitted in the case of taxable terminations occurring at death.

If 1 or more taxable terminations with respect to the same trust occur at the same time and as a result of the death of an individual, an election may be made to value all of the property included in such terminations in accordance with section 2032.

#### (d) Reduction for consideration provided by transferee.

For purposes of this chapter, the value of the property transferred shall be reduced by the amount of any consideration provided by the transferee.

of the stated redemption price at maturity over the tax-payer's basis for the obligation.

(D) Ratable share. For purposes of this paragraph, except as provided in subparagraph (E), the ratable share of the acquisition discount is an amount which bears the same ratio to such discount as—

(i) the number of days which the taxpayer held the obligation, bears to

(ii) the number of days after the date the taxpayer acquired the obligation and up to (and including) the date of its maturity.

(E) Election of accrual on basis of constant interest rate. At the election of the taxpayer with respect to any obligation, the ratable share of the acquisition discount is the portion of the acquisition discount accruing while the taxpayer held the obligation determined (under regulations prescribed by the Secretary) on the basis of—

(i) the taxpayer's yield to maturity based on the tax-payer's cost of acquiring the obligation, and

(ii) compounding daily.

An election under this subparagraph, once made with respect to any obligation, shall be irrevocable.

**(4) Certain short-term nongovernment obligations.**

(A) In general. On the sale or exchange of any short-term nongovernment obligation, any gain realized which does not exceed an amount equal to the ratable share of the original issue discount shall be treated as ordinary income.

(B) Short-term nongovernment obligation. For purposes of this paragraph, the term "short-term nongovernment obligation" means any obligation which—

(i) has a fixed maturity date not more than 1 year from the date of the issue, and

(ii) is not a short-term Government obligation (as defined in paragraph (3)(B) without regard to the last sentence thereof).

(C) Ratable share. For purposes of this paragraph, except as provided in subparagraph (D), the ratable share of the original issue discount is an amount which bears the same ratio to such discount as—

(i) the number of days which the taxpayer held the obligation, bears to

(ii) the number of days after the date of original issue and up to (and including) the date of its maturity.

(D) Election of accrual on basis of constant interest rate. At the election of the taxpayer with respect to any obligation, the ratable share of the original issue discount is the portion of the original issue discount accruing while the taxpayer held the obligation determined (under regulations prescribed by the Secretary) on the basis of—

(i) the yield to maturity based on the issue price of the obligation, and

(ii) compounding daily.

Any election under this subparagraph, once made with respect to any obligation, shall be irrevocable.

**(b) Exception for certain obligations.**

(1) In general. This section shall not apply to—

(A) any obligation issued by a natural person before June 9, 1997, and

(B) any obligation issued before July 2, 1982, by an issuer which is not a corporation and is not a government or political subdivision thereof.

(2) Termination. Paragraph (1) shall not apply to any obligation purchased (within the meaning of section 1272(d)(1)) after June 8, 1997.

**(c) Transition rules**

(1) Special rule for certain obligations issued before January 1, 1955. Paragraph (1) of subsection (a) shall apply to a debt instrument issued before January 1, 1955, only if such instrument was issued with interest coupons or in registered form, or was in such form on March 1, 1954.

(2) Special rule for certain obligations with respect to which original issue discount not currently includible.

(A) In general. On the sale or exchange of debt instruments issued by a government or political subdivision thereof after December 31, 1954, and before July 2, 1982, or by a corporation after December 31, 1954, and on or before May 27, 1969, any gain realized which does not exceed—

(i) an amount equal to the original issue discount, or

(ii) if at the time of original issue there was no intention to call the debt instrument before maturity, an amount which bears the same ratio to the original issue discount as the number of complete months that the debt instrument was held by the taxpayer bears to the number of complete months from the date of original issue to the date of maturity,

shall be considered as ordinary income.

(B) Subsection (a)(2)(A) not to apply. Subsection (a)(2)(A) shall not apply to any debt instrument referred to in subparagraph (A) of this paragraph.

(C) Cross reference. For current inclusion of original issue discount, see section 1272.

**(d) Double inclusion in income not required.**

This section and sections 1272 and 1286 shall not require the inclusion of any amount previously includible in gross income.

---

In 1997, P.L. 105-34, Sec. 1003(c)(1), amended subsec. (b), effective for sales, exchanges and retirements after 8/5/97.

Prior to amendment, subsec. (b) read as follows:

"(b) Exceptions.

"This section shall not apply to—

"(1) Natural persons. Any obligation issued by a natural person.

"(2) Obligations issued before July 2, 1982, by certain issuers. Any obligation issued before July 2, 1982, by an issuer which—

"(A) is not a corporation, and

"(B) is not a government or political subdivision thereof."

In 1988, P.L. 100-647, Sec. 1006(u)(4), substituted "subsection (a)(7)" for "subsection (a)(6)" in clause (a)(2)(A)(ii), effective for debt instruments issued after 12/31/86 in tax. yrs. end. after 12/31/86.

