FILED
IN CLERKS OFFICE

2006 MAR -1  P 2: 53

U.S. DISTRICT COURT
DISTRICT OF MASS.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,   )
                            )   CASE NO. 05-CR-10175-WGY
    Plaintiff,               )
                            )   VERIFIED MEMORANDUM OF LAW IN
vs.                         )   SUPPORT OF MOVE FOR DISCLOSURE
                            )   OF CHAMBERS PAPERS
Nadine J. Griffin,          )
                            )
    Accused, Belligerent Claimant. )
                            )

COMES NOW Nadine J. Griffin, the Accused Belligerent Claimant in the above-styled matter, and would show this Court the following:

It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents. In contrast to the English practice, see, e. g., Browne v. Cumming, 10 B. & C. 70, 109 Eng. Rep. 377 (K. B. 1829), American decisions generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit. The interest necessary to support the issuance of a writ compelling access has been found, for example, in the citizen's desire to keep a watchful eye on the workings of public agencies, see, e. g., State ex rel. Colscott v. King, 154 Ind. 621,621-627, 57 NE. 535, 536-538 (1900); State ex rel. Ferry v. Williams. 41 N.J.L. 332, 336-339 (1879), and in a newspaper publisher's intention to publish information concerning the operation of government, see, e. g., State ex rel. Youmans v. Owens, 28 Wis.2d 672, 677, 137 N.W.2d 470, 472 (1965), modified on other grounds, 28 Wis.2d 685a, 139 N.W.2d 241 (1966).

Nixon v. Warner Communications, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (footnotes omitted).

How that government is <u>supposed</u> to operate was described generations ago:

Mr. McKEOWN. ... What is free government? In its last analysis it is the intelligent and impartial administration of justice. It is public justice that holds the Union together. It is to the courts that we look for the protection of our lives, liberty, reputation, and rights of property. *The people have a greater concern in the judicial branch of the Government than in any other.* It is to the courts that the people look to protect them in their rights against the Nation or the world. The courts deal with the people in every relation of life from the day they enter the world, and direct the affairs of their estates and guide their hands after death in the distribution of their property.

Congressional Record, Volume 72, p. 9988 (June 3, 1930) (71st Congress, 2nd session).

Secrecy in court proceedings has long been anathema to free government.

Openness in court proceedings not only gets to the truth more readily, but also results in all those connected with the trial-parties, counsel witnesses, jurors and Judges-performing their functions more conscientiously. See Gannett Co. v. DePasquale, 443 U.S. 368,383,99 S.Ct. 2898, 61 L.Ed2d 608 (1979). *Criminal proceedings conducted in secret have had from time immemorial an odious tinge that carries with it a scent of grave injustice reminiscent of the Spanish Inquisition and the English Star Chamber.* In marked contrast to the openness in which the common law jury functioned, the Lords of the Star Chamber proceeded as inquisitors. A defendant's trial was based on charges made by persons whose identities were not disclosed, and he could be examined under torture, with the ultimate decision left to a court sitting without a jury. See Geoffrey Radcliffe and Geoffrey Cross, The English Legal System 107-08 (5th 00. 1971); 8 John H. Wigmore, On Evidence § 2250, at 282-84 (1961). Thus, the right accorded the press and the public to be present at a criminal trial is rooted in history and derived from English common law in response to the Star Chamber.

United States v. Cojab. 996 F.2d 1404 (2nd Cir. 1993).

Openness in Criminal Proceedings. Asbury Press contends that the district court committed procedural and substantive errors in sealing the records of the February 2 hearing and in denying Asbury Press' March 8 motion. Analysis begins with the substantive law. The Sixth Amendment declares that: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." U.S. Const. amend. VI. This constitutional guarantee derives from the English common law. This cherished right, John Lilburne declared in 1649 during his trial for high treason, is "the first fundamental liberty" of a free people. By the laws of England, Lilburne continued, all courts of Justice always ought to be free and open for all sorts of peaceable people to see, behold and hear, and have free access unto; and no man whatsoever ought to be tried in holes or corners, or in any place, where the gates are shut and barred, and guarded with armed men. . . .

Reprinted in IV Cobbett's Complete Collection of State Trials, 1270, 1273 (T.B. Howell ed., 1809), .Id.

Today the timorous law clerk, afraid to "offend" anyone, including the judge for which (he or she) works, government attorneys (as the respondent is in this case), or one of the powerful law firms for which the clerk one day hopes to work, has turned the need for the principles of "life tenure" for federal judges upside-down.

The Sixth Circuit had a few choice words to say about "secret law" a generation ago:

