UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Criminal No. 05-CR-10175-WGY-1 |
| | ) |
| v. | ) |
| | ) |
| NADINE J. GRIFFIN, | ) |
| | ) |
| Defendant. | ) |

UNITED STATES' TRIAL BRIEF

The United States of America, by and through undersigned counsel, hereby submits this Trial Brief to inform the Court of the nature of the case and to identify legal and factual issues that may arise at trial.

I.       STATUS OF THE CASE

Trial is set for July 10, 2006, before the Honorable William G. Young, United States District Court Judge.  The estimated time for the trial of the government's case-in-chief is approximately seven to eight days.  The government expects to call approximately thirty-five witnesses in its case-in-chief, absent stipulations.  Defendant is represented by attorney Alan S. Richey.

II.       BACKGROUND - OFFENSES

On July 13, 2005, a federal grand jury sitting in Boston, Massachusetts returned an indictment charging defendant Nadine J. Griffin with two counts of willfully filing false U.S. individual

1729730.1

income tax returns, in violation of 26 U.S.C. § 7206(1).

III.     **THEORY OF THE CASE**

In 1996, defendant began working as a salesperson for Global Prosperity ("Global"), an organization modeled after a multi-level marketing company that used a network of salespersons to sell audio cassette tapes and tickets to "offshore" seminars. By 1998 and 1999, defendant was one of Global's top salespersons.

Global was originally founded in the Fall of 1996 by Daniel P. Andersen ("Andersen") and David A. Struckman ("Struckman"), who met while both were salesmen for another multi-level marketing group company.[1] Andersen and Struckman centered their early efforts on marketing a 12 tape audio cassette series entitled Gateway to Financial Freedom (hereinafter "Global I") priced at $1,250. Ultimately, the Global products included tickets to a three-day offshore seminar called Global II retail priced at $6,250 per ticket, a five-day offshore seminar called Global III retail priced at $18,750 per ticket, and a five-day onshore seminar called Global IV retail priced at $37,500 per ticket. Global salespersons also received incentives called "revenue reimbursements" if they recruited more people to attend

---

[1]  In May 2004, Andersen, Struckman, Zo Lamantia, Kudlip Singh, and Dwayne Robare were indicted by a federal grand jury in Seattle, Washington, for conspiracy to defraud the United States. On July 20, 2005, a federal grand jury returned a superseding indictment against Struckman, Lamantia, and Kudlip Singh for additional charges of tax evasion. Trial against Mr. Struckman is scheduled for January 2007. All of the other defendants have pled guilty.

the offshore seminars.

The audio cassette tape series was marketed and sold as "wealth building strategies" and "business opportunities" where individuals could learn about "tax reduction strategies" and how to make lots of money.  But the subject matter of the tapes actually explained, among other subjects, that individuals could drop out of the tax system, not file tax returns, not use their social security numbers, and set-up foreign trust accounts that do not pay taxes, as well as various other ideas that could best be characterized as anti-tax schemes.

The Global seminars featured speakers who discussed "wealth building strategies," but in realty what many of the speakers promoted were fraudulent tax elimination schemes, as well as dubious investments schemes.  Some of the methods included using offshore trusts to hide ownership of income and assets, using foreign bank accounts to deposit and consume business income, and opening and maintaining domestic bank accounts in the names of nominee entities.  The seminars were held in such exotic places as Aruba, Bermuda, the Bahamas, and Cancun, Mexico.  Typically, seminars were held at least two to three times a year, and attendees at the seminars ranged from 500 to 2000 people per seminar.

The Global tapes and seminar tickets were sold to the public by individual salespersons such as defendant Griffin, who were

1729730.1

called "retailers."  As with other multi-level marketing businesses, retailers earned profits from their sale of products in a tiered system tied to sales performance.  Once a retailer sold a pre-determined number of products (i.e., tapes and tickets), typically six sales, the retailer was entitled to retain a percentage of the sales price from that product's sale, usually 80% to 90% of the sales price.

