UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 05-CR-10175-WGY-1 |
| | ) | |
| v. | ) | |
| | ) | |
| NADINE J. GRIFFIN, | ) | |
| | ) | |
| Defendant. | ) | |

UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through undersigned
counsel, hereby submits its Sentencing Memorandum and recommends
a sentence of imprisonment of 27 to 33 months.

I.    STATUS OF THE CASE

On July 24, 2006, a jury convicted defendant Nadine Griffin
("Griffin") on Count 2 of the Indictment charging her with
willfully filing a false 1999 U.S. Individual Income Tax Return
(Form 1040), in violation of 26 U.S.C. § 7206(1).  The jury could
not reach a unanimous verdict on Count 1 of the Indictment in
which Griffin was charged with willfully filing a false 1998 U.S.
Individual Income Tax Return (Form 1040), in violation of 26
U.S.C. § 7206(1).  As a result, the Court declared a mistrial on
Count 1.

On September 19, 2006, the government submitted an "Offense
Conduct Statement" to U.S. Probation, which set forth its version
of the offense.  On September 26, 2006, the U.S. Probation Office

issued a Presentence Report (PSR).  On December 29, 2006, counsel
for defendant submitted objections to the PSR.  Sentencing is
scheduled for January 16, 2007.

## II.  FACTUAL DISCUSSION

During the eight-day trial, which began on July 10, 2006,
the government presented evidence that showed Griffin knowingly
filed two false tax returns, a 1998 U.S. Individual Income Tax
Return, and a 1999 U.S. Individual Income Tax Return.  These tax
returns were false because Griffin failed to report the gross
receipts she made as a salesperson for Global Prosperity
("Global").  Over the two year period, Griffin received but
failed to report more than $900,000.00 in gross receipts; for the
1998 income tax return, Griffin failed to report approximately
$788,762.50 (*Trial Ex. 172*), and for the 1999 income tax return,
Griffin failed to report approximately $207,015.00. *(Trial Ex.
179*).  The total amount of unpaid taxes (income and
self-employment) is more than $285,000.00. (*Trial Ex. 176 & 183*).

### A.  *Background: Global Prosperity*

Griffin earned the money working as a salesperson for
Global, an organization modeled after a multi-level marketing
company that used a network of salespersons to sell audio
cassette tapes and tickets to various "offshore" seminars.
Griffin became associated with Global shortly after its inception
in the fall of 1996, and she worked closely with the founders of

2

Global over the next three years and became one of Global's top salespersons. (*Trial Tr. at 94-95, 102-103, 119-122, Margo Jordan-Satory, July 18, 2006*).[1]  Griffin was instrumental in recruiting other salespersons to Global, from which she financially benefitted.  Griffin recruited prospective members through the Global teleconferencing system called IDEA, "cold call" phone calls, and at the offshore seminars. (*Id. at 104*).  Griffin displayed the uncanny ability to gain the trust and respect of unwitting victims.

The products sold by Global and its salespersons promoted and encouraged individuals to stop paying income taxes, and it charged these individuals a lot of money to learn exactly how to do it.  The sales pitch used by salespersons like Griffin, and others, usually involved misleading potential customers about what Global was all about.  Salespersons typically told a prospective customers that they would be "working for yourself" and that persons could reduce their taxes if they followed the Global "recipe for success," which was all explained on audio cassette tapes and at the "offshore" seminars, if customers were willing to pay a "hefty" price.

---

[1]  In May 2004, Daniel Andersen, David Struckman, Lorenzo "Zo" Lamantia, Kudlip Singh, and Dwayne Robare (i.e., the Global Founders and/or associates) were indicted by a federal grand jury in Seattle, Washington, for conspiracy to defraud the United States.  On July 20, 2005, a federal grand jury returned a superseding indictment against Struckman, Lamantia, and Kuldip Singh for additional charges of tax evasion.  Trial against Mr. Struckman is scheduled for March 2007.  All of the other defendants have pled guilty.

