UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                  )
UNITED STATES OF AMERICA,         )
                                  )
          Plaintiff,              )
                                  )
          v.                      )  CRIMINAL ACTION
                                  )  NO. 05-10175-WGY
NADINE GRIFFIN,                   )
                                  )
          Defendant.              )
                                  )
```

SENTENCING MEMORANDUM

YOUNG, D.J.                                        June 6, 2007

One of the most striking aspects of the United States Constitution is its aspirational goal. The Framers of the Constitution, and the public who ratified it, sought not only to create a novel structure to govern democratically and justly, but to do so humbly with a vision of evolving towards a "more perfect Union."[1] The Constitution, as a document, may thus be viewed as the scaffolding of our Nation, undergirding our progress toward

---

[1] For a full discussion on the intricacies of the Preamble to the United States Constitution, including a detailed discussion of the issues and placement of sovereignty, see Akhil Reed Amar, America's Constitution - A Biography 21-39 (2005). Alexander Hamilton also provides a pithy but well-reasoned explanation on the desire to "form" a new Nation in his "Conjectures About the New Constitution, September 1787," in The Debate on the Constitution: Part One 9-11 (Bernard Bailyn, ed., The Library of America 1993).

embodying the many intangible and amorphous but universally understood ideals that bind us together as Americans.

Yet the Constitution is not purely aspirational; in fact, it is not largely so. Its purpose is not simply to enshrine the symbolic and lofty goals of our country -- a position rightly ascribed to the Declaration of Independence[2] -- instead, it serves a practical function cognizant that change does not always equal progress.[3] It is this purpose as a Great Contract that ought

---

[2] This point is perhaps best made by President Abraham Lincoln in the Gettysburg Address. Abraham Lincoln: His Speeches and Writings 734 (photo. Reprint 1999) (Roy P. Basler ed., The World Pub. Co. 1946). President Lincoln gave that memorable speech on November 19, 1863, and he began with a reminder that the Founders began this Nation with a dedication to liberty and to the proposition that "all men are created equal." Id. President Lincoln dates the birth of these aspirational goals not to the Constitution, but "[f]our score and seven years ago" to the writing of the Declaration of Independence. See id. Such thoughts by President Lincoln were not the result of the passion of that one solemn day. See id. at 709 ("Response to a Serenade"). On July 7, 1863, this same thought came casually to President Lincoln in a short address just after the Battle of Gettysburg where he asks: "How long ago is it - eighty odd years - since on the Fourth of July for the first time in the history of the world a nation by its representatives, assembled and declared as a self-evident truth that 'all men are created equal.' That was the birthday of the United States of America." See id. Thus, it is the Declaration of Independence that captures the spirit and goals of the United States that were enshrined in the Constitution - the latter document practically and pragmatically pursuing those goals, while understandably falling short of their full actualization.

[3] Erwin Chemerinsky highlights the oft-cited analogy of a written constitution to the rope that Ulysses used to bind himself to his ship's mast to avoid the temptation of the songs from Siren. Erwin Chemerinsky, A Grand Theory of Constitutional Law?, 100 Mich. L. Rev. 1249, 1258 (2002).

resonate most strongly within our society because it reminds us and binds us to a time when we feared losing the very liberties we call "rights" today.  This compact presents not only a magnetic north for society's navigation but the rudder for stable travel.[4]

Contract theory views the Constitution and its amendments as an exchange by the American people of their individual sovereignty in consideration of a federal union where the people's liberties are redrawn as rights and memorialized in a written compact.  No right in the Constitution more fully expresses this perspective than the right to trial by jury.  Indeed, only the United States of America -- out of all the states and empires over the long course of the world's history -- considers its jurors full constitutional officers in the discharge of their fact-finding function.[5]

---

[4] In perhaps his greatest speech, President Lincoln appealed to the Constitution and to the Nation's laws as the "solid quarry of sober reason" that will defeat the future enemy of passion. Basler, supra note 2 at 84-85 ("The Perpetuation of Our Political Institutions: Address Before the Young Men's Lyceum of Springfield, Illinois, January 27, 1838").  In an eloquent analogy to Peter as the rock of the Christian Church in Matthew 16:18, Lincoln saw reverence to calculated and debated law as the necessary foundation upon which a Nation hopeful of perpetuation must rely.  See id.  This appeal to reason over passion is reminiscent of Madison/Publius' similar warning that "passion never fails to wrest the scepter from reason."  The Federalist No. 55, at 336 (James Madison) (Isaac Kramnick, ed., Penguin Books 1987).

[5] The United States Constitution expressly so provides in erecting our fundamental structure of government.

UNITED STATES CONSTITUTION
Article I
Section 1. All legislative powers herein granted shall

The compact theory extends to Sixth Amendment jurisprudence as well.[6]  Indeed, the impulse behind the adoption of the Sixth Amendment is found in its historical roots where the jury trial was viewed as the people's administrative safeguard against the

---

be vested in a Congress of the United States, which shall consist of a **Senate** and **House of Representatives**.
.  .  .
Article II
Section 1. The executive power shall be vested in a **President** of the United States of America.
.  .  .
Article III
Section 1. The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The **judges**, both of the supreme and inferior courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office.

Section 2. . . . . The trial of all crimes, except in cases of impeachment, shall be by **jury**. . . .

U.S. Const. (emphasis added).  So it is that jurors in criminal cases are co-equal constitutional officers with the judges who preside.  Together they exercise the judicial power of the United States.  As Professor Amar writes, "[t]rial juries, widely viewed as the lower half of a bicameral judiciary, likewise had the power (and perhaps even the right and duty) to acquit with finality in such cases, even if the bench had already adjudged the law to be constitutionally sound."  Amar, <u>supra</u> note 1, at 61.

[6] The historical importance of the right to a trial by jury in criminal cases ought not be underestimated.  The need to flesh out this right was a major argument by the Anti-Federalists in opposition to the written Constitution.  See The Anti-Federalist: Writings by the Opponents of the Constitution 39-40 (Herbert J. Storing, ed., University of Chicago Press 1985) (including in its collection a letter from the Federal Farmer who was not only concerned with the right to a trial by jury itself, but also of a trial by jury in the vicinage of where the crime occurred).

government.[7]  Thus, concerns about the dilution of the role of the
jury in criminal proceedings is real,[8] for it is this right that
prevents the strong penalogical hand of governmental power from
descending on an individual *but for* the collective agreement of his
or her peers.

---

[7] See Herbert J. Storing, <u>What the Anti-Federalists Were
for: The Political Thought of the Opponents of the Constitution</u>
19 (University of Chicago Press, 1981).  "Juries are constantly
and frequently drawn from the body of the people, and freemen of
the country; and by holding the jury's right to return a general
verdict in all cases sacred, we secure to the people at large,
their just and rightful control in the judicial department."  <u>Id.</u>
(quoting Federal Farmer XV, 2.8.190 and explaining in an
accompanying footnote that "[a] general verdict is one in which
the jury finds either for the plaintiff or for the defendant in
general terms, judging both law and fact, as opposed to a special
verdict, in which a particular finding of fact is made by the
jury, leaving to the court the application of the law to the
facts thus found.") Much of the emphasis on the right to a jury
trial at the Founding was attributable to colonial experience
with Britain's abuse of the criminal process.  Jeffrey Abramson,
<u>We, the Jury: The Jury System and the Ideal of Democracy</u> 22-23
(Harvard Univ. Press 2001).  For instance, in the Stamp Act
Crisis of 1765-66, Britain often tried violators without juries
in admiralty courts, a procedure they attempted - to no avail due
to his countersuit for trespass - with John Hancock.  <u>Id.</u> at 23-
24.

[8] In the civil context, Seventh Amendment jurisprudence
"freezes" the scope of this right to that which existed under
English common law at the time of the amendment's adoption in
1791.  <u>See</u> <u>Markman</u> v. <u>Westview Instruments, Inc.</u>, 517 U.S. 370,
376 (1996).
     Lawrence M. Friedman states that "[i]n American legal
theory, jury power was enormous, and subject to few controls.