In 1986, P.L. 99-514, Sec. 1803(a)(1)(A), added para. (a)(4) . . . Sec. 1803(a)(2)(A), added subpara. (a)(3)(E) . . . Sec. 1803(a)(2)(B), substituted "this paragraph, except as provided in subparagraph (E)" for "this paragraph" in subpara. (a)(3)(D) . . . Sec. 1803(a)(3), amended subpara. (a)(3)(B), effective for tax. yrs. end. after 7/18/84 and as provided in Sec. 44(j) of P.L. 98-369, reproduced below.

Prior to amendment, subpara. (a)(3)(B) read as follows:

"(B) Short-term government obligation. For purposes of this paragraph, the term 'short-term Government obligation' means any obligation of the United States or any of its possessions, or of a State or any political subdivision thereof, or of the District of Columbia which is—

"(i) issued on a discount basis, and

"(ii) payable without interest at a fixed maturity date not more than 1 year from the date of issue. Such term does not include any tax-exempt obligation."

In 1984, P.L. 98-369, Sec. 41(a), added Code Sec. 1271 for tax. yrs. end. after 7/18/84. Sec. 44(j) of the Act provides:

"(j) Clarification that prior effective date rules not affected.

"Nothing in the amendment made by section 41(a) shall affect the application of any effective date provision (including any transitional rule) for any provision which was a predecessor to any provision contained in part V of subchapter P of chapter 1 of the Internal Revenue Code of 1954 (as added by section 41)."

---

(A) In general. In the case of an applicable high yield discount obligation issued by a corporation—

  (i) no deduction shall be allowed under this chapter for the disqualified portion of the original issue discount on such obligation, and

  (ii) the remainder of such original issue discount shall not be allowable as a deduction until paid.

For purposes of this paragraph, rules similar to the rules of subsection (i)(3)(B) shall apply in determining the amount of the original issue discount and when the original issue discount is paid.

(B) Disqualified portion treated as stock distribution for purposes of dividend received deduction.

  (i) In general. Solely for purposes of sections 243, 245, 246, and 246A, the dividend equivalent portion of any amount includible in gross income of a corporation under section 1272(a) in respect of an applicable high yield discount obligation shall be treated as a dividend received by such corporation from the corporation issuing such obligation.

  (ii) Dividend equivalent portion. For purposes of clause (i), the dividend equivalent portion of any amount includible in gross income under section 1272(a) in respect of an applicable high yield discount obligation is the portion of the amount so includible—

    (I) which is attributable to the disqualified portion of the original issue discount on such obligation, and

    (II) which would have been treated as a dividend if it had been a distribution made by the issuing corporation with respect to stock in such corporation.

(C) Disqualified portion.

  (i) In general. For purposes of this paragraph, the disqualified portion of the original issue discount on any applicable high yield discount obligation is the lesser of—

    (I) the amount of such original issue discount, or

    (II) the portion of the total return on such obligation which bears the same ratio to such total return as the disqualified yield on such obligation bears to the yield to maturity on such obligation.

  (ii) Definitions. For purposes of clause (i), the term "disqualified yield" means the excess of the yield to maturity on the obligation over the sum referred to subsection (i)(1)(B) plus 1 percentage point, and the term "total return" is the amount which would have been the original issue discount on the obligation if interest described in the parenthetical in section 1273(a)(2) were included in the stated redemption price at maturity.

(D) Exception for S corporations. This paragraph shall not apply to any obligation issued by any corporation for any period for which such corporation is an S corporation.

(E) Effect on earnings and profits. This paragraph shall not apply for purposes of determining earnings and profits; except that, for purposes of determining the dividend equivalent portion of any amount includible in gross income under section 1272(a) in respect of an applicable high yield discount obligation, no reduction shall be made for any amount attributable to the disqualified portion of any original issue discount on such obligation.

(F) Cross reference. For definition of applicable high yield discount obligation, see subsection (i).

(6) **Cross references.** For provision relating to deduction of original issue discount on tax-exempt obligation, see section 1288.

For special rules in the case of the borrower under certain loans for personal use, see section 1275(b).

(f) **Denial of deduction for interest on certain obligations not in registered form.**

(1) **In general.** Nothing in subsection (a) or in any other provision of law shall be construed to provide a deduction for interest on any registration-required obligation unless such obligation is in registered form.

(2) **Registration-required obligation.** For purposes of this section—

(A) In general. The term "registration-required obligation" means any obligation (including any obligation issued by a governmental entity) other than an obligation which—

  (i) is issued by a natural person,

  (ii) is not of a type offered to the public,

  (iii) has a maturity (at issue) of not more than 1 year, or

  (iv) is described in subparagraph (B).

(B) Certain obligations not included. An obligation is described in this subparagraph if—

  (i) there are arrangements reasonably designed to ensure that such obligation will be sold (or resold in connection with the original issue) only to a person who is not a United States person, and

  (ii) in the case of an obligation not in registered form—

    (I) interest on such obligation is payable only outside the United States and its possessions, and

    (II) on the face of such obligation there is a statement that any United States person who holds such obligation will be subject to limitations under the United States income tax laws.