> The concern of Justice Brennan that secrecy eliminates one of the important checks on the integrity of the system applies no differently in a civil setting. *In either the civil or the criminal courtroom, secrecy insulates the participants, masking impropriety, obscuring incompetence, and concealing corruption.*
>
> Brown & Williamson Tobacco Corp. v. Federal Trade Commission, 710 F.2d 1165 (6th Cir. 1983), *cert. denied,* 104 S. Ct. 1595 (1984).
>
> The Supreme Court's historical argument is based on policy considerations developed in the past that remain valid today. First, public trials play an important role as outlets for "community concern, hostility, and emotions." Richmond Newspapers, supra, at 571. *When judicial decisions are known to be just and when the legal system is moving to vindicate societal wrongs, members of the community are less likely to act as self-appointed law enforcers or vigilantes. "The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is 'done in a corner [or] in any covert manner.'"* Id. at 571.
>
> Second, public access provides a check on courts. Judges know that they will continue to be held responsible by the public for their rulings. Without access to the proceedings, the public cannot analyze and critique the reasoning of the court. The remedies or penalties imposed by the corner will be more readily accepted, or corrected if erroneous, if the public has an opportunity to review the facts presented to the court. In his concurrence, Justice Brennan emphasized this link between access to the courtroom and the popular control necessary in our representative form of government. Id at 592. Although the federal judiciary is not a majoritarian institution, public access provides an element of accountability. *One of the ways we minimize judicial error and misconduct is through public scrutiny and discussion.* Id.
>
> The English common law, the American constitutional system, and the concept of the "consent of the governed" stress the "public" nature of legal principles and decisions. Throughout our history, the open courtroom has been a fundamental feature of the American judicial system. Basic principles have emerged to guide judicial discretion respecting public access to judicial proceedings. These principles apply as well to the determination of whether to permit access to information contained in court: documents because court records often provide important, sometimes the only, basis or explanations for a court's decision. Id. (footnote omitted).

> ... The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is "done in a corner [or] in any covert manner." ... It is not enough to say that results alone will satiate the natural community desire for "satisfaction." A result considered untoward may undermine public confidence, and where the trial has been concealed from public view an unexpected outcome can cause a reaction that the system at best has fueled and at worst has been corrupted. *To work effectively, it is important that society's criminal process "satisfy the appearance of justice,"... and the appearance of justice can best be provided by allowing people to observe it.*

United States v. Becham, 789 F.2d 401 (6th Cir. 1986) (citations omitted).

> The public's interest in the functioning of its government certainly ranks among the highest when communication of information is concerned, and a quest for knowledge should not be blocked, especially when the public seeks "access to places traditionally open to the public."

Id. (citation omitted).

**Unfortunately, the blocking of access to knowledge is not a new phenomenon to the legal profession.**

> Woe unto you, lawyers! for ye have taken away the key of knowledge: ye entered not in yourselves, and them that were entering in ye hindered.
> Luke 11:52

This statement was made as a result of the "secret law" in the synagogues of Jerusalem at the time of Jesus Christ and in which the common man was not allowed to participate nor observe.

> Other circuits have agreed that "... where corruption in government is the focus of the proceeding in issue, this factor weighs against limitations on the traditional right of public access." United States v. Mmtin, 746 F.2d 964, 969 (3d Cir. 1984); Jemette, 653 F.2d at 614; Criden 1, 648 F.2d at 822; Myers, 635 F.2d at 952 ('The presumption is especially strong in a case like this [ABSCAM] where the evidence shows the actions of public officials. ...")

United States v. Becham, supra.

> A district court which denies access in the face of the strong common law presumption favoring access must articulate its reasons for such denial with specificity. In re Knight Publishing Co., 743 F.2d 231, 234 (4th Cir. 1984); Edwards, 672 F.2d at 1294; Criden I,

648 F.2d at 829. While we review the decision of the district court for abuse of discretion, it is clear that "[t]he mere statement that a decision lies within the discretion of the trial court does little to shed light on its reviewability. It means merely that the decision is uncontrolled by fixed principles or rules of law." Criden I. 648 F.2d at 817. See Brown & Williamson, 710 F.2d at 1177; Belo Broadcasting COIJ'. v. Clark, 654 F.2d 423, 430 (5th Cir. 1981); Jenrette, 653 F.2d at 613; WFMJ, 566 F.Supp. at 1040. In In re Knoxville News-Sentinel Co.. 723 F.2d 470, 476 (6th Cir. 1983), we noted that "the district court's decision is not accorded the traditional scope of 'narrow review reserved for discretionary decisions based on first-hand observation.'" Rather, we adopted the following view of the abuse of discretion standard to govern our review of right-to-access cases.

"To say that discretion exists, however, is not to say, as appellee contends, that what is involved here 'is simply a policy determination.' Appellants seek to vindicate a precious common law right, one that predates the Constitution itself. While the courts have sanctioned incursions on this right, they have done so only when they have concluded that justice so requires. To demand any less would demean the common law right." Id. at 476 (quoting Mitchell, 551 F.2d at 1260). Id.

The Order Denying the Move for a Fair and Impartial Hearing had to have been authored by a law clerk (and not a very competent one at that) is self-evident, because Judicial Official and CEO William G Young would not without exposing his incompetence, in his right mind, deny a Move for a Fair and Impartial Hearing.

Additionally, it must have been a law clerk that denied the Affidavit in Support of the Move for a Fair and Impartial Hearing, it could not possibly have been the Judicial Official and CEO William G. Young, because the Affidavit was a statement of facts and did not request a court order or court action.

Whoever authored these Electronic Orders was not able to discern that between an Affidavit and a move or that a denial of a move for a Fair and Impartial Hearing would be a statement – on the record – that the court is biased against the accused and consequently is grounds for recusal.

///

**WHEREFORE**, Nadine J. Griffin, MOVES THIS Court to grant the relief requested, or, in the alternative, articulate the reasons for its denial with specificity.

Respectfully submitted,

**VERIFICATION**

I, Nadine J. Griffin, declare under penalty of perjury as a Conscious, Thinking, Feeling, Living, Breathing, Flesh and Blood, Sentient Being that the forgoing is true and correct. All Rights retained without recourse.

Executed this 28 day of February, 2006.

Signature: /s/ Nadine J. Griffin
Nadine J. Griffin
Accused, Belligerent Claimant
c/o 36 Center Street, #143
Wolfeboro, New Hampshire [03894]