During the years 1998 and 1999, defendant Griffin was extremely successful at selling the tapes and tickets.  At trial, the evidence will show that defendant received more than $800,000 in gross receipts as a salesperson over the two years, but that none of it was reported on either income tax return for 1998 or 1999.

Although defendant did not report her sales activity for Global on the 1998 and 1999 tax returns, she did report on the 1998 and 1999 tax returns the gross receipts she earned as a salesperson for two other multi-level marketing businesses, ProStep and Melaleuca, which totaled less than $40,000 each year. In fact, prior to joining Global, from 1993 through 1997, defendant never reported on her income tax returns more than $50,000 in sales from ProStep and Melaleuca.

Defendant deposited her Global sales receipts into two bank accounts at Danvers Savings Bank using two different nominee business names: (1) Capital Finance Strategies, and (2) Angelica

1729730.1

Holdings.  When opening both bank accounts, defendant provided no social security number or taxpayer identification number (also known as a "TIN").  Instead, defendant provided the bank with a fraudulent Form W-8 (Certificate of Foreign Status) claiming that the bank accounts were owned by a foreign entity or nonresident alien and not subject to U.S. tax withholdings.  This was done with the intent to conceal, or attempt to conceal, her connection to the bank accounts.  Further, both bank accounts were non-interest bearing, which meant the money deposited into the bank accounts did not earn interest and which did not require the bank to report any interest to the IRS.

The Capital Finance Strategies ("CFS") account was opened on October 21, 1997.  Defendant maintained sole signature authority over this bank account.  The Angelica Holdings ("AH") account was opened on June 18, 1998.  Defendant and her father, James Griffin, shared signature authority over this bank account, but there is no evidence that Mr. Griffin deposited any money into either account.  On both signature cards, defendant claimed she was the "managing director" of the account.

Defendant, like other Global salespersons, claimed that she was "managing" the bank account, but did not "own" the bank account, which was a way of rationalizing why she did not have to report her Global sales on the tax returns; she only "managed" the account, she did not "own" the account.  It was semantics.

1729730.1

Interestingly, unlike the Global sales, the money defendant earned and received from ProStep and Melaleuca was not deposited into either bank account at Danvers Savings. Instead, the money defendant earned from ProStep and Melaleuca was deposited into her boyfriend's bank account at Boston Federal Savings.

As noted earlier, defendant's 1998 and 1999 tax returns only reported the sales from ProStep and Melaleuca, and defendant hired tax return preparers to prepare the returns. Mr. Joseph Cintron prepared defendant's 1998 tax return, and prior to preparing that tax return, he had prepared defendant's 1994, 1995, 1996, and 1997 income tax returns. In preparing the 1998 tax return, defendant provided Mr. Cintron with financial information relating to her work as a salesperson for ProStep and Melaleuca, including Forms 1099 from ProStep and Melaleuca. Defendant's 1998 tax return and related schedules reported total gross receipts of $31,348.01, business expenses of $15,177.86, and total income of $13,302.78. However, defendant failed to disclose or provide to Mr. Cintron any sales information relating to her sale of Global products. In fact, defendant did not even tell Mr. Cintron that she was working as a salesperson for Global. As a result, the failure of defendant to provide this information resulted in a false tax return, and defendant knew the return was false.

1729730.1

In April 2000, defendant hired Mr. William Kittredge to prepare her 1999 tax return. At that time, Mr. Kittredge and defendant had known each other for at least five years. They met in the early to mid-1990s when both were salespersons for Melaleuca. They met again in or around 1997 when both worked as salespersons for Global Prosperity. In preparing the 1999 tax return, defendant provided Mr. Kittredge with financial information relating to work as a salesperson for ProStep and Melaleuca. As with Mr. Cintron, defendant never provided Mr. Kittredge with any financial information relating to her Global sales that she made in 1999. As a result, Mr. Kittredge prepared the 1999 tax return using only the financial information from ProStep and Melaleuca.