Salespersons like Griffin sold the audio cassette tapes called "The Gateway to Financial Freedom" (hereinafter "Global I") for $1,250 per set of tapes. (*Trial Ex. 139 & 147*). The tapes contained lectures on how to drop-out of the tax system, not to pay taxes and not file tax returns, to set-up bank accounts using a Form W-8 (showing the account was owned by a foreign entity/non-resident alien), as well as other anti-tax rhetoric. (*Trial Tr. at 11, Becky Coggins, July 13, 2006; Trial Ex. 140 & 147*). These methods were ways persons could evade their taxes.

Tickets to a three-day offshore seminar called Global II retail priced at $6,250 per ticket, and tickets to a five-day offshore seminar called Global III retail priced at $18,750 per ticket. (*Trial Ex. 105-136, 139*). The seminars were held in such exotic places as Aruba, Bermuda, the Bahamas, and Cancun, Mexico. (*Trial Tr. at 12-13, Becky Coggins, July 13, 2006; Trial Ex. 105-136*). Typically, the seminars were held at least two to three times a year, and attendees at the seminars ranged from 500 to 1500 people per seminar. (*Trial Tr. at 115, Margo Jordan-Satory, July 18, 2006*). At the seminars, guest lecturers promoted what can be best characterized as tax evasion schemes and fraudulent investment schemes. (*See, e.g., Trial Tr. at 7-13, Becky Coggins, July 13, 2006*). During the years 1998 and 1999, Griffin regularly attended these offshore seminars and occasionally

introduced seminar speakers to the guests. (*Trial Tr. at 115-116,
Margo Jordan-Satory, July 18, 2006; Trial Ex. 160 & 165*).

To sell each of the Global products and retain the profits,
Griffin, like other Global salespersons, had to became a
"qualified retailer" at three different levels. (*Trial Ex. 139*).
For instance, to become a qualified retailer at the Global I
level, a prospective retailer generally had to refer six Global I
sales to a qualified retailer (typically the person who first
introduced them to Global and usually referred to as the
"up-line"). (*Trial Ex. 139*).  Generally, once the prospective
retailer referred six Global I sales to the qualified retailer
above her, the prospective retailer became a qualified retailer
at the Global I level and could then retain 80% to 90% of the
retail price of each Global I tape sold thereafter; typically,
$1,000 per set of tapes sold. (*Trial Ex. 139*).  The remaining
$250 was sent to the Global administrative office called
Educational Publishing Systems ("EPS"), which then mailed the
tapes (and tickets) to the purchaser of the product. (*Trial Tr.
at 7-9, 29-30, Becky Coggins, July 13, 2006*).

Similarly, to be a GII qualified retailer and retain the
profits of each GII ticket sold, the prospective GII retailer was
generally required to refer six GII sales to the GII qualified
retailer above her.  (*Trial Tr. at 89-91, Margo Jordan-Satory,
July 18, 2006; Tr. at 14-19, Becky Coggins, July 13, 2006; Trial*

5

*Ex. 139*).  After the six referrals, the prospective retailer became a GII qualified retailer and could retain 80% to 90% of the price of each GII ticket sold; typically, at least $5,000 per ticket. (*Coggins Tr. at 7-19*).  Similarly, to be a GIII qualified retailer, a similar number of sales needed to be referred to the person above her, and after becoming qualified, the retailer could retain at least $15,000 per ticket sold. (*Trial Ex. 139*). In order to make lots of money in Global, qualified retailers needed to recruit other prospective salespersons who would refer sales to them.

**B.    *Griffin's Participation in Global***

The evidence at trial showed that Griffin became an extremely successful qualified retailer at all three levels. (*Coggins Tr. at 14-19; Jordan Tr., July 18, 2006*).  She sold the tapes and tickets to numerous individuals and instructed customers to pay her using cashiers checks or money orders. According to witness testimony at trial, use of cashiers checks and money orders were the preferred method of payment so that it would make the government's ability to track the payments more difficult. (*Coggins Tr. at 26-27*).  Griffin recruited hundreds of people into Global, and many of these individuals referred Global I, GII, and GIII sales to her, which ultimately made her into one of Global's top salespersons. (*Id.* at 21; *Tr. at 94, Margo Jordan-Satory, July 18, 2006*).