There was a maxim of law that the jury was judge both of law and
fact in criminal cases."  Lawrence M. Friedman, <u>A History of
American Law</u> 251 (Simon and Schuster, 1973).  He goes on to state
that this maxim was strongest during the first generation of the
Revolutionary period, but that it slowly eroded as memories of
British practices were forgotten.  <u>Id.</u>

Yet, sadly, this right is not one of daily, expressive quality. Its scope may be reshaped and restricted without boisterous objection from Americans distanced from judicial action. Further, this reshaping may be done by the one person who stands to gain the power taken from the collective will of the people -- the judge.[9]

The modern struggle over the shaping of the right to trial by jury is waged over federal criminal sentencing.[10] It is one that

---

[9] In fact, Lawrence Friedman makes this point by stating that the maxim of jury as judge of both law and fact cited above was eroded through attacks by judges who saw it as a threat to their power and to their belief in the prioritization of uniformity of adjudication. Friedman, supra note 8, at 251. These judges were wrong. A stronger jury trial right in fact empowers the judge. See William G. Young, Vanishing Trials, Vanishing Juries, Vanishing Constitution, 40 Suffolk U. L. Rev. 67, 72-73 (2007) (arguing that strong juries in fact guarantee judicial independence); cf. Emily Bazelon, Diagraming Sentences: The Supreme Court's War on Sentencing Guidelines, Slate (Jan. 23, 2007), http://www.sentencing.nj.gov/downloads/pdf/articles/2007/Feb2007/news20.pdf.

[10] Professor Stephanos Bibas makes a strong argument that sentencing law must address the modern reality that the majority of criminal cases end with a plea bargain and not a jury trial. Stephanos Bibas, Judicial Fact-Finding and Sentence Enhancements in a World of Guilty Please, 110 Yale L.J. 1097, 1100, 1150 (2001) (including data that shows 91 percent of adjudicated felons pleaded guilty). While Professor Bibas highlights the potential adverse consequences of "jury focused" sentencing law, his desire to "translate the Constitution into the real world of guilty pleas" is incompatible with the guarantees of the United States Constitution. See id. at 1150. Such a view is incompatible with the Constitution because even though few defendants choose to (or, more cynically, believe they will benefit from) exercising their right to a jury, that right must remain a solid, defensive bulwark that the defendant must knowingly forego. Though a sentencing hearing has become more fact-driven and trial-like as a result of the growth of

began with the passage by Congress of mandatory sentencing guidelines that stripped from the individual the right to have, as the foundation for every day in prison, facts found by the uniform judgment of his peers beyond a reasonable doubt. See Apprendi v. New Jersey, 530 U.S. 466, 476-77 (2000); Mullaney v. Wilbur, 421 U.S. 684, 704 (1975); In re Winship, 397 U.S. 358, 363-64 (1970). From the passage of these guidelines to the present day, sentencing law has been in flux[11] as the federal district courts have struggled to give the Congressional mandate the greatest deference allowed under the Constitution, ever mindful that its restraints severely undermine the vitality of that legislation. The current struggle is not one between the power of Congress and the power of Federal Judges, but one between Congress and the people, with the judge the interested referee. The result of this struggle has been confusion and seismic shifts from year to year of the interpretation of the constitutional mandates.[12] Lost in this confusion is the faith,

---

adjudication through guilty pleas, see Douglas A. Berman, Symposium: Sentencing and Punishment: Conceptualizing Booker, 38 Ariz. St. L.J. 387, 404-05 (2006), the Constitution requires this Court to view sentencing law through the prism of the right to a jury.

[11] See Douglas A. Berman, Now What? The Post-Booker Challenge for Congress and the Sentencing Commission, 18 Fed. Sent. R. 157, 2006 WL 1895175, at *3-*4 (Feb. 2006) (commenting on the turmoil in federal sentencing law since 2003).

[12] See Douglas A. Berman, Perspective and Principles for the Post-Booker World, 17 Fed. Sent. R. 231, 2005 WL 292197, at *1-*3 (2005).

albeit a reluctant one, of the criminal defendant that she has received the punishment that the community of her peers adjudged befitted the transgression.[13]

But just as it has been said that "the arc of the moral universe is long but it bends toward justice,"[14] so too has the jurisprudence of the right to trial by jury recently arced toward more complete actualization.  In the recent decision in Cunningham v. California, -- U.S. -- , 127 S.Ct. 856 (2007), Justice Ginsburg, while speaking for a six justice majority of our United States Supreme Court, issued this ringing reminder:

> This Court has repeatedly held that, under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely a preponderance of the evidence.

Id. at 864.[15]

---

[13] This Court stated its concern about the human cost of the unconstitutional nature of the sentencing guidelines in United States v. Kandirakis, 441 F. Supp. 2d 282, 282 (D. Mass. 2006).

[14] Martin Luther King, Jr., "The Southern Christian Leadership Conference Presidential Address" (Aug. 16, 1967), available at http://www.hartford-hwp.com/archives/45a/628.html.

[15] Justice Thomas likewise, in a concurring opinion in Apprendi v. New Jersey, demonstrates the historical roots of this right by extensively citing to a 1872 authoritative treatise. 530 U.S. at 510 (Thomas, J., concurring).  This treatise stated that an indictment was required to allege all facts legally significant to a punishment.  Id.  A crime, therefore, consisted of all facts necessary to punishment.  Id.  The law required these facts to be found by a jury.  Id.
    Michael R. Dreeben, Deputy Solicitor General of the United States, appeared to agree with this statement when arguing in the Supreme Court in United States v. Rita.  He stated:

Here this Court endeavors to apply the recent Supreme Court decision in Cunningham in light of all controlling law from that Court and this Circuit that may possibly survive its holding, and to do so grounded in the specific facts found and procedures followed in this specific case.

## I.    Statement of Facts

On July 13, 2005, the government indicted Nadine Griffin ("Griffin") on two counts of filing false income tax returns in violation of 26 U.S.C. § 7206(1).  The government alleged that Griffin failed to report on her taxes the gross receipts she earned as a salesperson for Global Prosperity –- a multi-level marketing company that sold materials and held seminars for offshore customers.  Griffin Indictment [Doc. No. 1] ¶¶ 2-5.  Count 1 concerned tax returns filed in 1998, and Count 2 addressed the 1999 tax returns.  Id. ¶¶ 6-7.

On August 11, 2005, the Court entered a plea of not guilty on Griffin's behalf.  Trial by jury commenced on July 11, 2006.  After

---

As I understand this Court's sequence of opinions from Apprendi leading up to the most recent decision in Cunningham, if the law establishes a level of punishment that may be imposed based on the facts found by the jury and says to the judge, judge, you may not go above it unless you find a particular fact, that fact is subject to the Sixth Amendment rule that the Court has announced and must be found by a jury.

Oral Argument Trial Tr. 33:23-34:5, United States v. Rita, –-U.S.-– 127 S. Ct. 855 (No. 065754), available at http://www.supremecourtus.gov/oral_arguments/argument_transcripts/06-5754.pdf.

eight days of trial, this Court charged the jury.  Trial Tr. Vol. VIII at 61:14-95:24.  The Court instructed the jury on the law and provided a jury verdict form in compliance with this session's standing procedures as described in United States v. Kandirakis. 441 F. Supp. 2d 282, 319-329 (D. Mass. 2006).[16]  In accordance with those procedures, this Court charged the jury concerning the relevant sentencing enhancements under the now advisory guidelines at sentencing.  See Trial Tr. Vol. VIII at 84:5-86:3.  The jury verdict form reflected this Court's use of the jury in both the traditional, mandatory manner as to guilt and in its advisory role as to sentencing.  See Jury Verdict [Doc. No. 124].

Question One of the verdict form asked for a determination of "not guilty" or "guilty" for each of the two tax years at issue. Id. at 1.  The second question asked for a determination whether the government had proved beyond a reasonable doubt that "sophisticated means of concealment" were employed.  Id. at 2. Finally, the third question asked the jury to specify the amount of the aggregate tax loss that the government had proved beyond a reasonable doubt.  Id.  If the jury could not provide an exact number, the jury could check one of seven ranges of tax loss -- each of which corresponded to a sentencing guideline range.  See

_____

[16] This Court has employed such verdict forms to elicit advisory determinations of Guidelines enhancement questions since the Spring of 2004.  Kandirakis, 441 F. Supp. 2d at 330-31 (collecting cases).