(C) Authority to include other obligations. Clauses (ii) and (iii) of subparagraph (A), and subparagraph (B), shall not apply to any obligation if—

  (i) in the case of—

    (I) subparagraph (A), such obligation is of a type which the Secretary has determined by regulations to be used frequently in avoiding Federal taxes, or

    (II) subparagraph (B), such obligation is of a type specified by the Secretary in regulations, and

  (ii) such obligation is issued after the date on which the regulations referred to in clause (i) take effect.

(3) **Book entries permitted, etc.** For purposes of this subsection, rules similar to the rules of section 149(a)(3) shall apply.

(g) **Reduction of deduction where section 25 credit taken.**

The amount of the deduction under this section for interest paid or accrued during any taxable year on indebtedness with respect to which a mortgage credit certificate has been issued under section 25 shall be reduced by the amount of the credit allowable with respect to such interest under section 25 (determined without regard to section 26).

(h) **Disallowance of deduction for personal interest.**

(1) **In general.** In the case of a taxpayer other than a corporation, no deduction shall be allowed under this chapter for personal interest paid or accrued during the taxable year.

(2) **Personal interest.** For purposes of this subsection, the term "personal interest" means any interest allowable as a deduction under this chapter other than—

**(9) Special rule for rollovers to section 457 plans.** For purposes of this subsection, a distribution from an eligible deferred compensation plan (as defined in section 457(b)) of an eligible employer described in section 457(e)(1)(A) shall be treated as a distribution from a qualified retirement plan described in 4974(c)(1) to the extent that such distribution is attributable to an amount transferred to an eligible deferred compensation plan from a qualified retirement plan (as defined in section 4974(c)).

**(u) Treatment of annuity contracts not held by natural persons.**

(1) **In general.** If any annuity contract is held by a person who is not a natural person—

(A) such contract shall not be treated as an annuity contract for purposes of this subtitle (other than subchapter L), and

(B) the income on the contract for any taxable year of the policyholder shall be treated as ordinary income received or accrued by the owner during such taxable year.

For purposes of this paragraph, holding by a trust or other entity as an agent for a natural person shall not be taken into account.

(2) **Income on the contract.**

(A) In general. For purposes of paragraph (1), the term "income on the contract" means, with respect to any taxable year of the policyholder, the excess of—

(i) the sum of the net surrender value of the contract as of the close of the taxable year plus all distributions under the contract received during the taxable year or any prior taxable year, reduced by

(ii) the sum of the amount of net premiums under the contract for the taxable year and prior taxable years and amounts includible in gross income for prior taxable years with respect to such contract under this subsection.

Where necessary to prevent the avoidance of this subsection, the Secretary may substitute "fair market value of the contract" for "net surrender value of the contract" each place it appears in the preceding sentence.

(B) Net premiums. For purposes of this paragraph, the term "net premiums" means the amount of premiums paid under the contract reduced by any policyholder dividends.

(3) **Exceptions.** This subsection shall not apply to any annuity contract which—

(A) is acquired by the estate of a decedent by reason of the death of the decedent,

(B) is held under a plan described in section 401(a) or 403(a), under a program described in section 403(b), or under an individual retirement plan,

(C) is a qualified funding asset (as defined in section 130(d), but without regard to whether there is a qualified assignment),

(D) is purchased by an employer upon the termination of a plan described in section 401(a) or 403(a) and is held by the employer until all amounts under such contract are distributed to the employee for whom such contract was purchased or the employee's beneficiary, or

(E) is an immediate annuity.

(4) **Immediate annuity.** For purposes of this subsection, the term "immediate annuity" means an annuity—

(A) which is purchased with a single premium or annuity consideration,

(B) the annuity starting date (as defined in subsection (c)(4)) of which commences no later than 1 year from the date of the purchase of the annuity, and

(C) which provides for a series of substantially equal periodic payments (to be made not less frequently than annually) during the annuity period.

**(v) 10-percent additional tax for taxable distributions from modified endowment contracts.**

(1) **Imposition of additional tax.** If any taxpayer receives any amount under a modified endowment contract (as defined in section 7702A), the taxpayer's tax under this chapter for the taxable year in which such amount is received shall be increased by an amount equal to 10 percent of the portion of such amount which is includible in gross income.

(2) **Subsection not to apply to certain distributions.** Paragraph (1) shall not apply to any distribution—

(A) made on or after the date on which the taxpayer attains age 59½,

(B) which is attributable to the taxpayer's becoming disabled (within the meaning of subsection (m)(7)), or

(C) which is part of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the taxpayer or the joint lives (or joint life expectancies) of such taxpayer and his beneficiary.

**(w) Application of basis rules to nonresident aliens.**

(1) **In general.** Notwithstanding any other provision of this section, for purposes of determining the portion of any distribution which is includible in gross income of a distributee who is a citizen or resident of the United States, the investment in the contract shall not include any applicable nontaxable contributions or applicable nontaxable earnings.