Defendant used the proceeds from her sales of Global products to purchase various personal items. For instance, in June 1998, defendant purchased a Lincoln Town Car, making a down payment of $4,500 with a check from the CFS bank account. The title of the vehicle was in defendant's name.

In June 1998, defendant purchased a single family home located at 142 Locust Street in Danvers, Massachusetts. Defendant had been renting the home since early 1997 and paying approximately $2,000 in rent per month. In June 1998, just before the purchase of the house, defendant transferred $240,000 from her CFS account to the Angelica Holdings account. In August

7

1729730.1

1998, defendant purchased the home for approximately $325,000 with a down payment of approximately $189,000, which came from the Angelica Holdings bank account. Defendant attempted to title the home in the name of Angelica Holdings and submitted an alleged trust document to the bank, in an attempt to obscure and conceal her connection to the property. However, the bank's closing attorney refused to use the purported trust document and instead had the home titled in the name of "Angelica Holdings Realty Trust," in which defendant was named the trustee over the property. During the years 1998 and 1999, defendant lived in the house, paid the monthly mortgage payments, utilities, and was obligated to repay the loan.

## IV. **FACTUAL SUMMARY OF THE OFFENSES - 26 U.S.C. § 7206(1)**

The indictment alleges that defendant signed and filed the 1998 and 1999 tax returns knowing that they were false in that defendant failed to report on the tax returns the gross receipts that she received from her sales activity with Global, in violation of 26 U.S.C. § 7206(1).

The elements of a § 7206(1) prosecution are as follows:

1.    defendant made or cause to be made, a federal income
      tax return for the year in question which she verified
      to be true;

2.    that the return contained a written declaration that it
      was made under the penalties of perjury;

3.    that the tax return was false as to a material matter;
      and

8

    4.    that defendant signed the return willfully and knowing it was false with the intent of violating her duty under the tax laws and not as a result of accident, negligence or inadvertence.

A.    **Element #1: Subscribed to Tax Returns**

Defendant filed individual income tax returns, Forms 1040, for 1998 and 1999, signing each of the returns.  Mr. Cintron and Mr. Kittredge will testify that they prepared the returns, and that defendant never provided them with any financial information/documents regarding her Global sales.  IRS transcript records show that the returns for 1998 and 1999 were filed.

B.    **Element #2: Made Under Penalties of Perjury**

The tax returns in question contained the standard perjury jurat: "Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete."  Defendant's signature appears on both tax returns.  26 U.S.C. § 6064 (named signed to return is a prima facie evidence the individual named actually signed the return); 28 U.S.C. § 1731 (identified handwriting admissible to prove genuineness of questioned handwriting); Fed. R. Evid. 901(2) & (3).

C.    **Element #3: Filed Materially False Returns**

In 1998 and 1999, defendant worked as a salesperson for Pro-Step and Melaleuca and received Forms 1099 from those

1729730.1

companies documenting the sales she made.  Pro-Step hired salesperson to market and sell "leads" to other multi-level marketers.  Defendant's work with Melaleuca involved marketing and selling "wellness" products such as soap, shampoo, vitamins, and mineral supplements.  Defendant reported her sales from ProStep and Melaleuca on her 1998 and 1999 tax returns. Defendant, however, conspicuously omitted more than $800,000 in gross receipts she generated from Global during this same time period.  Unlike Pro-Step and Melaleuca, to further conceal the income earned by the retailers Global did not provide Forms 1099 documenting income earned by retailers.  Further, the Global products and vendors promoted techniques to obscure income from the IRS including using foreign bank accounts, domestic nominee bank accounts, and bogus trusts.

A federal search warrant was executed on the Global administrative offices located in Leominster, Massachusetts in August 2001.  Business records from the search confirm that defendant was a prolific Global retailer.  The documents include order forms documenting the names of clients who purchased Global products from defendant.