6

Griffin was a member of the VMA ("Volunteer Marketing Associates") and GLC ("Global Leadership Committee"), which represented individuals who were Global's top salespeople. (*Trial Tr. at 103-104, Margo Jordan-Satory, July 18, 2006*). Individuals in the VMA and GLC worked closely with the Global founders and instructed less experienced retailers, as well as prospective retailers, on how to sell the products. (*Id.*)

Griffin also received incentive payments from the Global founders for recruiting individuals to GII seminars. (*Id. at 110-115*). Any GIII qualified retailer, including Griffin, was eligible to receive "revenue reimbursement" checks for each new and repeat customer they recruited to attend the GII seminar. (*Id.*). For each person recruited to a GII seminar, Griffin, like others, received $300. (*Id.*). At trial, the evidence showed that Griffin received several revenue reimbursement checks, including one check for $37,500, which meant that Griffin had recruited approximately 125 people to the GII seminar. (*Id. at 111; Trial Ex. 75*).

Griffin's motivation for not reporting the Global sales was greed. Trial testimony from witnesses established that Griffin was interested in making a quick-buck regardless of the consequences. For example, trial witness Patsy Melson, a high school graduate from a small town in Arkansas, testified that she bought a GIII ticket from Griffin around March 1999. (*Trial Tr.*

7

*at 115-116, Patsy Melson, July 13, 2006*). To pay for the GIII ticket, Ms. Melson obtained a second loan on her home, and Griffin knew this. (*Id. at 128-129*). The jury heard Ms. Melson recount how she told Griffin that in order to pay for the GIII ticket to the Bahamas, which cost $18,750, as well as the additional expenses of an airline ticket and hotel room, she needed to take out a loan for $30,000. (*Id.*). Did Griffin tell Ms. Melson that that was probably not a wise idea? No. Did Griffin tell Ms. Melson to call her when she was in a better financial position? Never. Ms. Melson's testimony shows the extent to which Griffin was willing to make a buck. For Ms. Melson, Global did not turn-out to be road to riches, but a path that brought her and her family close to financial ruin.

Further, Griffin solicited customers to invest money in questionable investment schemes. At least one witness, Shirley Kedrowski, testified that Griffin sent her documents about investments in Oakleaf International Investments, an organization involving several individuals who were eventually prosecuted and convicted in the Western District of Washington for a massive fraudulent "Ponzi" scheme. (*Trial Tr. at 44, Shirley Kedrowski, July 14, 2006; Trial Ex. 137*). Fortunately, Ms. Kedrowski did not invest any money because of Ms. Griffin's solicitation. (*Id.*).

8

C.   *Griffin's Banking Activity*

Griffin hide the money she made from Global into at least two bank accounts at Danvers Savings Bank, and she used two different nominee names to hide her connection to each bank account.  One account was opened under the name "Capital Finance Strategies," and the other account was opened under the name "Angelica Holdings."  Griffin personally opened each bank account and to further conceal her connection to the account she never provided the bank with her social security number or taxpayer identification number (also known as a "TIN").

Instead, Griffin provided the bank with a fraudulent Form W-8 (Certificate of Foreign Status) claiming that the bank accounts were owned by a foreign entity or nonresident alien and not subject to U.S. tax withholdings. (*Trial Tr. at 95-96, Margo Jordan-Satory, July 18, 2006; Trial Ex. 18 & 81*).  In reality, there was no foreign entity or non-resident alien, as Griffin controlled the bank accounts.  Griffin used the Form W-8 rather than her social security number because by using the Form W-8 the bank did not have to report any financial information about the bank accounts to the IRS. (*Trial Ex. 81, Signature Card & Form W-8*).  In fact, the instructions on the Form W-8 stated that the bank was not required to report financial information to the IRS. (*Id.*).