id.  The Court further instructed the jury that if it could not determine that the government proved a range of tax loss beyond a reasonable doubt, it could return question three blank.  Trial Tr. Vol. VIII at 85:22-86:3.

The jury took two and a half days to deliberate before returning a verdict.  The jury could not reach a unanimous verdict on Count 1.  See Jury Verdict at 1 (showing that the jury left both the "not guilty" and "guilty" box unchecked).  The jury found Griffin guilty as to Count 2.  Id.  In its advisory role, the jury determined that the government proved beyond a reasonable doubt that sophisticated means of concealment were used and that Griffin's actions resulted in "more than $30,000, but less than $80,000" of tax loss.[17]  Id. at 2.  The Court declared a mistrial on Count 1.  Trial Tr. Vol. X at 19:7-8.  On September 5, 2006, the

---

[17] It bears noting that this advisory jury's handling of the sophisticated concealment enhancement demonstrates a jury's ability to handle complex sentencing factors and the ability for a sentencing court to effectuate Congressional policy and purpose through this process.  See Trial Tr. Vol. X at 9:19-10:23.  During deliberations, the jury requested further clarification of the term "sophisticated."  Id.  This Court answered that question by using the explanations in the Sentencing Guidelines Manual.  Id. at 6:11-15.  Moreover, the jury's ultimate verdict as to tax loss corresponds exactly to evidence for the 1999 tax year.  The smooth operation of this process ought put to rest Justice Breyer's concerns that a jury of twelve could not possibly apply Guideline definitions as well as a judge of one.  See United States v. Booker, 543 U.S. 220, 254-55 (2005) ("How could a judge expect a jury to work with the Guidelines' definitions of, say, 'relevant conduct . . . .'").  In addition, it demonstrates how the policies expressed in the Sentencing Guidelines may still be effectuated in an environment where full Constitutional rights are realized and properly allocated.

government dismissed that count in light of the partial guilty verdict.

## II.  Griffin's Initial Sentencing

On January 16, 2007, the Court convened to conduct the sentencing of Griffin.  As a result of requiring the government to try the enhancement issues of sophisticated concealment and the amount of tax loss to the advisory jury, the Court benefitted in its preparation for the hearing from a record well-developed by the evidentiary presentations of the government and the testing of that evidence by the defense.

This Court conducted the sentencing pursuant to 18 U.S.C. § 3553(a).  The Sentencing Guidelines, though pronounced advisory by the Supreme Court, United States v. Booker, 543 U.S. 220, 245 (2005), are still required to be calculated, considered, and given substantial weight when fashioning an individualized sentence, see United States v. Jimenez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc); United States v. Vazquez-Rivera, 470 F.3d 443, 449 (1st Cir. 2006).

To assist the Court in understanding how much deference to give the Sentencing Guidelines, it began its sentencing colloquy as it customarily does with a collection and recital of the various data points relative to Griffin's tax offense crime.  Sentencing Tr. at 4:6-5:8.  The nationwide average sentence was 20 months. Id. at 4:20-21.  The First Circuit average was 18 months.  Id. at

4:21-22.  The average sentence in the District of Massachusetts was 15 months.  Id. at 4:22-23.  Finally, the average sentence in this Session was 11 months.[18]   Id. at 4:25-5:2.  Once the Court determined these averages, it turned to the data contained in the Presentence Investigation Report ("PSR").

The data in the PSR was used to calculate the advisory guideline range.  The Court determined that Giffin was properly classified in Criminal History Category I.  Id. at 5:9-14.  In addition, the Court found, as did the advisory jury beyond a reasonable doubt, that Griffin was guilty of sophisticated concealment and, therefore, was subject to a two-level Base Offense Level enhancement.  Id.

The problem relative to Griffin's sentencing, however, lay with the calculation of the Base Offense Level itself because it required and turned on a finding of tax loss.  Id. at 5:9-11.  If the Court followed the advisory jury's calculation of tax loss as between $30,000 and $80,000, then the Base Offense Level would have been either 13 or 14.  See id. at 13:17-21.  This calculation would consider only the tax loss for Count 2 -- the count upon which the jury found Griffin guilty.  In the alternative, the Court could conduct its own fact-finding on tax loss and consider as well the

---

[18] This session's distinguished court reporter, Don Womack, retains, populates, and provides a public database searchable by offense for every sentence this Court levies at http://www.donwomack.com/.

13

tax loss stemming from Count 1 -- the hung jury count.  Were the Court to follow the latter route, the Court would be warranted in finding that the tax loss exceeded $200,000, which would raise the Base Offense Level to 16.  See id. at 13:23-14:5.

The Court faced this issue cognizant that controlling law commanded one particular outcome.  See United States v. Watts, 519 U.S. 148, 157 (1997).  First, on the issue of whether the Court could consider the tax loss that stemmed from the hung jury Count 1, the Court recognized and followed United States v. Watts, 519 U.S. 148 (1997), that allowed a sentencing court to consider conduct as to which a defendant has been acquitted.  Id. at 157. Second, the Court also faithfully applied First Circuit precedent that provided that the tax loss only be proved by a preponderance of the evidence.  See United States v. Antonakopoulos, 399 F.3d 68, 75 (1st Cir. 2005).  This required the Court to consider facts that exceeded the advisory jury's mandate.

The Court thus applied a preponderance of the evidence standard to the alleged 1998 tax loss contained in the hung jury count.  Sentencing Tr. at 17:5-8.  It did so believing that the jury likely hung on the issue of intent and not on the evidence of the tax loss.  Id. at 17:9-19; Trial Tr. Vol. X at 12:20-13:3.  The Court then found that, by a preponderance of the evidence, the tax loss for 1998 and 1999 likely exceeded $200,000.  Sentencing Tr. at 17:5-9.  It did so noting that it could not find beyond a

reasonable doubt the tax loss for 1998.  <u>Id.</u> at 25:8-14.  The Court harbors a reasonable doubt that Griffin had the requisite criminal intent with respect to her 1998 tax filing.  As a result, the Base Offense Level was calculated at 16 and then raised by the two level enhancement for sophisticated concealment to 18.  <u>Id.</u> at 17:20-24. This provided an advisory guideline range of 27 to 33 months.  <u>Id.</u> The Court then sentenced Griffin to 27 months.  <u>Id.</u> at 40:9-14.

## III. Reconsideration of Griffin's Sentence

On January 22, 2007, six days after Giffin's sentencing, the Supreme Court decided <u>Cunningham</u>.  As discussed below, this Court read that decision as affecting the legal framework applicable to Griffin's sentence.  In light of the new controlling law, Griffin's sentence appeared to constitute "clear error."  <u>See</u> <u>United States</u> v. <u>Morillo</u>, 8 F.3d 864, 868-69 (1st Cir. 1993) (addressing former Federal Rule of Criminal Procedure 35(c), which, after the 2002 Amendments, is now Rule 35(a)).

Accordingly, pursuant to Federal Rule of Criminal Procedure 35(a) and within the statutory time period computed in accordance with Federal Rule of Criminal Procedure 45(a), this Court found it necessary and proper to vacate the judgment and commitment order and to convene another sentencing hearing to correct the sentence earlier imposed.

The Court convened on February 22, 2007 to resentence Griffin in accordance with the new Supreme Court authority.  Before

15

explaining the reasoning behind the new sentence imposed, a brief survey of the legal framework and the implications of <u>Cunningham</u> is required.

## IV. The Legal Framework for Sentencing

In <u>Kandirakis</u>, this Court told the sentencing law story up to and including the Supreme Court's split decision in <u>United States</u> v. <u>Booker</u>, 543 U.S. 220 (2005). <u>Kandirakis</u>, 441 F. Supp. 2d at 285-288. It also provided a survey of the First Circuit's application of the law in the Post-<u>Booker</u> environment. <u>Id.</u> at 289-299. In light of that expansive treatment, only a brief explanation of the applicable law is required to frame the key issues and explain the effect of <u>Cunningham</u>.

### A. "Supreme" Law up to and Including **<u>Booker</u>**

The story of sentencing law after the promulgation of the Sentencing Guidelines has two conflicting themes, one or the other predominating at various times.