(2) **Applicable nontaxable contribution.** For purposes of this subsection, the term "applicable nontaxable contribution" means any employer or employee contribution—

(A) which was made with respect to compensation—

(i) for labor or personal services performed by an employee who, at the time the labor or services were performed, was a nonresident alien for purposes of the laws of the United States in effect at such time, and

(ii) which is treated as from sources without the United States, and

(B) which was not subject to income tax (and would have been subject to income tax if paid as cash compensation when the services were rendered) under the laws of the United States or any foreign country.

(3) **Applicable nontaxable earnings.** For purposes of this subsection, the term "applicable nontaxable earnings" means earnings—

(A) which are paid or accrued with respect to any employer or employee contribution which was made with respect to compensation for labor or personal services performed by an employee,

(B) with respect to which the employee was at the time the earnings were paid or accrued a nonresident alien for purposes of the laws of the United States, and

(C) which were not subject to income tax under the laws of the United States or any foreign country.

(4) **Regulations.** The Secretary shall prescribe such regulations as may be necessary to carry out the provisions of this subsection, including regulations treating contributions and earnings as not subject to tax under the laws of any

144. Qualified small issue bond; qualified student loan bond; qualified redevelopment bond.

145. Qualified 501(c)(3) bond.

146. Volume cap.

147. Other requirements applicable to certain private activity bonds.

In 1986, P.L. 99-514, Sec. 1301(b), added Subpart A as part of the changes made to Part IV.

## Sec. 141. Private activity bond; qualified bond.

### (a) Private activity bond.

For purposes of this title, the term "private activity bond" means any bond issued as part of an issue—

(1) which meets—

    (A) the private business use test of paragraph (1) of subsection (b), and

    (B) the private security or payment test of paragraph (2) of subsection (b), or

(2) which meets the private loan financing test of subsection (c).

### (b) Private business tests.

(1) **Private business use test.** Except as otherwise provided in this subsection, an issue meets the test of this paragraph if more than 10 percent of the proceeds of the issue are to be used for any private business use.

(2) **Private security or payment test.** Except as otherwise provided in this subsection, an issue meets the test of this paragraph if the payment of the principal of, or the interest on, more than 10 percent of the proceeds of such issue is (under the terms of such issue or any underlying arrangement) directly or indirectly—

    (A) secured by any interest in—

        (i) property used or to be used for a private business use, or

        (ii) payments in respect of such property, or

    (B) to be derived from payments (whether or not to the issuer) in respect of property, or borrowed money, used or to be used for a private business use.

(3) **5 percent test for private business use not related or disproportionate to government use financed by the issue.**

    (A) In general. An issue shall be treated as meeting the tests of paragraphs (1) and (2) if such tests would be met if such paragraphs were applied—

        (i) by substituting "5 percent" for "10 percent" each place it appears, and

        (ii) by taking into account only—

            (I) the proceeds of the issue which are to be used for any private business use which is not related to any government use of such proceeds,

            (II) the disproportionate related business use proceeds of the issue, and

            (III) payments, property, and borrowed money with respect to any use of proceeds described in subclause (I) or (II).

    (B) Disproportionate related business use proceeds. For purposes of subparagraph (A), the disproportionate related business use proceeds of an issue is an amount equal to the aggregate of the excesses (determined under the following sentence) for each private business use of the proceeds of an issue which is related to a government use of such proceeds. The excess determined under this sentence is the excess of—

        (i) the proceeds of the issue which are to be used for the private business use, over

        (ii) the proceeds of the issue which are to be used for the government use to which such private business use relates.

(4) **Lower limitation for certain output facilities.** An issue 5 percent or more of the proceeds of which are to be used with respect to any output facility (other than a facility for the furnishing of water) shall be treated as meeting the tests of paragraphs (1) and (2) if the nonqualified amount with respect to such issue exceeds the excess of—

    (A) $15,000,000, over

    (B) the aggregate nonqualified amounts with respect to all prior tax-exempt issues 5 percent or more of the proceeds of which are or will be used with respect to such facility (or any other facility which is part of the same project).

There shall not be taken into account under subparagraph (B) any bond which is not outstanding at the time of the later issue or which is to be redeemed (other than in an advance refunding) from the net proceeds of the later issue.

(5) **Coordination with volume cap where nonqualified amount exceeds $15,000,000.** If the nonqualified amount with respect to an issue—

    (A) exceeds $15,000,000, but

    (B) does not exceed the amount which would cause a bond which is part of such issue to be treated as a private activity bond without regard to this paragraph,

such bond shall nonetheless be treated as a private activity bond unless the issuer allocates a portion of its volume cap under section 146 to such issue in an amount equal to the excess of such nonqualified amount over $15,000,000.

(6) **Private business use defined.**

    (A) In general. For purposes of this subsection, the term "private business use" means use (directly or indirectly) in a trade or business carried on by any person other than a governmental unit. For purposes of the preceding sentence, use as a member of the general public shall not be taken into account.

    (B) Clarification of trade or business. For purposes of the 1st sentence of subparagraph (A), any activity carried on by a person other than a natural person shall be treated as a trade or business.