D.  **Element #4: Knowledge of Falsity and Willfulness**

Defendant knew the returns were false when she signed and filed them, and the government will prove that defendant's filing of the false tax returns was the result of a voluntary,

1729730.1

intentional violation of a known legal duty. <u>Cheek v. United States</u>, 498 U.S. 192, 200 (1991).

A significant aspect of the government's willfulness evidence involves the difference between how defendant treated her Pro-Step and Melaleuca income and her Global income, which defendant reported on her tax returns. Reporting the income from ProStep and Melaleuca on her tax returns reflects that defendant understood her duty to file a tax return and report her sales receipts on the return.

Further, the Global sales were deposited into bank accounts that defendant controlled. The disposition of funds in the account reflect that defendant consumed her Global receipts for personal expenditures such as home renovations, car payment, and a $189,103.65 down payment for the personal residence. There are also several checks made payable to ABSEX DEL NORTE, a foreign bank account.

Defendant also made several incriminating statements during offshore Global seminars which were captured on video tapes corroborating her ownership, and dominion and control over, the bank accounts, which were frequently referred to as owned by an "entity," or "trust." In a presentation at a Global offshore seminar in or around June 1998, defendant boasted about how much money she made. These statements corroborate defendant's control and ownership of the bank accounts and provide evidence to

1729730.1

conclude that defendant understood that she alone exerted such control and benefitted from the assets and money.

Finally, a real estate transaction conducted by defendant reinforces the fact that she alone decided how the money she earned from Global was spent. In 1997, defendant entered into a purchase and sale agreement to buy a single family home at 142 Locust St., Danvers, Massachusetts. The purchase and sale agreement, dated April 1997, reflects that defendant was conducting the purchase with her boyfriend at the time and that the sales price was $325,000, but that defendant would lease the property from April 1997 to June 1998 for $2,000 a month.

Shortly before the expiration of the lease in June 1998, defendant completed a residential loan application for the purchase of the property. The loan application noted that the principal borrower was Angelica Holdings and that defendant was a co-borrower. On the application, defendant reported joint assets equal to the amount in the bank accounts for Angelica Holdings ($242,425) and CFS ($28,449). The application also reflects that defendant making $45,000 per month. Defendant did not list any other assets.

After submitting the mortgage application in June 1998, defendant encountered difficulties in purchasing the home because defendant attempted to take title to the property in the name of Angelica Holdings, which defendant claimed to be a "trust." The

1729730.1

bank's closing attorney was concerned over the "trust" document
that defendant wanted to use in the purchase.  Because of these
concerns, the defendant was directed by the bank's attorney to
form Angelica Holdings Realty Trust, a nominee trust that would
take title to the property and which defendant would be listed as
the sole trustee over the property.  The purchase took place on
August 4, 1998.  The loan was approved by the bank, and defendant
put a down payment of approximately $189,103.65 on the property
paid from the Angelica Holdings bank account.

Notably, at the same time defendant was buying the house
with a down payment of $189.103.65, defendant's 1998 tax return
reported total income of $13,302.78.  The fact that defendant was
spending more in 1998 (i.e., rent and down payment) than she was
reporting on her 1998 tax return is itself evidence that
defendant was under reporting her actual income on the tax
return.

On April 5, 2001, defendant, acting as trustee, conveyed the
property from Angelica Holdings Realty Trust back to Angelica
Holdings.  Thereafter in November 2001, defendant received a
second loan from Danvers Savings Bank on the same property in the
amount of $188,000.  But before she could obtain the second loan
defendant was forced to execute a quitclaim deed from Angelica
Holdings back to Angelica Holdings Realty Trust.  These multiple
transfers, all to nominees entirely in defendant's control, is

13

strong circumstantial evidence of defendant's attempt to conceal her relationship to the property.