Griffin opened the Capital Finance Strategies ("CFS") account on October 21, 1997, and she maintained sole signature authority and exclusive control over this bank account. (*Trial Ex. 18, CFS Signature Card*). Checks written out of the bank account contain Griffin's signature. (*Trial Ex. 18-80, CFS Bank Records*). The evidence showed that Griffin deposited most of her Global sales into the CFS bank account. (*Id.*). The Angelica Holdings ("AH") account was opened on June 18, 1998. (*Trial Ex. 81*).

Griffin made regular deposits into each account sometimes in amounts totaling more than $50,000. For example, during the month of May 1998, Griffin deposited more than $225,000 into the CFS account. (*Trial Ex. 21, CFS Bank Records*). Further, Griffin regularly withdrew money from both accounts using checks in amounts totaling more than $1,000 per withdrawal. Typically, Griffin wrote the checks "made payable to cash" when withdrawing the money. (*Trial Ex. 20 & 21*).

The evidence showed Griffin also maintained at least one bank account outside the United States. Margo Jordan-Satory testified that Griffin maintained a "PILL" bank account located in the Bahamas and that Griffin had a debit card associated with that account to withdraw the money. (*Trial Tr. at 106-107, Margo Jordan-Satory, July 18, 2006*). The money deposited into Griffin's PILL account was transferred from the CFS account

10

and/or Angelica Holdings account.  PILL account holders, such as
Griffin, could also make money from the PILL bank by recruiting
individuals to open PILL bank accounts, and in return for
referring customers to open PILL accounts, the PILL bank would
pay the account holder, such as Griffin, as much as $200 per
referral. (*Id.* at 107-108).

D.   ***Griffin's 1998 & 1999 Tax Returns***

Griffin made a slew of money from selling the Global
products during 1998 and 1999, but none of that money was ever
reported on either 1998 or 1999 income tax return that she filed
with the IRS.  Griffin did report on the two tax returns for 1998
and 1999 the money she made as a salesperson for two other
multi-level marketing businesses; one company named "ProStep" and
the other company named "Melaleuca."  On each tax return for 1998
and 1999, Griffin reported less than $40,000 in sales. (*Trial Ex.
6 & 7*).  Interestingly, before joining Global, from 1993 through
1997, Griffin's income tax returns never showed more than $50,000
in sales from ProStep and Melaleuca. (*Trial Ex. 1-5*).  Also,
between 1993 and 1997, Griffin usually filed her income tax
returns after the due date of April 15th, and she rarely paid the
taxes owed in a timely manner. (*Trial Ex. 1-7, 9*).  In short, the
fact that Griffin regularly filed income tax returns and reported
the money from ProStep and Melaleuca is direct evidence that she
knew she had a duty to file and report the money she made from

11

her sales activity with Global.

Griffin also hired Mr. Joseph Cintron, a tax return preparer, to prepare her 1998 tax return. Prior to preparing the 1998 tax return, Mr. Cintron had prepared Griffin's 1994, 1995, 1996, and 1997 income tax returns. (*Trial Tr., Joseph Cintron, July 12, 2006; Trial Ex. 1-5*). In preparing the 1998 tax return, Griffin only provided Mr. Cintron with financial information relating to her work as a salesperson for ProStep and Melaleuca, including Forms 1099 (Miscellaneous Income) from these companies. (*Trial Ex. 6*). Griffin never provided Mr. Cintron with any financial information regarding Global. (*Trial Tr. at 58-62, Joseph Cintron, July 12, 2006*).