#### 1. The **<u>Apprendi</u>/<u>Blakely</u>/Constitutional <u>Booker</u>** Theme

In <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466 (2000), the Supreme Court did not address the Federal Sentencing Guidelines, but instead faced an analogous judge-based, determinate sentencing

16

scheme under a New Jersey hate crime statute.[19]  Id. at 469.  The
Court invalidated the New Jersey statute and stated:

> [o]ther than the fact of a prior conviction, any fact
> that increases the penalty for a crime beyond the
> prescribed *statutory maximum* must be submitted to a jury,
> and proved beyond a reasonable doubt. . . . '[I]t is
> unconstitutional for a legislature to remove from the
> jury the assessment of facts that increase the prescribed
> range of penalties to which a criminal defendant is
> exposed.'[20]

Id. at 490 (emphasis added) (quoting Jones v. United States, 526
U.S. 227, 252 (1999) (Stevens, J. concurring)).

This holding in Apprendi launched the first theme, which seeks
to reinvigorate a defendant's Sixth Amendment rights in light of
the judge-based sentencing scheme of the Sentencing Guidelines.
See id.

---

[19] The New Jersey statute at issue extended the imprisonment
of a defendant convicted for "possession of a firearm for an
unlawful purpose" if a trial judge found by a preponderance of
the evidence that the firearm was used to commit a "hate crime"
as described by New Jersey state law.  Apprendi, 530 U.S. at 468-
69.  If a Judge did so find, the range of punishment would be
increased from five to 10 years to 10 to 20 years.  Id.

[20] Justice Stevens's reasoning for the Court in Apprendi is
perhaps even more strongly voiced in the preemptive strike
against the dissenters, which states

> [w]hat ultimately demolishes the case for the
> dissenters is that they are unable to say what the
> right to trial by jury *does* guarantee, if, as they
> assert, it does not guarantee - what it has been
> assumed to guarantee throughout our history - the right
> to have a jury determine those facts that determine the
> maximum sentence the law allows.

530 U.S. at 498-99 (Scalia, J., concurring).

The Supreme Court built upon and strengthened Apprendi through two major decisions.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court applied Apprendi and invalidated the state of Washington's sentencing scheme.  Id. at 313-14.  In Blakely, the defendant pled guilty to second-degree kidnaping involving domestic violence and use of a firearm.  Id. at 298-99. The state law provided a maximum punishment of ten years for that crime.  Id.  Washington's sentencing scheme, however, provided a standard range of 49 to 53 months, but allowed a judge to impose a sentence above this range if he found "substantial and compelling reasons justifying an exceptional sentence."  Id. at 299 (quoting Wash. Rev. Code Ann. § 9.94A.120(2)).  The judge in Blakely found that the defendant had acted with "deliberate cruelty" -- a conclusion dependent upon facts neither admitted nor found by a jury -- and imposed a 90 month sentence.  Id. at 300, 303.

The Supreme Court applied Apprendi and invalidated the sentence.  Id. at 305.  The Court held that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings."  Id. at 303-04.  Since the facts admitted by Blakely would only have supported a maximum punishment of 53 months, the imposition of the 90 month sentence violated his Sixth Amendment rights.  Id. at 305.  The limits of Blakely were,

of course, that it applied its reasoning to a state sentencing scheme and not to the federal Sentencing Guidelines.

The natural extension of Blakely to the federal Sentencing Guidelines appeared imminent in Booker. A detailed discussion of that fractured opinion and its separate Constitutional and Remedial holdings need not be repeated.[21] It suffices to say that Constitutional Booker extended the Apprendi/Blakely theme by holding the federal Sentencing Guidelines unconstitutional under the same rationale as applied in Apprendi. Id. at 244 (Stevens, J.).

### 2. The Counter-Theme

The parallel but antipodal theme of the sentencing story is not as cohesively linear as the reinvigoration line of Apprendi/Blakely/Constitutional Booker. It is best discerned through a patchwork of cases that accord significant deference to the legislative scheme and none to the judges' partner in adjudication -- the American jury. After Apprendi, these cases seek to retain as much of the Sentencing Guidelines as possible, narrowly cabining in the burgeoning Sixth Amendment jurisprudence.

Before the enactment of the federal Sentencing Guidelines scheme, in McMillan v. Pennsylvania, 477 U.S. 79 (1986), the Supreme Court introduced the concept of "sentencing factors" and

---

[21] For a full discussion, see Kandirakis, 441 F. Supp. 2d at 286-288.

held that facts relevant solely to sentencing need only be proven by a preponderance of the evidence standard. Id. at 92. The Sentencing Commission adopted this standard of proof for the Sentencing Guidelines, see, e.g., United States v. Whiting, 28 F.3d 1296, 1304 (1st Cir. 1994), although no real "evidence" has ever been required to prove guideline "facts." See United States v. Green, 346 F. Supp. 2d 259, 281 (D. Mass. 2004) rev'd on other grounds by United States v. Yeje-Cabrera, 430 F.3d 1 (1st Cir. 2005) and United States v. Pacheco, 434 F.3d 106 (1st Cir. 2006).

In Watts, the Supreme Court addressed the issue of whether a sentencing court could consider conduct of a defendant alleged in an underlying charge but as to which he or she had been acquitted. 519 U.S. at 149. The Court answered in the affirmative, holding that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." Id. at 157.

In Almendarez-Torres v. United States, 523 U.S. 224, 228 (1998), the Court reaffirmed the distinction between elements of crimes and sentencing factors suggested by McMillan. Id. at 228. In addition, Almendarez-Torres stands for an often-recited[22]

---

[22] This exception is even cited in Apprendi's general rule requiring facts that increase the statutory maximum to be proved to a jury beyond a reasonable doubt. 530 U.S. at 490. It is, of course, not difficult to harmonize Apprendi and Almendarez-Torres. Prior convictions do not run afoul of Apprendi in

proposition that a prior conviction is a sentencing factor that need not be proven beyond a reasonable doubt. Id. at 246-47.

Finally, it is sufficient for this brief survey to conclude with mention of the Remedial Booker opinion. 543 U.S. at 245 (Breyer, J.). Remedial Booker sought to remedy the Sixth Amendment violation relative to the federal Sentencing Guidelines by severing and excising the provision making the Guidelines mandatory. Id. This rendered the Guidelines advisory, at least in name. Id. Despite the advisory nature of the Guidelines, the Remedial Booker holding also discussed the appropriate standard of review. Id. at 260-61. The Supreme Court held that the proper standard of review is whether the district court's sentence "is unreasonable" with regard to the factors enumerated in 18 U.S.C. § 3553(a). Id. at 261.

### B.   The First Circuit Explains and Applies Booker

The Supreme Court's decision in Remedial Booker highlighted, in one tortured opinion, the incompatible collision of the two disparate approaches to the application of the Sixth Amendment to the law of sentencing. After Remedial Booker, district courts, including this Court, looked to the circuit courts for controlling

---

increasing an offender's sentence because the offender either admitted to the facts upon which the prior conviction rests (through a guilty plea) or was accorded his right to trial by jury. Moreover, prior convictions usually do not involve "proof" at all since they are matters usually appropriate for judicial notice. See Fed. R. Evid. 201.

guidance on how to resolve the incompatible nature of _Booker_'s dual opinions and awaited further clarification by the Supreme Court.

The First Circuit wrestled with sentencing law post-_Booker_ in a few, key decisions.  It quickly became apparent that the incompatible approaches of the two _Booker_ decisions would be resolved in the First Circuit (just as in every other circuit) in favor of Justice Breyer's remedial holding, which sought to preserve the Sentencing Guidelines as far as possible without directly confronting Constitutional _Booker_.