(7) **Government use.** The term "government use" means any use other than a private business use.

(8) **Nonqualified amount.** For purposes of this subsection, the term "nonqualified amount" means, with respect to an issue, the lesser of—

    (A) the proceeds of such issue which are to be used for any private business use, or

    (B) the proceeds of such issue with respect to which there are payments (or property or borrowed money) described in paragraph (2).

(9) **Exception for qualified 501(c)(3) bonds.** There shall not be taken into account under this subsection or subsection (c) the portion of the proceeds of an issue which (if issued as a separate issue) would be treated as a qualified 501(c)(3) bond if the issuer elects to treat such portion as a qualified 501(c)(3) bond.

### (c) Private loan financing test.

(1) **In general.** An issue meets the test of this subsection if the amount of the proceeds of the issue which are to be used (directly or indirectly) to make or finance loans (other than loans described in paragraph (2)) to persons other than governmental units exceeds the lesser of—

    (A) 5 percent of such proceeds, or

    (B) $5,000,000.

AFFIDAVIT IN SUPPORT
OF MOVE TO CLARIFY WORD "PERSON"

Nadine J. Griffin,
CASE NO. 1:05-CR-10175-WGY

# EXHIBIT "F"
## 6 pages

Chapter 3(17)00   Service Center and MCC Accounting and Data Control

# Table of Contents

## 3(17)(46)0   Automated Non-Master File Accounting

Processing Applications—Initial Sort—Child Support
    Assessments   3(17)(46)6.4
Assessable Applications—Child Support
    Assessments   3(17)(46)6.5
Decrease and Other Applications—Child Support
    Assessments   3(17)(46)6.6
Reports—Form 5461; Report of Action Under Public Law
    93–647 Child Support Assessments   3(17)(46)6.7
Preparation of Form 5461, Report of Action Under Public
    Law 93–647, Figure 10   3(17)(46)6.8
HHS Office Address   3(17)(46)6.9
CSO State AGency Addresses   3(17)(46)6.(10)
Regions   3(17)(46)6.(11)

### 3(17)(46)7
### NMF Tax Straddles

Maintenance of NMF Tax Straddles   3(17)(46)7.1
Tax Straddles—Deficit Reduction Act of 1984 for IMF and
    BMF Tax Returns   3(17)(46)7.2
Establishment and Assessment of the NMF
    Account   3(17)(46)7.3
Maintenance of Case File   3(17)(46)7.4
Billing of Case File   3(17)(46)7.5

### 3(17)(46)8
### Billing Notices

Notice Issuance (1st, 2nd, 3rd, and 4th)   3(17)(46)8.1
Undeliverable Non Master File Notices   3(17)(46)8.2
TDA Issuance   3(17)(46)8.3
Master File Entity Freeze   3(17)(46)8.4
Entity Updates/Undeliverable Notices   3(17)(46)8.5
Alternative Notice Generation   3(17)(46)8.6

### 3(17)(46)9
### Subsequent Transactions

General Posting of Subsequent Transactions   3(17)(46)9.1
Service Center Deposits   3(17)(46)9.2
District Office Deposits   3(17)(46)9.3
Other Transactions   3(17)(46)9.4
Processing of Advance NMF Payments, Payment Posting
    Vouchers (Forms 3244 and 3244–A)   3(17)(46)9.5
Escrow Account for Withholding Agent (Account 4610,
    Unapplied Advance Payments) (PSC
    Only)   3(17)(46)9.6
NMF Dishonored Checks   3(17)(46)9.7
Entity Changes   3(17)(46)9.8
Section 847—Special Estimated Tax (SET)
    Program   3(17)(46)9.9

### 3(17)(46)(10)
### Establishing and Updating NMF TDA Accounts
### on IDRS

NMF TDA Account Establishment on IDRS   3(17)(46)10.1
NMF TDA Subsequent Transactions to
    IDRS   3(17)(46)(10).2

### 3(17)(46)(11)
### NMF Balancing

Introduction   3(17)(46)(11).1
Cut-Off Dates   3(17)(46)(11).2
Researching NMF for Balancing Purposes   3(17)(46)(11).3
Balancing   3(17)(46)(11).4
Identifying Journals (Weekly)   3(17)(46)(11).5
Matching NMF Subsidiary to RACS General
    Ledger   3(17)(46)(11).6
Matching Trial Balances by TIN   3(17)(46)(11).7
Research RACS Recaps   3(17)(46)(11).8
Reconciliation Report—Form 3997   3(17)(46)(11).9
Penalty and Interest Review   3(17)(46)(11).(10)
Penalty and Interest Computations   3(17)(46)(11).(11)
Credit Balances—Refund Returns   3(17)(46)(11).(12)
Account Review   3(17)(46)(11).(13)

### 3(17)(46)(12)
### Write-Off Accounts and End of Fiscal Year
### Processing

Currently Not Collectible Accounts (NMF status 53, Account
    1830)   3(17)(46)(12).1
Reopening and Reactivating Currently Not Collectible
    Accounts (53'd)   3(17)(46)(12).2
Debit/Credit Accounts Written-Off   3(17)(46)(12).3
Collection Statute Expired Processing   3(17)(46)(12).4
Zero Balance NMF Accounts   3(17)(46)(12).5