**V.      EVIDENTIARY ISSUES**

A.   Summary and Expert Witnesses

To assist the jury in the examination of the unreported gross receipts in this case and to prove the charges in the indictment, the government intends to present summary/expert witness testimony.  In this case, the government will have summary/expert witness Michael Pleshaw testify at trial in the government's case-in-chief.  The government may also call expert witness Nicoli Ferrell to testify at trial in its case-in-chief. In the government's summary/expert witness notice filed in February 2006, the government notified defendant that IRS Revenue Agent Michael Pleshaw would be called as a witness at trial, and that IRS Revenue Agent Nicoli Ferrell may also testify at trial in the government's case-in-chief.

Mr. Pleshaw's anticipated testimony will include testimony about the unreported gross receipts received by defendant through her involvement with Global.

Ms. Ferrell's anticipated testimony will involve explanation of "trusts" including types, structure, uses, grantor trust rules, sham/fictitious trusts, and the taxation regarding different trust arrangements.

1729730.1

B.    Bank Deposits Method of Proof

The government intends to prove the unreported gross receipts through a bank deposits method of proof.  The bank deposits method of proof requires proof that 1) the defendant was engaged in an income producing business, 2) she made regular deposits of funds into bank accounts, 3) an adequate and full investigation of those accounts was made to differentiate between income and non-income deposits, and 4) unidentified deposits have the inherent appearance of income, e.g., the size of the deposits, odd or even amounts, fluctuations in amounts corresponding to seasonal fluctuations of the business involved, source of checks deposited, dates of deposits, accounts into which deposited, etc.  United States v. Morse, 491 F.2d 149, 152 (1st Cir. 1974); United States v. Slutsky, 487 F.2d 832, 841-42 (2d Cir. 1973); United States v. Venuto, 182 F.2d 519, 521 (3d Cir. 1950).

The evidence to prove the first two elements are easily met as defendant was engaged in an income producing business activity, that is, selling Global products during the relevant time period.  The bank account analysis of the CFS account confirms that defendant was engaged in this business because it shows regular deposits were made into the bank accounts in the two-year period.  Moreover, the amounts deposited and the manner in which payments were remitted, typically through cashier's

1729730.1

Case 1:05-cr-10175-WGY    Document 115    Filed 07/07/2006    Page 16 of 21

checks and money orders, are consistent with the statements of
Global clients and other Global salespersons, some of whom will
testify at trial.  Furthermore, an adequate and full
investigation of the bank accounts was conducted, which show that
unidentified deposits have the inherent appearance of income in
that the size of deposits, as well as the form of deposits (i.e.,
cashier's checks, money orders) are similar to the identified
deposits.

At trial, the government expects that about eighteen
customer clients of defendant Griffin will testify that they
wrote cashier's checks, money orders, or personal checks to
either CFS or Angelica Holdings in exchange for the tapes or
seminar tickets.

C.    Intrinsic and Extrinsic Evidence

On March 1, 2006, the government filed a 404(b) notice of
intent to introduce other acts evidence.  As stated in that
motion, the government intends to offer defendant's filing of
U.S. Individual Income Tax Returns (Forms 1040) for the years
1993 through 1997 as "intrinsic evidence" to the charged offenses
and not subject to Federal Rule of Evidence 404(b).  In an
abundance of caution, if the Court were to find that these acts
are not intrinsic to the charged offenses, the government gave
notice of its intention to introduce the following "other acts"
of defendant in its motion filed on March 1, 2006.

1729730.1

In a second 404(B) Notice filed on March 15, 2006, to provide more clarification to the first notice, the government filed notice that it intends to introduce defendant's tax filing history prior to 1998 and defendant's filing of state tax returns.

D.    Admissibility of Documents

As in all tax cases, the government will offer numerous documents into evidence.  Although defendant could stipulate to the admissibility of some of these documents, the government will nevertheless briefly address the issue of the admissibility of various documents in this case.