Griffin's 1998 tax return and related schedules showed total gross receipts of $31,348.01; business expenses of $15,177.86; and total income of $13,302.78. (*Trial Ex. 6*). During this same time period, Griffin deposited more than $700,000 into the CFS bank account. (*Trial Ex. 18-80, CFS Bank Records*). Griffin's intentional decision not to provide or inform Mr. Cintron about her Global sales resulted in a false 1998 individual tax return, and Griffin knew that the return was false in that it did not report any of her Global sales.

In April 2000, Griffin hired Mr. William Kittredge to prepare her 1999 tax return. (*Trial Ex. 7*). At that time, Mr. Kittredge and Griffin had known each other for at least five

12

years. (*Trial Tr. at 85-90, William Kittredge, July 17, 2006*).
They met in the early to mid-1990s when both were salespersons
for Melaleuca. (*Id. at 85-88*).  They met again in or around 1997
when both worked as salespersons for Global. (*Id.*).  In the
Spring of 2000, Griffin hired Mr. Kittredge to prepare her 1999
income tax return. (*Id. at 91-93*).  Griffin provided Mr.
Kittredge with financial information relating to her work as a
salesperson for ProStep and Melaleuca. (*Id. at 93-94*).  However,
as with Mr. Cintron, Griffin never provided Mr. Kittredge with
any financial information relating to the Global sales that she
made in 1999. (*Id. at 99-101*).  As a result, Mr. Kittredge
prepared the 1999 tax return using only the financial information
from ProStep and Melaleuca, and the return omitted the Global
sales Griffin made during 1999. (*Trial Ex. 7*).

    **E.**   ***Griffin's Personal Expenditures: Home and Car***

Griffin used the money she made from selling Global products
to make various personal expenditures, including the purchase of
a car, a home, a rental property in the Bahamas, as well as
extensive travel and gambling.  Two of Griffin's more notable
purchases were a Lincoln Town car and a home in Danvers,
Massachusetts.

In June 1998, Griffin purchased a 1995 Lincoln Town Car.
(*Trial Ex. 153*).  On the purchase application form submitted to
the car dealership at that time, Griffin claimed she earned

13

approximately $100,000 in gross income a year; although the 1997 tax return she filed with the IRS two months later (in August 1998) showed that Griffin was making less than $42,000.00 per year. (*Id.; Trial Ex. 5*).  Griffin financed a portion of the car purchase and made a down payment of $4,500 using a check from the CFS bank account. (*Trial Ex. 153*).  The title of the car was in Griffin's name. (*Id.*).

In August 1998, Griffin purchased a single family home and made a $189,000 down payment on the purchase price, yet at the same time she made this down payment she was reporting less than $42,000 per year on her 1997 income tax return.  The home Griffin purchased was located at 142 Locust Street in Danvers, Massachusetts. (*Trial Ex. 100, 102*).  Before buying the home, Griffin had been renting the personal residence since early 1997 and paying approximately $2,000 in rent per month. (*Trial Tr. at 4-5, Roger Macorelle, July 17, 2006; Trial Ex. 155*).  In June 1998, just before the purchase of the house, Griffin transferred $240,000 from her CFS account to the Angelica Holdings bank account. (*Trial Ex. 20, 82*).  Griffin purchased the home for approximately $325,000 and made a down payment of approximately $189,103.65, which came from the Angelica Holdings bank account. (*Trial Ex. 100, 102, 104*).  Griffin obtained a mortgage to pay the remaining home purchase price. (*Trial Ex. 94*).  In the mortgage application, Griffin reported that she was making

14

$45,000 per month, a figure inconsistent with the amount of money she was reporting to the IRS. (*Trial Ex. 93*).

Instead of titling the home in her own name, Griffin attempted to title the home in the name of a purported trust called "Angelica Holdings" for the sole purpose of making it more difficult for the government to learn who owned the property. (*Trial Ex. 102*). Griffin obtained the purported trust document from Innovative Financial Consultants ("IFC"), an organization located in Arizona that promoted tax evasion schemes, which included the use of fraudulent trusts and nominee bank accounts to hide money from the government. (*Trial Tr. at 23-24, Jeff Lewis, July 18, 2006*). The leaders of this organization, as well as some of their members, were convicted in the District of Arizona for conducting a large scale conspiracy to defraud the government. Griffin personally knew the leaders and obtained the Angelica Holdings trust document from them. In fact, on July 19, 2006, counsel for defendant informed the Court that Mr. Dennis Posley, the organizer of IFC, was going to be called as a witness for the defense; however, defendant never called him as a witness at trial. (*Trial Tr. at 140, July 19, 2006*).