In _United States_ v. _Pho_, 433 F.3d 53 (1st Cir. 2006), the First Circuit recognized the advisory nature of the sentencing guidelines, but also held that a district court is not free categorically to dispense with their advised penalty range.  _See id._ at 61-62.  The defendant in _Pho_ pled guilty to a one-count information that charged him with possession with intent to distribute cocaine base. _Id._ at 57.  At disposition, the district court calculated the guideline range but stated that it was no longer mandatory and that the sentence must only meet a standard of reasonableness. _Id._ at 58.  The district court then concluded that the guideline ratio that treated crack cocaine as 100 times more serious than cocaine powder was unfair and recalculated Pho's sentence according to a 20 to 1 ratio.  _Id._

The First Circuit reversed and stated that a district court's discretion "is subject to the limitations imposed by Congress," and

22

that "the guidelines remain part and parcel of the sentencing algorithm." Id. at 61. The First Circuit went on to classify the crack-to-powder ratio as a "policy judgment" reserved to Congress. Id. at 62. Since the district court's departure from the guidelines derogated Congressional policy, it erred as matter of law. Id. at 64. The effect of Pho, of course, is to render every aspect of the entire Sentencing Guidelines matter of law since every aspect expresses a "policy judgment," see Kandirakis, 441 F. Supp. 2d at 291-93, even though the sentencing range that results is, and must be, purely advisory, subject to being trumped by a reasoned articulation of the other section 3553(a) factors, see, e.g., United States v. Goodhue, -- F.3d -- , 2007 WL 1430183, *4-*7 (1st Cir. May 16, 2007) (providing a lengthy discussion of extremely complex drug weight calculation even though the result is advisory).

In United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006) (en banc), the First Circuit sat *en banc* to address the question of "what role the advisory guidelines should play in a post-Booker sentence." Id. at 518. The panel began by reasserting that appellate review of sentences for reasonableness may occur regardless of whether they fell within or without the sentencing guidelines. Id. at 517. A sentence within the guidelines is reviewable and thus not presumptively or *per se* reasonable. Id. at 517-18. The guidelines are, however, generalizations that

integrate and address all of the 18 U.S.C. § 3553(a) factors and must be considered. Id. at 518. "In most cases, this will mean that the district court will have to calculate the applicable guidelines range including the resolution of any factual or legal disputes necessary to that calculation . . . ."[23] Id.

Jimenez-Beltre went to great lengths to clarify the scope and degree of a sentencing judge's discretion after Booker. It did not, however, examine the issue of greater import, i.e., who would find, and by what evidentiary standard, the facts necessary to apply an enhancement to a defendant's sentence. See Jimenez-Beltre, 440 F.3d at 520. Jimenez-Beltre raised that issue through a Sixth Amendment attack on his sentence based upon an enhancement due to a prior conviction. Id. In light of Almendarez-Torres, however, that claim was a non-starter. The First Circuit had no need, therefore, to reach the more profound merits of that argument, but simply could, and did, rely on stare decisis, stating that Almendarez-Torres remained good law until expressly overruled. Jimenez-Beltre, 440 F.3d at 520; see United States v. Washington, No. 06-1970, 2007 WL 901653, slip op., at *1 (1st Cir. Mar. 27,

---

[23] See, e.g., United States v. Garcia-Carrasquillo, where the First Circuit criticized the sentence of the district court for failing to explain her guidelines calculation, to include any reasoned analysis, or to reference any evidence that influenced her decision. 483 F.3d 124, 132-33 (1st Cir. 2007).

2007) (collecting cases); <u>United States</u> v. <u>Miller</u>, 478 F.3d 48, 52 (1st Cir. 2007).

Regrettably, like the other circuits, the First Circuit has not chosen to explore the Sixth Amendment repercussions in the post-<u>Booker</u> atmosphere with anything other than a reflexive recital of the constitutionally incompatible principals espoused in Remedial <u>Booker</u>.  <u>See</u> <u>United States</u> v. <u>O'Brien</u>, 435 F.3d 36, 41 (1st Cir. 2006); <u>United States</u> v. <u>Tejeda</u>, 481 F.3d 44, 57 (1st Cir. 2007) ("[A]s long as the statutory maximum is not affected, a sentencing judge is permitted to determine by a preponderance of the evidence the factual basis for a sentencing enhancement.")  In <u>United States</u> v. <u>O'Brien</u>, 435 F.3d 36 (1st Cir. 2006), the court stated, without any analysis or clarification, that "it remains (as before <u>Booker</u>) for the judge to determine the factual basis for an enhancement, so long as the statutory ceiling is not raised."  <u>Id.</u> at 41 (internal citations omitted).  It is, however, just this issue -- what constitutes the statutory maximum -- that is so critical to Sixth Amendment analysis.

In sum, although Constitutional <u>Booker</u> was all about juries, circuit decisions in the wake of Remedial <u>Booker</u> have been all about judges -- what they can do, and why and how they need explain themselves.  Even though Remedial <u>Booker</u> was intended to be evanescent, <u>see</u> 543 U.S. at 265 ("The ball now lies in Congress'

court."), it seems at times as though the Constitutional <u>Booker</u> opinion had never been written.[24]

### C. <u>Cunningham</u> and its Effect

And so came <u>Cunningham</u>.

The defendant in <u>Cunningham</u> was tried and convicted of sexual abuse of a child under 14.  127 S.Ct at 860.  He was sentenced

---

[24] Divorcing sentencing from evidentiary facts found by a jury beyond a reasonable doubt strikingly dilutes the moral authority of the sentencing judge - and most judges appear agreeable to this development. <u>See</u> Judge Nancy Gertner, <u>From Omnipotence to Impotence: American Judges and Sentencing</u>, 4 Ohio St. J. Crim. L. 523, 536, 538 (2007) ("[A]nnouncing that the Guidelines were advisory did not make them so. . . . Rigid, numerical categories still anchored sentencing. . . . [After <u>Booker</u>,] when the Commission issued a report on the judges, which districts were acting 'in conformance' with the Guidelines, which were not, there was, nary a whisper from the federal court. . . . The belief that judges [are] not competent to sentence without code-like diktats from a Sentencing Commission represents an extraordinary attitudinal shift in less than two decades.") (reordered from original).

Absent jury fact-finding distilled upon a transparent record and bereft of moral authority, the reasoning behind each individual sentence is cloaked in a secrecy that thwarts the true development of a common law of sentencing and prevents public ratification, criticism, and weighing of its central assumptions, detriments, and benefits. <u>See</u> <u>Kandirakis</u>, 441 F. Supp. 2d at 332-33 n.76.  In light of this shadowed sentencing scheme, the legitimacy of any particular sentence is adjudged by the public not on the facts evidenced by their twelve constitutional representatives but through their pre-conceived and generalized notions.  One result is a sophomoric cry that "[sentencing] [j]udges should engage in disobedience - they should refuse to enforce unjust laws."  Recent Case, <u>Civil Disobedience - The Role of Judges - Ninth Circuit Affirms Mandatory Sentence</u>, 120 Harv. L. Rev. 1988, 1992 (2007).  Where such lumpen proposals appear in reputable legal publications, one might "wish more judges treated the jurors as a treasure rather than a nuisance."  Letter from John W. Keker, Esq., May 23, 2007 (on file in Chambers).

under California's determinate sentencing law ("DSL"), which created a lower term, middle term, and upper term sentence for that offense. Id. Under the DSL, a judge, and not a jury, could find facts by only a preponderance of the evidence that would expose a defendant to the upper term. Id. Absent facts that would support an enhancement, a judge would be required to sentence the defendant to the middle term. Id.

The Supreme Court held California's DSL unconstitutional as violating the Sixth Amendment. Id. at 871. The Court did so by reiterating the Apprendi/Blakely command that any fact that increases a defendant's sentence must be found by a jury beyond a reasonable doubt.[25] See id. at 863-64. In so doing, the Supreme Court focused squarely on the important question of what constitutes a "statutory maximum" for Sixth Amendment purposes. Id. at 868. The Court held that the statutory maximum in this case was the middle term of the DSL because if only the elements of the charged offense necessary for a guilty verdict were proven, a punishment at that level would result. See id. In contrast, a sentence to the upper term would require the judge to find facts that constituted an aggravating circumstance. Id.

---

[25] As is quoted in the Introduction and attributed to Justice Ginsburg, the language the Supreme Court used in Cunningham tracks almost verbatim the language from Apprendi. Compare Cunningham, 127 S.Ct at 863-64 with Apprendi, 530 U.S. at 489.

In defining the statutory maximum, the Supreme Court rejected the argument that the applicable statutory maximum was, instead, the upper term because the DSL afforded discretion to the judge to decide whether the upper sentence was justified.  Id. at 869. Again referencing Blakely, the Supreme Court responded by stating, "broad discretion to decide what facts may support an enhanced sentence . . . does not shield a sentencing system . . . . If the jury's verdict alone does not authorize the sentence . . . the Sixth Amendment requirement is not satisfied." Id.