### 3(17)(46)(13)
### Semi-Annual DAIP Review

### 3(17)(46)(14)
### The Automated Non-Master File

Introduction   3(17)(46)(14).1
Entering and Exiting the System   3(17)(46)(14).2
NMF Account Transcript Requests   3(17)(46)(14).3
NMF Research on the Automated NMF
    System   3(17)(46)(14).4
NMF Block Control/Correction   3(17)(46)(14).5
BOB/Error Correction   3(17)(46)(14).6
Loading the ULC   3(17)(46)(14).7
Original Entry   3(17)(46)(14).8
Data Entry/Key Verification   4(17)(46)(14).9
Data Corrections/Key Verification   3(17)(46)(14).(10)
Unpostables Corrections   3(17)(46)(14).(11)
Nullified Unpostables   3(17)(46)(14).(12)
Recall Closed Account   3(17)(46)(14).(13)
Subsequent Transactions   3(17)(46)(14).(14)
Processing Entity Changes   3(17)(46)(14).(15)
Unpostable Entity Changes   3(17)(46)(14).(16)
Index Card System   3(17)(46)(14).(17)
Index Card Research and Transcript
    Request   3(17)(46)(14).(18)
Archive NMF Accounts   3(17)(46)(14).(19)

(Next page is 3(17)(46)0-2.1)

(j) IRM 3(11)(25)0, Miscellaneous Tax Returns

(k) IRM 3(15)(148)0, BMF and NMF DP Tax Adjustments

(l) IRM 48(13)2, AIMS—DO and SC Processing

(m) IRM 3(17)(243)0, Miscellaneous Accounting

(n) IRM 8114, Appeals Returns Processing and Control

## 3(17)(46)1.5 (1-1-96)
## Tax Owed by Minor Children

(1) If the correspondence received from a taxpayer indicates the account is for a minor child, update the IDRS history section of the account using Command Code "ENMOD" to include the parents name and phone number and "MINOR" to the account.

(2) If the minor's account is in notice status, the account will be accelerated to ACS status with no further action by IRS personnel.

(3) If the account is in TDA status, refer the case to SCCB.

(4) For all other situations, this information will be used when contacting minor taxpayers until the information is no longer displayed on IDRS.

## 3(17)(46)1.6 (1-1-96)
## Security Over Taxpayer Information, Returns and Documents

Service officials and managers must communicate security standards contained in IRM 1(16)12 to subordinate employees and establish methods to enforce them. Employees are responsible for taking required precautions in providing security for the documentation, information, and property which they handle in performing official duties.

When using IDRS, only access those tax modules required to accomplish your official duties. All IDRS accesses are recorded for immediate review and to determine the accuracy of an adjustment. Any unauthorized access or browsing of tax modules by employees to satisfy personal curiosity or for fraudulent reasons are prohibited by IRS and are subject to disciplinary actions and/or dismissal from the service.

## 3(17)(46)1.7 (1-1-96)
## Glossary of Accounting Terms

(1) ABATEMENTS: To reduce an assessment of tax, penalty, or interest, when determined the assessment is incorrect. Abatements require the signature of the Certifying Officer and are supported by the legal document: Voucher and Schedule of Overpayment and Overassessment, Form 2188.

(2) ABSTRACTS: The detailed breakdown of revenue receipts within the 7 major tax classes, particularly within the Excise Classification. Abstracting identifies the specific type of tax collected and directs it to the proper appropriation account set by Congressional Act.

(3) ADVANCE PAYMENT: Payment made for an anticipated predetermined deficiency prior to the actual additional tax assessment.

(4) ALCOHOL, TOBACCO AND FIREARMS (AT&F): A Bureau within the Treasury Department with responsibility for monitoring the manufacture and sale of Alcohol, Tobacco and Firearms.

(5) ASSESSMENT: Amount of tax, interest or penalty charged to a taxpayer.

(6) ASSESSMENT CERTIFICATE: To impose a tax as authorized by the Internal Revenue Code. Assessments are supported by a summary record of assessment signed by an appointed assessment officer.

(7) AUDIT TRAIL: Control of source documents, cross reference from one type of action to another to provide a means for retrieval.

(8) BALANCE DUE: Amounts of tax, interest, penalty or other receivables that remain unpaid.

(9) CALENDAR YEAR: Twelve consecutive months ending December 31.

(10) COMMAND CODE (CC): A five or six character code used to initiate contact with IDRS.

(11) COMPUTER PARAGRAPH NOTICE (CP): A computer generated message, which generates a notice resulting from an analysis of the taxpayer's account, used to notify the taxpayer of a balance due, refund, or no balance status.

(12) CREDIT BALANCE: A condition in which the amounts of credit on a tax account exceed the balance due.

(13) DAILY ASSESSMENTS: Assessments which are pre-journalized.