1.    IRS Service Center Records

The government will offer documents from the Internal Revenue Service Center through an IRS Service Center Representative.  These documents include: (1) defendant's tax returns for 1993 through 1999, which are admissible under Federal Rules of Evidence 803(6), 803(8), and 902, and 26 U.S.C. § 6064, and (2) transcripts, certificates of assessments and payments, and certification of lack of records, which are admissible under Federal Rules of Evidence 803(6), 803(8), 803(10), and 902.

2.    Business Records

The government will also offer business records pursuant to Federal Rule of Evidence 803(6).  These records will include bank account records, such as bank account statements, checks, deposit

1729730.1

items, and loan documents.  The government will also seek to introduce a number Global-related documents that salespersons, such as defendant, used in selling the cassette tapes and seminar tickets.

A business record must satisfy four requirements in order to be admissible under Rule 803(6): (1) it must have been made in the course of a regularly conducted business activity; (2) it must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the document; and (4) the document must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.  United States v. Grossman, 614 F.2d 295, 296-97 (1st Cir. 1980).

3.  Duplicates

Many of the documents that the government intends to offer into evidence are photocopies of documents.  Photocopies are admissible pursuant to Federal Rules of Evidence 1002 and 1003. The Federal Rules of Evidence provide that the original writing, recording, or photograph is not required.  "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."  Fed. R. Evid. 1003.

1729730.1

4.    Certified Documents – Public Records

The government anticipates offering into evidence certified copies of certain public records.  Certified copies of public records require no extrinsic evidence of authenticity to be admitted.  Fed. R. Evid. 902(1) and (4).

E.    Admissions

The government intends to offer numerous admissions made by defendant.  A defendant's statement is never considered hearsay when offered by the government.  Fed. R. Evid. 801(d)(2)(A).  Rather, the statement is an admission by a party opponent, and it does not require any special guarantee of trustworthiness.  United States v. Singleterry, 29 F.3d 733, 736 (1st Cir. 1994).  Rule 801(d)(2) "does not limit an admission to a statement against interest."  United States v. Turner, 995 F.2d 1357, 1363 (6th Cir. 1993).

In this case, defendant made numerous statements to Global customers, as well as others, which will be used at trial.  These statements are admissible against her pursuant to Federal Rule of Evidence 801(d)(2)(A).

F.    Cooperating Witnesses & Plea Agreements

There are four witnesses that will testify at trial who have either cooperated with the government through plea agreements or have been given informal witness immunity.  Three witnesses have pled guilty to criminal offenses and have agreed

19

1729730.1

to cooperate in this prosecution, and they include: (1) Becky Coggins, (2) Margo Jordan, and (3) Jeff Lewis.  The fourth witness who has cooperated with the government is William Kittredge.  He was given informal immunity from prosecution in 2003, in regard to the criminal prosecution of Daniel Andersen, David Struckman, and others, and again in 2005, in regard to this matter.

**VI.    <u>CONCLUSION</u>**

The foregoing is a summary of points the government expects may arise at trial.  If any legal issues arise that have not been covered in this memorandum, the government respectfully requests permission to file supplemental memoranda of law.

WHEREFORE, the government respectfully submits its Trial Brief.

<div style="margin-left:40%">

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

</div>

By:
<div style="margin-left:40%">

/s/ *Christopher J. Maietta*
CHRISTOPHER J. MAIETTA
Trial Attorney
U.S. Department of Justice


/s/ *John N. Kane*
JOHN N. KANE
Trial Attorney
U.S. Department of Justice

</div>

Dated: July 7, 2006

<div align="center">20</div>

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day, July _____, 2006, served upon the person listed below a copy of the foregoing document by mail:

Alan S. Richey, Esq.
P.O. Box 1505
Port Hadlock, Washington 98339
(360) 437-4005

_____
Christopher J. Maietta

1729730.1