Griffin submitted the fraudulent trust document to the bank as evidence that the home would be owned by the purported trust. The alleged trustees of the trust were located in Arizona. At trial, an alleged trustee, Jeff Lewis, who pled guilty to the

15

previously mentioned conspiracy, testified that he was the trustee of the Angelica Holdings trust and that the purpose of the trust was to prevent the IRS from knowing who actually owned assets associated with the trust. (*Trial Tr. at 33, Jeff Lewis, July 18, 2006*). Mr. Lewis also testified that although he was a trustee of the trust, he never met Griffin and did not know about her purchase of the house. (<u>*Id.*</u> *at 25-27*).

Griffin's attempt to title the home in the name of Angelica Holdings with trustees in Arizona proved unsuccessful as the bank's closing attorney refused to allow Griffin to title the home in the name of the purported trust. Rather, the home was titled in the name of "Angelica Holdings Realty Trust," which listed Griffin as the trustee of the property, rather than alleged trustees located in Arizona. The testimony and documents presented at trial concerning this particular transaction is evidence of the steps Griffin took to hide her finances and assets from the government.

III.        **GOVERNMENT'S PRELIMINARY SENTENCING CALCULATION**

| UNITED STATES SENTENCING GUIDELINE FACTORS | |
|---|---|
| **U.S.S.G. GUIDELINE (1999 Ed.)** | **OFFENSE LEVEL** |
| U.S.S.G. § 2T1.1(a)(1), § 2T4.1(K) (Tax Table) (more than $200,000) | + 16 |
| § 2T1.1(b)(2), Sophisticated Concealment | + 2 |
| Adjusted Offense Level | + 18 |
| Criminal History Category | I |
| **Sentencing Range** | **27-33 Months Imprisonment, Zone D** |

A.    *Base Offense Level*

Griffin's base offense level should be calculated using U.S.S.G. § 2T1.1(a)(1). Under that guideline, Griffin's base offense level is 16, which is based on the total tax loss for Counts 1 and 2 of the Indictment. The total tax loss is approximately $285,090.15. See Trial Ex. 179 & 183. As noted above, the jury returned a unanimous verdict of guilty on Count 2, but the jury could not reach a unanimous verdict on Count 1 (i.e., hung jury). At trial, the government presented evidence that the tax loss for Count 1 was $243,825.15, and that the tax loss for Count 2 was $41,265.00. See Trial Ex. 179 & 183.

In determining Griffin's sentence, the Court should consider as relevant conduct the underlying tax loss figures from Count 1, the charged count in which the jury did not reach a unanimous

17

verdict.  See U.S.S.G. § 1B1.3 (Relevant Conduct); United States
v. Cabo, 241 F.3d 98, 101-02 (1st Cir. 2001) (sentencing court
may consider acquitted conduct in fashioning sentence).  The
First Circuit has held that a district court may consider the
underlying facts with respect to a particular count in which
trial on that count ends in a hung jury.  See United States v.
LaCroix, 28 F.3d 223, 231 (1st Cir. 1994).  Similarly, the First
Circuit has ruled that "a defendant's acquittal on a particular
count does not limit the sentencing court's flexibility in
considering the same underlying facts in respect to the count of
conviction." Id. (citing United States v. Mocciola, 891 F.2d 13,
16 (1st Cir. 1989)); see also United States v. Gobbi, No. 06-
1643, 2006 WL 3804388 (1st Cir. Dec. 28, 2006) (citations
omitted).  The Court is not prevented from considering evidence
relating to the tax loss from Count 1 in determining Griffin's
sentence.  Accordingly, the government submits that the
calculation of Griffin's base offense level should be based on
the tax loss relating to Count 1 (hung jury) and Count 2
(conviction).