The Supreme Court in Cunningham does, in all fairness, take pains in *dicta* to distinguish the California DSL from the post-Booker advisory federal sentencing guidelines.[26]  See id. at 870. The Supreme Court highlights the critical distinction as being the discretion under the federal system for the judge freely to sentence within a defined range in contrast to the DSL, which fixed the sentence to a sentencing triad without any ranges for discretion.  Id.  It ought be noted, however, that this distinction merely affirms the constitutionality of the federal sentencing

_____

[26] Though this Court must apply the decision in Cunningham faithfully and accept the Supreme Court's characterization of its own holding, it ought be noted that Justice Alito, in his dissent, ascribes an even greater importance to the decision when he states: "The California sentencing law that the Court strikes down today is indistinguishable in any constitutionally significant respect from the advisory Guidelines scheme that the Court approved in United States v. Booker." Cunningham, 127 S.Ct. at 873 (Alito, J., dissenting) (internal citation omitted). If Justice Alito's dissent correctly characterizes Cunningham, it is hard to see how any of Remedial Booker survives.

guidelines when used in an advisory role, *it does not speak* to the constitutionality of current federal sentencing *practice* that requires deriving guideline ranges from "facts" found by a judge on a non-evidentiary record only by a preponderance of the evidence.[27]

In short, the importance of Cunningham is two-fold. First, much as a codicil is to a revoked will, Cunningham's timing -- after the internally irreconcilable Booker decisions -- *republishes* the Apprendi/Blakely/Constitutional Booker theme over Remedial Booker's minimization of the Sixth Amendment. Thus, the epicenter of Sixth Amendment jurisprudence for sentencing purposes is located on the facts found by a jury beyond a reasonable doubt. See Cunningham, 127 S.Ct. at 863-64. Second, the analysis in Cunningham reiterates and clarifies that the "statutory maximum" for Sixth Amendment analysis must be determined, in first instance, by jury-found facts. See id. at 868. For these two purposes, it

---

[27] As Frank Bowman writes in a very thoughtful, careful, and persuasive discussion of the Sixth Amendment framework after Cunningham:

> declaring the Guideline advisory does not alter the fundamental requirement of rational decision making. After Booker, a sentencing judge is still presented with a statutorily created range of sentencing choices. . . . A sentence at the upper end of such a range cannot be rationally justified unless the judge find some fact in addition to the elements of the crime.

Frank O. Bowman III, "The Question is Which is to Be Master - That's All": Cunningham, Claiborne, Rita and the Sixth Amendment Muddle, 19 Fed. Sent. R. 155 (Feb. 2007).

makes no difference that <u>Cunningham</u> focuses on a state sentencing law instead of the federal advisory sentencing guidelines.

**V.    Federal Sentencing Guidelines after <u>Cunningham</u>**

As a result of <u>Cunningham</u>, this Court felt compelled to change its sentencing practice to comport with a defendant's Sixth Amendment rights.  <u>See</u> 127 S.Ct. at 868.  The impetus for the change came from a reevaluation after <u>Cunningham</u> as to what constitutes the statutory maximum sentence that may be levied from facts found by a jury beyond a reasonable doubt.[28]  <u>See</u> <u>id.</u>

The possible options for what constitutes the statutory maximum for Sixth Amendment purposes must be examined, but a point about the advisory guidelines is first required.  Much has been made -- stemming from Remedial <u>Booker</u> -- that rendering the federal sentencing guidelines advisory remedied any Sixth Amendment violation.  <u>See</u> <u>Booker</u>, 543 U.S. at 245; <u>Pho</u>, 433 F.3d at 61; <u>United States</u> v. <u>Pesaturo</u>, 476 F.3d 60, 73 (1st Cir. 2007).  As defined in Remedial <u>Booker</u>, applied by the First Circuit, and

---

[28] To be clear, once this statutory maximum is determined, this Court sees no constitutional problem with a sentencing judge exercising the discretion to sentence within any range below that maximum based upon facts found by the sentencing judge by only a preponderance of the evidence.  This principle has never been the subject of a Sixth Amendment challenge.  <u>See</u> <u>Apprendi</u>, 530 U.S. at 476.  The coherence of a Sixth Amendment jurisprudence that extends a jury trial right to facts that increase a defendant's punishment and not to mitigating facts is, however, the subject of recent scholarship.  <u>See</u> Jonathan F. Mitchell, <u>Apprendi's Domain</u>, Supreme Court Review (forthcoming 2007), <u>available at</u> <u>http://ssrn.com/abstract=978971</u>.

conducted by actual district courts, the contours and substance of
this remedy demonstrate that the term "advisory" is a misnomer.
See, e.g., Jimenez-Beltre, 440 F.3d at 517-18 (holding that the
Sentencing Guidelines deserve substantial weight).    It is a
misnomer first because the sentencing guidelines were never fully
"mandatory."  See Watts, 519 U.S. at 162 (Stevens, J., dissenting)
(pointing out, in a pre-Booker environment, what information a
judge may use to depart from a Sentencing Guideline determination);
United States v. Derbes, 369 F.3d 579, 580 (1st Cir. 2004)
(reviewing a district court's four-level downward departure).    A
sentencing judge could depart from the calculated range, but was
required to justify that departure in a manner that would satisfy
de novo appellate review.  Derbes, 369 F.3d at 581.  The pre-Booker
federal sentencing guidelines were, more accurately, mandatory
unless a district court found an aggravating or mitigating factor
not included in section 3553.  Booker, 543 U.S. at 234.   This
exception made the Sentencing Guidelines function, in the
aggregate, along lines more accurately described as a heavy
presumption of correctness.

In the Post-Booker environment, circuits that have interpreted
the remedial holding as providing that a sentence within the
advisory range is per se, presumptively, or rebuttably reasonable,
merely reinstate the pre-existing presumption by insulating such a

sentence from appellate review.[29]   See, e.g., United States v. Mykytiuk, 415 F.3d 606, 607-08 (7th Cir. 2005); United States v. Tobacco, 428 F.3d 1148, 1151 (8th Cir. 2005).  The First Circuit has linguistically avoided adopting that position.  See Jimenez-Beltre, 440 F.3d 517-18 (refusing to label the guidelines *per se* or presumptively reasonable).  In the same breath, however, this Circuit has held that a district court must give the guidelines "substantial weight" as the amalgamation and integration of the section 3553(a) factors and the voice of Congressional policy.  Id. at 518.  It is difficult, if not impossible, to understand how "substantial weight" does not result in a presumption of correctness, even if that presumption is weaker than the "mandatory, but" iteration of pre-Booker appellate review.[30]   See, e.g., United States v. Gilman, 478 F.3d 440, (1st Cir. 2007) ("Because [the defendant] seeks here to attack an in-guideline-range sentence as excessive, he must 'adduce fairly powerful mitigating reasons and persuade us that the district judge was unreasonable in balancing pros and cons despite the latitude

_____

[29] See Stephen R. Sady, Guidelines Appeals: The Presumption of Reasonableness and Reasonable Doubt, 18 Fed. Sent. R. 170, 2006 WL 1895179, *1-*2 (Feb. 2006), for a discussion on the problematic nature of a presumption of reasonableness after Booker.

[30] Does Booker provide merely an academic remedy to Sixth Amendment violations through its dual misperception of beginning with a fully mandatory system and ending with a completely discretionary one?  This issue is important, but it is ancillary to the issue faced by this Court after Cunningham.

implicit in saying that a sentence must be 'reasonable.''") (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 59 (1st Cir. 2006)).

The larger and more important point is not the weight that a district court must give the advisory guidelines, but the appellate review that remains after Remedial Booker. After Booker, an appellate court will review a district court's sentence for "reasonableness." 543 U.S. at 261. Though "[t]he reasonableness requirement [of] Booker . . . operates within the Sixth Amendment constraints," it highlights the remaining constitutional problem with sentencing practice –- how to determine the statutory maximum. See Cunningham, 127 S.Ct. at 870-71.