(14) DATA CONTROL: Procedures designed to put all documents under control to assure that all documents are processed.

(15) DEBIT BALANCE: A condition in which the balance due exceeds the total amount of credits.

(16) DEPOSIT DATE: The calendar date coinciding with the Julian Date in the DLN.

(17) DEPOSIT FUND COLLECTIONS: Account established to control receipts held in suspense, pending some other action.

(18) DEPOSIT TICKET: The form the Deposit Function is required to prepare to deposit each day's balanced remittances.

(19) DISHONORED CHECKS: Depositories return unprocessable checks to our Accounting Branch by charging these items against the Treasury General Account (TGA) as unpaid checks—these charge backs are due to the Deposit Function's erroneous encoding, lack of encoding, taxpayer insufficient funds etc.

(20) DISTRIBUTED INPUT SYSTEM (DIS): replaced the old Direct Data Entry System (DDE) and is connected (interfaced) directly to our Computer Room for all Master File input.

(21) DISTRICT OFFICE: An Office of Internal Revenue Service located in a principal city for each state.

(22) DOCUMENT: A business form, voucher, or written evidence of a transaction.

(23) DOCUMENT CODE: The fourth and fifth digits of the DLN which identify the type of document used to record tax data information on a taxpayer's account. For example, doc. code 41 identifies Form 941, Employer's Quarterly Federal Tax Return Refer to Document 6209, ADP and IDRS Information, for a complete listing of doc. codes.

(24) DOCUMENT LOCATOR NUMBER (DLN): A fifteen-digit number assigned to every return and document input through the ADP system that affects a taxpayer account. The document locator number is used to identify and locate the document.

(25) DOCUMENT REGISTER: A numerical listing of each item in a block of returns or documents. It is used as a transmittal on each block of remittance documents. Part 3 or a photo copy of the Form 813 is used to create the Master Control Record (MCR) on the Service Center Control File (SCCF). The Form 813, part 2, is used to clear the SCCF.

(26) DUE DATE: Prescribed date on which a calendar or fiscal year return must be filed.

(27) DUMMY TAX PERIOD ENDING: A 2000 series tax period ending used to establish an account on the Automated NMF system when that account already exists on the data base causing a duplicate Primary Key condition. When establishing an account with a "dummy" tax period, be sure to input the actual period ending date of the assessment into the Actual Period Ending Date field of the entity.

(28) EMPLOYER IDENTIFICATION NUMBER: A nine-digit number used to identify a taxpayer's business account.

(29) ENTITY AREA: The face of an input document where the name, address, account number, tax period and other entity data may appear.

(30) FEDERAL TAX DEPOSITS (FTD): A system whereby taxpayers are required to make deposits of trust fund monies through either local, commercial or Federal Reserve Banks. These deposits are forwarded to Treasury which prepares a special Certificate of Deposit and places each item on a magnetic tape. These tapes are then shipped to MCC for posting to the taxpayer's account.

(31) FILE LOCATION CODE (FLC): The first two digits of the DLN assigned to identify the district office related to the processing service center.

(32) FISCAL YEAR (FY): Twelve consecutive months ending on the last day of any month other than December.

(33) FREEZE CODE: A code restricting the Master File from refunding or offsetting from an account.

(34) GOOD BLOCK PROOF (GBP): Part 2 of the Form 813 is used to clear the NMF DLN from the Service Center Control File (SCCF). This is referred to as a Good Block Proof (GBP).

(35) INTEGRATED DATA RETRIEVAL SYSTEM (IDRS): A computer system with the capability to instantaneously retrieve or update stored information which works in harmony with our Master File of taxpayer accounts. This system is aimed at quick resolution of problems and queries concerning current taxpayer accounts. It also furnishes information immediately for IRS personnel in their work assignments.

(36) JOURNALIZATION: The process of debiting and crediting General Ledger accounts. Every tax transaction that involves money must be journalized to maintain accounting control.

(37) JULIAN DATE: A system of numbering the days of the year from 001 through 365 (or 366) and used as the 6th, 7th & 8th digits of the DLN.

(38) MASTER FILE: Subsidiary records of taxpayers' accounts established and maintained on magnetic tape at the MCC.

(39) MASTER FILE TAX CODE (MFT CODE): A two-digit number which identifies the type of tax.

(40) MASTER CONTROL RECORDS (MCR): A tape is created from part 3 or a copy of Form 813. This tape will create the MCR on the Service Center Control File (SCCF).

(41) MICROFILM: A media to provide photographic records to printed data on a reduced scale.

(42) MM/DD/YY: The six-digit format which identifies the month, day, and year, i.e., Jan. 03, 1986 will be 01/03/86.

(43) NAME CONTROL (ALSO REFERRED TO AS ALPHA): The first four letters or hyphens of the principal name of the taxpayer. Blank spaces will be included if the principal name consists of less than four characters.

Automated Non-Master File Accounting

(44) NON-MASTER FILE: Subsidiary records of taxpayers accounts which are not established and maintained on one of the Master Files. They were manually maintained for the liability period on Unit Ledger Cards prior to the Automated Non-Master File System and are now maintained on the data base since the automation.