     In determining the total tax loss in this case, the Court
need only find the tax loss figures by a preponderance of the
evidence.  United States v. Gobbi, No. 06-1643, 2006 WL 3804388
(1st Cir. Dec. 28, 2006).  Here, the total tax loss figures for
Count 1 and Count 2 equal $285,090.15, and can be considered by

18

the Court in determining Griffin's base offense level.  <u>See</u>
U.S.S.G. § 2T1.1(a)(1).

The jurors were also asked by the Court to consider two
special questions: 1) the amount of the tax loss; and 2) whether
Griffin used sophisticated concealment in carrying out the
offense.  In regard to the tax loss for Count 2, the jury
unanimously agreed that the tax loss was more than $30,000 but
less than $80,000, and the jury also unanimously agreed that
Griffin used sophisticated concealment to carry out the crime.

### B.    <u>Sophisticated Concealment, U.S.S.G. § 2T1.1(b)(2)</u>

Griffin's base offense level should be increased by two
levels pursuant to U.S.S.G. § 2T1.1(b)(2), which provides that
"[i]f the offense involved sophisticated concealment, increase by
2 levels."  The Commentary to this section states, in pertinent
part, that "'sophisticated concealment' means especially complex
or especially intricate offense in which deliberate steps are
taken to make the offense, or its extent, difficult to detect.
Conduct such as hiding assets or transactions, or both, through
the use of fictitious entities, corporate shells, or offshore
bank accounts ordinarily indicates sophisticated concealment."
U.S.S.G. § 2T1.1. Commentary, ¶ 4.

As previously noted, the jury unanimously agreed that
Griffin used sophisticated concealment to carry out the crime.
The evidence to support the sophisticated concealment enhancement

included, but was not limited to, Griffin's use of offshore bank account called "P.I.L.L.," cashiers checks and money orders, as well as her use of the CFS and Angelica Holdings bank account, which she opened and controlled. (*Trial Tr. at 106-109, Margo Jordan-Satory, July 18, 2006; Trial Ex. 18-92*).

    **C.**   ***Criminal History***

Griffin's criminal history category appears to be a level I, as the government is unaware of any other criminal convictions resulting in imprisonment, as defined by U.S.S.G. § 4A1.1.

    **D.**   ***Fine***

Under the advisory guidelines, with an adjusted offense level of 18, the fine range is $6,000 to $60,000. See U.S.S.G. § 5E1.2(c)(3).  The government recommends a fine of at least $30,000.  Griffin has presented no documentation or statement about her inability to pay a fine.  As noted below, we know nothing about Griffin's current finances, or employment.

    **E.**   ***Other Relevant Facts***

The Court should also be aware of several other facts. First, Griffin has not filed any income tax returns (individual, corporate, or partnership), or paid any tax (income or self-employment tax) since the 1999 tax year.  The last tax return Griffin filed was the false 1999 individual income tax return.  Further, at this time, the undersigned counsel is unaware of Griffin's current employment status and finances.

During the criminal investigation of Griffin, it was learned that she continues to use nominee names when opening bank accounts, just as she did back in 1997, 1998, and 1999 when she was using CFS and Angelica Holdings as her personal bank accounts.

The government respectfully requests that Griffin be required to provide a detailed, financial statement to the Court as part of her sentence, so that the Internal Revenue Service may begin collecting the back taxes, penalties, and interest Griffin owes.  In addition, the government respectfully requests that Griffin be ordered to file true and accurate income tax returns with the IRS, which shows all of the money she has earned over the last five years.