When considering what constitutes a statutory maximum for Sixth Amendment purposes, the existence of appellate review based on reasonableness defines the issue. It is clear that what must be reasonable about a district court's sentence is not merely procedural, but also substantive. See United States v. Moreland, 437 F.3d 424, 434 (4th Cir. 2006) (explaining the difference between procedural and substantive appellate review). More precisely, a reasonable sentence requires a correlation between the factual record and the district court's reasoning in imposing a sentence. See United States v. Ossai, 485 F.3d 25, 32 (1st Cir. 2007) (reviewing the reasonableness of the "fact-intensive" determination of "physical restraint" by analyzing the factual

record).  As a result, Booker did not create a pure, discretionary sentencing system, but, because of the appellate review that remains, simply traded one determinate scheme directed by the sentencing guidelines for a determinate scheme based on reasonable, reviewable, factual judgments.  See, e.g., Cunningham, 127 S.Ct. at 880 (Alito, J., dissenting) ("Booker's reasonableness review necessarily supposes that some sentences will be unreasonable in the absence of additional facts justifying them."); Ossai, 485 F.3d at 32.

For example, consider a case where a defendant is charged under a statute with a penalty range from five years to life imprisonment.  Consider also that a jury finds facts that are properly viewed as only supporting the elements of the offense.  If a judge sentenced such a defendant to life, would not such a sentence require the judge to find some additional, aggravating facts?  And would not a review of that sentence for reasonableness depend upon a judgment regarding the correlation between those judge-found facts and the sentence imposed?  The answer to both questions is in the affirmative.[31]  See United States v. Doe, 128

---

[31] In a largely paradoxical dissent, Justice Alito agrees with this premise.  Cunningham, 127 S.Ct. at 875-76 (Alito, J., dissenting).  Justice Alito presents a hypothetical similar to the one posed above and argues, "[s]uppose that the sentencing judge imposes the maximum sentence allowed by statute -- 50 years of imprisonment -- without identifying a single fact about the offense or the offender as a justification for this lengthy sentence. Surely that would be an unreasonable sentence that could not be sustained on appeal."  Id. at 876.

Fed. Appx. 179, 181-82 (2d Cir. 2005) (vacating a district court's sentence at the maximum allowed by the applicable statute in light of undue weight placed on the perceived threat of the defendant). As a result of such appellate review, the facts of each case limit the sentence that a judge may reasonably impose.[32]  See Cunningham, 127 S.Ct. at 876 (Alito, J., dissenting).  This, in turn, and in light of Cunningham, implicates the Sixth Amendment.  See id. at 869 ("If . . . the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied.")

One of the barriers that prevents courts from reaching this logical conclusion is a misunderstanding of the Sixth Amendment rights implicated by sentencing law.  For instance, even though the holding in Pho is properly limited to cabining a sentencing judge's discretion categorically to dispense with a clear congressional policy, the reasoning that leads to the holding highlights a common error in post-Booker jurisprudence.  See Pho, 433 F.3d at 61.  The panel concludes that Constitutional Booker "held that mandatory sentencing enhancements triggered by judge-found facts were in derogation of the constitutionally assured right to trial by jury."

---

[32] "[I]n every existing sentencing system in which conviction presents the judge a choice of more and less severe punishments for the same crime, a rational sentencing judge must find the existence of aggravating non-element factors in order to justify imposition of some subset of the legally available sentences." Bowman, supra note 27.

Id. (citing Booker, 543 U.S. at 244-45).  The panel then characterizes Remedial Booker as curing "that infirmity" by rendering the sentencing guidelines advisory.  Id.  The confusion that the split Booker opinion created is captured in this reasoning, which implies that the "mandatory" nature of the guidelines and not the issue of "judge-found facts" was the infirmity at stake in Booker.  See id.  This perspective views the constitutional right at stake as one held by the sentencing judge to exercise discretion and not, as ought be the case, as one held by *the defendant* to have sentencing enhancing facts proved to a jury beyond a reasonable doubt.  See Cunningham, 127 S.Ct. at 860 (reversing the disposition below "because the four-year elevation based on judicial factfinding denied petitioner *his right* to a jury trial.") (emphasis added).

As illustrated by consideration of rational, fact-based appellate review, and in light of a proper understanding of who holds the Sixth Amendment right at stake, the dispositive issue becomes what constitutes the statutory maximum for Sixth Amendment purposes.  See id. at 868.  There are three possible options: (1) the maximum term allowable by statute; (2) the minimum

term required by statute;[33] or (3) a judicially determined range based on jury-found or defendant-admitted facts.

The first option is easily set aside. The discussion of reasonableness review, in addition to explicit Supreme Court precedent, demonstrate that the statutory maximum for Sixth Amendment purposes cannot be viewed as the maximum term allowed under the applicable statute.[34]  See Blakely, 542 U.S. at 303-04 ("In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings.");

---

[33] There is an argument that this second option could also include a possible fourth option that defines the statutory maximum as the greater of the minimum required by the statute or 24 months.  The rationale for this argument stems from the provision in 18 U.S.C. § 3553(c)(1) that requires a statement of reasons to support a sentence only when the penalty exceeds 24 months.  While this argument does recognize the close correlation between appellate review of the sufficiency of the district court's reasoning, it fails to recognize that reasonableness is not the touchstone of Sixth Amendment analysis.  See Cunningham, 127 S.Ct. at 870.  Instead, even a reasonable sentence that relies on facts not proven to a jury beyond a reasonable doubt will violate the Sixth Amendment if it increases the penalty beyond the statutory maximum.  To this end, not requiring a statement of reasons when the sentence is under 24 months speaks only to the ability to divine the district court's justification when levying a shorter sentence and does not address what maximum penalty is supported by the proven facts.

[34] On February 12, 2007, the Sentencing Fairness and Equity Restoration Act of 2007 was introduced into the United States House of Representative.  This bill proposes to set the lower range of the advisory sentencing guidelines as a mandatory minimum and establish the statutory maximum as the maximum sentence provided in the statute establishing the offense.  H.R. 993, 110th Cong. § 2 (2007).

<u>Ring</u> v. <u>Arizona</u>, 536 U.S. 584, 586 (2002) ("A defendant may not be exposed to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone.") (citing <u>Apprendi</u>, 530 U.S. at 483).  First, as the hypothetical above demonstrates, logic alone counsels that a sentence at the maximum term allowed under a statute would not be reasonable if only the elements of the offense were proven and no aggravating facts were considered.[35]  Second, <u>Cunningham</u> made this logic its very holding.  <u>See</u> 127 S.Ct. at 868.  In <u>Cunningham</u>, the Supreme Court held that the applicable statutory maximum was the middle term of the triad structure because the judge was required to sentence at that level if only the elements of the offense were proven.  <u>See</u> <u>id.</u>  Despite the fact that the judge was legislatively empowered under the limits of the statute -- upon finding additional, aggravating facts -- to sentence above the middle term, such an upward movement pierced the "statutory maximum."[36]  <u>See</u> <u>id.</u> Finally, to recognize this first option as the constitutionally applicable statutory maximum would contradict the parsimony

---

[35] Justice Alito, in his dissent in <u>Cunningham</u>, reaches the same conclusion.  127 S.Ct. at 876.

[36] The failure to recognize that the "statutory maximum" is not the maximum allowed under a statute will be the cause for much of the post-<u>Booker</u> and now post-<u>Cunningham</u> disagreement with this Court's holding in this case.  <u>See,</u> <u>e.g.,</u> <u>United States</u> v. <u>Belskis</u>, 477 F. Supp. 2d. 237, 240-41 (D. Me. 2007) (rejecting an argument as to <u>Cunningham</u>'s applicability after defining the statutory maximum as the maximum allowed under the statute).

provision in the Sentencing Reform Act that states that a sentencing court, "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Even a narrow reading of the parsimony provision requires a court to find some non-element facts to impose upper-term sentences. See id.

The next consideration is whether the minimum penalty required by a statute constitutes the statutory maximum. There is some logic to this conclusion when viewed through the lens of a defendant convicted solely based on conduct sufficient to satisfy the elements of the offense. In addition, Cunningham appears to support an approach whereby the district court first identifies what penalty would be levied if only the base elements were proven to a jury. See 127 S.Ct. at 868. The Supreme Court in Cunningham, however, applied this approach and held that the middle term, not the lowest term, was the statutory maximum. See id. By not returning the lowest term required by statute, the Supreme Court foreclosed this option. See id. In addition, such an option would explicitly contravene the remedial structure pronounced in Booker whereby a sentencing judge must apply the section 3553(a) factors to impose a reasonable sentence. Booker, 543 U.S. at 261. Booker's remedial structure necessitates at least some range within which a sentencing judge may exercise the discretion necessary to effectuate Congressional purposes and policies. See id.