(45) NON-REMITTANCE (N/R): Returns and documents received without a payment or an unacceptable form of payment are processed in the Non-Remittance Numbering Function and the assigned DLN Julian Date is a week-end date.

(46) OFFER-IN-COMPROMISE: A proposal for settlement of tax liability for an amount less than that previously assessed (or unassessed) or a liability for specific penalties assessed (or unassessed).

(47) PERIOD ENDING: The ending year and month indicating the period covered by a tax return, e.g; 8609 indicates a return for the period ended September 30, 1986. For the Automated NMF system, a six digit field in MMDDYY format.

(48) POSTING VOUCHERS: Various procedures require the Deposit Activity to prepare a source document (Posting Voucher) containing all the required information for input.

(49) PRESEARCH: The act of searching for required data not present on the source documents via the IDRS or ANMF terminals prior to the actual deposit of the remittance.

(50) PROBLEM RESOLUTION PROGRAM (PRP): A program established whereby taxpayers' problems can be referred and controlled until the problems are resolved.

(51) RECAPITULATION: Balancing the summaries of remittances to the documents.

(52) RECONCILIATION: Resolving discrepancies within the total document count and money amount for each block.

(53) REFUND: Money returned to the taxpayer as a result of overpayment of a tax liability.

(54) REIMBURSABLE PROJECTS: Projects for which IRS is paid to perform the actual processing of other agencies' data.

(55) REJECT: A return or document determined to be unprocessable because of missing data, erroneous blocking, or incomplete information. The document is coded to reject by tax examiners and is placed on reject registers for correction by error perfection groups.

(56) REMITTANCE AMOUNT: An amount of money received in payment to taxes—may be a check, money order, cashier's check, or cash.

(57) REVENUE RECEIPTS: Monies collected in payment of tax liabilities. The net totals of Accounts 2100 and 2200.

(58) SEIZED PROPERTY: Circumstance(s) sometimes requires IRS to take possession of a delinquent taxpayer's property and sell it for payment of back taxes.

(59) SERVICE CENTER CONTROL FILE (SCCF): A Magnetic Tape Control System to record the receipt of Returns or documents into the processing pipeline, to record the process of the documents through the processing system and finally to record the fact that all items have been completed. The SCCF systems maintain separate totals for revenue receipt items and other items.

(60) SOCIAL SECURITY NUMBER: A nine digit number used to identify an individual taxpayer account.

(61) STATUTE LIMITATIONS: The Internal Revenue Code states that the IRS will assess tax, refund credit, and collect taxes within a specific time frame. This limit is known as the "Statute of Limitations." The determination of a statute expiration differs from assessment (ASED), refund (RSED), and collection (CSED). See IRM 3(15)(58)0, Statute Limitations for further information.

(62) SUBSEQUENT PAYMENT: A payment received for an account that has been assessed and the taxpayer has been billed.

(63) TAX CLASS: Revenue Receipts are categorized into seven major tax classes. These are: withholding, individual income, corporation income, excise, estate and gift, carriers tax and Federal Unemployment Tax.

(64) TAX PERIOD: A four digit number which represents the end of the tax liability year for a return; and is designated by the year and month, EXAMPLE: 8612.

(65) TAXPAYER: An entity liable for any type of Federal tax.

(66) TAXPAYER DELINQUENT ACCOUNT (TDA): A computer generated printout indicating that the taxpayer's account has reached a delinquent status. TDA's are sent to the Service Center Collection Branch for collection action.

(67) TAXPAYER IDENTIFICATION NUMBER (TIN): Every taxpayer on the Master File has a permanent number for identification of the tax account. The Employer Identification Number (EIN) is used to identify taxpayers on the Business Master File. The Social Security Number (SSN) is used as the account number of the taxpayer on the Individual Master File. The format of these account numbers is:

| VALUE | MEANING |
|-------|---------|
| EIN | nn–nnnnnnn |
| SSN | nnn–nn–nnnn |

(68) TRANSACTION CODE (TC): A three-digit number which defines the precise nature of the transaction. For example, TC 150 indicates "Return Filed & Tax Liability Assessed." Refer to Document 6209, ADP and IDRS Information, for complete listing of transaction codes.

(69) UNIDENTIFIED REMITTANCE (UR): Remittances without the necessary identification to apply to a Master File or a Non-Master File account.

(70) UNIDENTIFIED REMITTANCE FILE (URF): A separate file within the Integrated Data Retrieval System containing all remittances received that cannot be immediately identified or applied. Each record within the file contains the URF control number, amount or remittance, type of remittance, received date, taxpayer's name and other identifying information, if known.

(71) UNIT LEDGER CARD (ULC) Form 6335: Account cards that were used prior to the Automated Non-Master File System to record all transactions related to a tax liability maintained manually.

(72) WEEKLY ASSESSMENTS: Assessments which are post journalized.

(73) WITH REMITTANCE (W/R): Any document received with cash, check, money order or other forms of payment.