**F.**    ***Sentencing Calculation & Recommendation***

In this case, under the advisory guidelines, with an adjusted offense level of 18 and a criminal history category of I, Griffin's sentence is 27-33 months incarceration.  Based on Griffin's role in the offense and extensive criminal conduct, a sentence at the high-end of the guideline range is appropriate and reasonable in this case.  At every turn, Griffin has used deception and fraud to advance her goal of financial success.  Griffin deceived Global customers, the bank, the tax professionals, and the government.  A sentence at the high-end of the guidelines takes into consideration the nature of the offense and the seriousness of her conduct, promotes respect for the law,

21

and acts as a deterrent for others who may consider similar
conduct.

     In determining defendant's sentence, the Court must consider
the Guidelines and the other factors listed in 18 U.S.C. §
3553(a).  In United States v. Booker, the Supreme Court directed
that "[t]he district courts, while not bound to apply the
Guidelines, must consult those Guidelines and take them into
account when sentencing."  United States v. Booker, 125 S. Ct.
738, 767 (2005).

     After a court calculates the sentence under the advisory
Guidelines, a court then considers the factors set forth in §
3553(a) to determine whether to impose the Guidelines sentence or
a non-Guidelines sentence.  Booker, 125 S. Ct. at 767.  A court
must consider the need for the sentence imposed to reflect the
seriousness of the offense, to promote respect for the law, and
to provide just punishment for the offense; to afford adequate
deterrence to criminal conduct; to protect the public from
further crimes of the defendant; and to provide the defendant
with needed educational or vocational training, medical care, or
other correctional treatment in the most effective manner.  18
U.S.C. § 3553(a)(2).  In addition, a court must consider the
kinds of sentence available and the applicable category of
offenses and category of defendant as set forth in the Guidelines
and its policy statements, as well as the need to avoid

unwarranted sentencing disparities among defendants who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(3)-(6).

As the Eighth Circuit recently discussed, it is important to consider the effect of a term of imprisonment on the deterrence of tax crimes:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws.  Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

> The Guidelines recognize that "[t]ax offenses, in and of themselves, are serious offenses" and that the amount of the tax loss should be the main focus at sentencing.  Because "a greater tax loss is obviously more harmful to the treasury and more serious than a smaller one," the Guidelines recognize that "the sanction necessary to deter" future tax crimes increases "as the potential benefit from the offense increases."  Finally, the Guidelines underscore the importance of sentences including a term of imprisonment:

> Under pre-guidelines practice, roughly half of all tax evaders were sentenced to probation without imprisonment, while the other half received sentences that required them to serve an average prison term of twelve months. This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length. As a result, the number of purely probationary sentences will be reduced. The Commission believes that any additional costs of imprisonment that may be incurred as a result of the increase in the average term of imprisonment for tax offenses are inconsequential in relation to the potential increase in revenue.  According to estimates

current at the time this guideline was originally developed (1987), income taxes are underpaid by approximately $90 billion annually.  Guideline sentences should result in small increases in the average length of imprisonment for most tax cases that involve less than $100,000 in tax loss.  The increase is expected to be somewhat larger for cases involving more taxes.

United States v. Ture, 450 F.3d 352, 357-59 (8th Cir. 2006) (citations omitted).

Accordingly, in this case, a sentence within the Guideline range of 27 to 33 months incarceration is presumptively reasonable, and accommodates the Congressional purpose, affirmed by the Supreme Court, of obtaining fair sentences which are uniform to the extent possible.

IV.  **CONCLUSION**

The government respectfully submits its Sentencing Memorandum.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  _/s/ Christopher J. Maietta_
CHRISTOPHER J. MAIETTA
Trial Attorney
U.S. Department of Justice

_/s/ John N. Kane_
JOHN N. KANE
Trial Attorney
U.S. Department of Justice

24

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day, January <u>12th</u>, 2007, served upon the person listed below a copy of the foregoing document by email and ECF filing:


Alan S. Richey, Esq.
P.O. Box 1505
Port Hadlock, Washington 98339
(360) 437-4005


_____
Christopher J. Maietta