39

This leads to the third option -- that the statutory maximum constitutes the upper term of a judicially determined range. After Booker, this range cannot be imposed on the sentencing judge by the Sentencing Guidelines. 543 U.S. at 245. The Sentencing Guidelines may, however, advise a sentencing judge as to a reasonable range of penalties. Id. The key to this calculation is that such a range must be determined solely by the facts found by a jury beyond a reasonable doubt and reflected in its verdict.[37] Cunningham, 127 S.Ct. at 863-64; Blakely, 542 U.S. at 303 ("Our precedents make clear, however, that the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*.")   The upper term of this range constitutes the statutory maximum. Cunningham, 127 S.Ct. at 863-64; Blakely, 542 U.S. at 303.

In practice, a sentencing judge would first consider the jury verdict and the facts underlying such a verdict. See Blakely, 542 U.S. at 303. The judge would calculate the Base Offense Level in the Sentencing Guidelines from these facts for an advisory range.

---

[37] In an old, but interesting case from the Commonwealth of Massachusetts, the Supreme Judicial Court addressed a case where a single larceny statute involved grades of crimes depending on the value of property allegedly stolen. Hope v. Commonwealth, 9 Metcalf 134, 139 (Mass. 1845). The Supreme Judicial Court held that the value of the property was thus an integral element of the crime and was required to be asserted in the indictment. See id. The parallel between this old state case and the situation faced by Griffin in this Court is notable and instructive.

Guided by the advisory range and an ever-developing body of common law,[38] the sentencing judge would determine the statutory maximum supported by the jury-found facts and the minimum sentence that ought be imposed as a result of those facts.[39]  The sentencing judge would then normally sentence within that range based upon the section 3553(a) factors and aided by any facts found by a preponderance of the evidence.[40]  The district judge could not enhance the sentence beyond this range without putting the facts of that enhancement before a jury.  See Cunningham, 127 S.Ct. at 863-64.  On appellate review, the reasonableness of the sentence would

---

[38] David J. D'Addio, in an influential law review article on this topic, suggests that reasonable ranges will remain abstract, but will be significantly aided by the development of careful appellate review and the rise of a "common law of 'reasonable sentences.'" David J. D'Addio, Sentencing After Booker: The Impact of Appellate Review on Defendants' Rights, 24 Yale L. & Pol'y Rev. 173, 194 (2006).

[39] The Sentencing Initiative Committee has gone so far as to propose a simplified sentencing guideline system that would empower juries to find the facts that would determine the theoretical statutory maximums in such a case.  See generally The Constitution Project Sentencing Initiative: Recommendations for Federal Criminal Sentencing in a Post-Booker World, 18 Fed. Sent. R. 310 (2002) (suggesting the assignment of a defendant's offense to a sentencing range in a simplified grid based on the jury's fact-finding or the particulars of his plea).  In addition, David D'Addio argues that reasonable range must be determined solely by the facts of the conviction.  D'Addio, supra note 38, at 192.

[40] It is here that a sentencing judge remains faithful to the Supreme Court requirements in McMillan, 477 U.S. at 92. Factors relevant only to sentencing may be found by a preponderance of the evidence.  Id.  This Court simply makes clear that factors relevant only to sentencing must not pierce the statutory maximum.

be adjudged, first, as to the calculation of the statutory maximum and minimum and then, second, as to the weighing of the section 3553(a) factors.

After Cunningham, this Court holds that the latter approach is now required by controlling law. See id. Such a conclusion is a natural outgrowth of the Apprendi/Blakely/Constitutional Booker Sixth Amendment jurisprudence that requires facts found by a jury beyond a reasonable doubt to determine the applicable statutory maximum. Id. This conclusion was called into doubt by Remedial Booker, which, though promoting the appellate review that serves as its hemlock, left the resonance of Constitutional Booker unclear on this issue. See id. at 875 (Alito, J., dissenting) (stating that Remedial Booker required sentencing judges to make factual findings). Cunningham removed this doubt by applying a definition of a statutory maximum that accommodates both the Constitutional holding of Booker and its Remedial decision. See id. at 868 (reaching its decision "in light of both parts of the Court's Booker opinion.").

## VI.  The Resentence of Nadine Griffin

In light of Cunningham's guidance as to what constitutes the statutory maximum for Sixth Amendment purposes, this Court resentenced Griffin. First, the Base Offense Level of the advisory Sentencing Guidelines was calculated from the facts reflected in

the jury's verdict.[41]   Resentencing Tr. at 4:23-10:11.  The jury found only tax loss for Count 2 beyond a reasonable doubt.  The jury also indicated that it found the range of tax loss as more that $30,000, but less than $80,000.  As a result, this Court was required to consider only the tax loss from Count 2.  In addition, since the jury could not find a definite amount of tax loss beyond a reasonable doubt, this Court was required to consider the amount of tax loss as $30,000 or else risk applying a fact not found by the jury to the calculation of the initial sentencing range.  Thus, under the 1998 Sentencing Guidelines, a tax loss of $30,000 returned a Base Offense Level of 12.  Since there was no dispute that Griffin belonged in a Criminal History Category I, the advisory sentencing range was 10-16 months.

In this case, however, this Court also put to the jury an enhancement for sophisticated concealment.  The jury found Griffin guilty beyond a reasonable doubt of this enhancement.  As a result, it was proper for this Court to include this two-level enhancement in the initial calculation of the advisory Base Offense Level.  The Base Offense Level, adjusted for this enhancement, thus became a level 14, which advised a sentencing range of 15-21 months.

---

[41] One issue that this Court faced on resentencing was that the jury verdict form reflected the use of the 2004 Sentencing Guidelines rather than the 1998 version.  On resentencing, this Court, aided by counsel and the probation officer, employed the 1998 version to calculate the applicable advisory Base Offense Level from the tax loss and the jury-found enhancements.

Griffin's case presented a straight-forward tax evasion scheme. There were no circumstances related to this case that counseled this Court not to adopt the advisory Guideline range. As a result, this Court held that, after Cunningham, the applicable statutory maximum sentence was 21 months. See 127 S.Ct. at 868.

With that statutory maximum in mind, this Court then considered the section 3553(a) factors in light of all facts found by a preponderance of the evidence and all relevant conduct. This consideration included this Court's finding by a preponderance of the evidence but not beyond a reasonable doubt that Griffin ought be accountable for the tax loss alleged under Count 1. This Court subsequently resentenced Griffin up to, but not exceeding, the statutory maximum of 21 months. Resentencing Tr. at 20:2-8.

## VII. Conclusion

The right of a criminal defendant to the defined elements of a trial by jury was one of the least controversial rights enshrined in the Bill of Rights as evidenced by its inclusion in the very organization of our government. U.S. Const. art. III, § 2.; see Apprendi, 530 U.S. at 498 (Scalia, J., concurring). This was the case because the Founders shared a mutual vision derived from common experience that the locus of power for criminal prosecution must reside not in the State, but in the people through a jury. See id.

In _Cunningham_, the United States Supreme Court took a long stride to reinvigorate this original application of the Sixth Amendment.  _See_ 127 S.Ct. at 863-64.  In so doing, the Supreme Court affirmed and clarified the jurisprudence expressed in _Apprendi_, _Blakely_, and Constitutional _Booker_.  Here, the concrete result of this decision was a need to reevaluate what constitutes a statutory maximum for purposes of the Sixth Amendment.  After much thought on this question, this Court reached the only conclusion compatible with _Cunningham_ and the existing body of controlling law.  The statutory maximum must be judicially-determined from the facts either admitted by a defendant or reflected in a jury verdict and found upon evidence beyond a reasonable doubt.  _See_ _Cunningham_, 127 S.Ct. at 863-64.  This statutory maximum range must first be determined during sentencing before a judge may exercise discretion to sentence within the advisory guideline range or depart therefrom for any appropriate reason.

Since this conclusion affected Griffin's sentence, and thus her constitutional rights, the recalculation of her sentence was proper and now conforms to the Sixth Amendment.


/s/ William G. Young
_____
WILLIAM G. YOUNG
DISTRICT JUDGE


45